1       The Honorable Benjamin H. Settle

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
8                              AT SEATTLE

9   COMMANDER EMILY SHILLING; *et al.*,        No. 2:25-cv-241

10                          *Plaintiffs*,       PLAINTIFFS' MOTION FOR
                                                PRELIMINARY INJUNCTION
11                  v.
                                                ORAL ARGUMENT REQUESTED
12  DONALD J. TRUMP, in his official capacity as
    President of the United States; *et al.*,   NOTE ON MOTION CALENDAR:
13                                              MARCH 19, 2025
                            *Defendants*.
14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION FOR PRELIMINARY
INJUNCTION
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

# TABLE OF CONTENTS

**Page(s)**

I. Introduction ............................................................................................................. 9

II. Factual Background ............................................................................................... 10

    A. Military Service by Transgender People ..................................................... 10

    B. The 2016 Carter Policy. ............................................................................. 11

    C. The 2017 Ban. ........................................................................................... 12

    D. The 2021 Austin Policy. ............................................................................ 13

    E. The 2025 Military Ban. ............................................................................. 14

    F. Active-Duty Plaintiffs' Distinguished Military Service. ...................................... 16

    G. Other Plaintiffs. ........................................................................................ 18

    H. The Military Ban's Effects on Plaintiffs. ................................................... 19

III. Legal Standard ..................................................................................................... 19

IV. Argument .............................................................................................................. 20

    A. Plaintiffs are Likely to Succeed on the Merits of Their Claims. ......................... 20

        1. Plaintiffs Are Likely to Succeed on Their Equal Protection Claim. .......... 20

            a. The Military Ban is Subject to Heightened Scrutiny. ................... 21

                i. The Ban Facially Classifies and Purposefully Discriminates Based on Transgender Status. ................... 21

                ii. The Ban Also Classifies Based on Sex. ........................... 23

            b. The Military Ban Does Not Survive Any Scrutiny. ...................... 24

        2. The Military Ban Violates Plaintiffs' First Amendment Rights. .............. 28

            a. The Ban Violates the First Amendment's Proscription Against Content and Viewpoint-Based Discrimination. ............... 28

            b. The Ban Chills Constitutionally Protected Expression. ................. 30

            c. The Ban Does Not Survive the Constitutional Scrutiny Applicable to Speech in the Military Context. .............................. 31

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

3. The Military Ban Violates Plaintiffs' Procedural Due Process Rights. ........................................................................... 31

4. Defendants Should be Equitably Estopped from Enforcing the Military Ban Against Active-Duty Plaintiffs. ............................... 33

B. Plaintiffs Will Suffer Irreparable Injury Absent an Injunction. ........................... 35

C. The Balance of Equities and the Public Interest Favor an Injunction. .................. 37

V. Conclusion .................................................................................................... 38

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

Cᴀsᴇs

4

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .............................................................................................19

5

*Anderson v. Laird*,
   466 F.2d 283 (D.C. Cir. 1972).............................................................................................29

6

7

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ........................................................................................35, 37

8

9

*Baker v. City of SeaTac*,
   994 F.Supp.2d 1148 (W.D. Wash. 2014)............................................................................32

10

*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972)..............................................................................................................32

11

12

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)..............................................................................................................23

13

14

*Brandt ex rel. Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ................................................................................................23

15

*Brown v. Glines*,
   444 U.S. 348 (1980)..............................................................................................................31

16

17

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, .............................................................22

18

*Collins v. Brewer*,
   727 F.Supp.2d 797 (D. Ariz. 2010) ................................................................................35, 36

19

20

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985)..............................................................................................................29

21

22

*Cota v. Maxwell-Jolly*,
   688 F.Supp.2d 980 (N.D. Cal. 2010) ..................................................................................36

23

*Dekker v. Weida*,
   679 F.Supp.3d 1271 (11th Cir. 2023) ..................................................................................23

24

25

*Doe 1 v. Trump*,
   275 F.Supp.3d 167 (D.C. Cir. 2017)....................................................................................12

26

MOTION FOR PRELIMINARY
INJUNCTION - 4
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) .............................................................19, 37

*Evancho v. Pine-Richland Sch. Dist.*,
  237 F.Supp.3d 267 (W.D. Pa. 2017) .................................................22

*Flack v. Wis. Dep't of Health Servs.*,
  328 F.Supp.3d 931 (W.D. Wis. 2018) ...............................................22

*Gay L. Students Ass'n v. Pac. Tel. & Tel. Co.*,
  595 P.2d 592 (Cal. 1979) ...................................................................30

*Gay Students Org. of Univ. of N.H. v. Bonner*,
  509 F.2d 652 (1st Cir. 1974) .............................................................30

*Goldie's Bookstore, Inc. v. Superior Ct.*,
  739 F.2d 466 (9th Cir. 1984) .............................................................35

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .............................................................24

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) .....................................................23, 24

*Int'l Franchise Ass'n v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) .............................................................19

*Ixcot v. Holder*,
  646 F.3d 1202 (9th Cir. 2011) ...........................................................32

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994) ...........................................................................24

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) ...........................................................................29

*Johnson v. Williford*,
  682 F.2d 868 (9th Cir. 1982) .............................................................33

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) .......................................................22, 24

*Kankamalage v. INS*,
  335 F.3d 858 (9th Cir. 2003) .............................................................32

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) .....................................................passim

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) .................................................................36

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994).................................................................................32

*Log Cabin Republicans v. United States*,
    716 F.Supp.2d 884 (C.D. Cal. 2010) ......................................................30

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010) ..................................................................30

*Matthews v. Harney Cnty. Sch. Dist. No. 4*,
    819 F.2d 889 (9th Cir.1987) ...................................................................33

*McLaughlin v. Florida*,
    379 U.S. 184 (1964)................................................................................24

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..................................................................37

*Mem'l Hosp. v. Maricopa County*,
    415 U.S. 250 (1974)................................................................................27

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ..................................................................35

*N. Cheyenne Tribe v. Norton*,
    503 F.3d 836 (9th Cir. 2007) ..................................................................37

*Owens v. Brown*,
    455 F.Supp. 291 (D.D.C. 1978) ..............................................................25

*PFLAG v. Trump*,
    No. 25-cv-00337, Slip Op. (D. Md. Feb. 14, 2025).................................21

*Portman v. County of Santa Clara*,
    995 F.2d 898 (9th Cir. 1993) ..................................................................31

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)................................................................................28

*Romer v. Evans*,
    517 U.S. 620 (1996)................................................................................22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)................................................................................29

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) ......................................................................................20, 25

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) .................................................................24

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) ....................................................................................24

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) .................................................................35

*Stockman v. Trump*,
    2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) .........................................12

*Stone v. Trump*,
    280 F.Supp.3d 747 (D. Md. 2017) ............................................................12

*Sunearth, Inc. v. Sun Earth Solar Power, Co.*,
    846 F.Supp.2d 1063 (N.D. Cal. 2012) .....................................................36

*Talbott v. Trump*,
    No. 25-cv-00240 (D.D.C., filed Feb. 12, 2025) .......................................25

*Texas v. Johnson*,
    491 U.S. 397 (1989) ..................................................................................29

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) ..................................................................................22

*Ulrich v. City & County of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) .............................................................31, 33

*United States v. Virginia*,
    518 U.S. 515 (1996) ......................................................................20, 23, 24

*United States v. Windsor*,
    570 U.S. 744 (2013) ..................................................................................20

*W. Va. State Bd. Of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..................................................................................29

*Watkins v. U.S. Army*,
    875 F.2d 699 (9th Cir. 1989) .........................................................33, 34, 35

*Weaver v. Graham*,
    450 U.S. 24 (1981) ....................................................................................32

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................37

*Witt v. Dep't of Air Force*,
   527 F.3d 806 (9th Cir. 2008) ...........................................20, 25, 31

**REGULATIONS**

Exec. Order 14148, *Initial Rescissions of Harmful Executive Orders and Actions*,
   90 Fed. Reg. 8237 (Jan. 20, 2025) .......................................................14

Exec. Order 14168, *Defending Women from Gender Ideology Extremism and
   Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615
   (Jan. 20, 2025).................................................................................15, 22

Exec. Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg.
   8757 (Jan. 27, 2025).............................................................................9

Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*,
   90 Fed. Reg. 8771 (Jan. 28, 2025) .......................................................21

Exec. Order 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed.
   Reg. 8853 (Jan. 29, 2025) ...................................................................21

Exec. Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279
   (Feb. 5, 2025).......................................................................................21

Executive Order 14004, *Enabling All Qualified Americans to Serve Their Country
   in Uniform* (Jan. 25, 2021) ................................................................13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

# I.     INTRODUCTION

Servicemembers take an oath to bear true faith and allegiance to the United States Constitution and defend it against all enemies foreign and domestic. Plaintiffs include six Americans who have taken this solemn oath, and the great responsibility it entails, and have served this Country with dedication, honor, and distinction for collectively more than 100 years. Each has had a long, distinguished career in the United States military, and they all plan to continue to serve. Plaintiffs also include one patriot who plans to enlist to serve his Country.

Plaintiffs are soldiers and sailors, Commanders and Staff Sergeants, Navy pilots and counterintelligence officers, veterans of deployments to Iraq and Afghanistan, and recipients of numerous medals, awards, and honors. They are also transgender. For this reason—and this reason alone—the current administration is kicking them and other transgender servicemembers out of the military and banning them from future service. Three weeks ago, President Trump signed Executive Order 14183 (the "Military Ban" or "the Ban"), which cruelly demeans transgender people, baselessly declares transgender status incompatible with military service, and bans transgender people from the military.[1] The Ban asserts that having a gender identity inconsistent with one's sex assigned at birth "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life," and it is a "falsehood … not consistent with the humility and selflessness required of a service member." Ban § 1. The Ban directs the Secretary of Defense to promptly update standards for retention and accession accordingly.

The Military Ban represents a sharp reversal from existing policy and a repudiation of promises the government made to its transgender servicemembers, who have honorably served their Country. The policy allowing open transgender military service was the result of years-long deliberations and research by senior-ranking members of the Department of Defense ("DoD"), which concluded that open service by transgender servicemembers is consistent with military

---

[1] Exec. Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) (Exhibit 1 to Gordon Decl.).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

readiness. And our armed forces have been strengthened, not diminished, by transgender individuals serving openly. Indeed, our military—which comprises entirely volunteer recruits—needs *more* servicemembers who are willing, ready, and able to fight—not fewer.

The very same Constitution that Plaintiffs and their fellow transgender servicemembers have sworn to defend safeguards them from the blatant, invidious discrimination embodied in the Ban. The Ban cannot be squared with our constitutional commitments to equal protection, due process, or freedom of expression. No legitimate—let alone compelling—government interest can sustain the exclusion of an entire group of people from military service based on a characteristic that the military itself concluded has no bearing on an individual's fitness to serve.

Plaintiffs seek a preliminary injunction to safeguard their First, Fifth, and Fourteenth Amendment rights, and to prevent irreparable injury to themselves and others. The public interest and balance of equities strongly favor preserving the *status quo*. The purge of transgender servicemembers from one of society's most important civil institutions would have irreparable consequences for those directly affected and for the military itself. This purge would simultaneously stain this country's constitutional commitments and shatter its promise of fair treatment under the law.

Plaintiffs request this Court issue a preliminary injunction enjoining the Military Ban's enforcement as to Plaintiffs and other current and aspiring transgender servicemembers.

## II.    FACTUAL BACKGROUND

### A. Military Service by Transgender People.

Transgender people have a military history likely as long as the history of the United States military itself. As early as 1862, transgender servicemember Albert Cashier heeded President Abraham Lincoln's call to serve and protect the collective Union, openly expressing his male identity and using male pronouns. Gordon Decl. Exs. 2-3.

Nevertheless, DoD regulations barred transgender people from serving openly until a policy change in 2016. Since that time, the ability of willing, capable individuals, and militarily

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    deployable servicemembers deemed able to serve and protect has only ever been limited by

2    prejudicial and unconstitutional executive fiat.

3    **B. The 2016 Carter Policy.**

4        In July 2015, then-Secretary of Defense Ashton Carter, in consultation with the secretaries

5    of military departments, ordered the creation of a working group to form policy options regarding

6    the service of transgender people in the military (hereafter, the "Working Group"). Bourcicot Decl.

7    ¶14; Wagner Decl. ¶11. The Working Group included and/or consulted scholarship from medical

8    experts, personnel experts, readiness experts, health insurance companies, civil employers, and

9    commanders whose units included transgender servicemembers, among others. It concluded that

10    excluding transgender persons from military service would require the discharge of highly trained

11    and experienced servicemembers, leaving unexpected vacancies in operational units and requiring

12    expensive and time-consuming recruitment and training of replacement personnel and ultimately,

13    harming the military by excluding qualified individuals based on a characteristic with no relevance

14    to a person's fitness to serve. Wagner Decl. ¶¶12-14. The Working Group's conclusion was

15    informed by a 2016 report by the RAND National Defense Research Institute, commissioned by

16    the military, which found no evidence that allowing transgender individuals to serve would

17    negatively impact unit cohesion, operational effectiveness, or readiness. Wagner Decl. ¶15;

18    Bourcicot Decl. ¶16 & Ex. A.

19        One year later, in consideration of the multitude of data gathered by the Working Group,

20    Secretary Carter announced that the military would be best served by permitting transgender

21    people to serve openly ("the Carter Policy"). Gordon Decl. Ex. 4. He issued Directive-Type

22    Memoranda 16-005, announcing "that service in the United States military should be open to all

23    who can meet the rigorous standards for military service and readiness," and that, "[c]onsistent

24    with the policies and procedures set forth in this memorandum, transgender individuals shall be

25    allowed to serve in the military." Wagner Decl. Ex. A at 2. The memorandum also ordered the

26    DoD to update its accession standards by July 1, 2017, so that no individual would be disqualified

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  solely based on being transgender. *Id.* at 4. Subsequently, the various military departments issued

2  guidance implementing the Carter Policy "to allow open service by transgender soldiers," noting

3  that they would "be subject to the same standards as any other Soldier of the same gender." *See,*

4  *e.g.*, Wagner Decl. ¶¶19-20 & Ex. B; *see also* Gordon Decl. Ex. 5.

5      In the time since, and before subsequent changes in policy, numerous servicemembers

6  disclosed their transgender status to the military in reliance on the Carter Policy and, specifically,

7  DoD guidance that they would not be discharged on that basis—among them Plaintiff Commander

8  Dremann. Dremann Decl. ¶8.

9  **C. The 2017 Ban.**

10     On July 26, 2017, President Trump changed course, announcing a ban on transgender

11  individuals from serving in the military (the "2017 Ban"), followed by a presidential memorandum

12  directing then-Secretary James Mattis to prevent Secretary Carter's accession policy from going

13  into effect. Gordon Decl. Exs. 6-8; *but see id.* Ex. 9.

14     Four separate federal lawsuits challenged President Trump's directive, and each court

15  issued a preliminary injunction blocking the ban, including in this District. *See Karnoski v. Trump*,

16  No. 17-cv-1297, 2017 WL 6311305, at *1 (W.D. Wash. Dec. 11, 2017) (Pechman, J.), *vacated*

17  *and remanded on other grounds*, 926 F.3d 1180 (9th Cir. 2019); *see also Stone v. Trump*, 280

18  F.Supp.3d 747, 754 (D. Md. 2017); *Stockman v. Trump*, No. 17-cv-1799, 2017 WL 9732572, at

19  *1 (C.D. Cal. Dec. 22, 2017); *Doe 1 v. Trump*, 275 F.Supp.3d 167, 176-77 (D.D.C. 2017), *vacated*

20  *on other grounds by sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).

21     On February 22, 2018, Secretary Mattis presented recommendations to President Trump

22  that would disqualify individuals who "have undergone gender transition" from joining the

23  military (the "Mattis Policy"). Gordon Decl. Ex. 10. The Mattis Policy created a limited exception

24  for transgender individuals who had already transitioned in reliance on the prior policy. Following

25  this, the government sought to stay the preliminary injunctions on the basis that the Mattis Policy

26  was independent of the 2017 Ban.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   After a lengthy, multi-jurisdictional appeals process, the 2017 Ban, as modified by the

2   Mattis Policy, ultimately went into effect in 2019, and transgender people were prohibited from

3   enlisting in the military. The ban as set forth in the Mattis Policy remained in effect until it was

4   rescinded by President Biden. Wagner Decl. ¶23.

5   **D.  The 2021 Austin Policy.**

6   On January 25, 2021, President Biden issued Executive Order 14004, *Enabling All*

7   *Qualified Americans to Serve Their Country in Uniform* ("Equal Service EO"), repealing the 2017

8   Ban and Mattis Policy. Wagner Decl. ¶23; *see also* Gordon Decl. Ex. 11. The Equal Service EO

9   announced that "it shall be the policy of the United States to ensure that all transgender individuals

10  who wish to serve in the United States military and can meet appropriate standards shall be able

11  to do so openly and free from discrimination." Equal Service EO § 1. The order was issued with

12  the backing of "substantial evidence that allowing transgender individuals to serve in the military

13  does not have any meaningful negative impact on the Armed Forces." *Id.* And it cited "substantial

14  evidence," including the RAND Report (described as a "meticulous, comprehensive study

15  requested by the Department of Defense"); 2018 testimony by "the then-serving Chief of Staff of

16  the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the

17  Air Force … that they were not aware of any issues of unit cohesion, disciplinary problems, or

18  issues of morale resulting from open transgender service"; and a statement made by a "group of

19  former United States Surgeons General … that 'transgender troops are as medically fit as their

20  non-transgender peers and that there is no medically valid reason—including a diagnosis of gender

21  dysphoria—to exclude them from military service or to limit their access to medically necessary

22  care.'" *Id.*; Wagner Decl. ¶23.

23  Shortly thereafter, the DoD, under the direction of then-Secretary of Defense Lloyd Austin,

24  revised military policy to reinstate the right of transgender people to serve on equal terms with

25  others ("the Austin Policy"), "based on the conclusion that open service by transgender persons

26  who are subject to the same high standards and procedures as other servicemembers with regard

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and

2  retention is consistent with military service and readiness." Wagner Decl. ¶24 & Ex. D; Cisneros

3  Decl. ¶10. This policy was implemented via the April 2021 DoD Instruction 1300.28, *In-Service

4  Transition for Transgender Service Members*, which detailed procedures by which transgender

5  servicemembers may transition while serving and addressed readiness considerations with respect

6  to in-service transitions. *Id.* ¶¶10-12.

7      The Austin Policy, the Equal Service EO that preceded it, and the DoD instructions that

8  followed, together ensured that all servicemembers were held to the same standards and

9  procedures, thus guaranteeing readiness and deployability, all the while preserving retention. *E.g.*,

10  Gordon Decl. Ex. 12. The Austin Policy was known for fostering "openness and trust among team

11  members, enabling all members of [the] total force to bring their full selves to their high stakes

12  mission, … thereby engend[ering] stronger unit cohesion … [which is] vital to successfully

13  advancing America's national security interests around the world." Wagner Decl. ¶30.

14  **E. The 2025 Military Ban.**

15      On the day he took office for his second term, President Trump rescinded the Austin Policy.

16  Wagner Decl. ¶37; Exec. Order 14148, *Initial Rescissions of Harmful Executive Orders and

17  Actions*, 90 Fed. Reg. 8237, 8237-41 §§ 2-3 (Jan. 20, 2025).

18      Seven days later, on January 27, 2025, President Trump issued the Military Ban revoking

19  "all policies, directives, and guidance issued pursuant to" the Equal Service EO, which established

20  the non-discriminatory policy, and directing the DoD "to take all necessary steps to implement the

21  revocations" to exclude transgender people from military service. Military Ban § 5(b). The Ban

22  contends, without citation to evidence or support, that government policy favoring "high standards

23  for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity" "is

24  inconsistent with the medical, surgical, and mental health constraints on individuals with gender

25  dysphoria" and "is also inconsistent with shifting pronoun usage or use of pronouns that

26  inaccurately reflect an individual's sex." *Id.* § 2; Wagner Decl. ¶39.

MOTION FOR PRELIMINARY
INJUNCTION - 14
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    The Military Ban further claims, again without support, that "adoption of a gender identity

2    inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable,

3    truthful, and disciplined lifestyle … [and] is not consistent with the humility and selflessness

4    required of a service member." Military Ban § 1. The Ban repudiates the gender identities of

5    transgender servicemembers and prohibits "males to use or share sleeping, changing, or bathing

6    facilities designated for females" and "females to use or share sleeping, changing, or bathing

7    facilities designated for males." *Id.* § 4(d).

8    The Ban also incorporates the definitions of another executive order that defines so-called

9    "gender ideology" as the "false claim" that a person may have a gender identity that is incongruent

10   with their birth sex.[2] Pursuant to the Military Ban and the Gender EO, the military has sought to

11   eliminate any recognition of transgender people or gender identity. Gordon Decl. Exs. 14-16.

12   The Military Ban's claim that being transgender renders any individual—let alone

13   individuals such as the six Plaintiffs who have each served at least one decade in the military, and

14   together *over one century* (Dkt. 1, ¶¶11-16)—is unsupported by the evidence and indeed harmful

15   to the national security of the United States. And, according to the direct forerunner Acting Under

16   Secretary of Defense for Personnel and Readiness, implementing the Ban would reduce military

17   capability via the loss of highly skilled servicemembers (and potential servicemembers), at great

18   cost to American taxpayers, and has the potential to erode servicemembers' trust in military

19   leadership to make sound and consistent policy decisions. Vazirani Decl. ¶¶3, 23-30.

20   On February 7, 2025, Defendant Secretary Hegseth began implementing the Military Ban

21   by issuing a memorandum, "Prioritizing Military Excellence and Readiness," which makes clear

22   that "all new accessions for individuals with a history of gender dysphoria are paused." Gordon

23   Decl. Ex. 17; *see also id.* Exs. 18-19.

24

25   ---

[2] *See* Exec. Order 14168, *Defending Women from Gender Ideology Extremism and*

26   *Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, 8615 § 2(f) (Jan. 20, 2025) (the "Gender EO") (Exhibit 13 to Gordon Decl.).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**F. Active-Duty Plaintiffs' Distinguished Military Service.**

**Commander Emily "Hawking" Shilling** is a 42-year-old woman who has honorably served in the Navy with distinction for over 19 years. Shilling Decl. ¶¶2-4. Commander Shilling comes from a military family and joined the Navy out of a deep love of country, drive to serve, sense of adventure, and a desire to push her abilities to the limit. *Id.* ¶5. She was a combat aviator and deployed to Afghanistan and Iraq on an aircraft carrier, from which she conducted 60 combat missions, leading to the award of three air medals for her meritorious service. *Id.* ¶7. Commander Shilling has served as a United States Navy Test Pilot, where she conducted high-risk flight tests to advance aviation technology and improve aircraft capabilities. *Id.* The Navy has invested over $20 million in her career. *Id.* Commander Shilling currently serves as an Aerospace Engineering Duty Officer, charged with leading large Naval acquisition programs. *Id.* ¶6. Her work directly impacts the future of naval aviation, ensuring that the fleet remains operationally effective, technologically advanced, and mission-ready. *Id.* Commander Shilling is transgender. *Id.* ¶8.

**Commander Blake Dremann** is a 43-year-old man who has honorably served in the Navy with distinction for over 19 years. Dremann Decl. ¶¶1-2, 4. He currently serves on the USS Frank Cable in Guam as a Supply Officer. *Id.* ¶¶3, 6. As part of his duties, he supervises 35 sailors and five junior officers working to repair submarines for forward deployment. *Id.* ¶6. This is a milestone job, considered equivalent to a lieutenant colonel, O5 command, in the other military branches. *Id.* Before his current assignment, he served as a Supply Officer at the aviation maintenance depot in North Carolina, and numerous other assignments, including service on a submarine. *Id.* ¶7. Commander Dremann has received two Defense Meritorious Service Medals, two Meritorious Medals, a Joint Service Commendation Medal, a Navy and Marine Corps Commendation Medal, a Joint Service Achievement Medal, and four Navy and Marine Corps Achievement Medals. *Id.* ¶11. He is currently preparing for his 12th career deployment. *Id.* Commander Dremann is transgender. *Id.* ¶8.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    **Lieutenant Commander Geirid Morgan** is a 45-year-old woman who has honorably
2    served in the U.S. Navy with distinction for 14 years. Morgan Decl. ¶¶3, 5. She initially served as
3    an enlisted service member from 1998 to 2002, and after earning her Ph.D. from the University of
4    Utah, she commissioned as an Officer and reentered active service in 2015. *Id.* ¶5. Lieutenant
5    Commander Morgan initially specialized as an enlisted Navy diver supporting mission critical
6    security operations following the September 11, 2001 attacks. *Id.* ¶7. She now works as a Program
7    Officer with the Office of Naval Research, managing a science and technology funding portfolio
8    that invests in fundamental and applied human physiology research efforts to fill current and
9    projected operational capability gaps in the U.S. Navy and the Marine Corps. *Id.* Lieutenant
10   Commander Morgan is transgender. *Id.* ¶9.

11   **Sergeant First Class Cathrine "Katie" Schmid** is a 40-year-old woman who has
12   honorably served in the U.S. Army with distinction for over 20 years. Schmid Decl. ¶¶2, 5. She is
13   currently stationed at Fort George G. Meade in Maryland. *Id.* ¶4. Sergeant First Class Schmid has
14   received numerous awards and decorations for her service. *Id.* ¶19. She is a Signals Intelligence
15   Analyst and a Brigade Equal Opportunity Advisor. *Id.* ¶7. She previously performed duties as a
16   Multi-Domain Intelligence Non-Commissioned Officer in Charge, Senior Technical Intelligence
17   Sergeant, Platoon Sergeant, Signals Intelligence Sergeant, Squad Leader, Multifunction Team
18   Leader, Brigade Land and Ammunition NCO, Brigade Current Operations NCO, Signals
19   Intelligence Analyst, All-Source Analysis System Master Analyst, Human Intelligence Collector,
20   and Counterintelligence Agent. *Id.* ¶8. Sergeant First Class Katie Schmid is transgender. *Id.* ¶9.

21   **Sergeant First Class Jane Doe** is a 37-year-old woman who has honorably served in the
22   United States Army with distinction for over 17 years. Doe Decl. ¶¶1, 3. Sergeant First Class Doe
23   serves as a satellite communications operator and maintainer. *Id.* ¶6. She was deployed to Iraq in
24   2009 and then again in 2011, and she also served nine months in Kuwait. *Id.* ¶¶5, 11. Sergeant
25   First Class Doe has received numerous awards and decorations for her service in the Army. *Id.*

26

1    ¶12. As a result of her excellent service, she has been promoted into senior Army leadership. *Id.*

2    ¶11. Sergeant First Class Doe is transgender. *Id.* ¶7.

3    **Staff Sergeant Videl Leins** is a 34-year-old woman who is actively serving in the United

4    States Air Force at Nellis Air Force Base in Las Vegas, Nevada, and has honorably served in the

5    Air Force with distinction for 16 years. Leins Decl. ¶¶2-3, 5. She joined the Air Force to follow in

6    her grandfather's footsteps. *Id.* ¶6. Staff Sergeant Leins has been deployed to Iraq, Kuwait, and

7    South Korea, and has earned multiple awards for excellence in military engineering. *Id.* ¶9. She

8    specializes in electrical systems and has held key roles in electrical infrastructure management

9    across multiple military assignments. *Id.* ¶¶7, 9. Staff Sergeant Leins is transgender. *Id.* ¶10.

10    Commanders Shilling and Dremann, Lieutenant Commander Morgan, Sergeants First

11    Class Schmid and Doe, Staff Sargeant Leins, and active-duty military servicemembers of Gender

12    Justice League are collectively referred to as "Active-Duty Plaintiffs."

13    **G. Other Plaintiffs.**

14    **Matthew Medina** is a 23-year-old man who intends to join the Marine Corps. Medina

15    Decl. ¶¶2, 5-6, 8. Mr. Medina was raised under difficult circumstances, and he hopes the military

16    will provide him an opportunity to provide for his family, pursue higher education, and find role

17    models and support in the brotherhood of the Marines. *Id.* ¶¶5-6, 9. He has been preparing to join

18    the military for the past year, including by consulting with a recruiter, completing his application

19    documents, and working to meet tattoo removal and physical fitness requirements. *Id.* ¶8. Mr.

20    Medina is transgender. *Id.* ¶¶13-15.

21    **Gender Justice League** is a civil and human rights membership organization with its

22    principal offices in Seattle, Washington that advocates on behalf of transgender individuals in the

23    State of Washington and across the country. Askini Decl. ¶1. Gender Justice League seeks to create

24    a community for transgender people and to empower them to combat discrimination, prejudice,

25    and violence they face in their daily lives. *Id.* Plaintiffs Schmid, Leins, and Medina are members

26    of Gender Justice League. *Id.* ¶2.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**H.  The Military Ban's Effects on Plaintiffs.**

Each of the Active-Duty Plaintiffs have disclosed their transgender status and expressed their gender identity, including within the military, and wish to continue to be able to do so without fear of retaliation or discharge. Shilling Decl. ¶18; Dremann Decl. ¶10; Morgan Decl. ¶12; Schmid Decl. ¶16; Doe Decl. ¶14; Leins Decl. ¶15. Being able to present as their authentic selves has made Active-Duty Plaintiffs even more productive and healthy servicemembers. Shilling Decl. ¶14; Dremann Decl. ¶11; Morgan Decl. ¶13; Schmid Decl. ¶18; Doe Decl. ¶13; Leins Decl. ¶13. Since the Military Ban was issued, Active-Duty Plaintiffs have become deeply concerned about their future in the military, their livelihood, the healthcare benefits for themselves and their family, and their retirement benefits. Shilling Decl. ¶16; Dremann Decl. ¶12; Morgan Decl. ¶15; Schmid Decl. ¶23; Doe Decl. ¶16; Leins Decl. ¶14. Indeed, Secretary Hegseth's February 7 memorandum halts the provision of medical transition-related medical treatment for any servicemember. Gordon Decl. Ex. 17. Plaintiff Medina also faces immediate harm because Secretary Hegseth's memorandum implementing the Ban prevents him from joining the Marines as planned. Medina Decl. ¶¶8-15.

## III.    LEGAL STANDARD

A preliminary injunction is warranted where a party has shown that "(1) it is likely to succeed on the merits of its claim, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of hardships tips in its favor, and (4) a preliminary injunction is in the public interest." *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Alternately, a preliminary injunction is also appropriate when "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor," combined with a likelihood of irreparable injury and a showing that the injunction serves the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1

## IV.    ARGUMENT

A preliminary injunction should enter here because (1) the Military Ban's manifest unconstitutionality makes Plaintiffs likely to succeed on their claims, (2) the balance of hardships tilts strongly in their favor because Plaintiffs face the loss of jobs, careers, healthcare and more while Defendants would not be harmed by an injunction; and (3) maintaining the status quo serves the public interest by allowing distinguished servicemembers to continue to serve in the military, thereby enhancing readiness and morale.

**A. Plaintiffs are Likely to Succeed on the Merits of Their Claims.**

**1.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). And the government is not "free to disregard the Constitution when it acts in the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981).

There is no "different equal protection test" for the "military context." *Id.* at 69-71; *see also United States v. Virginia*, 518 U.S. 515, 555 (1996) (applying heightened scrutiny to military college); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (heightened scrutiny applied to the previous ban on military service by transgender persons); *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (heightened scrutiny applied to military's former "Don't Ask, Don't Tell" policy).

Here, the Military Ban sets forth a clear and categorical command to bar anyone who expresses "a gender identity inconsistent with [that] individual's sex" from being able to serve in our military. Military Ban § 1. In so doing, the Ban denies Plaintiffs the equal protection of our laws.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1

### a.    The Military Ban is Subject to Heightened Scrutiny.

2      The Military Ban is subject to heightened scrutiny because it facially classifies and

3   purposefully discriminates based on transgender status, and because it classifies based on sex.

4

### i.    The Ban Facially Classifies and Purposefully Discriminates Based on Transgender Status.

5

6      The Ban singles out transgender people for exclusion and disparagement on its face. It

7   declares the identities of transgender people a "falsehood" and states that transgender people are

8   incapable of a "commitment to an honorable, truthful, and disciplined lifestyle, even in one's

9   personal life." Military Ban § 1. And the Gender Order, the definitions of which the Military Ban

10  incorporates, repudiates the existence of transgender people altogether, deeming their gender

11  identities a "falsehood." Military Ban § 3; Gender Order §§ 2(a), (f)-(g). One "cannot fathom

12  discrimination more direct than the plain pronouncement of a policy resting on the premise that

13  the group to which the policy is directed does not exist." *PFLAG v. Trump*, No. 25-cv-00337, Slip

14  Op., at 41 (D. Md. Feb. 14, 2025), ECF No. 62.

15     The Military Ban drips with contempt. It was issued for the openly discriminatory purpose

16  of expressing governmental disapproval of transgender people—even in their personal lives—and

17  rendering them unequal to others. Moreover, the Ban is just one of many executive actions

18  undertaken by the current administration during the past month exhibiting animus toward

19  transgender people. The administration has attempted to restrict their access to health care;[3] strip

20  them from protections in employment, housing, and education;[4] forbid them from having accurate

21  federal identity documents consistent with their identities;[5] erase the very existence of transgender

22

23     _____

[3] Exec. Order 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed.
24   Reg. 8771 (Jan. 28, 2025); Gender EO § 4(c).

[4] Gender EO §§ 3(f), 4(b), 7(b)-(c); Exec. Order 14190, *Ending Radical Indoctrination in*
25   *K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); Exec. Order 14201, *Keeping Men Out of*
     *Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025).

26     [5] Gender EO § 3(d).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

people from government websites to national monuments;[6] and defund organizations that provide transgender people services and support,[7] among myriad others. This degree of animus is remarkable in its breadth and scope and reinforces the Military Ban's unconstitutional purpose as a status-based classification of persons undertaken for its own sake, motivated by a "bare … desire to harm a politically unpopular group," something the Constitution's Equal Protection guarantee forbids. *Romer v. Evans*, 517 U.S. 620, 634 (1996)*; see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

A policy that "on its face treats transgender persons differently than other persons" constitutes discrimination based on transgender status, and warrants heightened scrutiny, including within the military context. *Karnoski*, 926 F.3d at 1201. In *Karnoski*, the Ninth Circuit rejected defendants' claim that President Trump's 2017 Ban on transgender military service was merely a classification based on "gender dysphoria" and "gender transition" rather than transgender status. *Id.* Here, the Military Ban is far broader even than the ban considered in *Karnoski*, which contained a "reliance exception" for existing servicemembers. The Military Ban contains no such exception. Indeed, not only does the Ban mandate the exclusion of all transgender people from military service, it also impugns their character even in their private lives, declaring them incapable of "humility and selflessness," "honor[]," "truthful[ness]," or "a disciplined lifestyle." Military Ban § 1.[8]

Numerous other courts have also held that laws classifying persons based on transgender status warrant heightened scrutiny. *See, e.g.*, *Kadel*, 100 F.4th at 143; *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 952-53 (W.D. Wis. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237

---

[6] Gender EO § 3(e); Gordon Decl., Exs. 14-16, 20-23.

[7] Gender EO § 3(g).

[8] By referencing "gender dysphoria," the Ban also facially classifies based on transgender status on this basis, as "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it." *Kadel v. Folwell*, 100 F.4th 122, 146 (4th Cir. 2024); *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, No. 20-cv-06145, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022) (Bryan, J.); Ettner Decl. ¶34.

MOTION FOR PRELIMINARY INJUNCTION - 22
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    F.Supp.3d 267, 288 (W.D. Pa. 2017); *cf. Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 670 n.4

2    (8th Cir. 2022).

### ii.    The Ban Also Classifies Based on Sex.

4    By singling out transgender people for discrimination, the Military Ban also constitutes a

5    sex-based classification subject to heightened scrutiny. "[A]ll gender-based classifications …

6    warrant heightened scrutiny." *Virginia*, 518 U.S. at 555 (quotation omitted).

7    The plain text of the Ban makes clear that it classifies based on sex. The Ban establishes

8    the government's categorical policy that "expressing a [] 'gender identity' divergent from <u>an

9    individual's sex [designated at birth]</u> … cannot satisfy the rigorous standards necessary for military

10   service." Military Ban § 1 (emphasis added). The Ban similarly declares that "adoption of a gender

11   identity inconsistent <u>with an individual's sex</u> conflicts with a soldier's commitment to an

12   honorable, truthful, and disciplined lifestyle, even in one's personal life." *Id.* (emphasis added).

13   Thus, the Ban explicitly imposes differential treatment based solely on an individual's sex: it

14   "penalizes" a person designated male at birth for the same "action[]" of expressing a female gender

15   identity that it "tolerates" in persons designated female at birth. *Bostock v. Clayton County*, 590

16   U.S. 644, 660 (2020); *see also Dekker v. Weida*, 679 F.Supp.3d 1271, 1289-90 (N.D. Fla. 2023)

17   ("If one must know the sex of a person to know whether or how a provision applies to the person,

18   the provision draws a line based on sex."), *appeal argued*, No. 23-12155 (11th Cir. Nov. 22, 2024).

19   The Ban also constitutes a sex-based classification by virtue of its classification based on

20   transgender status, because "discrimination on the basis of transgender status is a form of sex-

21   based discrimination." *Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024). That is because "[i]t

22   is impossible to discriminate against a person for being … transgender without discriminating

23   against that individual based on sex." *Bostock*, 590 U.S. at 660.

24   Any argument that the Ban does not treat people differently because it purportedly applies

25   equally to men and women fails. There is no exception to heightened scrutiny for sex-based

26   classifications that apply equally to men as a group and women as a group. Indeed, "[t]his argument

MOTION FOR PRELIMINARY
INJUNCTION - 23
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  elides common sense and is inconsistent with Supreme Court precedent about how to approach

2  equal-protection analyses." *Kadel*, 100 F.4th at 147. "Judicial inquiry under the Equal Protection

3  Clause … does not end with a showing of equal application." *McLaughlin v. Florida*, 379 U.S.

4  184, 191 (1964). The Supreme Court has rejected this "equal application" argument in the context

5  of sex classifications. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994).

6      Finally, the Ban discriminates based on sex stereotypes. "Many courts … have held that

7  various forms of discrimination against transgender individuals constitute sex-based

8  discrimination for purposes of the Equal Protection Clause because such policies punish

9  transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Hecox*, 104

10  F.4th at 1080 (quotation omitted); *see also Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir.

11  2000). "In so holding, these courts have recognized a central tenet of equal protection in sex

12  discrimination cases: that states 'must not rely on overbroad generalizations' regarding the sexes."

13  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 609 (4th Cir. 2020) (quoting *Virginia*, 518 U.S.

14  at 533).

15          **b.    The Military Ban Does Not Survive Any Scrutiny.**

16      Because the Ban is subject to heightened scrutiny, "Defendants bear the burden of

17  establishing that they reasonably determined the policy 'significantly furthers' the government's

18  important interests, and that is not a trivial burden." *Karnoski*, 926 F.3d at 1202. To survive such

19  scrutiny, Defendants must offer an "exceedingly persuasive" and "genuine" justification that is

20  "not hypothesized or invented post hoc in response to litigation" and does "not rely on overbroad

21  generalizations." *Virginia*, 518 U.S. at 531, 533. Defendants must also demonstrate a "close

22  means-end fit" that does not "classify unnecessarily and overbroadly by gender when more

23  accurate and impartial lines can be drawn." *Sessions v. Morales-Santana*, 582 U.S. 47, 63 n.13, 68

24  (2017). This "burden of justification is demanding" and it "rests entirely on the [government]."

25  *Virginia*, 518 U.S. at 533.

26

1    In *Karnoski*, the Ninth Circuit emphasized that even in military affairs, "deference does

2    not mean abdication." 926 F.3d at 1202 (quoting *Witt*, 527 F.3d at 821); *see also Rostker*, 453 U.S.

3    at 72 (no deference in military matters where discriminatory acts are undertaken "unthinkingly or

4    reflexively and not for any considered reason"); *Owens v. Brown*, 455 F.Supp. 291, 305-09

5    (D.D.C. 1978) (invalidating ban on assignment of female servicemembers where overbreadth

6    belied asserted purpose of preserving combat effectiveness and rejecting government's morale and

7    discipline rationales). Moreover, deference is unwarranted where a military policy does not reflect

8    any degree of independent and measured judgment on the part of military officials. *See Karnoski*,

9    926 F.3d at 1202. Because the Ban does not reflect such an exercise of independent military

10   judgment, deference is not owed. The Ban fails any level of review.

11   The Government may argue the justifications offered for instituting the 2017 ban on

12   military service are the same for instituting the 2025 Ban, and that allowing transgender individuals

13   to serve in the military would purportedly impact military readiness, unit cohesion, and resources.

14   Defs.' Opp'n Br. at 23, *Talbott v. Trump*, No. 25-cv-00240 (D.D.C., filed Feb. 12, 2025), ECF No.

15   38. Yet the evidence, including the comprehensive review and analysis carried out prior to the

16   Carter Policy, along with the actual experience of implementation of the Austin Policy, refute these

17   proffered reasons to treat transgender persons in military service differently from non-transgender

18   servicemembers. Wagner Decl. ¶23; Vazirani Decl. ¶¶12-15; Del Toro Decl. ¶¶11-18; Cisneros

19   Decl. ¶¶15, 17; Skelly Decl. ¶¶11, 13-15; Bourcicot Decl. ¶¶26-28.

20   First, there is no rational connection between military readiness and the exclusion of

21   transgender servicemembers. DoD came to that conclusion after a lengthy process of research and

22   careful deliberation. Wagner Decl. ¶¶11-16. Arbitrary exclusion of skilled and capable individuals

23   from service does not improve military readiness or effectiveness. Wagner Decl. ¶¶23-24, Ex. D.

24   The Active-Duty Plaintiffs, who have served honorably and with distinction, and are highly

25   decorated, prove the point. For example, in her nearly two decades of Navy service, Commander

26   Shilling has earned three air medals for her role as a combat aviator. Shilling Decl. ¶¶4, 7. In her

more than twenty years of service, Sergeant First Class Schmid has earned, among other awards, five Army Commendation Medals, two Joint Service Achievement Medals, and six Army Achievement Medals. Schmid Decl. ¶19. Commander Dremann, with more than nineteen years of service, earned among other medals, two Defense Meritorious Service Medals, a Joint Service Commendation Medal, and four Navy and Marine Corps Achievement Medals. Dremann Decl. ¶¶4, 11. The military's readiness and capabilities would suffer from separating these and other distinguished transgender servicemembers. Cisneros Decl. ¶26; Bourcicot Decl. Ex. A at 46.

The military has invested considerable resources in training transgender individuals like Active-Duty Plaintiffs who have specialized skills, perform at high levels, and hold critical positions. The military "makes an investment in each individual; when you remove an individual, it is not plug and play. It takes time to fill positions, and this negatively impacts readiness." Cisneros Decl. ¶26. The military would incur a significant burden to fill vacancies due to the Military Ban, which also reduces the potential recruiting pool by excluding transgender recruits. Cisneros Decl. ¶¶26-27; Skelly Decl. ¶23. Moreover, abandoning a working equal service policy in favor of a discriminatory one erodes trust in leadership as transgender servicemembers have relied on permission to serve based on the same applicable, merit-based standards as any other service member. Cisneros Decl. ¶28; Skelly Decl. ¶25; Vazirani Decl. ¶¶11, 16-18.

With respect to readiness and deployability, there is no basis for singling out transgender servicemembers' health care needs and short-term periods of deployment unavailability— particularly in comparison to the significantly larger periods of deployment unavailability experienced by other active-duty soldiers due to injuries, infectious disease, pregnancy, and myriad other conditions. Wagner Decl. ¶44; Bourcicot Decl. ¶27. As the district court in *Karnoski* found, "*all* service members might suffer from medical conditions that could impede performance, and indeed . . . it is common for service members to be non-deployable for periods of time due to an array of such conditions." 2017 WL 6311305, at *8. There simply is no evidence that healthcare

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  needs of transgender people impose burdens or negatively impact readiness or deployability any

2  more or differently than the healthcare needs of *all* servicemembers.

3  In addition, the abrupt policy reversal represented by the Military Ban is a distraction and

4  stressor to currently serving transgender troops, their chain of command, and their colleagues—

5  one that erodes force morale and trust in command and detracts from readiness. Cisneros Decl.

6  ¶¶25, 28; Vazirani Decl. ¶¶24-25. The Ban disrupts and undermines military readiness and

7  lethality. Cisneros Decl. ¶24-26; Vazirani Decl. ¶¶27, 30. It not only breaks faith with transgender

8  servicemembers, but it also breeds distrust among other groups within the military who may

9  reasonably worry about whether they should be concerned about abrupt decisions regarding their

10 eligibility to serve. Bourcicot Decl. ¶¶32-33.

11 Second, the Ban does not rationally advance unit cohesion. Rather, it negatively impacts

12 unit cohesion, a fundamental component of readiness. Bourcicot Decl. ¶¶26, 28. The military is a

13 meritocracy, where what matters is the ability to perform—full stop. *Id.* Recognizing that concerns

14 about service by transgender people could be addressed with proper leadership and training, the

15 DoD embarked upon a year-long process of developing and disseminating guidance and training

16 for the military. Wagner Decl. ¶¶11-22. Transgender servicemembers have now served for several

17 years without any adverse effect on cohesion. Vazirani Decl. ¶24. Plaintiffs' experiences illustrate

18 that service on such equal standards promotes unit cohesion. *E.g.*, Dremann Decl. ¶¶8, 10-11;

19 Morgan Decl. ¶¶13, 17-18; Shilling Decl. ¶¶12-14; Schmid Decl. ¶¶13-19.

20 Lastly, any justification based on impact on military resources fails at the outset. The

21 government may not "protect the public fisc by drawing an invidious distinction between classes"

22 of persons. *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 263 (1974). And the Ban would

23 cost—not save—the U.S. taxpayers. As the district court in *Karnoski* found, the costs associated

24 with providing transition-related care to active-duty servicemembers "are exceedingly minimal."

25 *Karnoski*, 2017 WL 6311305, at *8; *see also* Bourcicot Decl. Ex. A at 36, 70. Moreover, such

26 costs are offset by savings in other healthcare expenses that can be avoided. Bourcicot Decl. Ex.

MOTION FOR PRELIMINARY
INJUNCTION - 27
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

A at 9-10. Meanwhile, the cost of separating transgender servicemembers and finding and training replacements is estimated to be nearly one billion dollars— "*more than 100 times greater* than the cost to provide transition-related healthcare." *Karnoski*, 2017 WL 6311305, at *8; Gordon Decl. Ex. 24; *see also* Vazirani Decl. ¶13; Cisneros Decl. ¶13; Skelly Decl. ¶¶14, 24.

### 2.    The Military Ban Violates Plaintiffs' First Amendment Rights.

Plaintiffs are likely to succeed on their First Amendment claim. The Military Ban, along with attendant guidance, constitutes content-based and viewpoint-based policies that plainly violate Plaintiffs' First Amendment rights to freedom of speech. U.S. Const., amend. I.

The Ban sets forth a categorical policy that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." Military Ban § 1 (emphasis added); *see also* Gordon Decl. Ex. 17. Because "the policy penalizes transgender service members—but not others—for disclosing their gender identity," it constitutes an impermissible content-based restriction on speech. *See Karnoski*, 2017 WL 6311305, at *9.

No government interest is served by the Ban's restriction on transgender individuals' speech rights; rather, the Ban's infringement on speech impedes military readiness and unit cohesion and thus cannot withstand constitutional scrutiny.

### a.    The Ban Violates the First Amendment's Proscription Against Content and Viewpoint-Based Discrimination.

"The First Amendment generally prevents government from proscribing speech . . . or even expressive conduct … because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted). The Ban explicitly prohibits transgender people from disclosing that they are transgender or expressing a gender identity that is different from their sex assigned at birth. It specifically targets the "assertion" of an identity and "use of pronouns that inaccurately reflect an individual's sex [designated at birth]" "even in one's personal life." Military Ban §§ 1-2. The Ban thus coerces transgender people willing to serve our Country in the military into the shadows and chills their speech, even in private.

The Ban constitutes a content-based and viewpoint-based restriction. A cisgender male servicemember may state that he is a man or disclose his gender identity without penalty, but a transgender male servicemember is forbidden from expressing the same. Content-based regulations are subject to "the most exacting scrutiny," *Texas v. Johnson*, 491 U.S. 397, 412 (1989) (citation omitted), and "[v]iewpoint discrimination is … an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). That is especially so "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* And while "First Amendment rights to free speech and expression may be 'less' for a soldier than a civilian, they are by no means lost." *Anderson v. Laird*, 466 F.2d 283, 295 (D.C. Cir. 1972). Indeed, notwithstanding any deference that might otherwise be afforded to the military, regulations restricting speech on military installations may not discriminate against speech based on its viewpoint. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 805-06 (1985). Further, in the context of a "speech-restrictive law with 'widespread impact … the government … is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 907 (2018).

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Ban commands all those who serve our Country in the military to adopt an ideological viewpoint that having "a gender identity inconsistent with an individual's sex" is a "falsehood" and "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life." Military Ban § 1.

Transgender servicemembers have honestly communicated their identity to their peers and command, which in turn has made them and their units stronger and more effective. "Honesty is the single biggest piece in building a cohesive team." Doe Decl. ¶13. But the Ban would prohibit

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  Sergeant First Class Schmid from "disclosing [her] transgender status and expressing [her]

2  womanhood." Schmid Decl. ¶16. And Commander Dremann is concerned he will no longer be

3  able to "continue to be able [to] engage in speech and conduct disclosing [his] transgender status

4  and expressing [his] gender identity." Dremann Decl. ¶10.

**b.  The Ban Chills Constitutionally Protected Expression.**

7  "Coming out" speech, such as disclosure of one's gender identity or sexual orientation,

8  long has been recognized as protected First Amendment activity. *See, e.g.*, *Gay Students Org. of*

9  *Univ. of N.H. v. Bonner,* 509 F.2d 652, 660-61 (1st Cir. 1974); *Gay L. Students Ass'n v. Pac. Tel.*

10 *& Tel. Co.*, 595 P.2d 592, 610-11 (Cal. 1979) (coming out to employer a form of political freedom);

11 *Log Cabin Republicans v. United States*, 716 F.Supp.2d 884, 969 (C.D. Cal. 2010) (coming out

12 speech by gay servicemembers constituted protected First Amendment activity in challenge to

13 military's Don't Ask Don't Tell policy), *vacated on other grounds*, 658 F.3d 1162 (9th Cir. 2011).

14 Active-Duty Plaintiffs have been serving for many years having disclosed their transgender

15 identities without disruption or harming readiness and unit cohesion. They have relied upon and

16 taken major steps to transition medically and socially and now face severe harm, including

17 upending their careers through discharge if they are or have been honest about who they are. In

18 addition, Plaintiff Matthew Medina, who seeks to join the U.S. Marine Corps is chilled from being

19 truthful about who he is.

20 The Military Ban's chilling effect has been imminent and immediate. The Ban is already

21 being implemented (*see* Gordon Decl. Ex. 17; Morgan Decl. ¶15), and Plaintiffs face a "realistic

22 danger of sustaining a direct injury as a result of the [Ban's'] operation or enforcement," *Lopez v.*

23 *Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). Active-duty and other transgender members of

24 Gender Justice League have already begun to hide their gender identity. Askini Decl. ¶¶3-4.

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1

**c.** **The Ban Does Not Survive the Constitutional Scrutiny Applicable to Speech in the Military Context.**

2

3    There is no governmental interest, much less a substantial one, in prohibiting transgender

4    people from disclosing their gender identity and expressing accurately who they are. Regulations

5    of speech in the military context fail constitutional scrutiny unless they "restrict speech no more

6    than is reasonably necessary to protect the substantial government interest." *Brown v. Glines*, 444

7    U.S. 348, 355 (1980). Here, no governmental interest, let alone a substantial one, justifies

8    prohibiting transgender individuals from disclosing their gender identities and expressing their

9    gender as all other servicemembers may do.

10    **3.** **The Military Ban Violates Plaintiffs' Procedural Due Process Rights.**

11    Active-Duty Plaintiffs are also likely to succeed on their procedural due process claim. The

12    Ban deprives them of liberty and property interests protected by the Constitution; retroactively

13    punishes conduct previously approved by Defendants, offending basic notions of fairness; and

14    mandates categorical pre-judgments that render any individual process meaningless.

15    The Ban deems Active-Duty Plaintiffs unfit for service based on explicit, stigmatizing

16    labels of dishonesty and dishonor. *E.g.*, Morgan Decl. ¶14. This is precisely the type of reputational

17    harm that, in connection with a call for adverse action against their employment status, deprives a

18    servicemember of protected liberty interests. *See Ulrich v. City & County of San Francisco*, 308

19    F.3d 968, 981-82 (9th Cir. 2002) ("stigma plus" test does not require separate protectible interest

20    in employment and stigmatizing statements need only be related to adverse action); *Portman v.*

21    *County of Santa Clara*, 995 F.2d 898, 907 (9th Cir. 1993) (charges that "carry the stigma of moral

22    turpitude such as dishonesty or immorality may implicate a liberty interest"); *see also Witt*, 527

23    F.3d at 812-13 (stigma plus test applies in military context). Here, the extreme charges against

24    Active-Duty Plaintiffs have been widely published and affect their ability to work in an entire

25    professional sector. *E.g.*, Morgan Decl. ¶18.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    Moreover, the Ban retroactively punishes servicemembers for doing precisely what

2 Defendants invited and induced them to do. By setting forth a policy for transgender

3 servicemembers to seek advanced approval of a transition plan (Cisneros Decl. ¶¶11-12), and by

4 explicitly stating that no individual would be discharged or penalized for transgender status alone

5 (*e.g.*, Bourcicot Decl. ¶24; Wagner Decl. ¶¶20, 28), the military created a reasonable expectation

6 that Active-Duty Plaintiffs would not be retroactively punished for disclosing their status or for

7 taking pre-approved steps to transition. *See Baker v. City of SeaTac*, 994 F.Supp.2d 1148, 1154

8 (W.D. Wash. 2014) (Robart, J.) (public employees have "property interest in continued

9 employment" when they have "reasonable expectation" based on "existing rules" or mutually

10 explicit "understandings" (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Active-Duty

11 Plaintiffs relied on those assurances. *See infra* Section IV(A)(4).

12    The Due Process Clause forbids such a bait and switch. "Elementary considerations of

13 fairness dictate that individuals should have an opportunity to know what the law is and to conform

14 their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI*

15 *Film Prods.*, 511 U.S. 244, 265 (1994). By seeking now to disqualify servicemembers who were

16 allowed to serve openly even under the 2017 Ban (*see, e.g.*, Dremann Decl. ¶8; Schmid Decl. ¶15),

17 the Military Ban "attaches a new disability, in respect to transactions or considerations already

18 past," in violation of bedrock principles of due process. *Landgraf*, 511 U.S. at 269; *see also*

19 *Kankamalage v. INS*, 335 F.3d 858, 862-63 (9th Cir. 2003). Procedural due process principles exist

20 for precisely these circumstances—to protect against "retribution against unpopular groups or

21 individuals" by "'restraining arbitrary and potentially vindictive'" measures. *Landgraf*, 511 U.S.

22 at 266-67 (quoting *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981)); *see also Ixcot v. Holder*, 646

23 F.3d 1202, 1207 (9th Cir. 2011).

24    Active-Duty Plaintiffs' claims are ripe in this respect. The Military Ban pre-judges

25 transgender servicemembers as unfit based on categorical judgments of moral turpitude, rendering

26 futile any process that might be provided to servicemembers to address their individual ability to

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

meet military standards. *See Matthews v. Harney Cnty. Sch. Dist. No. 4*, 819 F.2d 889, 893-94 (9th Cir.1987) (due process lacking where employer goes through mechanics of a hearing "totally devoid of a meaningful opportunity to be heard"); *see also Watkins v. U.S. Army*, 875 F.2d 699, 705 (9th Cir. 1989) (court will not require plaintiff to exhaust futile remedies). The Military Ban briefly nods to "medical interventions" that might be part of a servicemember's treatment, but then—likely aware that individuals like Active-Duty Plaintiffs have met the same medical requirements as all other servicemembers—it reiterates that transgender identity alone renders a servicemember unfit. By pivoting so quickly away from individual merit, the Military Ban leaves no room to "clear [one]'s name." *Ulrich*, 308 F.3d at 982 (internal quotations omitted). Under these extreme circumstances, a servicemember need not complete a futile hearing divorced from individual merit before this Court can conclude that implementation of the Ban will violate Active-Duty Plaintiffs' due process rights.

### 4. Defendants Should be Equitably Estopped from Enforcing the Military Ban Against Active-Duty Plaintiffs.

Active-Duty Plaintiffs are also likely to secure relief under the equitable doctrine of estoppel. "[T]his court has held that where justice and fair play require it, estoppel will be applied against the government, even when the government acts in its sovereign capacity if the effects of estoppel do not unduly damage the public interest." *Johnson v. Williford*, 682 F.2d 868, 871 (9th Cir. 1982) (quotation omitted).

The Military Ban deems Active-Duty Plaintiffs unfit for continued service solely because of their transgender status, even though they are successful servicemembers who meet or exceed all military standards, and even though Defendants took affirmative acts to pre-approve the expression of their gender identity and each step taken to transition. The Active-Duty Plaintiffs followed the rules set by Defendants, reasonably relying on basic principles that persist through policy changes: that they would not be punished retroactively for asking permission and following policy, and that they would be judged on their merit.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    There is "no single test" to determine whether Defendants have affirmatively

2 misrepresented material facts in a manner that justifies estoppel. *Watkins*, 875 F.2d at 707. Each

3 case is evaluated on its own facts and circumstances. *Id.* Although some affirmative act beyond

4 mere negligence is needed, the government need not have *intended* to mislead a party. *Id.*

5    Here, the military affirmatively established a formal system for approving servicemembers

6 to transition, which is consistent with procedures for other health care any servicemember may

7 need and includes a documented treatment plan approved by military command. Cisneros Decl.

8 ¶¶11-12; Vazirani Decl. ¶13. Each request was approved at multiple levels of command. *See, e.g.*,

9 Bourcicot Decl. ¶21 (describing multiple levels of Army review). As part of that plan, a

10 servicemember's gender marker is changed in the Defense Enrollment Eligibility Reporting

11 System (the database that tracks information about service members), and they must conform to

12 military standards according to that gender. Cisneros Decl. ¶11. Active-Duty Plaintiffs justifiably

13 relied on the approval of those written plans when deciding whether, when, and how to transition

14 on the job, and in taking irreversible steps of disclosure and transition. Shilling Decl. ¶¶10-11;

15 Dremann Decl. ¶9; Morgan Decl. ¶11; Schmid Decl. ¶14; Doe Decl. ¶8; Leins Decl. ¶12; Askani

16 Decl. ¶3. Defendants' assurances were bolstered by explicit commitments that no otherwise-

17 qualified servicemember would be involuntarily separated or otherwise denied continuation of

18 service solely based on gender identity. *See, e.g.*, Bourcicot Decl. ¶24; Wagner Decl. ¶28.

19    Enjoining Defendants from involuntarily separating, discharging, or taking other adverse

20 actions against Active-Duty Plaintiffs based on their adherence to previously approved transition

21 plans and gender designations would not damage the public interest. Applying estoppel here would

22 simply require Defendants to do what they have already done for years with success: retain Active-

23 Duty Plaintiffs who are qualified to serve. On the other side of the balance, shattering

24 servicemembers' careers and their families' wellbeing solely because they relied upon Defendants'

25 procedures and promises would cause a tremendous injustice. *See supra* Section II.G.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    Having established that estoppel is appropriate against the government, the Court applies

2    traditional elements of estoppel, which are apparent here. *See Watkins*, 875 F.2d at 709 (defendant

3    must know the facts and intend that conduct will be relied upon; plaintiff must be ignorant of facts

4    and rely upon conduct to his injury). As in *Watkins*, Defendants knew Active-Duty Plaintiffs were

5    transgender when they approved their plans. Defendants expected Active-Duty Plaintiffs to follow

6    their approved plans and to use facilities and meet standards based upon their updated gender

7    marker in the military system. Active-Duty Plaintiffs did not know those approved steps would be

8    retroactively punished, especially in light of their continued retention and promotion based on

9    merit and Defendants' statements that members would not be punished based on status. Equity

10   demands that Defendants be held to their word.

11   **B.  Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.**

12   Absent preliminary relief, Plaintiffs will suffer a litany of irreparable harms. Irreparable

13   harm has "traditionally [been] defined as harm for which there is no adequate legal remedy, such

14   as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

15   For purposes of a preliminary injunction, a plaintiff "need not prove that irreparable harm is certain

16   or even nearly certain." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011).

17   Instead, a plaintiff must only demonstrate a "likelihood" of irreparable harm. *Id.* at 1187. That is

18   particularly true when the practice to be enjoined has employment-related consequences, as the

19   Ninth Circuit has repeatedly emphasized that "permitting an alleged unfair labor practice to reach

20   fruition . . . *is* irreparable harm." *Id.* at 1191.

21   First, as explained above, the Military Ban violates Plaintiffs' constitutional rights to equal

22   protection, due process, and free speech, and these violations alone establish irreparable harm.

23   *Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). Constitutional

24   violations result in immediate irreparable injury as a matter of law. *See Monterey Mech. Co. v.*

25   *Wilson*, 125 F.3d 702, 715 (9th Cir. 1997); *Collins v. Brewer*, 727 F.Supp.2d 797, 813 (D. Ariz.

26   2010) (finding irreparable harm from the "serious constitutional and dignitary harms" from likely

MOTION FOR PRELIMINARY
INJUNCTION - 35
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   violation of equal protection of being denied equal health care benefits), *aff'd sub nom. Diaz v.*

2   *Brewer*, 656 F.3d 1008 (9th Cir. 2011); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08

3   (9th Cir. 2009) (loss or chilling of First Amendment rights "for even minimal periods of time

4   unquestionably constitutes irreparable injury").

5        Second, while the constitutional harms are sufficient to enjoin the Military Ban, there are

6   additional irreparable harms affecting Plaintiffs' daily lives. Active-Duty Plaintiffs all stand to lose

7   their current roles in the military and associated benefits. The harm to Mr. Medina is likewise

8   apparent: he will not be able to join the Marine Corps, which he has been taking steps to do for

9   over a year. Medina Decl. ¶¶8, 13. Beyond the loss of their careers, those currently serving will

10  also lose healthcare coverage for themselves and their families, causing extreme anxiety and stress.

11  *E.g.*, Morgan Decl. ¶15; Schmid Decl. ¶23. Denial of healthcare coverage and the accompanying

12  "anxiety and stress" independently qualify as irreparable harm as a matter of law. *Collins*, 727

13  F.Supp.2d at 812; *accord Cota v. Maxwell-Jolly*, 688 F.Supp.2d 980, 997 (N.D. Cal. 2010)

14  (reduction in medical benefits "is sufficient to establish irreparable harm to those likely to be

15  affected by the program cuts").

16       Active-Duty Plaintiffs will also suffer reputational harm. Military service is a career of

17  patriotism, loyalty, and trust—traits that Plaintiffs have cultivated, embodied, and integrated into

18  their daily lives. As enforcement of this Military Ban looms, it irrevocably erodes soldiers'

19  professional reputations and the bonds of trust and loyalty their reputations are built upon by

20  declaring Plaintiffs unfit to serve the country they have loyally served. A soldier's reputation and

21  the essential bonds with others are hard-earned over decades. This erosion is irreparable. *Sunearth,*

22  *Inc. v. Sun Earth Solar Power, Co.*, 846 F.Supp.2d 1063, 1083 (N.D. Cal. 2012) (potential loss of

23  goodwill and loss of the ability to control one's reputation are irreparable where plaintiff has made

24  significant investment in establishing a reputation).

25       Plaintiffs face serious, immediate, and irreparable harms as a consequence of the Ban.

26

MOTION FOR PRELIMINARY
INJUNCTION - 36
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

**C. The Balance of Equities and the Public Interest Favor an Injunction.**

The balance of equities and the public interest both weigh decisively in favor of an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 27 (2008) (courts must "give serious consideration to … the balance of equities and the public interest"); *Drakes Bay Oyster Co.*, 747 F.3d at 1092 (noting these factors merge when the government is a party). To make this determination, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843-44 (9th Cir. 2007).

Where the impending harm to Plaintiffs involves a violation of constitutional rights, the public interest clearly favors protecting those rights. "[B]y establishing a likelihood that [the government's] policy violates the U.S. Constitution," as Plaintiffs have done here, they "ha[ve] also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal.*, 757 F.3d at 1069. Simply put, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Given the numerous violations of Plaintiffs' constitutional rights at issue in this case, the public interest is served only by granting the preliminary injunction.

Plaintiffs will suffer significant additional harm if this Court does not issue a preliminary injunction. The Military Ban will forcibly cut short servicemembers' decades-long, decorated military careers, prohibit others from starting a career of service to their country, and irrevocably damage servicemembers' professional and personal lives. These irreparable harms are only compounded by practical daily consequences to service members and their families like loss of stable income and loss of medical care. *E.g.*, Shilling Decl. ¶16; Doe Decl. ¶16; *see also supra* Section II.G.

In contrast, any harm Defendants might claim is negligible. Defendants need only maintain the status quo—do nothing and follow a policy that has been in place for almost ten years. The Military Ban identifies no evidence indicating that the military has suffered in any way from the

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  presence of transgender servicemembers over the last ten years. Allowing transgender individuals

2  to continue to serve their country for the duration of trial would cause no harm to Defendants.

3      Simply put, there is no indication that maintaining the pre-Military Ban status quo would

4  harm the military or disserve the public interest. Accordingly, the balance of equities tips sharply

5  in Plaintiffs' favor.

6  **V.   CONCLUSION**

7      For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary

8  injunction.

9      Dated this 19th day of February 2025.

10      *Pursuant to Local Rules W.D. Wash. LCR 7(e)(6) and this Court's order of February 19,*

11  *2024, I certify that this memorandum contains 9,988 words, in compliance with the word limit*

12  *set forth in the Court's order.*

13

14                           Respectfully submitted,

15                           By:   <u>*s/ Matthew P. Gordon*</u>

16                               Matthew P. Gordon, WSBA No. 41128

                             MGordon@perkinscoie.com

17                           By:  <u>*s/Abdul Kallon*</u>

18                               Abdul Kallon, WSBA No. 60719

                             AKallon@perkinscoie.com

19                           **Perkins Coie LLP**

20                           1201 Third Avenue, Suite 4900

                         Seattle, Washington 98101-3099

21                           Telephone: 206.359.8000

                         Facsimile: 206.359.9000

22                           Danielle Sivalingam (*pro hac vice*)

23                           Perkins Coie LLP

                         505 Howard Street, Suite 1000

24                           San Francisco, CA 94105-3204

                         Telephone: 415.344.7000

25                           Facsimile: 415.344.7050

                         Email: DSivalingam@perkinscoie.com

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 West 30th Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   Mary Grace Thurmon (*pro hac vice*)
2   Bo Yan Moran (*pro hac vice*)
    Perkins Coie LLP
3   3150 Porter Drive
    Palo Alto, CA 94304-1212
4   Telephone: 650.838.4300
    Facsimile: 650.838.4350
5   Email: MThurmon@perkinscoie.com
    Email: BMoran@perkinscoie.com
6

7   Gabriella Romanos Abihabib (*pro hac vice*)
    Perkins Coie LLP
8   1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
9   Telephone: 212.262.6900
    Facsimile: 212.977.1649
10  Email: GRomanos@perkinscoie.com

11  Attorneys for Plaintiffs
12

13  Sasha Buchert (*pro hac vice*)
    Lambda Legal Defense and Education Fund, Inc.
14  815 16th St. NW, Suite 4140
    Washington, DC 20006
15  Telephone: 202.804.6245
    Facsimile: 855.535.2236
16  Email: SBuchert@lambdalegal.org

17  Jennifer C. Pizer (*pro hac vice*)
    Lambda Legal Defense and Education Fund, Inc.
18  800 South Figueroa Street, Suite 1260
    Los Angeles, CA 90017
19  Telephone: 213.382.7600
    Facsimile: 855.535.2236
20  Email: JPizer@lambdalegal.org

21
    Camilla B. Taylor (*pro hac vice*)
22  Kenneth Dale Upton, Jr. (*pro hac vice*)
    Lambda Legal Defense and Education Fund, Inc.
23  3656 N Halsted St.
    Chicago, IL 60613
24  Telephone: 312.663.4413
    Facsimile: 855.535.2236
25  Email: CTaylor@lambdalegal.org
    Email: KUpton@lambdalegal.org
26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

Omar Gonzalez-Pagan (*pro hac vice*)
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585
Facsimile: 855.535.2236
Email: OGonzalez-Pagan@lambdalegal.org

Kell Olson (*pro hac vice*)
Lambda Legal Defense and Education Fund, Inc.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
Telephone: 323.370.6915
Facsimile: 855.535.2236
Email: KOlson@lambdalegal.org

Attorneys for Plaintiffs

Sarah Warbelow (*pro hac vice*)
Cynthia Weaver (*pro hac vice*)
Ami Patel (*pro hac vice*)
Human Rights Campaign Foundation
1640 Rhode Island Ave. N.W.
Washington, DC 20036
Telephone: 202.527.3669
Facsimile: 202.347.5323
Email: Sarah.Warbelow@hrc.org
Email: Cynthia.Weaver@hrc.org
Email: Ami.Patel@hrc.org

Attorneys for Plaintiffs

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1

2

3

4

## CERTIFICATE OF SERVICE

On February 19, 2025, I caused to be served upon the below named counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of the foregoing document.

5

6

7

8

9

10

11

12

13

14

| Jean Lin<br>Jason C. Lynch<br>John Robinson<br>Elizabeth B. Layendecker<br>Trial Attorneys<br>United States Department of Justice<br>Civil Division, Federal Programs<br>Branch<br>1100 L Street NW<br>Washington, DC 20005<br>Telephone: 202.616.8489<br>Facsimile: 202.514.1359<br><br>Jean.Lin@usdoj.gov<br>Jason.Lynch@usdoj.gov<br>John.J.Robinson@usdoj.gov<br>Elizabeth.B.Layendecker@usdoj.gov | ____ Via the Clerk's eFiling Application<br>____ Via hand delivery<br>____ Via U.S. Mail, 1st Class,<br>        Postage Prepaid<br>____ Via Overnight Delivery<br>__X__ Via Facsimile<br>        Via Email |

15

Dated:  this 19th day of February, 2025.

16

17

By:    *s/ Matthew P. Gordon*
         Matthew P. Gordon, WSBA No. 41128
         MGordon@perkinscoie.com

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
CASE NO. 2:25-CV-241

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762