IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, *et.al.*

    *Plaintiff*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    *Defendants*.

No. 1:25-cv-240-ACR

**RESPONSE TO THE COURT'S ORDER**

On Thursday, February 27, the Court ordered Defendants to respond by 10:00 a.m. on Saturday, March 1, to a list of questions the Court devised after it received a copy of the new Department of Defense policy.[1] Defendants have made a good faith effort to gather the requested information in the time allotted and hereby respond, based on presently available information, as follows:

**1. The total amount of Department of Defense (DoD) spending per year from 2015 to 2024, and the total overall for that time period.**

DoD provides public descriptions and data on its annual budgets. *See, e.g.*, Under Secretary of Defense (Comptroller), *DoD Budget Request*, *available at* https://comptroller.defense.gov/Budget-Materials/. The "Defense Budget Overview" available on that website, for example, breaks down by fiscal year and distinguishes requested versus actual amounts. For the most recent fiscal year (FY2024), the document reflects that DoD requested $944.7 billion and was appropriated $918.1 billion.

The appropriated amounts are also available in each year's National Defense Authorization Act. *See, e.g.*, Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, div. D (Procurement Tables), §§ 4101–4601, Pub. L. No. 118-159.

---

[1] The Court also added that "[i]f Defendants do not have ready access to 'spending' amounts, they can provide the budgeted amounts."

Defendants will stipulate that the amount cited in the Action Memo ("DoD spent $52,084,407 providing care to active-duty Service members to treat gender dysphoria") is but a small fraction of DoD's overall budget. Indeed, that was the 2016 RAND Report's primary observation. Defendants further stipulate that the $52,084,407 amount is likewise a small fraction of DoD's total medical budget.

2. **The total amount of DoD spending per year from 2015 to 2024 on psychotherapy for all service members, and the total overall for that time period.**

The Department obtained the recent psychotherapy cost data for service members diagnosed with gender dysphoria by extracting cost data by the International Classification of Disease (ICD) code for gender dysphoria. While the same process could presumably be completed in aggregate for the 9-year period this is a time-consuming process that could take three to four weeks or longer, especially given the relevant staff's primary responsibility to perform mission critical functions. Defendants also refer the Court to the average cost comparison study previously reviewed by the Department which showed that health care costs for service members diagnosed with gender dysphoria were approximately three times higher than health care costs for service members without gender dysphoria for the years 2015-2017. *See* ECF No. 38-4 at 33.

3. **The total amount of DoD spending per year from 2015 to 2024 on surgical care for all service members, and the total overall for that time period.**

As with response number 2 above, DoD presumably could determine the cost of surgical care for all service members for the 9-year period but again, that is a time-consuming process that could take three to four weeks, or longer, especially given the relevant staff's primary responsibility to perform mission critical functions.

4. **The total amount of DoD spending per year from 2015 to 2024 on elective surgical care for all service members, and the total overall for that time period.**

The Department of Defense has previously defined elective surgeries and procedures as

"those that are not urgent and can be rescheduled for a later date" including but not limited to "laser surgery, hernia repair, non-emergent back surgery, colonoscopies, and joint replacements." *See* DoD Fact Sheet: Elective Surgeries and Procedures, https://www.defense.gov/News/Releases/Release/Article/2123633/fact-sheet-elective-surgery-and-procedures/. In order for the Department to estimate the total costs of elective surgical care, it would need to identify the ICD codes for all such conditions/procedures and aggregate the total costs. This is a time-consuming process that could take several weeks if not months, when considering the relevant staff's primary responsibility to perform mission critical functions.

5. **If publicly available links exist, links to the line-item budget for DoD spending for each year between 2015 and 2024.**

See response to No. 1 above.

6. **Identification of any "mental health constraint," other than gender dysphoria, that DoD has previously found to be inconsistent with "honesty, humility, and integrity."**

DoDI 6130.03 Section 6.28 lists many learning, psychiatric, and behavioral disorders that are generally incompatible with military service, but the Department does not typically list the specific bases supporting disqualification for such conditions. *See* ECF No. 13-11 at 51-53.

7. **For each Plaintiff, whether implementation of the Action Memo would require him or her to be separated from the Armed Forces.**

Defendants do not know whether the DoD policy (TAB A to the Action Memo), which sets forth the conditions and processes for separation, would require Plaintiffs be separated from the Armed Forces, for the following reasons:

**a.** With respect to the currently-serving Plaintiffs, their potential separation depends on whether the service member has "a current diagnosis or history of, or exhibit[s] symptoms consistent with, gender dysphoria" (DoD 2025 Policy § 4.3.a.) or has "a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment

3

for gender dysphoria or in pursuit of a sex transition" (*id.* § 4.3.b.). While many (though not all) Plaintiffs allege a prior diagnosis of gender dysphoria, and many allege to have received "transgender healthcare," the specifics of that healthcare are not provided. Without knowing more, it is difficult for Defendants to begin to assess whether any of the Plaintiffs would fall within Sections 4.3.a. or 4.3.b. of the policy.

**b.** Even assuming that one or more currently-serving Plaintiffs fall within Sections 4.3.a or 4.3.b. of the 2025 Policy, that does not compel their administrative separation. Rather, such service members may elect to separate voluntarily per Section 4.4.a.4. and receive twice as much in "separation pay" as they would if separated involuntarily. *See id.* § 4.4.a.5 (citing 10 U.S.C. § 1174; DoDI 1332.29). And service members with more than 18, but less than 20, years of service will be eligible for early retirement in accordance with DoDI 1332.46. *See* 2025 Policy § 4.4.a.8.

**c.** Even for those Plaintiffs who do not elect voluntary separation or are ineligible for early retirement, the policy provides "for a waiver on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities, and the Service member concerned meets [certain] criteria." 2025 Policy § 4.3.c. Those criteria include:

> 1. The Service member demonstrates 36 consecutive months of stability in the Service member's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and
>
> 2. The Service member demonstrates that he or she has never attempted to transition to any sex other than their sex; and
>
> 3. The Service member is willing and able to adhere to all applicable standards, including the standards associated with the Service member's sex.

**d.** Even for Plaintiffs who do not meet, or are unwilling to abide by, the criteria for an exception, the next step is not separation. Rather, the heads of the respective Military Services

4

would initiate administrative separation under the applicable instructions, such as DoDI 1332.14 (for enlisted Service members) or DoDI 1332.30 (for commissioned officers).  As the 2025 policy reaffirms, enlisted service members can request an administrative separation board (2025 Policy § 4.4.a.6) and officers can request a board of inquiry (*id.* § 4.4.a.7 (citing 10 U.S.C. § 1182)). Although retention is unlikely, Defendants cannot prejudge how those boards would decide, and Military Service Secretaries would not be bound by Board recommendations if the Service Secretary determines an individual service member should remain in military service based on the individual circumstances of each Plaintiff.

    **e.** With respect to those Plaintiffs who hope to join the military, it is likewise difficult to predict whether the 2025 policy bars their service.  None of the four "accessions" Plaintiffs alleges a diagnosis of gender dysphoria—the primary criterion on which the 2025 policy turns.  *See generally* 2d Am. Compl. ¶¶ 148–56 (McCallister), ¶¶ 157–63 (Shishkina), ¶¶ 164–70 (Nature), ¶¶ 171–79 (Neary).  Even if those Plaintiffs fall into the descriptions of Sections 4.1.a. or 4.1.b., they may be "considered for a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the[m] that directly supports warfighting capabilities."  2025 Policy § 4.1.c.  Defendants cannot prejudge the result of that waiver process.

    **8.**     **The most recent estimate made by the DoD of the number of transgender individuals currently serving in the Armed Forces.**

The Department of Defense does not track service members or applicants by gender identity and has no means of searching for the requested information as it pertains to "transgender individuals[.]"  However, in 2016, the RAND Corporation estimated that between 1,320 to 6,630 of the 1.3 million active duty servicemembers identified as the opposite biological sex. *See* ECF No. 13-29 at 11-12.  Further, as noted in the attached Congressional Research Search report entitled "FY2025 NDAA: TRICARE Coverage of Gender-Affirming Care (updated January 10, 2025)," between January 1, 2016, and May 14, 2021, DOD reportedly provided gender-affirming care

5

(surgical and nonsurgical care) to 1,892 active duty servicemembers. Using ICD codes corresponding to gender dysphoria, the Department in the 2018 Mattis Report estimated that 994 individuals received medical care for gender dysphoria between October 2015 and October 2017.

Dated: March 1, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ALEX HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

<u>/s/ *Elizabeth B. Layendecker*</u>
ELIZABETH B. LAYENDECKER
JASON C. LYNCH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1359
Jason.Lynch@usdoj.gov

*Counsel for Defendants*