The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

EMILY SHILLING, et al.,

          Plaintiffs,

      v.

DONALD J. TRUMP, et al.,

          Defendants.

Case No. 2:25-cv-241

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**NOTE ON MOTION CALENDAR: MARCH 19, 2025**

DEFENDANTS' OPPOSITION TO PI MOTION
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

    A.    DoD Policy Prior to 2015 ................................................................... 4

    B.    The 2016 Carter Policy. ..................................................................... 5

    C.    The 2018 Policy .................................................................................. 6

    D.    President Biden's Policy. ..................................................................... 7

    E.    President Trump's Executive Orders. .................................................. 8

    F.    DoD's 2025 Policy ............................................................................. 9

    G.    Prior Litigation in the First Trump Administration ........................... 11

    H.    The Instant Action ............................................................................ 12

ARGUMENT ................................................................................................................... 12

    I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ................. 12

        A.    Plaintiffs Have Failed to Exhaust Their Administrative Remedies. .................. 12

        B.    Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim ............... 14

            1.    The military's judgment is entitled to significant deference. ................. 14

            2.    The Policy does not classify based on "transgender Sstatus," and even if it did, heightened scrutiny would not apply ....................... 15

            3.    The Policy does not classify based on sex ............................................. 17

            4.    The Policy survives constitutional scrutiny ......................................... 19

            5.    Alleged animus is not a reason to grant Plaintiff's motion. .................... 26

        C.    DoD's Policy Does Not Violate the First Amendment ........................................ 27

        D.    DoD's Policy Does Not Violate Procedural Due Process .................................. 29

        E.    Equitable Estoppel Does Not Bar Implementing the Policy .............................. 31

    II.    Plaintiffs Are Not Likely To Suffer Irreparable Harm  ....................................... 33

    III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction ....... 34

    IV.    Any Preliminary Injunction Should Apply to the Named Plaintiffs Only ............... 35

    V.    Any Preliminary Injunction Cannot Impede the Military's Discretion to Make Assignment, Deployment, and Operational Decisions. ............................................ 35

CONCLUSION ................................................................................................................. 36

DEFENDANTS' OPPOSITION TO PI MOTION
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)................................................................31

*Austin v. U.S. Navy Seals 1-26,*
  142 S. Ct. 1301 (2022)........................................................1, 37

*Boardman v. Pac. Seafood Grp.,*
  822 F.3d 1011 (9th Cir. 2016) ...............................................33

*Bostock v. Clayton County,*
  590 U.S. 644 (2020)..........................................................18, 19

*Bowen v. Gilliard,*
  483 U.S. 587 (1987) ...............................................................16

*Chaudhry v. Aragón,*
  68 F.4th 1161 (9th Cir. 2023) ...........................................30, 31

*Christoffersen v. Washington State Air Nat. Guard,*
  855 F.2d 1437 (9th Cir. 1988) ...............................................29

*Church v. Biden,*
  573 F. Supp. 3d 118 (D.D.C. 2021) ........................................34

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985)..........................................................16, 17

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989).............................................20, 22, 23, 25

*Craig v. Boren,*
  429 U.S. 190 (1976) ...............................................................16

*Dandridge v. Williams,*
  397 U.S. 471 (1970) ...............................................................20

*Dep't of Homeland Sec. v. New York,*
  140 S. Ct. 599 (2020)..............................................................36

*Diaz v. United Agric. Emp. Welfare Ben. Plan & Tr.,*
  50 F.3d 1478 (9th Cir. 1995) .................................................15

*Doe 1 v. Trump,*
  275 F. Supp. 3d 167  (D.D.C. 2017) ............................12, 32, 33

DEFENDANTS' OPPOSITION TO PI MOTION
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

*Doe 2 v. Shanahan,*
  755 F. App'x 19, 25 (D.C. Cir. 2019)..................................................................3

*Doe 2 v. Shanahan,*
  917 F.3d 694 (D.C. Cir. 2019)..............................................................*passim*

*Eknes-Tucker v. Governor of Alabama,*
  114 F.4th 1241 (11th Cir. 2024) .................................................................18, 19

*Emery Min. Corp. v. Sec'y of Labor,*
  744 F.2d 1411 (10th Cir. 1984) .......................................................................32

*Estate of Amaro v. City of Oakland,*
  653 F.3d 808 (9th Cir. 2011) ............................................................................33

*Farris v. Rice,*
  453 F. Supp. 2d 76 (D.D.C. 2006) ...................................................................34

*FCC v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993).........................................................................................20

*Fikre v. FBI,*
  35 F.4th 762 (9th Cir. 2022) ......................................................................29, 30

*Gill v. Whitford,*
  585 U.S. 48 (2018)...........................................................................................36

*Gilligan v. Morgan,*
  413 U.S. 1 (1973)....................................................................................1, 2, 35

*Goldman v. Weinberger,*
  475 U.S. 503 (1986)........................................................................3, 15, 28, 29

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999).........................................................................................36

*Harkness v. Sec'y of Navy,*
  858 F.3d 437 (6th Cir. 2017) ...........................................................................37

*Hartikka v. United States,*
  754 F.2d 1516 (9th Cir. 1985) .........................................................................34

*Hecox v. Little,*
  104 F.4th 1061 (9th Cir. 2024) ........................................................................16

*Heidman v. United States,*
  414 F. Supp. 47 (N.D. Ohio 1976)...................................................................13

DEFENDANTS' OPPOSITION TO PI MOTION
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

*Heller v. Doe*,
    509 U.S. 312 (1993) .................................................................................................. 20

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ........................................................................... 19, 20

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ....................................................................... 3, 4, 16

*Karnoski v. Trump*,
    No. C17-1297 (MJP), 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ................... 12, 30, 31

*L.W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023),144 S. Ct. 2679 (June 24, 2024) ...................................... *passim*

*Lewis v. Casey*,
    518 U.S. 343 (1996) .................................................................................................. 36

*Lying v. Castillo*,
    477 U.S. 635 (1986) .................................................................................................. 17

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976) ........................................................................................... 16, 17

*McCarthy v. Madigan*,
    503 U.S. 140 (1992) .................................................................................................. 13

*Muhammad v. Sec'y of the Army*,
    770 F.2d 1494 (9th Cir. 1985) .................................................................................. 14

*Myers v. Bethlehem Shipbuilding Corp.*,
    303 U.S. 41 (1938) .................................................................................................... 13

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................. 35

*OPM v. Richmond*,
    496 U.S. 414 (1990) .................................................................................................. 32

*Orloff v. Willoughby*,
    345 U.S. 83 (1953) ......................................................................................... 1, 28, 37

*Parisi v. Davidson*,
    405 U.S. 34 (1972) .................................................................................................... 13

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) .................................................................................... 19

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

*Rajapske v. TrueBlue,*
   No. 3:22-CV-5785-RAJ, 2023 WL 1798239 (W.D. Wash. Feb. 7, 2023) ............................ 34

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ................................................................................................. 29, 30

*Reinhard v. Johnson,*
   209 F. Supp. 3d 207 (D.D.C. 2016) ....................................................................... 34, 35

*Rostker v. Goldberg,*
   453 U.S. 57 (1981) ......................................................................................... 15, 16, 25

*Sampson v. Murray,*
   415 U.S. 61 (1974) .......................................................................................................... 34

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
   411 U.S. 1 (1973) ..................................................................................................... 17, 23

*Smith v. Harvey,*
   541 F. Supp. 2d 8 (D.D.C. 2008) ................................................................................... 30

*Stein v. Dowling,*
   867 F. Supp. 2d 1087 (S.D. Cal. 2012) ......................................................................... 14

*Stockman v. Trump,*
   No. EDCV 17-1799, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) ............................... 12

*Stone v. Trump,*
   280 F. Supp. 3d 747 (D. Md. 2017) ............................................................................... 12

*Stone v. Trump,*
   400 F. Supp. 3d 317 (D. Md. 2019) ............................................................................... 12

*Sulit v. Schiltgen,*
   213 F.3d 449 (9th Cir. 2000) ......................................................................................... 33

*Tennessee v. Cardona,*
   No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) .............................................. 19

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ................................................................................. 3, 27, 28, 36

*Trump v. Karnoski,*
   586 U.S. 1124 (2019) ....................................................................................................... 3

*United States v. Browning,*
   630 F.2d 694 (10th Cir. 1980) ....................................................................................... 32

DEFENDANTS' OPPOSITION TO PI MOTION
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

*United States v. Owens,*
   54 F.3d 271 (6th Cir. 1995) ........................................................................... 32

*United States v. Virginia,*
   518 U.S. 515 (1996) ........................................................................ 21, 22, 25

*Vance v. Bradley,*
   440 U.S. 93 (1979) ......................................................................................... 20

*Watkins v. U.S. Army,*
   875 F.2d 699 (9th Cir. 1989) ................................................................... 33, 34

*Wenger v. Monroe,*
   282 F.3d 1068 (9th Cir. 2002) ........................................................... 13, 14, 31

*White Mountain Apache Tribe v. Hodel,*
   840 F.2d 675 (9th Cir. 1988) ........................................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................................................... 15

*Yagman v. Garcetti,*
   852 F.3d 859 (9th Cir. 2017) ........................................................................ 32

**Statutes**

10 U.S.C. § 1182 ................................................................................... 11, 15

10 U.S.C. § 1552 ......................................................................................... 34

10 U.S.C. § 7419 ........................................................................................... 5

28 U.S.C. § 1491 ......................................................................................... 34

42 U.S.C. § 2000e-2 .................................................................................... 18

**Regulations**

Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness,*
   90 Fed. Reg. 8757 (Jan. 27, 2025) .................................................... *passim*

DEFENDANTS' OPPOSITION TO PI MOTION
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

1

**INTRODUCTION**

2      "Under Article II of the Constitution, the President of the United States, not any federal

3  judge, is the Commander in Chief of the Armed Forces."  *Austin v. U.S. Navy Seals 1-26*, 142

4  S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring).  "[J]udges are not given the task of running

5  the [military]," and indeed, "[o]rderly government requires that the judiciary be as scrupulous not

6  to interfere with legitimate [military] matters as the [military] must be scrupulous not to intervene

7  in judicial matters."  *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953).

8      The Judiciary must be especially careful to adhere to the usual—and highly deferential—

9  rules governing judicial review of military decisionmaking when it involves "a vexing and novel

10  topic of medical debate" about which the people, the States, and the federal government are

11  engaged in policy debates.  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471–72 (6th Cir. 2023),

12  *cert. granted*, 144 S. Ct. 2679 (June 24, 2024).  "Constitutionalizing new areas of American life is

13  not something federal courts should" ever "do lightly."  *Id.*  Courts should be especially cautious

14  about doing so in the military context when the Supreme Court repeatedly has upheld military

15  policies that, according to some, "would unquestionably have fallen had any government

16  attempted to apply them in the civilian world."  *Doe 2 v. Shanahan*, 917 F.3d 694, 732 (D.C. Cir.

17  2019) (Williams, J., concurring).

18      In an exercise of "professional military judgment[]" about the composition of our Nation's

19  armed forces, *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), the Department of Defense ("DoD") has

20  long disqualified individuals from entering military service who have physical or emotional

21  impairments.  DoD has been particularly cautious about service by individuals with mental health

22  conditions, given the unique mental and emotional stresses of military service.  For that reason,

23  the vast majority of Americans between ages 17 and 24 are ineligible to join the military for mental,

24  medical, or behavioral reasons.  In any context other than the one at issue in this case, DoD's

25  professional military judgment about the risks of allowing individuals with physical or emotional

26  impairments to serve in the military would be virtually unquestionable.  Indeed, "[i]t would be

27  difficult to think of a clearer example of the type of governmental action that was intended by the

28

Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process." *Id.*

Even in this context, multiple Administrations have acknowledged the risks stemming from service by individuals with gender dysphoria, a mental health condition associated with clinically significant distress or impairment in social, occupational, or other important areas of human functioning.  That the policies have differed reflects only that military leaders have had varying degrees of willingness to tolerate such risks and have drawn lines based on different cost-benefit calculations at different times.  But all such decisions are committed to the military's discretion because the composition of the military is an area where the Supreme Court has long recognized that judicial deference is at its highest point.  Not only are courts ill-equipped to determine the impact that any intrusion upon military authority might have, but, as noted above, our constitutional scheme charges the Executive and Legislative Branches with carrying out the Nation's military policy.   Separation-of-powers concerns thus significantly constrain the Judiciary's intrusion into military regulations in this area.

Against this backdrop, Plaintiffs sued to challenge (1) the Commander in Chief's Executive Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("*Military* EO"), which stated that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" are incompatible with the high standards demanded for military service, and (2) the new DoD implementing policy that presumptively disqualifies individuals with gender dysphoria from military service.  The *Military* EO as well as the DoD policy also prohibit the use of sleeping, changing, or bathing facilities by servicemembers who do not belong to the sex designated for such facilities.

Plaintiffs now seek the extraordinary relief of a preliminary injunction, asserting Equal Protection, First Amendment, Procedural Due Process, and estoppel claims.  But there is no need for emergency relief now because the servicemembers have yet to exhaust the administrative processes available under the new DoD policy, and their potential loss of employment or inability to join the military does not constitute irreparable harm because it is subject to remediation.

DEFENDANTS' OPPOSITION TO PI MOTION—2
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

More importantly, Plaintiffs are unlikely to succeed on the merits of their claims. The Commander in Chief has determined that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere condition and without the benefit of routine medical treatment or special provisions." *Military* EO § 1. DoD has likewise announced its policy that service in the Military Services is only open to persons who can meet the high standards for military service and readiness without special accommodations. DoD's policy of presumptively disqualifying individuals with gender dysphoria is substantially related to the important government interests in military readiness and lethality because the medical condition is associated with clinically significant distress or impairment of important areas of functioning. Although Plaintiffs contend that the DoD policy should be struck down because it is allegedly motivated by animus toward trans-identifying people, that argument is foreclosed by Supreme Court precedent. It cannot be said that the policy "is inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018). Where, as here, a policy "has a legitimate grounding in national security concerns," the Court "must accept that independent justification." *Id*.

The parties are not starting from a clean slate, given the prior litigation on DoD's 2018 policy that closely resembles the current policy. The Supreme Court allowed that policy to go into effect, staying the district court's preliminary injunction enjoining the policy. *Trump v. Karnoski*, 586 U.S. 1124 (2019). The Ninth Circuit then, consistent with the Supreme Court's order, extended the stay. *Karnoski v. Trump*, 926 F.3d 1180, 1202 (9th Cir. 2019). And the D.C. Circuit separately recognized that the military had "substantial arguments for why the [2018 policy] complies with the equal protection principles of the Fifth Amendment." *Doe 2 v. Shanahan*, 755 Fed. App'x 19, 25 (D.C. Cir. 2019).

The Court should also reject Plaintiffs' other claims. Judicial review of military policies challenged on First Amendment grounds is "far more deferential than constitutional review of similar laws or regulations designed for civil society," *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986), and DoD's policy satisfies that deferential standard. Plaintiffs' Procedural Due Process

DEFENDANTS' OPPOSITION TO PI MOTION—3
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

claim also fails because there is no constitutionally-protected property interest in continued military service, and, in any event, DoD's policy provides for an administrative process for servicemembers to challenge their separation. Plaintiffs' estoppel claim fails because they lack a cause of action, and the remedy of estoppel is unavailable to estop the Federal Government from making generally applicable policy changes such as the ones at issue.

## BACKGROUND

### A.    DoD Policy Prior to 2015

DoD has long disqualified individuals from entering military service who have "physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have." DoD Report & Recommendations on Military Service by Transgender Persons ("2018 Report") (Feb. 2018). Ex. 1 at 9. The military has sensibly taken a particularly cautious approach with respect to mental health standards, considering "the unique mental and emotional stresses of military service." *Id.* at 10; *see also id.* at 20 (noting that "[m]ost mental health conditions . . . are automatically disqualifying" for entry into the military). As a result, 71 percent of Americans between ages 17 to 24 are ineligible to join the military (without a waiver) for mental, medical or behavioral reasons. *Id.* at 6.

In general, the military has aligned these disqualifying conditions with the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), published by the American Psychiatric Association. *Id.* at 10. Military standards for decades therefore presumptively disqualified individuals with a history of "transsexualism," consistent with the inclusion of that term in the DSM. *Id.* at 7, 9–10. Indeed, historically, trans-identifying individuals "could not serve openly in the military." *Karnoski*, 926 F.3d at 1187. In 2013, the American Psychiatric Association replaced the term "gender identity disorder" (itself a replacement for "transsexualism") with "gender dysphoria" in the DSM. 2018 Report at 10, 12. It explained that it no longer viewed identification with a gender different from one's sex (*i.e.*, trans-identifying status), on its own, to be a disorder. *See id.* at 12. It stressed, however, that a subset of trans-identifying people suffers from a medical

condition called "gender dysphoria," which is a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration." *Id.* at 12. Importantly, DSM-5 observed that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 13.

Aside from imposing stringent medical standards, the military has also long treated servicemembers differently according to their sex as necessary. 2018 Report at 37 (noting that because of the "unique nature of military service," servicemembers "of the same biological sex are often required to live in extremely close proximity to one another"). "Given their biological differences, males and females have long been assigned to separate berthing, bathroom, and shower facilities, and subject to different sets of physical fitness, body fat, uniform, and grooming standards." *Doe 2*, 917 F. 3d at 707 (Williams, J., concurring). Congress too has required the military to separate the two sexes and to ensure their privacy in various contexts. *See* 10 U.S.C. §§ 7419, 7420, 8431, 8432, 9419, 9420.

**B.    The 2016 Carter Policy**

In 2015, then-Secretary of Defense Ashton Carter ordered the creation of a working group to study the policy and readiness implications of open service by trans-identifying persons, but instructed the group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." Memorandum from Secretary Carter (July 28, 2015), Ex. 2. DoD commissioned the RAND National Defense Research Institute to conduct a study, which . concluded that the proposed policy change would have "an adverse impact on health care utilization and costs, readiness, and unit cohesion," but that these harms would be "'negligible' and 'marginal' because of the small, estimated number" of trans-identifying servicemembers relative to the size of the armed forces as a whole. 2018 Report at 14.

In 2016, Secretary Carter adopted a policy that allowed trans-identifying servicemembers to transition if they were diagnosed with gender dysphoria by a military medical provider and could adhere to the standards associated with their biological sex until a military medical provider determined that their gender transition was complete. *Doe 2*, 917 F.3d at 710 (Williams, J.,

DEFENDANTS' OPPOSITION TO PI MOTION—5
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

concurring). The policy also allowed trans-identifying individuals, including those who had already transitioned, to enter military service if they met certain medical criteria. *See* DoDI 6130.03 Vol I § 6.28(t) , Ex. 3 at 5–6. Under that policy, trans-identifying individuals who lacked a history or diagnosis of gender dysphoria, whether they were currently serving or seeking to serve, could serve if they met the standards associated with their biological sex. 2018 Report at 4.

The Carter Policy was not immediately implemented, however, because of concerns raised by multiple military branches and requests for up-to-three-year' delays in implementing the policy. *See* May 26, 2018, Testimony of Secretary James Mattis at 62, Ex. 4. In June 2017, Secretary Mattis approved the Services' recommendation to delay the implementation of the accession standards. *Doe 2*, 917 F.3d at 712.

## C.    The 2018 Policy

In August 2017, President Trump issued a memorandum stating that the Carter policy had "failed to identify a sufficient basis to conclude that terminating [DoD's] longstanding policy . . .would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources[.]" Presidential Mem. (Aug. 25, 2017) at 2–3, Ex. 5. The President called for "further study" to ensure that implementation of the Carter policy "would not have those negative effects." *Id.* at 3. Secretary Mattis then convened a panel of experts to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." 2018 Report at 17.

The panel consisted of senior military leaders who were selected because of "their experience leading warfighters," "their expertise in military operational effectiveness," and their "statutory responsibility to organize, train, and equip military forces." 2018 Report at 18. In addition to being "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force," the panel drew on experts dedicated to issues involving personnel, medical treatment, and military lethality. *Id.* The panel also met with commanders of trans-identifying servicemembers and those servicemembers themselves. *Id.* It further examined information regarding gender dysphoria; its treatment; the impact of this condition on military

DEFENDANTS' OPPOSITION TO PI MOTION—6
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

effectiveness, unit cohesion, and resources; and data regarding servicemembers diagnosed with gender dysphoria. *Id.* at 18, 31.

Upon the panel's recommendation, and following President Trump's approval, Secretary Mattis adopted the 2018 policy, under which trans-identifying persons with a history or diagnosis of gender dysphoria were disqualified from military service, except: (1) if they had been stable for 36 consecutive months in their biological sex prior to accession; (2) if they were diagnosed with gender dysphoria after entering into service, did not require a change of gender, and remained deployable within applicable retention standards; and (3) currently serving servicemembers who had been diagnosed with gender dysphoria after the Carter policy took effect and prior to the effective date of the 2018 policy could continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria. 2018 Policy at 2. With limited exceptions, trans-identifying persons who required or had undergone gender transition were disqualified. *Id.* Trans-identifying persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, could serve in their biological sex. *Id.*

"In the Department's military judgment," this was necessary because service by these individuals is "not conducive to, and would likely undermine, the inputs—readiness, good order and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality." *Id.* at 32, 41.

## D.    President Biden's Policy

Immediately after taking office, President Biden issued Executive Order 14004, largely reverting to the Carter policy based on his judgment that "the Secretary of Defense's 2016 conclusions remain valid[.]" *See* 86 Fed. Reg. 7471 (Jan. 25, 2021). A history or diagnosis of gender dysphoria was still a bar to military accession unless the applicant had been asymptomatic for 18 months. 2024 DoDI 6130.03 Vol I § 6.28(t). An applicant who had undergone sex reassignment surgery was disqualified unless (1) the surgery was more than 18 months prior and (2) no further surgery was required. *Id.* §§ 6.13(g)(1), (4); *id.* §§ 6.14(n)(1), (4). Prior cross-sex hormonal interventions were likewise disqualifying, unless the applicant was "stab[le]" as

DEFENDANTS' OPPOSITION TO PI MOTION—7
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

1   specified in the medical standards.  *See id.* §§ 6.24(t)(1)–(4).  All servicemembers were "subject

2   to the standard[s], requirement[s], or polic[ies] associated with their gender marker in the [Defense

3   Enrollment Eligibility Reporting System]."  *See* DoDI 1300.28 § 3.1(a).  A servicemember could

4   change his or her gender marker only upon "a diagnosis from a military medical provider" that

5   "gender transition [was] medically necessary," *id.* § 3.4(a), and upon approval of the commanding

6   officer, *id.* §§ 3.4(b)–(c), among other steps and requirements, including the completion of the

7   prescribed medical treatment plan, *id.* § 3.3(d)(2).

8   **E.     President Trump's Executive Orders**

9        On January 27, 2025, President Trump issued the *Military* EO, revoking President Biden's

10  Executive Order 14004.  The *Military* EO noted that "[l]ongstanding Department of Defense . . .

11  policy (DoD Instruction (DoDI) 6130.03) provides that it is the policy of the DoD to ensure that

12  service members are '[f]ree of medical conditions or physical defects that may reasonably be

13  expected to require excessive time lost from duty for necessary treatment or hospitalization.'"  *Id.*

14  § 1.  "As a result, many mental and physical health conditions are incompatible with active duty,

15  from conditions that require substantial medication or medical treatment to bipolar and related

16  disorders, eating disorders, suicidality, and prior psychiatric hospitalization."  *Id.*  The *Military* EO

17  further stated that "[t]he Armed Forces must adhere to high mental and physical health standards

18  to ensure our military can deploy, fight, and win, including in austere conditions and without the

19  benefit of routine medical treatment or special provisions."  *Id.*

20       The *Military* EO thus declared that "[i]t is the policy of the United States Government to

21  establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and

22  integrity."  *Id.* § 2.  The *Military* EO further stated that "this policy is inconsistent with the medical,

23  surgical, and mental health constraints on individuals with gender dysphoria" and "with shifting

24  pronoun usage or use of pronouns that inaccurately reflect an individual's sex."  *Id.*  Section 3 of

25  the *Military* EO incorporated the definitions of Executive Order 14168, 90 Fed. Reg. 8615 (Jan.

26  20, 2025) ("*Defending Women* EO"), which provided that "[i]t is the policy of the United States

27  to recognize two sexes, male and female," and that "'sex' shall refer to an individual's immutable

28
**U.S. DEPARTMENT OF JUSTICE**
                                                        **Civil Division, Federal Programs Branch**
                                                        **1100 L Street NW**
                                                        **Washington, DC 20530**
                                                        **Tel: (202) 514-3346**

biological classification as either male or female," *id.* § 2.

The *Military* EO set certain deadlines for DoD to update the medical standards for accession and retention, *id.*, § 4(a), to end pronoun usage inconsistent with biological sex, *id.* § 4(b), and to identify all additional steps and issue guidance necessary to fully implement the order, *id.* § 4(c). It further provided that "[a]bsent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males." *Id.* § 4(e).

On February 7, 2025, Secretary of Defense Pete Hegseth delegated authority to the Under Secretary of Defense for Personnel and Readiness "to provide additional policy guidance and implementation guidance outside of the normal DoD issuance process." ECF No. 58-4. He also paused accession by anyone with a history of gender dysphoria, and on certain medical procedures—including "newly initiated gender-affirming hormone therapy." *See id.* at 1 & n.1.

## F.    DoD's 2025 Policy

On February 26, 2025, DoD issued "Additional Guidance on Prioritizing Military Excellence and Readiness." *See* ECF No. 58-7. The Policy proceeds in six pertinent parts, as supplemented by additional guidance.

First, the Policy affirms that "the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," are inconsistent with the standards of military service. 2025 Policy § 1.b.[1] Accordingly, persons meeting the criteria are generally disqualified from serving. *Id.* § 1.d.

Second, the Policy sets accessions and retention standards to further the stated policy. For accession, the policy disqualifies anyone with gender dysphoria or a history of hormonal/surgical transitioning from joining the military, unless given "a waiver on a case-by-case basis, provided

---

[1] For brevity, Defendants will refer to "a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," as having gender dysphoria.

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities." *Id.* §§ 4.1.a–c.  To be eligible for such a waiver, the applicant must be willing to serve in his or her biological sex.  *Id.* § 4.1.c.  Per a subsequent clarifying guidance, "a compelling Government interest" can include "special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department."  ECF No. 64-1.  The clarifying guidance further provides that, to be eligible for such a waiver, an individual must meet the following criteria:

> 1. The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

> 2. The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and

> 3. The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

*Id.* at 1–2.  With respect to current servicemembers, gender dysphoria or transition is likewise disqualifying unless there is a compelling government interest in retention and the member meets the same three criteria above.  *See* 2025 Policy §§ 4.3.a–c.

Third, the Policy establishes that disqualified servicemembers will be processed for administrative separation pursuant to DoDI 1332.14 (enlisted members) or DoDI 1332.30 (commissioned officers).  If they wish, involuntarily separated enlisted servicemembers will be afforded an administrative separation board, whereas commissioned officers will be afforded a board of inquiry.  2025 Policy § 4.4.a.6, 7.[2]

Fourth, the Policy sequences the separation process.  Before any separation proceedings take place, the Military Departments must first "[e]stablish procedures and implement steps to identify servicemembers who have [gender dysphoria]."  *See id.* §§ 3.3.e, 4.4.b.  Pursuant to

---

[2] In this way, the 2025 Policy expands the right to such boards.  For example, a servicemember with fewer than six years of total active and reserve military service typically would not be entitled to an administrative separation board, but would be separated under the Notification procedures.  *See* DoDI 1332.14, § 5.2.

DEFENDANTS' OPPOSITION TO PI MOTION—10
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

clarifying guidance, the deadline to establish such procedures is March 26, 2025.  ECF No. 58-8. Before then, "DoD personnel shall take no action to identify Service members pursuant to the [2025 Policy]." *Id.*

Fifth, the Policy reiterates the Secretary's February 7, 2025, instruction that all surgical procedures associated with facilitating sex reassignment are cancelled but that existing cross-sex hormonal interventions may continue until separation is complete.  *Id.* § 4.2.b, c.  Servicemembers, however, may consult with a DoD healthcare provider concerning a diagnosis of gender dysphoria and receive mental health counseling for such a diagnosis.  *Id.* § 4.2.d.

Sixth, the Policy affirms adherence to the definitions in the *Defending Women* EO, and provides that in keeping with good order and discipline, "[p]ronoun usage when referring to Service members must reflect a Service member's [biological] sex." *Id.* § 1.f, 1.h.  And "[w]here a standard, requirement, or policy depends on whether the individual is a male or female . . . all persons will be subject to the standard, requirement or policy associated with their sex." *Id.* § 1.g.

The Policy was informed "through consideration of, among other things, the President and Secretary's written direction, existing and prior DoD policy, and prior DoD studies and reviews of service by individuals with gender dysphoria," including "a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria.  *See* Feb. 26, 2025 Action Memo (ECF No. 71-1) at 3.

**G.    Prior Litigation in the First Trump Administration**

There was extensive litigation following President Trump's August 2017 Memorandum, and four federal district courts, including this Court, entered preliminary injunctions prohibiting enforcement of certain directives in the Memorandum.  *See Karnoski v. Trump*, No. C17-1297 (MJP), 2017 WL 6311305, at *10 (W.D. Wash. Dec. 11, 2017); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177, 217 (D.D.C. 2017); *Stone v. Trump*, 280 F. Supp. 3d 747, 769 (D. Md. 2017); *Stockman v. Trump*, No. EDCV 17-1799, 2017 WL 9732572, at *16 (C.D. Cal. Dec. 22, 2017).  Upon the adoption of the 2018 policy, the defendants moved to dissolve those preliminary injunctions.  The D.C. Circuit vacated the injunction in *Doe 2* in January 2019.  *See id.*  The Supreme Court likewise

stayed the injunctions entered in *Karnoski* and *Stockman*. *See Trump v. Karnoski*, No. 18A625 (U.S. Jan. 22, 2019) (order staying preliminary injunction); *Trump v. Stockman*, No. 18A627 (U.S. Jan. 22, 2019) (same). And the *Stone* court dissolved the preliminary injunction it had issued in August 2019. *See Stone v. Trump*, 400 F. Supp. 3d 317 (D. Md. 2019). Each case was dismissed following President Biden's revocation of the 2018 policy.

**H.    The Instant Action**

On February 6, 2025, seven individual Plaintiffs—six of whom are servicemembers and one hopes to enlist in the military—and one organizational Plaintiff, the Gender Justice League, filed the instant action. Plaintiffs amended their complaint on March 4, asserting equal protection, free speech, procedural due process, and equitable estoppel claims. On February 19, 2025, Plaintiffs moved for a preliminary injunction. Plaintiffs filed a supplemental brief in support of their motion for a preliminary injunction on March 4, 2025.

## ARGUMENT

**I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS**

### A.    The Servicemember Plaintiffs Have Failed to Exhaust Their Administrative Remedies

Judicial review is premature at this stage because the servicemember Plaintiffs have not yet exhausted the administrative remedies prescribed by the Policy. *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002) ("An internal military decision is unreviewable unless the plaintiff alleges . . . exhaustion of available intraservice remedies."); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938)) ("[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.") "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37 (1972). This is especially true in the military context, "given the judiciary's lack of expertise in areas of military judgment and its long-standing policy of non-intervention in internal military affairs." *Heidman*

DEFENDANTS' OPPOSITION TO PI MOTION—12
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

1    *v. United States*, 414 F. Supp. 47, 48 (N.D. Ohio 1976).  Even where a controversy survives

2    administrative review, "exhaustion of the administrative procedure may produce a useful record

3    for subsequent judicial consideration, especially in a complex or technical factual context."

4    *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992); *see White Mountain Apache Tribe v. Hodel*, 840

5    F.2d 675, 677 (9th Cir. 1988) ("[T]he [administrative exhaustion] doctrine insures that a court will

6    have before it a factual record to review, not merely an administrative decision to contradict.").

7        Here, the servicemember Plaintiffs have not satisfied the requirement that they allege

8    "exhaustion of available intraservice remedies."  *Wenger*, 282 F.3d at 1072.  The Policy provides

9    that all enlisted servicemembers and officers identified for involuntary separation processing

10   pursuant to the Policy will, if desired by the enlisted servicemember or officer, be afforded an

11   administrative separation review board (enlisted servicemembers) or a Board of Inquiry (officers),

12   *see* 2025 Policy § 4.4.a. & a.6, 7, and "be afforded all applicable administrative processing

13   protections," *see* DoDI 1332.14 (Aug. 1, 2024) § 5.3 (administrative separation board procedures);

14   DoDI 1332.30 (May 11, 2018) § 5 (Board of Inquiry procedures).  Enlisted servicemembers may

15   be administratively separated "following a determination that doing so is in the best interest of the

16   relevant Military Service," and officers may be separated when their "retention is not clearly

17   consistent with the interests of national security."  2025 Policy § 4.4.a.  And even if Plaintiffs are

18   ultimately separated and choose to seek judicial review of their separation, the administrative

19   process will aid judicial review at that point because it "will produce a record for appeal to the

20   courts."  *Muhammad v. Sec'y of the Army*, 770 F.2d 1494, 1496 (9th Cir. 1985).

21       No exception to the exhaustion requirement applies.  *See Muhammad*, 770 F.2d at 1495

22   (discussing circumstances in which the exhaustion requirement may be excused, including lack of

23   opportunity for remediation, irreparable harm, futility, and presence of substantial constitutional

24   question).  As discussed below, any Plaintiff separated pursuant to the Policy will not suffer

25   irreparable harm, as available administrative remedies both before and after separation, and

26   judicial review after separation, can provide complete remediation.  *Stein v. Dowling*, 867 F. Supp.

27   2d 1087, 1098 (S.D. Cal. 2012) (holding that a servicemember facing administrative separation

28

DEFENDANTS' OPPOSITION TO PI MOTION—13
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

allegedly in violation of the First and Fifth Amendments would not be irreparably harmed because he could obtain compete remediation from a record correction board and subsequent judicial review). Plaintiffs also have not established that pursuit of such remedies is "demonstrably doomed to fail." *Diaz v. United Agric. Emp. Welfare Ben. Plan & Tr.*, 50 F.3d 1478, 1485 (9th Cir. 1995) ("[B]are assertions of futility are insufficient to bring a claim within the futility exception."). Again, Plaintiffs can contest their separation before an administrative separation board or board of inquiry. Administrative separation boards may recommend that servicemembers subject to this policy be retained, and that recommendation may be approved by the separation authority or Secretary of the relevant service. *See* DoDI 1332.14 § 5.3.e(7), f(4)(b). Similarly, when a Board of Inquiry determines that an officer should be retained, the "case is closed," subject to narrow exceptions. *See* 10 U.S.C. § 1182(d)(1)(A); DoDI 1332.30 § 5.6(d). Neither the Court nor Defendants can prejudge what those boards may ultimately decide with respect to the servicemember Plaintiffs. Finally, Plaintiffs have not raised substantial constitutional claims, as demonstrated by this opposition brief.

**B.    Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim**

**1.    The military's judgment is entitled to significant deference**

Courts extend great deference to the political branches when reviewing the "complex, subtle, and professional decisions as to the composition . . . of a military force." *Winter*, 555 U.S. at 24. "Judicial deference is at its apogee" in this area because "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman*, 475 U.S. at 507–08 (citation omitted); *see also Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress [] and with the President." (internal citations omitted)). Because "it is difficult to conceive of an area of governmental activity in which the courts have less competence," *Rostker v. Goldberg*, 453 U.S.

DEFENDANTS' OPPOSITION TO PI MOTION—14
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

57, 66 (1981), the Supreme Court has stressed that "the tests and limitations to be applied may differ because of the military context," *id.* at 67.

Thus, in *Rostker*, for example, the Supreme Court applied a deferential standard to hold that a facially discriminatory, sex-based draft-registration statute was "not invidious, but rather realistically reflect[ed] the fact that the sexes [were] not similarly situated." *Id.* at 79 (citation omitted). The Court explained that the sex-based classification was within constitutional bounds because Congress determined that the statute minimized "added burdens" and "administrative problems" and promoted "the important goal of military flexibility," and "[i]t is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization." *Id.* at 81–82. Instead of conducting its own "evaluation" of the evidence, the Court adopted "an appropriately deferential examination of Congress' evaluation of that evidence." *Id.* at 83. The Court also accepted *post hoc* justifications, even when an analogous policy in the civilian context would call for closer scrutiny. *Id.* at 81. In other words, the Supreme Court has allowed Congress and the Executive wide latitude to choose "among alternatives" in furthering military interests. *Rostker*, 453 U.S. at 71–72.

> **2. The Policy does not classify based on "transgender status," and even if it did, heightened scrutiny would not apply**

Plaintiffs contend that DoD's policy is "subject to heightened scrutiny because it facially classifies and purposefully discriminates based on transgender status."[3] PI Mot. at 21–23. But that is incorrect; DoD's new accession and retention standards do not exclude all trans-identifying individuals. Instead, they turn on gender dysphoria and a history of hormonal or surgical transition, and thus rational-basis review applies. To the extent the Ninth Circuit previously held that DoD's similar 2018 Policy was subject to heightened scrutiny and *Karnoski*, 926 F.3d at 1201, and that

---

[3] To the extent Plaintiffs seek to challenge the *Military EO*, they lack standing to do so. No Plaintiff can be separated or prevented from joining the military based on the Executive Order alone. In other words, those harms are not traceable to the Executive Order. Nor would enjoining the Executive Order necessarily remedy Plaintiffs' harms, as the DoD policy may remain. The focus of the Court's analysis, therefore, should be the 2025 Policy and its clarifying guidance.

DEFENDANTS' OPPOSITION TO PI MOTION—15
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

classification based on trans-identifying status constituted quasi-suspect class, *see Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024), Defendants respectfully submit that those holdings were wrongly decided.  Indeed, the Supreme Court is poised to address the question this term.  *Skrmetti*, 144 S. Ct. 2679.  Moreover, the Supreme Court has not recognized any new suspect class or quasi-suspect class in almost half a century.  *See Craig v. Boren*, 429 U.S. 190 (1976) (sex constitutes quasi-suspect class).  Instead, it has repeatedly declined to do so.  *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (mental disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age).  Given the high bar to establishing a quasi-suspect class and the deference owed in the military context, heightened scrutiny should not apply.

The same conclusion results from an application of the factors the Supreme Court has used to determine whether a quasi-suspect class exists: a "discrete group" defined by "immutable" characteristics that is "politically powerless" and has suffered a history of discriminatory treatment.  *See Lying v. Castillo*, 477 U.S. 635, 638 (1986) (citing *Murgia*, 427 U.S. at 313–14).  Trans-identifying persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group."  *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).  "Transgender status" is not "necessarily immutable, as the stories of 'detransitioners' indicate."  *Skrmetti*, 83 F.4th at 487.  It further is not characterized by a specific defining feature, but instead may be said to include "a huge variety of gender identities and expressions."  *Id.*; *see also* Br. of American Psychological Association at 6 n.7, *United States v. Skrmetti*, No. 23-477 (U.S. 2024) (stating that "transgender" is an "umbrella term" that covers "varied groups" and "many diverse gender experiences").

Trans-identifying persons moreover are not "political[ly] powerless[]" either.  *San Antonio Indep. Sch. Dist.*, 411 U.S. at 28.  "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting[,]" and many "States have passed laws specifically allowing some of the treatments sought here."  *Skrmetti*, 83 F.4th at 487.  Indeed, the trans-identifying people have attracted the support of twenty States, former high-ranking military officials, and the large law firm that has entered an appearance in this case, among others.  *Cf. id.*

DEFENDANTS' OPPOSITION TO PI MOTION—16
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

at 487.  And trans-identifying persons achieved at least some version of their desired military

policy from the last two Democratic Administrations and can reasonably be expected to do so

again from the next Democratic Administration.  It is therefore untenable to claim that trans-

identifying persons "have no ability to attract the attention of lawmakers." *Cleburne*, 473 U.S. at

445.  The mere fact that trans-identifying persons may not be able to "mandate the desired . . .

responses" from every Administration, and that they may "claim some degree of prejudice from

at least part of the public at large," is insufficient.  *Id.*  Similarly, claims of historical injustice

towards trans-identifying individuals are not sufficient to establish a quasi-suspect class.  The

Supreme Court in *Cleburne* "rejected the argument that mental disability is a suspect classification,

despite a history of compulsory sterilization, exclusion from public schools, and a system of state-

mandated segregation and degradation." *Eknes-Tucker*, 114 F.4th 1241, 1266 (11th Cir. 2024)

(Lagoa, J., concurring).  If that combination of historical injustices was not enough to establish a

quasi-suspect class, neither are Plaintiffs' claims of historical injustice.

### 3.  The Policy does not classify based on sex

Plaintiffs next contend that DoD's 2025 Policy "also constitutes a sex-based classification

subject to heightened scrutiny."  PI Mot. at 23–24.  Again, Plaintiffs are incorrect.

The 2025 Policy does not distinguish based on sex in the way that sex-based classifications

typically distinguish based on sex.  It regulates all servicemembers, "regardless of sex." *Skrmetti*,

83 F.4th at 480.  It is an "across-the-board regulation [that] lacks any of the hallmarks of sex

discrimination." *Id.*  "It does not prefer one sex over the other." *Id.*  "It does not include one sex

and exclude the other." *Id.*  "It does not bestow benefits or burdens based on sex." *Id.*  "And it

does not apply one rule for males and another for females." *Id.*

Plaintiffs cite the Supreme Court's Title VII-specific conclusion in *Bostock v. Clayton*

*County*, 590 U.S. 644 (2020), in arguing that the 2025 Policy constitutes sex discrimination.  *See*

PI Mot. at 23.  In *Bostock*, the Supreme Court reasoned that Title VII's prohibition on sex

discrimination incorporated a but-for causation standard and held that when an employer fires an

DEFENDANTS' OPPOSITION TO PI MOTION—17
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

employee because that employee is gay or trans-identifying, sex is necessarily a but-for cause of such discrimination if, among other things, the individuals are "similarly situated." 590 U.S. at 656, 668–69, 683.

*Bostock* is inapposite. The Supreme Court's conclusion in *Bostock* was derived entirely from Title VII's "plain terms," *id.* at 676, which provide, in relevant part, that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1). The text of the Equal Protection Clause does not contain any similar language, and for that reason, Title VII's "text-driven reasoning applies only to Title VII," not to constitutional equal protection claims. *Skrmetti*, 83 F.4th at 484–85; *see also, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024) (collecting cases); *Eknes-Tucker*, 114 F.4th at 1263 (11th Cir. 2024) (collecting analysis of the issue).

Tellingly, the Supreme Court in *Bostock* rejected the employer's argument that to isolate sex, the Court had to keep all other variables constant. 590 U.S. at 671. The Court reasoned that "[t]he employers might be onto something if Title VII only ensured equal treatment between groups of men and women[.]" *Id.* Equal treatment, of course, is the Equal Protection analysis here. Lest there be any doubt, "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). *Bostock*'s Title VII-specific analysis is thus inapplicable here.

Moreover, *Bostock* proceeds from the premise that an employer discriminates against a person because of sex where the employer "treat[s] that individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. While in the Title VII context individuals are generally "similarly situated" because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions," *id.* at 660, men and women are not similarly situated when it comes to certain military standards. In addition, DoD's retention and accessions standards treat everyone equally regardless of sex.

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

Plaintiffs cite decisions concerning medical transition, such as *Kadel v. Folwell*, 100 F.4th 122, 146 (4th Cir. 2024) (8-6 en banc decision). *See* PI Mot. at 24. *Kadel* held that certain funding restrictions on the provision of certain kinds of treatments implicated suspect classifications because the questions were framed in a way that turned on sex—*e.g.*, allowing mastectomies to treat cancer, but not to treat gender dysphoria, 100 F.4th at 134, or allowing females to receive vaginoplasty and breast reconstruction but not males, *id.* at 153.

The Government believes that *Kadel* is wrongly decided, but the case is in any event unhelpful to Plaintiffs because the "two reasons" *Kadel* found the state laws in that case to be "textbook sex discrimination" for equal protection purposes, *id.* at 153–54, would not apply to a purported ban on trans-identifying persons. First, the ban could be applied "without referencing sex." *Id.* at 153. Unlike in *Kadel*, DoD would *not* need to know "what sex [the applicant] was assigned at birth." *Id.* Male or female, the applicant or servicemember would be disqualified for *identifying as* the opposite sex. That is not a sex-based distinction. Second, the purported ban on trans-identifying persons would not be "based on gender stereotypes." *Id.* at 154. Such a ban would equally bar men who identify as women and women who identify as men, and thus, it would be "free of fixed notions concerning the roles and abilities of males and females." *Id.* Accordingly, *Kadel* and other similar cases in the context of medical treatment for gender dysphoria are inapposite.

### 4.    The Policy survives constitutional scrutiny

As explained above, because the Policy does not discriminate based on sex or against any suspect class, rational-basis review applies. Rational-basis review "is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). It is "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989). Under this standard, the challenged policy enjoys "a strong presumption of validity," and the challenger bears "the burden to negative every conceivable basis which might support it" without regard to "whether the conceived reason for the challenged distinction actually motivated the [decision]." *Beach*, 508 U.S. at 314–15. Courts are further

DEFENDANTS' OPPOSITION TO PI MOTION—19
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

1    "compelled under rational-basis review to accept . . . generalizations even when there is an

2    imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993). That is, a

3    classification does not fail simply because it "is not made with mathematical nicety or because in

4    practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970). Rather,

5    classifications may be "both underinclusive and overinclusive" and "perfection is by no means

6    required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979).

7        Plaintiffs contend that intermediate scrutiny applies. Under that standard, the policy must

8    "serve[] important governmental objectives" and be "substantially related to the achievements of

9    those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) . Under either standard,

10   however, the presumptive disqualification of individuals with gender dysphoria satisfies

11   constitutional scrutiny.

12       As DoD explained with respect to the 2018 policy, generally allowing such individuals to

13   serve poses "substantial risks" and would "undermine readiness, disrupt unit cohesion, and impose

14   an unreasonable burden on the military that is not conducive to military effectiveness and

15   lethality." 2018 Report at 2. DoD reached the same conclusion in the 2025 Policy, finding that

16   "[s]ervice by [ ] individuals [with gender dysphoria] is not in the best interest of the Military

17   Services and is not clearly consistent with the interests of national security." 2025 Policy, § 1.c

18   As explained below, ample evidence supports the military's judgment on this issue.

### a)    Military Readiness

20       As DoD explained in 2018 and reiterated as to its current policy (which expressly relies on

21   the 2018 report, *see* Action Memo at 3), service by individuals with gender dysphoria poses at

22   least two significant risks to military readiness.

23       *First*, DoD is concerned about subjecting those with a history of gender dysphoria to the

24   unique stresses of military life. *See* 2018 Report at 21, 42. At the outset, any mental-health

25   condition characterized by clinically significant distress or impairment in functioning raises

26   readiness concerns. That is why servicemembers suffering from "[a]ny DSM-5 psychiatric

27   disorder with residual symptoms" that "impair social or occupational performance[]" need "a

28

DEFENDANTS' OPPOSITION TO PI MOTION—20
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

1   waiver . . . to deploy," as the military must consider the "risk of exacerbation if the individual were

2   exposed to trauma or severe operational stress." *Id.* at 34.   Particularly given "the absence of

3   evidence on the impact of deployment on individuals with gender dysphoria," DoD concluded that

4   this condition posed readiness risks.  *Id.*; *see also id.* at 42.  That judgment has also been reflected

5   in the Carter and Austin policies, which disqualified individuals with a history of gender dysphoria

6   absent proof that they had been stable without clinically significant distress for 18 months.

7        In forming this conclusion, DoD's panel of experts reviewed evidence that military service

8   can be a contributor to suicidal thoughts.  *Id.* at 21–22.  Data pertaining to servicemembers with

9   gender dysphoria reflected similar trends.  *See id.*  The 2018 Report noted that "[s]ervice members

10  with gender dysphoria are eight times more likely to attempt suicide than Service members as a

11  whole (12% versus 1.5%)."  *Id.*  The data reflected that servicemembers with gender dysphoria

12  were also nine times more likely to have mental health encounters than the servicemember

13  population as a whole (28.1 average encounters per servicemember versus 2.7 average encounters

14  per servicemember).  *Id.*  For example, from October 2015 to October 3, 2017, the 994 active-duty

15  servicemembers diagnosed with gender dysphoria accounted for 30,000 mental health visits.  *Id.*

16  Especially given the evidence that military service in itself can be a contributor to suicidal

17  thoughts, DoD had legitimate concerns that allowing individuals with gender dysphoria to serve

18  would subject them and their comrades to unacceptable risks.  *Id.* at 19, 21.

19       As noted, the current policy expressly relied on these findings from the 2018 Report.  *See*

20  Action Memo at 3.  DoD also relied on a 2021 review that found that "rates of disability evaluation

21  were estimated to be higher among [trans-identifying] service members."  Action Memo at 3

22  (alterations in original).  Looking at data over a 24-month period, this review found that "nearly

23  40% of Service members with gender dysphoria in an observed cohort were non-deployable" at

24  some time during that period.  *Id.*  DoD determined that "[t]his level of non-deployability creates

25  significant readiness risk and places additional burdens on Service members without gender

26  dysphoria to meet requirements."  *Id.*

27

28

The current policy further relied on a 2025 medical literature review, which found that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime[.]" *Id.* The review further found that "the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their [non-trans-identifying] counterpart," that "transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to [non-trans-identifying] individuals," and "the strength of evidence on transgender mental health and [sex-reassignment] care is low to moderate." *Id.* at 3–4.

These concerns are not new. The 2016 RAND Report relied on by both Secretary Carter and President Biden cautioned that "it is difficult to fully assess the outcomes of treatment" for gender dysphoria as a general matter, given "the absence of quality randomized trial evidence"—"the gold standard for determining treatment efficacy"—and that, in any event, "it is not known how well these findings generalize to military personnel." RAND Report at 10. Although Secretary Carter and President Biden were more willing to tolerate these suicide-related risks, the current Commander in Chief and Secretary of Defense are not constitutionally compelled to hew to the risk tolerance of their predecessors. "[T]here's nothing unusual about a new administration coming to office inclined to favor a different policy direction.'" *Doe 2*, 917 F.3d at 729 (Williams, J., concurring) (cleaned up).

*Second*, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by sex-reassignment interventions, it remains the case that transition-related medical treatment—namely, cross-sex hormonal intervention and sex-reassignment surgery— could render transitioning servicemembers "non-deployable for a potentially significant amount of time." 2018 Report at 35. The Endocrine Society recommends "quarterly bloodwork and laboratory monitoring of hormone levels during the first year" of transition intervention, meaning that if "the operational environment does not permit access to a lab for monitoring hormones," then the transitioning servicemember must forgo "treatment, monitoring, or the deployment," each of which "carries risks for readiness." *Id.* at 33. That period of potential non-deployability only increases for those who obtain sex-reassignment surgery, which in addition to a recommended "12

DEFENDANTS' OPPOSITION TO PI MOTION—22
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

1    continuous months" of cross-sex hormonal intervention "prior to genital surgery," comes with

2    "substantial" recovery time, even without complications. *Id.*

3        In addition to being inherently problematic in the military setting, these limits on

4    deployability could have harmful effects on transitioning servicemembers' units as a whole. Any

5    increase in the number of non-deployable servicemembers requires those who can deploy to bear

6    "undue risk and personal burden," which itself "negatively impacts mission readiness." *Id.* at 35.

7    On top of these personal costs, servicemembers who deploy more frequently to "compensate for"

8    their unavailable comrades face risks to family resiliency. *Id.* And when servicemembers with

9    medical conditions do deploy but then fail to meet fitness standards in the field, "there is risk for

10   inadequate treatment within the operational theater, personal risk due to potential inability to

11   perform combat required skills, and the potential to be sent home from the deployment and render

12   the deployed unit with less manpower." *Id.* at 34. All of this, DoD has concluded, poses a

13   "significant challenge for unit readiness." *Id.* at 35.

**b)    Unit cohesion, good order, and discipline**

15       Apart from these readiness concerns, DoD reasonably determined that exempting

16   individuals with gender dysphoria who have undergone gender transition or seek to do so from the

17   military's sex-based standards would undermine "good order, discipline, steady leadership, unit

18   cohesion, and ultimately military effectiveness and lethality." 2018 Report at 28.

19       As DoD has explained, a contrary approach would risk, among other things, "erod[ing]

20   reasonable expectations of privacy" by other servicemembers. *Id.* at 31, 37. Indeed, "[g]iven the

21   unique nature of military service," servicemembers must often "live in extremely close proximity

22   to one another when sleeping, undressing, showering, and using the bathroom." *Id.* at 37. To

23   protect reasonable expectations of privacy, the military has therefore "long maintained separate

24   berthing, bathroom, and shower facilities for men and women." *Id.* In DoD's judgment, allowing

25   trans-identifying individuals to use the facilities of their preferred gender "would invade the

26   expectations of privacy" of the other servicemembers sharing those facilities. *Id.* Thus, absent the

27   creation of separate facilities for transitioned or transitioning servicemembers, which could be both

28

DEFENDANTS' OPPOSITION TO PI MOTION—23
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

"logistically impracticable for the Department," as well as unacceptable to those servicemembers, the military would face irreconcilable privacy demands.  *Id.*

Such considerations are not animated by animus toward trans-identifying individuals.  The implementation handbook for the Carter policy, for example, repeatedly stressed the need to respect the "privacy interests" and "rights of Service members who are not comfortable sharing berthing, bathroom, and shower facilities with a transitioning Service member[,]" and urged commanders to try to accommodate competing interests to the extent that they could.  *See, e.g.*, 2016 Implementation Handbook at 38; *see id.* at 22, 29, 33, 60–61, 63–64; *see also* 2018 Report at 38.  In addition, the Supreme Court has recognized that it is "necessary to afford members of each sex privacy from the other sex in living arrangements," *Virginia*, 518 U.S. at 550 n.19, and "[i]n the context of recruit training, this separation is even mandated by Congress," 2018 Report at 37.

Aside from these privacy-related considerations, DoD has expressed concerns that exempting servicemembers from sex-based standards in training and athletic competitions based on gender identity would generate perceptions of unfairness in the ranks.  2018 Report at 36.  For example, requiring female servicemembers to compete with biological males who identify as female but retain male physiology, DoD reasoned, would likely put the former at a disadvantage. *Id.* at 31, 36.  And in violent activities, "pitting biological females against" those with male physiology but a female gender identity, and vice versa, could pose "a serious safety risk as well." *Id.* at 36.

Again, these are legitimate military concerns.  Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for servicemembers to address biological differences between the sexes.  *Virginia*, 518 U.S. at 550 n.19.  Indeed, the Supreme Court has deferred to Congress's judgment that including women in the draft would create "administrative problems such as housing and different treatment with regard to . . . physical standards." *Rostker*, 453 U.S. at 81.  Especially given DoD's view that "physical competition[] is central to the military life and is indispensable to the training and

DEFENDANTS' OPPOSITION TO PI MOTION—24
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

preparation of warriors," 2018 Report at 36, DoD's judgments in this respect are entitled to deference.

Moreover, the "collision of interests" injected by the Carter and Austin policies' departure from military uniformity poses "a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions." 2018 Report at 37.  As DoD previously noted regarding the Carter policy, the "routine execution of daily activities" could become a recurring source of uncertainty, if not "discord in the unit," requiring commanders "to devote time and resources to resolve issues not present outside of military service." *Id.* at 38.  Given that "[l]eaders at all levels already face immense challenges in building cohesive military units," DoD concluded that it would be unwise to maintain a policy that "will only exacerbate those challenges and divert valuable time and energy from military tasks." *Id.* at 37–38.  That conclusion remains the same today.

Plaintiffs nevertheless contend that trans-identifying servicemembers have been serving under the Austin Policy for years without disruption to unit cohesion. PI Mot. at 25–27.  But they rely only on declarations and testimony of former military officials who claim that they were unaware of problems regarding unit cohesion. *See id.*  This includes a declaration from the former Under Secretary of Defense for Personnel and Readiness.  But as the declaration of the current official performing the duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs explains, "it would be highly unusual for individualized service member complaints regarding unit cohesion, military readiness, medical readiness, deployability, and lethality to reach the level of the Under Secretary."  Dill Decl. ¶ 6, Ex. 6.

### c)    Disproportionate costs

Finally, DoD noted that a review of cost data by the Office of the Assistant Secretary of Defense for Health Affairs indicated that between 2015 and 2024, DoD spent $52,084,407 providing care to active-duty Service members to treat gender dysphoria, including $15,233,158 for psychotherapies; $3,135,593 for cross-sex hormonal intervention, and $14,324,739 for surgical care.  Action Memo at 4.  This is consistent with DoD's finding in 2018 that transition-related

DEFENDANTS' OPPOSITION TO PI MOTION—25
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

interventions under the Carter policy was "proving to be disproportionately costly on a per capita basis[.]" 2018 Report at 41. Specifically, DoD noted that the medical costs for servicemembers with gender dysphoria was "nearly three times" compared to servicemembers without this condition. *Id.* And that was "despite the low number of costly sex reassignment surgeries that have been performed so far"—34 non-genital procedures and one genital surgery—which likely increased as more servicemembers avail themselves of these measures in the last few years. *Id.*

Several commanders had also reported that providing servicemembers in their units with transition-related interventions "had a negative budgetary impact" because of the use of "operations and maintenance funds to pay for . . . extensive travel throughout the United States to obtain specialized medical care." *Id.* This is not surprising, given that transition-related interventions "require[] frequent evaluations" by both a mental-health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services." *Id.* at 41 n.164. Transitioning servicemembers consequently "may have significant commutes to reach their required specialty care," with those "stationed in more remote locations fac[ing] even greater challenges." *Id.* To be sure, the healthcare cost for treating servicemembers' gender dysphoria is small relative to DoD's total healthcare expenditure, but such cost and benefit analysis is decidedly for DoD, not this Court, to make. Given the military's general interest in maximizing efficiency through minimizing costs, *see* 2018 Report at 3, DoD reasonably concluded that its disproportionate expenditures on facilitating gender transition should be better devoted elsewhere, *see id.* at 41. That considered judgment is entitled to significant deference.

### 5.    Alleged animus is not a reason to grant Plaintiff's motion

Plaintiffs also contend that the Policy is unconstitutional because it allegedly reflects animus. *See* PI Mot. at 21–22. But *Hawaii v. Trump* forecloses this argument.

In *Hawaii*, as in this case, the plaintiffs challenged a policy that they alleged "was motivated not by concerns pertaining to national security but by animus toward Islam." 585 U.S. at 681. The plaintiffs—and the dissent—thus contended that "a more stringent standard of review" applied. *Id.* at 741 (Sotomayor, J., dissenting). But the *Hawaii* majority rejected that argument,

DEFENDANTS' OPPOSITION TO PI MOTION—26
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

1    holding that, in the national security context, the Court must "uphold the policy so long as it can

2    be understood to result from a justification independent of unconstitutional grounds." *Id.* at 705.

3    　　　　"The *Hawaii* Court offered two justifications for this standard of review—both of which

4    readily apply here." *Doe 2*, 917 F.3d at 732 (Williams, J., concurring). "For one, judicial inquiry

5    into the national-security realm raises concerns for the separation of powers by intruding on the

6    President's constitutional responsibilities." *Id.* (cleaned up). "For another, when it comes to

7    collecting evidence and drawing inferences on questions of national security, the lack of

8    competence on the parts of the courts is marked." *Id.* "For both of these reasons, [a court's] review

9    into matters of national security is highly constrained." *Id.*

10    　　　　Here, as in *Hawaii*, "[i]t cannot be said that it is impossible to 'discern a relationship to

11    legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" 585 U.S. at

12    706. "[B]ecause there is persuasive evidence that [the Policy] has a legitimate grounding in

13    national security concerns, quite apart from any [animus], [the Court] must accept that independent

14    justification." *Id.* The Policy "is expressly premised on legitimate purposes[,]" *id.*, to ensure "the

15    high mental and physical standards necessary for military service." 2025 Policy at 1. Plaintiffs

16    may challenge the Policy "based on their perception of its effectiveness and wisdom," but courts

17    "cannot substitute [their] own assessment for the Executive's predictive judgments on such

18    matters, all of which are delicate, complex, and involve large elements of prophecy." *Id.* at 707–

19    08 (citation omitted).

20    　　　　**C.    DoD's Policy Does Not Violate the First Amendment**

21    　　　　Plaintiffs are also unlikely to succeed on their First Amendment claim. *See* PI Mot. at 28–

22    31. The Supreme Court explained in *Goldman v. Weinberger* that judicial review "of military

23    regulations challenged on First Amendment grounds is far more deferential than constitutional

24    review of similar laws or regulations designed for civilian society." 475 U.S. at 507. The military

25    "need not encourage debate or tolerate protest to the extent that such tolerance is required of the

26    civilian state by the First Amendment." *Id.* This is so, the Court explained, because "to accomplish

27    its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps."

28    
DEFENDANTS' OPPOSITION TO PI MOTION—27
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

1    *Id.* And "[t]he essence of military service 'is the subordination of the desires and interests of the

2    individual to the needs of the service.'" *Id.* (quoting *Orloff*, 345 U.S. at 92). While these aspects

3    of military life do not "render entirely nugatory" the guarantees of the First Amendment in the

4    military context, "within the military community there is simply not the same individual autonomy

5    as there is in the larger civilian community." *Goldman*, 475 U.S. at 507 (cleaned up). Courts

6    accordingly "must give great deference to the professional judgment of military authorities

7    concerning the relative importance of a particular military interest." *Id.* Indeed, courts are "ill-

8    equipped to determine the impact upon discipline that any particular intrusion upon military

9    authority might have," and the military authorities are the ones charged with carrying out our

10   Nation's military policy. *Id.* at 507–08; *see also Khalsa v. Weinberger*, 787 F.2d 1288, 1290 (9th

11   Cir. 1985).

12       Plaintiffs nonetheless contend that DoD's Policy violates the First Amendment because it

13   (i) "prohibits transgender people from disclosing that they are transgender or expressing a gender

14   identity that is different from their sex" and (ii) prohibits the use of "pronouns" inconsistent with

15   one's sex. PI Mot. at 28. But DoD's Policy does not ban anyone based on their speech or

16   expressive conduct; rather, it presumptively disqualifies individuals with gender dysphoria from

17   military service—a restriction that only turns on an individual's medical condition. *See* 2025

18   Policy § 1(d).

19       While the DoD's Policy requires servicemembers to use pronouns that accurately reflect

20   an individual's sex, *see* 2025 Policy § 1(h) ("In keeping with good order and discipline, salutations

21   (*e.g.*, addressing a senior officer as 'Sir' or 'Ma'am') must also reflect an individual's sex."), such

22   a policy does not violate the First Amendment, particularly given the deferential standards set forth

23   in *Goldman*. The military has an interest in "uniformity," 475 U.S. at 510, and a policy requiring

24   that salutations uniformly reflect an individual's sex reasonably furthers that interest. A contrary

25   policy allowing servicemembers to choose for themselves which pronouns to use when addressing

26   others would risk leading to confusion and disuniformity. *Cf.* Standards of Care for the Health of

27   Transgender and Gender Diverse People, S80, WPATH (8th ed. 2022) (trans-identifying

28
DEFENDANTS' OPPOSITION TO PI MOTION—28
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

individuals "may use the pronouns they/them/theirs, or neopronouns which include e/em/eir, ze/zir/hir, er/ers/erself among others"). And if the First Amendment applied as Plaintiffs suggest, then Plaintiffs arguments would raise other First Amendment concerns that would exacerbate uniformity and group-cohesion concerns. *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021).

While that should be the end of the analysis under *Goldman*, even if the Court were to apply the stricter standards applicable only in the civilian context, the military's "pronoun" policy would not violate the First Amendment. The Policy is not "content-based" because it does not "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Rather, the Policy simply provides for a uniform way for servicemembers to address senior officers and others. For the same reason, the policy is not "viewpoint-based"; it is not "based on the specific motivating ideology or the opinion or perspective of the speaker." *Id.* at 168. Again, the policy has nothing to do with the ideology or opinion of any speaker, but simply adopts a uniform approach to salutations across the military.

### D.    DoD's Policy Does Not Violate Procedural Due Process

Plaintiffs also lack likelihood of success on the merits of their procedural due process claim. PI Mot. at 23–25. To state such a claim, a plaintiff must allege "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022), *aff'd*, 601 U.S. 234 (2024).

It is well established, however, that "there is no constitutionally-protected property interest in continued military service or the employment benefits that come with military service." *Smith v. Harvey*, 541 F. Supp. 2d 8, 15–16 (D.D.C. 2008). That is why, in *Karnoski*, the district court dismissed the plaintiffs' procedural due process claim. 2017 WL 6311305, at *7 ("Plaintiffs' Amended Complaint alleges neither a 'protectible liberty or property interest' nor a 'denial of adequate procedural protections' as required for a procedural due process claim."); *see also, e.g.*, *Christoffersen v. Washington State Air Nat. Guard*, 855 F.2d 1437, 1443 (9th Cir. 1988) (plaintiffs had "no constitutionally protected property interest in continued employment with the Washington

DEFENDANTS' OPPOSITION TO PI MOTION—29
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

[Air National] Guard"). Accordingly, Plaintiffs cannot point to their possible future separation as itself a loss of a "liberty or property interest protected by the Constitution." *Fikre*, 35 F.4th at 776.

Plaintiffs seek to avoid this black letter law by characterizing their injury as sounding in "reputational harm," rather than a loss of continued employment in the military. PI Mot. at 31–32. But the Ninth Circuit has also recognized that "damage to reputation—without more—is insufficient to implicate the Fourteenth Amendment's Due Process Clause." *Chaudhry v. Aragón*, 68 F.4th 1161, 1170 (9th Cir. 2023). Instead, Plaintiffs must show that any alleged reputational harm "[i]s accompanied by some additional deprivation of liberty or property." *Id.* This is known as a "stigma-plus" due process claim. *Id.* "To lodge such a 'stigma-plus' due process claim, a plaintiff must show: (1) the public disclosure of a stigmatizing statement by the government; (2) the accuracy of which is contested; (3) *plus* the denial of some more tangible interest such as employment." *Id.* at 1170–71.

Plaintiffs are not likely to succeed on any such "stigma plus" due process claim here. To the extent Plaintiffs claim that separation brands them as being dishonest or dishonorable, they are mistaken: the DoD guidance provides that for any Plaintiffs who are separated, "[c]haracterization of service . . . will be honorable except where the Service member's record otherwise warrants a lower characterization." *See* 2025 Policy § 1(e). Thus, as to any Plaintiff who is separated, their military record will simply state that they were honorably discharged, which is not stigmatizing and therefore cannot serve as a basis for a "stigma plus" claim. *See Wenger*, 282 F.3d at 1074–75; *Ben Shalom v. Sec'y of Army*, 489 F. Supp. 964, 972 (E.D. Wis. 1980) (no procedural due process interest claim where plaintiff's "discharge was honorable, and there was no public disclosure by the Army of the reasons for her discharge").

Moreover, even if Plaintiffs could satisfy the requirements for asserting a "stigma plus" claim, the claim would still be unlikely to succeed because Plaintiffs have not alleged a "denial of adequate procedural protections." *Karnoski*, 2017 WL 6311305, at *7. The DoD guidance provides that "[s]ervice members being processed for separation . . . will be afforded all statutorily required rights and benefits." 2025 Policy at 2. "All enlisted Service members who are

DEFENDANTS' OPPOSITION TO PI MOTION—30
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

involuntarily separated pursuant to th[e] policy will, if desired by the Service member, be afforded an administrative separation board." *Id.* § 4.4(a)(6); *see also* DoDI 1332.14 § 5.3 (administrative separation board procedures); DoDI 1332.30 § 5 (Board of Inquiry procedures).    And "[a]ll officers who are involuntarily separated pursuant to th[e] policy will be afforded a Board of Inquiry, if desired by the officer, in accordance with 10 U.S.C. § 1182." *Id.* § 4.4(a)(7).    Such procedures are more than sufficient to satisfy the "base requirement" of the Due Process Clause that a person deprived of a liberty interest "be given an opportunity to be heard at a meaningful time and in a meaningful manner." *Yagman v. Garcetti*, 852 F.3d 859, 864 (9th Cir. 2017).

### E.    Equitable Estoppel Does Not Bar Implementing the Policy

Plaintiffs are also unlikely to succeed on their estoppel claim.    *See generally Doe 1*, 275 F. Supp. 3d at 205– (dismissing estoppel claim in case challenging DoD's 2018 policy on service by trans-identifying individuals).    As a threshold matter, Plaintiffs' estoppel claim fails because "private rights of action to enforce federal law must be created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and Congress has created no cause of action for estoppel.

Even assuming *arguendo* that the remedy of estoppel could be applied to the federal government, it certainly is not available here—to compel the military to access and retain individuals with a medical condition that it believes is incompatible with the high mental and physical standards necessary for military service.    *See OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990).    At a minimum, estoppel does not apply to policy changes by the federal government.    *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (similar).    The government may alter its policies for any number of reasons.    It is therefore unsurprising that Plaintiffs do not cite any case holding that a federal agency is estopped from changing its generally applicable policies.

In any event, Plaintiffs cannot satisfy the elements of an estoppel claim.    Even in situations where a court has concluded that an estoppel claim against the government might be available—

DEFENDANTS' OPPOSITION TO PI MOTION—31
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

such as individualized challenges to non-policy actions—courts "invoke the doctrine of estoppel against the government with great reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980). In the rare circumstances in which equitable estoppel may apply against the government, a party must show: (1) knowledge of the true facts by the party to be estopped; (2) intent to induce reliance or actions giving rise to a belief in that intent; (3) ignorance of the true facts by the relying party; (4) detrimental reliance; and two additional elements unique to the government-litigation context: (5) "affirmative misconduct (not mere negligence)"; and (6) "a serious injustice outweighing the damage to the public interest of estopping the government." *Estate of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011); *see also, e.g.*, *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000) ("estoppel against the government is unavailable where" challengers "have not lost any rights to which they were entitled"). At least four of those factors are missing here.

First, none of the statements or policies cited by Plaintiffs involved definite representations to induce specific Plaintiffs' reliance on the Carter or Austin policies. As the court recognized in *Doe 1*, none of the statements or policies was a "definite representation to any of the individual Plaintiffs," but rather "constituted a broad policy decision by the government that affected scores of individuals." 275 F. Supp. 3d at 206. The government "did not specifically represent to any particular individual that he or she would be permitted to serve." *Id.* Accordingly, "[t]he cases that Plaintiffs cite are distinguishable." *Id.*

Second, any reliance on statements or policies would not have been reasonable because it is well known that government policies may be changed for any number of reasons. The likelihood of such a shift was especially foreseeable here given that the government has changed its policies on this issue *each time* the Administration changed in 2017, 2021, and 2025.

Third, there is no evidence suggesting that Defendants engaged in the requisite "affirmative misconduct" to sustain a claim of estoppel against the government. The bar for establishing "affirmative misconduct" is high, requiring a showing of "affirmative misrepresentation or affirmative concealment of a material fact by the government." *Watkins v. U.S. Army*, 875 F.2d

DEFENDANTS' OPPOSITION TO PI MOTION—32
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

1    699, 707 (9th Cir. 1989).  Here, simply changing government policy decidedly is not affirmative

2    misconduct.  *See Doe 1*, 275 F. Supp. 3d at 207 (government had not engaged in "misconduct" as

3    the court understood that term in this context).  Nor have Plaintiffs shown that the government has

4    "threaten[ed] to work a serious injustice" or that "the public's interest will not be unduly damaged

5    by the imposition of estoppel," for the reasons explained above.  *Watkins*, 875 F.2d at 708.

6    **II.    Plaintiffs Are Not Likely To Suffer Irreparable Harm**

7         Plaintiffs have also failed to "must demonstrate immediate threatened injury."  *Boardman*

8    *v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016).  Even outside the military context, the

9    standard for an irreparable injury is a demanding one: "[m]ere injuries, however substantial, in

10   terms of money, time and energy necessarily expended in the absence of a stay, are not enough"

11   to qualify as irreparable, and "[t]he possibility that adequate compensatory or other corrective

12   relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a

13   claim of irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  In the military context,

14   the moving party must "make a much stronger showing of irreparable harm than the ordinary

15   standard for injunctive relief."  *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985);

16   *see also Church v. Biden*, 573 F. Supp. 3d 118, 145 (D.D.C. 2021) (noting that "the showing of

17   irreparable harm must be *especially strong* before an injunction is warranted, given the national

18   security interests weighing against judicial intervention in military affairs.").

19        Plaintiffs' asserted harms relating to the loss of employment and other collateral

20   consequences, including reputational damage, are insufficient to meet that high burden.  As the

21   Ninth Circuit has held in the military context, "[t]he loss of income, the ensuing collateral effects

22   thereof, and the possibility of stigma are "external factors common to most discharged employees

23   and not attributable to any unusual actions relating to the discharge itself [and thus,] will not

24   support a finding of irreparable injury, however severely they may affect a particular individual."

25   *Hartikka*, 754 F.2d at 1518; *see also Rajapske v. TrueBlue*, No. 3:22-CV-5785, 2023 WL 1798239,

26   at *2 (W.D. Wash. Feb. 7, 2023) (similar).  In fact, even "the stigma attach[ed] to a less than

27   honorable discharge" does not warrant emergency injunctive relief.  *Hartikka*, 754 F.2d at 1518;

28

DEFENDANTS' OPPOSITION TO PI MOTION—33
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

*see also Reinhard v. Johnson*, 209 F. Supp. 3d 207, 220 (D.D.C. 2016) (servicemember's involuntary separation for misconduct did not constitute irreparable harm despite claim that the discharge will create a "stigma," or otherwise "unfairly paint" plaintiff). Of course, a servicemember separated under the DoD Policy will receive an honorable discharge, unless his or her record otherwise warrants a lower characterization. 2015 DoD Policy, § 1.e.

Importantly, "given the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury." *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006); *see also Reinhard*, 209 F. Supp. 3d at 220 (separation from the military did not constitute irreparable harm); 28 U.S.C. § 1491(a)(1) (authorizing courts "to issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records"). Here, Plaintiffs can first contest any separation in the administrative separation board or board of inquiry and can seek further review with the relevant record correction board, *see* 10 U.S.C. § 1552. Because their asserted injuries are subject to remediation, Plaintiffs' alleged injuries are not irreparable.

## III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction

The balance of equities also tips against preliminary relief. The Commander in Chief has determined that it is "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," and that this policy is "inconsistent with the medical, surgical and mental health constraints on individuals with gender dysphoria." *Military* EO § 2. The Constitution charges the Commander in Chief with ultimate responsibility over the Nation's military policy. *See Doe 2*, 917 F.3d at 730 (Williams, J., concurring). "It is this power of oversight and control of military force *by elected representatives and officials* which underlies our entire constitutional system." *Id.* (quoting *Gilligan*, 413 U.S. at 10). There is a strong public interest in deferring to the Commander in Chief's judgment on which military policies would best protect the Nation. This is especially true where, as here, the judgment is based on, among other things, the recommendation of senior

DEFENDANTS' OPPOSITION TO PI MOTION—34
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

military leaders and experts who conducted "extensive review and deliberation" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." 2018 Report at 18.

## IV.    Any Preliminary Injunction Should Apply to the Named Plaintiffs Only

If the Court is nevertheless inclined to grant preliminary injunctive relief, such relief should be limited to only Plaintiffs. Under Article III, a federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Thus, "a plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury." *Id.* (emphasis added). Longstanding equitable principles likewise suggest the same limitation. A court's equitable authority is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999). And "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Indeed, no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter. *See Hawaii*, 585 U.S. at 716 (Thomas, J., concurring).

## V.    Any Preliminary Injunction Cannot Impede the Military's Discretion to Make Assignment, Deployment, and Operational Decisions

Any injunctive relief also should not interfere with military assignment, deployment, and operational decisions. Here, Plaintiffs seek a broad injunction that would essentially require the Court to insert itself into the military chain of command. *See* Proposed Order, ECF No. 23-1. Decisions about how to assign and deploy servicemembers, however, are for the military to make, under the supervision of the President as Commander in Chief, not civilian courts. For that reason, challenges to such assignment decisions are non-justiciable even when they involve a constitutional challenge.

In *Orloff*, for example, the Court emphasized that it had "found no case where th[e] Court ha[d] assumed to revise duty orders as to one lawfully in the service." 345 U.S. at 94. Circuit

DEFENDANTS' OPPOSITION TO PI MOTION—35
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346

courts likewise have uniformly declined to second-guess military judgments regarding fitness for duty and assignments. *See, e.g.*, *Harkness v. Sec'y of Navy*, 858 F.3d 437, 443 (6th Cir. 2017) (noting in a case involving a First Amendment challenge to military assignment decisions that "courts are generally reluctant to review claims involving military duty assignments"). That hesitation has extended even to constitutional challenges. *See*, *e.g.*, *Orloff*, 345 U.S. at 93–94 (Fifth Amendment); *Harkness*, 858 F.3d at 443–45 (First Amendment). And when district courts have disregarded this uniform caselaw, the Supreme Court has intervened. *See Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1301 (2022).

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction. If the Court is inclined to issue any injunctive relief, Defendants respectfully request a stay for two days to allow the Solicitor General time to decide whether to seek appellate relief, and if such relief is sought, a stay pending disposition of the appeal.

*Pursuant to Local Rule 7(e)(6) and this Court's order of March 13, 2025, I certify that this memorandum contains 12,982 words, in compliance with the word limit set forth in the Court's order.*

Dated: March 14, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         ALEX HAAS
                                         Director, Federal Programs Branch

                                         JEAN LIN
                                         Special Litigation Counsel

                                         */s/ John Robinson*
                                         JASON C. LYNCH
                                         JOHN ROBINSON
                                         ELIZABETH B. LAYENDECKER

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**1100 L Street NW**
**Washington, DC 20530**
**Tel: (202) 514-3346**

Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 616-8489
john.j.robinson@usdoj.gov

*Counsel for Defendants*

DEFENDANTS' OPPOSITION TO PI MOTION—37
*Shilling, et al. v. Trump, et al.*, No. 2:25-cv-241-BHS

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3346