

THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING; *et al.*,

               *Plaintiffs*,

DONALD J. TRUMP, in his official capacity as
President of the United States; *et al.*,

               *Defendants*.

No. 2:25-cv-241

**PLAINTIFFS' REPLY IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**NOTE ON MOTION CALENDAR:
MARCH 19, 2025**

PLS.' REPLY IN SUPP. OF
MOT. FOR PRELIM. INJ.
(CASE NO. 2:25-CV-241 BHS)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

## TABLE OF CONTENTS

**Page(s)**

I.      Introduction.................................................................................................. 1

II.     Argument ..................................................................................................... 2

    A.      Administrative Exhaustion Is Not Required. ........................................ 2

    B.      The Military Ban Violates the Fifth Amendment's Equal Protection
            Guarantee. ............................................................................................ 3

        1.      The Ban is Motivated by Animus and Is Therefore
                Unconstitutional.......................................................................... 3

        2.      The Ban Purposefully Discriminates Based on Transgender Status........... 4

        3.      The Ban Purposely Discriminates Based on Sex. ...................... 7

        4.      Defendants Cannot Justify the Ban............................................ 8

            a)      Military Readiness. ......................................................... 8

            b)      Unit Cohesion. .............................................................. 12

            c)      Cost. .............................................................................. 13

    C.      The Ban Violates Plaintiffs' First Amendment Rights. ....................... 14

    D.      Active-Duty Plaintiffs Have Established a Due Process Violation. ..... 15

    E.      Defendants Should be Estopped from Retroactively Discharging Active-
            Duty Plaintiffs. .................................................................................... 16

    F.      Plaintiffs Are Suffering Irreparable Harms.......................................... 18

III.    CONCLUSION............................................................................................ 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adair v. England*,
 183 F.Supp.2d 31 (D.D.C. 2002) ................................................................2

*Ariz. Dream Act Coal. v. Brewer*,
 757 F.3d 1053 (9th Cir. 2014) ................................................................18

*Baker v. City of SeaTac*,
 994 F.Supp.2d 1148 (W.D. Wash. 2014) ................................................15

*Bostock v. Clayton County*,
 590 U.S. 644 (2020) ..................................................................................7

*Bowen v. Gilliard*,
 483 U.S. 587 (1987) ..................................................................................5

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*,
 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ...................................6

*Charles Schwab & Co. v. Fin. Indus. Regul. Auth. Inc.*,
 861 F.Supp.2d 1063 (N.D. Cal. 2012) ......................................................2

*Christofferson v. Washington State Air National Guard*,
 855 F.2d 1437 (9th Cir. 1988) ................................................................15

*City of Cleburne v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985) ...............................................................................4, 5

*Doe 1 v. Trump*,
 275 F.Supp.3d 167 (D.D.C. 2017) ...........................................................17

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
 897 F.3d 518 (3d Cir. 2018) ....................................................................12

*Doe v. Horne*,
 115 F.4th 1083 (9th Cir. 2024) ..................................................................5

*Downen v. Warner*,
 481 F.2d 642 (9th Cir. 1973) ................................................................2, 16

*Elgin v. Dep't of Treas.*,
 567 U.S. 1 (2012) ......................................................................................2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

*Emery Mining Corp. v. Secretary of Labor*,
   744 F.2d 1411 (10th Cir. 1984) .................................................................16

*F.V. v. Barron*,
   286 F.Supp.3d 1131 (D. Idaho 2018) ..........................................................5

*Fikre v. Fed. Bureau of Investigation*,
   35 F.4th 762 (9th Cir. 2022) ......................................................................15

*Graham v. Richardson*,
   403 U.S. 365 (1971) ...................................................................................14

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024) .................................................................5, 7

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994) ......................................................................................7

*Johnson v. California*,
   543 U.S. 499 (2005) ......................................................................................3

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) (en banc) ...................................................6, 7

*Karnoski v. Trump*,
   2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) .......................................4, 18

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ............................................................. passim

*Latta v. Otter*,
   19 F.Supp.3d 1054 (D. Idaho) ...................................................................14

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010) .....................................................................15

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
   682 F.3d 1 (1st Cir. 2012) ............................................................................7

*Muhammad v. Sec'y of Army*,
   770 F.2d 1494 (9th Cir. 1985) .....................................................................2

*Nyquist v. Mauclet*,
   432 U.S. 1 (1977) ..........................................................................................7

*Parents for Priv. v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ...................................................................12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and**
**Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign**
**Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

*PFLAG, Inc. v. Trump*,
  2025 WL 685124 (D. Md. Mar. 4, 2025)...............................................................18

*Plyler v. Doe*,
  457 U.S. 202 (1982)................................................................................................5

*Rice v. Cayetano*,
  528 U.S. 495 (2000)................................................................................................7

*Romer v. Evans*,
  517 U.S. 620 (1996)................................................................................................4

*Rostker v. Goldberg*,
  453 U.S. 57 (1981)..................................................................................................1

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
  965 F.3d 945 (9th Cir. 2020)..................................................................................6

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017)..................................................................................................3

*Smith v. Harvey*,
  541 F.Supp.2d 8 (D.D.C. 2008).......................................................................15, 16

*Talbott v. United States*,
  Case No. 1:25-cv-00240 (ACR), Slip Op. (D.D.C. Mar. 18, 2025) (ECF No.
  89) ................................................................................................................ passim

*Trump v. Hawaii*,
  585 U.S. 667 (2018)................................................................................................4

*Turner Broad. Sys., Inc. v. FCC*,
  512 U. S. 622 (1994).............................................................................................14

*Ulrich v. City & County of San Francisco*,
  308 F.3d 968 (9th Cir. 2002).................................................................................16

*United States v. Owens*,
  54 F.3d 271 (6th Cir. 1995)...................................................................................16

*United States v. Virginia*,
  518 U.S. 515 (1996)...............................................................................................12

*Vasquez-Rodriguez v. Garland*,
  7 F.4th 888 (9th Cir. 2021)......................................................................................3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

*Washington v. Trump,*
　　2025 WL 659057 (W.D. Wash. Feb. 28, 2025) ........................................................18

*Watkins v. U.S. Army,*
　　875 F.2d 699 (9th Cir. 1989) ...................................................................16, 17, 18

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
　　485 F.Supp.3d 1 (D.D.C. 2020) .................................................................................1

*Windsor v. United States,*
　　699 F.3d 169 (2d Cir. 2012), *aff'd,* 570 U.S. 744 (2013) ...............................5, 7, 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

I.    **INTRODUCTION**

Notwithstanding Plaintiffs' years of distinguished and patriotic military service, the Military Ban and Defendants' implementing guidance would categorically bar them and all other transgender servicemembers from the military for no reason other than because they are transgender. This exclusion of an entire group of people from military service based on a characteristic that the military itself has concluded has no bearing on fitness to serve is blatantly unconstitutional, for the reasons explained in Plaintiffs' Motion.

In response, Defendants argue for unbridled deference to their "professional military judgment" and try to downplay the Ban as something less than a bar to service by transgender people. But "deference does not mean abdication," *Rostker v. Goldberg,* 453 U.S. 57, 70 (1981), particularly when the Ban "is soaked in animus and dripping with pretext." **Exhibit 36** (hereafter "*Talbott* Op."), at 64.[1] And as Defendants have proclaimed, under the Ban, "*[t]ransgender* troops are disqualified from service." Dkt. 61-2 (emphasis added).

Defendants argue about military readiness but ignore unrefuted evidence undermining their contentions: years of experience and numerous declarations demonstrating that transgender servicemembers like Plaintiffs enhance rather than undermine military readiness and unit cohesion. As the court in *Talbott v. Trump* stated, "the cruel irony is that thousands of transgender servicemembers have sacrificed—some risking their lives—to ensure for others the very equal protection rights the Military Ban seeks to deny them." *Talbott* Op. at 5.[2]

Finally, Defendants minimize the devastating harm to Plaintiffs from losing their careers and their livelihoods as "subject to remediation" because they can appeal to military administrative boards. But no transgender person could prevail before such a board in the face of a policy directing that they be separated because of *who they are.*

---

[1] Exhibits are attached to the Second Supplemental Declaration of Matthew Gordon.

[2] The entry of the preliminary injunction in *Talbott* does not counsel against the entry of a preliminary injunction here. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 59-60 (D.D.C. 2020).

PLS.' REPLY IN SUPP. OF MOT.
FOR PRELIM. INJ. - 1
(CASE NO. 2:25-CV-241 BHS)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    The Ban and its implementing guidance are already threatening significant harm. Plaintiffs

2    and other transgender servicemembers are being reassigned, denied advancement opportunities,

3    and placed on involuntary administrative absence. Without injunctive relief, their distinguished

4    military careers will be over. Plaintiffs ask this Court to ensure that those sacrifices are not in vain.

5    **II.    ARGUMENT**

6        **A.  Administrative Exhaustion Is Not Required.**

7        Defendants argue that judicial review is premature because Active-Duty Plaintiffs have not

8    exhausted the administrative procedures prescribed by the February 26 Guidance. Dkt. 76 at 13-

9    14. But administrative exhaustion is not required because Plaintiffs' claims raise "substantial

10   constitutional questions" and seeking administrative relief would be futile. *See Talbott* Op. at 37-

11   39. Defendants attempt to evade this by highlighting the deference afforded internal administrative

12   procedures within the military. But no level of administrative deference can bypass Active-Duty

13   Plaintiffs' right to seek relief to prevent violations of their constitutional rights.

14       Constitutional challenges may bypass administrative exhaustion requirements because

15   such issues often must be resolved by courts and not administrative boards. *See Muhammad v.*

16   *Sec'y of Army*, 770 F.2d 1494, 1495 (9th Cir. 1985) (administrative exhaustion not required "if

17   substantial constitutional questions are raised"); *Charles Schwab & Co. v. Fin. Indus. Regul. Auth.*

18   *Inc.*, 861 F.Supp.2d 1063, 1074-75 (N.D. Cal. 2012). Here, Plaintiffs bring claims under the First

19   and Fifth Amendments. Each claim implicates "substantial constitutional questions" reserved for

20   resolution in a judicial forum.

21       Indeed, constitutional claims are "singularly suited" to judicial forums and are clearly

22   inappropriate for military boards. *Downen v. Warner*, 481 F.2d 642, 643 (9th Cir. 1973); *see also*

23   *Adair v. England*, 183 F.Supp.2d 31, 55 (D.D.C. 2002), *aff'd sub nom. In re Navy Chaplaincy*,

24   2020 WL 11568892 (D.C. Cir. Nov. 6, 2020); *cf. Elgin v. Dep't of Treas.*, 567 U.S. 1, 28-29 (2012)

25   (Alito, J., dissenting) ("facial constitutional" claims challenging military draft were "entirely

26   outside the Board's power to decide").

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    Moreover, "[w]here the agency's position 'appears already set' and recourse to

2 administrative remedies is 'very likely' futile, exhaustion is not required." *Vasquez-Rodriguez v.*

3 *Garland*, 7 F.4th 888, 896 (9th Cir. 2021). The Ban establishes a *categorical bar* on military

4 service by transgender persons—mandating implementation without discretion. *See* Military Ban

5 §§1, 2; *see also* Dkts. 58-7, 64-1. The "waiver" set forth in the implementing guidance (Dkts. 58-

6 7, 64-1) is no exception at all, as in reality, no transgender person can meet the conditions for this

7 purported "waiver." Ettner Suppl. Decl. ¶¶13-14; Wagner Suppl. Decl. ¶¶17-18; Skelly Suppl.

8 Decl. ¶10; *see also Talbott* Op. at 63. Because Defendants' position "appears already set," internal

9 military procedures are futile, and Active-Duty Plaintiffs need not exhaust them before seeking

10 judicial review.

11    **B.  The Military Ban Violates the Fifth Amendment's Equal Protection Guarantee.**

12    The Ban and its guidance purposefully bar transgender persons from military service based

13 on animus towards transgender people. They also facially classify based on transgender status and

14 sex. They are thus subject to heightened scrutiny, *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th

15 Cir. 2019), which requires courts to "smoke out" improper uses of suspect lines, *Johnson v.*

16 *California*, 543 U.S. 499, 506 (2005), and to ensure that laws do not "classify unnecessarily and

17 overbroadly … when more accurate and impartial lines can be drawn." *Sessions v. Morales-*

18 *Santana*, 582 U.S. 47, 63 n.13 (2017).

19    **1.  The Ban is Motivated by Animus and Is Therefore Unconstitutional.**

20    The Ban and its guidance are plainly motivated by animus towards transgender people.

21 Both state, without any basis, that being transgender is inconsistent with "honesty, humility, …

22 and integrity." Military Ban §2; Dkt. 58-7, §1(b). They both also incorporate the Gender Order,

23 which defines "gender ideology" as the "false claim that males can identify as and thus become

24 women and vice versa." Dkt. 31-13 §2(f). And again, the primary justification for the Ban is that

25 "*adoption of a gender identity inconsistent with an individual's [birth] sex* conflicts with a soldier's

26 commitment to an honorable, truthful, and disciplined lifestyle, *even in one's personal life*."

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   Military Ban §1 (emphasis added). The Ban's "language is unabashedly demeaning, its policy

2   stigmatizes transgender persons as inherently unfit, and its conclusions bear no relation to fact."

3   *Talbott* Op. at 64.

4          Defendants argue that *Trump v. Hawaii*, 585 U.S. 667 (2018), counsels otherwise, but that

5   was a First Amendment—not equal protection—case, and the proclamation at issue there was

6   "*expressly* premised on legitimate purposes" and "*[t]he text sa[id] nothing about religion*." *Id.* at

7   706 (emphasis added). *See also Talbott* Op. at 43-44. Here, by contrast, the Ban is expressly

8   premised on an illegitimate purpose—animus.

9          The Constitution forbids policies that on their face result from "negative attitudes" and

10  "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). As

11  explained in Plaintiffs' briefs (Dkt. 23, at 21-22; Dkt. 60, at 6-7), the Ban is dripping with animus

12  and reflects a "bare … desire to harm" transgender people, "identif[ying] persons by a single trait

13  and then den[ying] them protection across the board," constituting "a denial of equal protection of

14  the laws in the most literal sense." *Romer v. Evans*, 517 U.S. 620, 633-34 (1996). There is no basis

15  for this animus-laden motivation. The honorable and distinguished service records of Active-Duty

16  Plaintiffs prove how meritless the offensive assertions in the Ban are—assertions also contradicted

17  by the implementing guidance's directive that transgender servicemembers' separations be deemed

18  "honorable." Dkt. 58-7, §1(e). Because the Ban reflects animus on its face and seeks to "deem a

19  class of persons a stranger to [our] laws," it is unconstitutional. *Romer*, 517 U.S. at 635.

20          **2.  The Ban Purposefully Discriminates Based on Transgender Status.**

21          The Ban and its guidance also "distinguish[] on the basis of transgender status, a quasi-

22  suspect classification, and [are] therefore subject to intermediate scrutiny." *Karnoski v. Trump*,

23  2017 WL 6311305, at *7 (W.D. Wash. Dec. 11, 2017). Defendants ask the Court to ignore the

24  controlling law of this Circuit, arguing the Ban turns on gender dysphoria rather than transgender

25  status. Dkt. 76 at 15. But the Ninth Circuit already rejected this argument. *Karnoski*, 926 F.3d at

26  1201. In *Karnoski*, the court considered a 2018 ban that was far less sweeping than the instant Ban

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    and contained none of the categorical disparaging language about the character of transgender

2    servicemembers present here. *Id.* Unlike this Ban, the 2018 ban also contained meaningful

3    exemptions for certain transgender servicemembers. Nevertheless, the *Karnoski* court held that the

4    2018 ban classified "based on transgender status," and was therefore subject to heightened

5    scrutiny. *Id.* Since then, the Ninth Circuit has repeatedly affirmed that classifications based on

6    transgender status warrant heightened scrutiny. *See, e.g.*, *Doe v. Horne*, 115 F.4th 1083, 1102 (9th

7    Cir. 2024); *Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024), as amended (June 14, 2024); *see*

8    *also* Dkt. 23 at 21-23.[3]

9           Defendants ignore these controlling precedents to argue the Ban does not classify based on

10    transgender status because the "standards do not exclude all trans-identifying individuals." Dkt.

11    76 at 15. In other words, Defendants claim that the Ban applies only to persons with a medical

12    history of gender dysphoria, not necessarily all trans-identifying people. This argument lacks merit

13    for three reasons.

14           First, it is factually wrong and foreclosed by precedent. The Department of Defense

15    ("DoD") proclaimed in no uncertain terms that "*[t]ransgender troops* are disqualified from

16    service" simply because they are transgender. Dkt. 61-2 (emphasis added); *see also Talbott* Op. at

---

17           [3] Defendants contend transgender people do not meet the factors for being a quasi-suspect

18    class. Dkt. 76 at 16-17. But they do. Dkt. 23 at 22-23 (collecting cases); *see also Talbott* Op. at

19    51-57. Regardless, not all considerations are necessary. The first two alone (the group has been

      historically "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987), and has a

      defining characteristic bearing no "relation to ability to perform or contribute to society,"

20    *Cleburne*, 473 U.S. at 440-41) may be dispositive. *See Plyler v. Doe*, 457 U.S. 202, 216 & n.14

      (1982). Besides, Defendants' immutability argument misses the mark. "No 'obvious badge' is

21    necessary." *Windsor v. United States*, 699 F.3d 169, 183 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013)

      (quoting *Mathews v. Lucas*, 427 U.S. 495, 506 (1976)). "[T]he test is broader," *id.*, as it includes

22    whether individuals exhibit "distinguishing characteristics that define them as a discrete group."

      *Bowen*, 483 U.S. at 602. Further, "transgender people are unarguably a politically vulnerable

23    minority." *F.V. v. Barron*, 286 F.Supp.3d 1131, 1145 (D. Idaho 2018) (subsequent history

      omitted). One need only look at the administration's actions the past two months. Reminiscent of

24    book burnings from bygone eras, the administration has sought to erase any recognition of

      transgender people from and by any part of the federal government. Dkt. 31-13, §3(e); *see also*

25    Dkts. 31-21, 31-22, 31-23. It has also eliminated protections for transgender people and adopted

      discriminatory policies affecting their ability to participate in society in all aspects of life, from

26    health care and education to housing and employment. *See, e.g.*, Dkt. 31-13; **Exhibits 27, 28, 29,**

      **30, 31**. This context further illustrates the animus motivating the Ban.

---

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

20-21. And in *Karnoski*, the Ninth Circuit noted that references to "transgender persons" demonstrated that "the 2018 Policy on its face treats transgender persons differently than other persons." 926 F.3d at 1201. Moreover, the Ban forbids military service by people who have "a gender identity inconsistent with an individual's [birth] sex." Military Ban §1. *That, of course, is the very definition of being transgender.* Dkt. 37, ¶25; Dkt. 71-3 at 18. Moreover, the Ban is not limited to a gender dysphoria diagnosis or a history of such; the Ban prohibits any person who has shown *symptoms* of gender dysphoria or has ever *attempted to transition* from military service and requires people to live consistent with their birth sex in every aspect of their lives. Dkts. 58-7, 64-1. However, even "[t]he mere acknowledgment of being transgender inherently reveals a disconnect between one's gender identity and assigned birth sex, which would be considered a 'symptom' of gender dysphoria and implies the potential for transition." Ettner Suppl. Decl. ¶10. This is a distinction without a difference. *Id.*; *see also id.* ¶¶13-14; Wagner Suppl. Decl. ¶¶17-18; Skelly Suppl. Decl. ¶10.

Second, that the Ban's implementing guidance targets those who experience gender dysphoria illustrates the purposeful and facial discrimination based on transgender status and, consequently, sex. By targeting gender dysphoria, the Ban and the guidance simply target "transgender identity by proxy." *Kadel v. Folwell*, 100 F.4th 122, 149 (4th Cir. 2024) (en banc). That is because "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it." *Id.* at 146; *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022) (Bryan, J.) ("A person cannot suffer from gender dysphoria without identifying as transgender.") (cleaned up). This is simply one of those circumstances in which a "proxy's fit is sufficiently close to make a discriminatory inference plausible." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020) (quotation omitted).

Third, the Ban and the guidance's definition of sex also demonstrates the purposeful discriminatory nature of the Ban towards transgender people. The Ban and the guidance adopt the

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  Gender Order's exclusionary definitions, which were "carefully drawn to target transgender

2  [servicemembers]" for exclusion. *Hecox*, 104 F.4th at 1078. This is so even though the definition

3  of sex "is likely an oversimplification of the complicated biological reality of sex and gender." *Id.*

4  at 1076.[4]

5  Finally, even assuming *arguendo* that the Ban targeted most, but not all, transgender

6  individuals, that would not save it. "A law is not immune to an equal protection challenge if it

7  discriminates only against some members of a protected class but not others." *Hecox*, 104 F.4th at

8  1079; *see also Rice v. Cayetano*, 528 U.S. 495, 516-17 (2000); *Nyquist v. Mauclet*, 432 U.S. 1, 7-

9  9 (1977); *Kadel*, 100 F.4th at 144.

10  ### 3. The Ban Purposely Discriminates Based on Sex.

11  Defendants argue that the Ban "does not distinguish based on sex" because "it regulates all

12  servicemembers, 'regardless of sex.'" Dkt. 76 at 17. But the Supreme Court already rejected this

13  "equal application" argument in the context of sex classifications. *See J.E.B. v. Alabama ex rel.*

14  *T.B.*, 511 U.S. 127, 142 n.13 (1994); *id.* at 159-60 (Scalia, J., dissenting).

15  Defendants also assert that *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020), is

16  inapposite. Dkt. 76 at 17-19. This contention defies the Ninth Circuit's holding, citing *Bostock*,

17  that "discrimination on the basis of transgender status is a form of sex-based discrimination."

18  *Hecox*, 104 F.4th at 1079.

19  Regardless, the Ban and the guidance indisputably turn on sex. They are premised on the

20  notion that adopting "a gender identity inconsistent with *an individual's [birth] sex* conflicts with

21  a soldier's commitment to an honorable, truthful, and disciplined lifestyle." Military Ban §1

22  (emphasis added). The Ban prohibits military service by anyone who "express[es] a false 'gender

---

23  [4] Even if *Karnoski* were not controlling, and even without "suspect" or "quasi-suspect"

24  classifications, which are present here, the Supreme Court has struck down laws "when there are historic patterns of disadvantage suffered by the group adversely affected by the statute." *Windsor*,

25  699 F.3d at 180; *see also Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 10 (1st Cir. 2012) (citing *USDA v. Moreno*, 413 U.S. 528 (1973); *Cleburne*, 473 U.S. 432; *Romer*,

26  517 U.S. 620). These decisions demand that "review … be more demanding" in such circumstances. *Windsor*, 699 F.3d at 180; *see also Massachusetts*, 682 F.3d at 10.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  identity' divergent from an *individual's [birth] sex*" and "use of pronouns that inaccurately reflect

2  an *individual's [birth] sex*." Military Ban §§1, 2 (emphasis added). The guidance also requires that

3  servicemembers "be willing and able to … [meet] the standards associated with *his or her [birth]*

4  *sex*" and that they "ha[ve] never attempted to transition to *any sex other than his or her [birth]*

5  *sex*." Dkt. 64-1, at 1-2 (emphasis added).

### 4.  Defendants Cannot Justify the Ban.

7  Defendants primarily seek to justify the Ban based on the 2018 Mattis Report, which was

8  based on speculative and hypothetical concerns as opposed to concrete data and the actual

9  experience of actively serving transgender servicemembers.[5] In doing so, Defendants ignore or

10  misleadingly represent the real-life experience of actively serving transgender servicemembers, as

11  exemplified by Plaintiffs and the experience of so many others during the approximate decade in

12  which transgender servicemembers have served under the Carter Policy, the Mattis Policy (if

13  grandfathered), and the Austin Policy. "[H]ad Defendants conferred with transgender

14  servicemembers and those who serve with them, instead of making specious generalizations, they

15  might have learned that the Military Ban is little more than a solution in search of a problem."

16  *Talbott* Op. at 62.

17  In seeking to justify the Ban, Defendants cite purported concerns about military readiness,

18  unit cohesion, and costs. None of these are availing, as even a cursory review reveals. *See Talbott*

19  Op. at 57-64.

### a)  Military Readiness.

21  With no sense of irony, Defendants argue that they are concerned about the wellbeing of

22  transgender people: "DoD is concerned about subjecting those with a history of gender dysphoria

23  to the unique stresses of military life." Dkt. 76 at 20. But Active-Duty Plaintiffs are acutely aware

24  of the "unique stresses of military life"—each has experienced it for at least a decade.

25

26  _____

[5] The 2018 Mattis Report's misconceptions and faulty analysis were thoroughly explored and refuted in a report authored by former military surgeons general. *See* **Exhibit 32**.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    Cumulatively, they have nearly 100 years of boots-on-the-ground military service. Their military

2    experience is neither speculative nor hypothetical; it is a record of distinguished and honorable

3    service. Each is highly decorated, and several have served in combat and been successfully

4    deployed to austere deployments. *See* Dkts. 24 ¶¶4, 6-7, 14; 25 ¶¶4-6, 11; 26 ¶¶5, 7, 17; 27 ¶¶3, 5-

5    6, 12; 28 ¶¶5, 7-9; 39 ¶¶5, 7-8, 17; Moran Decl. ¶11; *see also* **Exhibit 33**.

6        Defendants have access to nearly ten years of data related to active-duty transgender

7    military service. "That Defendants did not review the impact of their service does not mean it does

8    not exist." *Talbott* Op. at 58. But rather than undergo a thoughtful and scrupulous assessment of

9    these data, Defendants instead rushed forward with a Ban, dusted off the 2018 Mattis Report, and

10   tacked on a couple misleading cites to reports in trying to justify their view that transgender people

11   are unfit to serve in the military. Such a "rushed and haphazard" implementation is highly unusual

12   in the development of military policy. Wagner Suppl. Decl. ¶¶25-26; Skelly Suppl. Decl. ¶20; *see*

13   *also Talbott* Op. at 22-23.

14       **Mental health disparities:** The military has universal medical standards that all

15   servicemembers—including transgender troops—are required to meet for accession or retention.

16   Dkt. 31-12 (DoDI 6130.03, Vol.1), §1.2(d); Dkt. 73-5 (DoDI 6130.03, Vol.2), §1.2(a). Rather than

17   rely on and apply those neutral standards to transgender servicemembers who are otherwise

18   qualified and have otherwise been assessed for mental health concerns, Defendants seek to

19   categorically bar all transgender people from serving based on misleadingly cited statistics about

20   mental health co-morbidities, including suicidality in the transgender population.

21       But "peer-reviewed research consistently demonstrates that disparities in mental health

22   outcomes among transgender individuals are primarily driven by external sociocultural and

23   institutional factors rather than inherent psychological conditions." Ettner Suppl. Decl. ¶21. In fact,

24   the Literature Review cited by Defendants, which "did not survey studies on transgender persons

25   in military service," *Talbott* Op. at 27, expressly states that these mental health disparities are

26   "largely driven by minority stress, discrimination, social rejection, lack of access to gender-

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   affirming care, and increased exposure to violence and victimization." Dkt. 71-4 at 2. Contrary to

2   Defendants' misleading portrayal, the Literature Review concludes that "[r]esearch demonstrates

3   that suicide risk among transgender … individuals is *mitigated by access to gender-affirming care*,

4   strong social and family support, *legal and social recognition*, affirming mental health services,

5   community connectedness, and *protections against discrimination*." *Id.* (emphasis added).

6       Defendants cite the 2018 Mattis Report to repeat the falsehood that transgender

7   servicemembers are eight times more likely to *attempt* suicide. Dkt. 76 at 21. But not only does

8   the military already restrict individuals who are suicidal from enlisting, Dkt. 31-12 §6.28(m), a

9   cursory review of the data shows the summary of results addresses suicidal *ideation*, not suicidal

10  *attempts*. Dkt. 73-2 at 9. In addition, the higher rates of suicidal ideation are not "necessarily

11  attributable to a higher presence of mental health co-morbidities in the transgender population, but

12  rather to the higher frequency of interactions with mental health and medical providers." Ettner

13  Suppl. Decl. ¶18; *see also id.* ¶19. Moreover, none of the reports relied on by Defendants look at

14  what differences there are, if any, between transgender servicemembers diagnosed with gender

15  dysphoria and cisgender servicemembers with other conditions in this regard.

16      Defendants likewise misleadingly use mental health encounter data from the 2018 Mattis

17  Report to improperly infer that transgender servicemembers are mentally unfit to serve. Dkt. 76 at

18  21. Defendants omit that transgender servicemembers are *required* to make frequent mental health

19  appointments regardless of their actual need or stability. In fact, "[a] substantial portion of mental

20  health interactions among transgender individuals is attributable to institutional and regulatory

21  requirements," which "significantly increase recorded mental health visits, thereby creating a

22  misrepresentation of mental health co-morbidities within the transgender population." Ettner

23  Suppl. Decl. ¶17. The transition process *requires* these visits in accordance with a treatment plan.

24  Dkt. 33-4, §§3.2(a)(3), 3.2(b); **Exhibit 32**, at 24. In other words, Defendants grossly mispresent

25  the data and seek to penalize transgender servicemembers for following their individual transition

26  plans, as required, to successfully change their gender in the DEERS system.

PLS.' REPLY IN SUPP. OF MOT.
FOR PRELIM. INJ. - 10
(CASE NO. 2:25-CV-241 BHS)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    Defendants' reliance on the AMSARA Report is also misplaced. Defendants misleadingly

2    cite this report to argue that transgender servicemembers experience higher rates of disability

3    evaluations than other servicemembers. Dkt. 76 at 31; *but see Talbott* Op. at 25-27, 58-59. But the

4    AMSARA Report says no such thing. Defendants limit the AMSARA Report's conclusion that

5    transgender servicemembers "appear similar to the full military applicant pool," that rates of

6    adverse attrition are the same, and that transgender servicemembers "remain in service for longer

7    durations than individuals with other medical conditions, including common psychiatric

8    diagnoses." Ettner Suppl. Decl. ¶37; Dkt. 71-3 at 24.

9    Defendants misleadingly rely on the Literature Review's observation that the strength of

10    the evidence pertaining to gender-affirming care tends to be low to moderate. Dkt. 76 at 22. What

11    Defendants fail to clarify is that such terms are medical terms of art and that "[m]any widely

12    accepted and routinely performed medical interventions do not meet the threshold for 'high-

13    quality' evidence." Ettner Suppl. Decl. ¶26. Indeed, the evidence base for gender-affirming care

14    is "as robust as many other common medical interventions." *Id.*

15    **Deployability:** Defendants ignore that transgender servicemembers, including Plaintiffs,

16    have deployed around the world, including to combat zones and austere environments. Defendants

17    cite the AMSARA Report to argue that "nearly 40%" were non-deployable over a 24-month

18    period. Dkt. 76 at 21. But the AMSARA Report only "estimate[d] that *fewer than* 40% of the

19    transgender service members … would have been deemed non-deployable due to mental health

20    reasons *at some time* during the 24 months following initial diagnosis." Dkt. 71-3 at 15 (emphasis

21    added). Defendants do not identify how this number compares to non-transgender servicemembers

22    with other conditions or generally among servicemembers, nor how long a servicemember was

23    nondeployable. Ettner Suppl. Decl. ¶¶33-39. Indeed, the AMSARA Report notably "does not

24    include a valid comparison to non-transgender service members, making it impossible to assess

25    whether transgender personnel experience disproportionately higher rates of non-deployability or

26    attrition." *Id.* ¶35. Indeed, it expressly acknowledges this limitation. Dkt. 71-3 at 11-12.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    The AMSARA Report did, however, compare retention and deployability for transgender

2    servicemembers to non-transgender servicemembers diagnosed with depression, and it found that

3    "the transgender cohort stayed in service longer, on average, than did the depression cohort" and

4    "also had a greater proportion of members available for deployment than the depression

5    cohort." Ettner Suppl. Decl. ¶36.; Dkt. 71-3 at 12. In other words, "members of the transgender

6    cohort are more deployable than members of the matched cohort of service members with

7    depressive disorders." *Id.* Yet Defendants do not categorically bar servicemembers "who have a

8    current diagnosis or history of, or exhibit symptoms consistent with," depression. *See* Wagner

9    Suppl. Decl. ¶8; *see also* Dkt. 73-5, §5.28.

10    **b)  Unit Cohesion.**

11    Defendants also dust off the 2018 Mattis Report to argue that allowing military service by

12    transgender persons disrupts unit cohesion. Dkt. 76 at 23-25. But the argument fails. *See Talbott*

13    Op. at 60-62. Defendants identify no unit cohesion issues except a hypothetical concern that

14    "absent the creation of separate facilities," transgender servicemembers would undermine

15    expectations of privacy. Dkt. 76 at 23-24. Plaintiffs do not seek separate facilities, and hypothetical

16    disruptions to unit cohesion are insufficient to justify Defendants' policy under heightened

17    scrutiny. *See United States v. Virginia*, 518 U.S. 515, 533 (1996). Furthermore, multiple courts,

18    including the Ninth Circuit, have held that allowing transgender people to live in accordance with

19    their gender identity does not harm the privacy or safety of others. *See, e.g.*, *Parents for Priv. v.*

20    *Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d

21    518, 531 (3d Cir. 2018).

22    Defendants summarily dismiss the sworn declarations from former military officials who

23    testify that there have been no issues with unit cohesion, specifically challenging the knowledge

24    basis of former Under Secretary Gil Cisneros. Dkt. 76 at 25; *but see* Dkt. 36, ¶19. But it is

25    inconceivable that none of these officials would have become aware of these issues, which

26    Defendants purportedly consider serious, if they existed. Regardless, Defendants offer no

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  contradictory testimony, nor challenge the knowledge basis for the declarations of the other former

2  military officials. *See* Dkt. 32, ¶28; Dkt. 33, ¶35; Dkt. 34, ¶15; Dkt. 35, ¶¶17-18; Dkt. 38, ¶15;

3  *Talbott* Op. at 36 ("Defendants … have proffered no evidence to contradict these assertions.").

4       It is not just officials under the Austin policy who have reported no issues with unit

5  cohesion, however. The Chairman of the Joint Chiefs in 2018 testified, "the issue with transgender

6  [service] has never been about cohesion or discipline anyway," and as long as troops are able to

7  meet the generally applicable standards, he did not "expect to see discipline or issues of unit

8  cohesion." Dkt. 76-4 at 58:20-59:2. Indeed, all four service chiefs testified in 2018 that they had

9  not seen threats to unit cohesion. *See* **Exhibit 34**.

10      In truth, unit cohesion is gravely harmed by the Ban, which disrupts chains of command

11 and career progression and threatens the loss of distinguished servicemembers. Skelly Suppl. Decl.

12 ¶¶7-8.

13                              **c)   Cost.**

14      Defendants seek to justify the Ban with cost data showing that DoD spent over $52 million

15 providing care for transgender servicemembers from 2015-2024. However, as Defendants

16 recognize, this "is but a small fraction of DoD's overall budget" and "is likewise a small fraction

17 of DoD's total medical budget." Dkt. 73-3 at 2. And while Defendants do not identify how much

18 the military spends overall on psychotherapy, hormone therapy, and surgical care generally or in

19 comparison to similar conditions, in 2023, the military spent nearly eight times as much on Viagra

20 ($41 million) as it does on transgender health care in a given year ($5.2 million). Wagner Suppl.

21 Decl. ¶24. Also, the cost comparison in the 2018 Mattis Report ignores that the spike in cost was

22 attributable to the availability of treatment that had been previously denied to transgender

23 servicemembers. Dkt. 73-2 at 31-32; *see also Talbott* Op. at 62-63.

24      Finally, Defendants' argument is largely beside the point, as "the Supreme Court has

25 rejected the argument that cost-cutting is a sufficient reason" for denying equal protection of the

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    law. *Latta v. Otter*, 19 F.Supp.3d 1054, 1083 (D. Idaho), *aff'd*, 771 F.3d 456 (9th Cir. 2014); *see*

2    *also Graham v. Richardson*, 403 U.S. 365, 375 (1971); *Windsor*, 699 F.3d at 186-87.

3    **C.  The Ban Violates Plaintiffs' First Amendment Rights.**

4    The Ban's various attacks on transgender people are an ideology. The notion that "a gender

5    identity inconsistent with an individual's sex conflicts with a soldier's commitment to an

6    honorable, truthful, and disciplined lifestyle, even in one's personal life," Military Ban §1; the

7    guidance's declaration that transgender people do not embody the values of "honesty," "humility,"

8    and "integrity," Dkt. 58-7 §1(b); and the Gender Order's proclamation that "gender ideology" is

9    the "false claim that males can identify as and thus become women and vice versa" and that

10   "gender identity "does not provide a meaningful basis for identification and cannot be recognized

11   as a replacement for sex," Dkt. 31-13, §§2(f), (g), all represent a system of ideas—a viewpoint.

12   By imposing these viewpoints and ideology and demanding adherence to them (even in

13   private), the Ban and its guidance chill the speech of transgender servicemembers who will not

14   risk their career and reputation to be candid about who they are. "[A]cknowledgement and

15   disclosure of one's identity, which is a definitional aspect of being transgender, is a critical step in

16   any person's gender transition[.]" Ettner Suppl. Decl. ¶13.

17   Defendants trivialize Plaintiffs' First Amendment claim by focusing myopically on

18   pronoun usage, and they characterize transgender servicemembers as seeking autonomy that is not

19   available in the military context. Not so. Plaintiffs simply seek the ability to express their gender

20   just as any other servicemember. This is not akin to an individual seeking some anomalous

21   expression that deviates from generally applicable neutral regulations that prohibit such

22   expression; rather, the Ban prohibits transgender servicemembers, and only them, from expressing

23   their gender identity and expressing themselves consistent with it, even in private. *See* Military

24   Ban §1; Dkt. 58-7 §§1(c), (h). Thus, in addition to discriminating against protected speech based

25   on viewpoint, the government also creates speaker-based discrimination for the sole purpose of

26   exercising a content preference. *Turner Broad. Sys., Inc. v. FCC*, 512 U. S. 622, 658 (1994)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  (explaining that strict scrutiny applies to regulations reflecting "aversion" to what "disfavored

2  speakers" have to say). Transgender servicemembers rightfully fear they will no longer be able to

3  honestly disclose their transgender status and face a "realistic danger of sustaining a direct injury

4  as a result of the [Ban's] operation and enforcement," *Lopez v. Candaele*, 630 F.3d 775, 785 (9th

5  Cir. 2010).

6  **D.  Active-Duty Plaintiffs Have Established a Due Process Violation.**

7  Active-Duty Plaintiffs had a reasonable expectation, giving rise to a property interest, that

8  their military-approved transition plans would not result in their separation.[6] *See Baker v. City of*

9  *SeaTac*, 994 F.Supp.2d 1148, 1154 (W.D. Wash. 2014) (reasonable expectation giving rise to

10  protectible interest in employment may be based on "mutually explicit understandings"). 

11  Defendants, who rely heavily on the 2018 Mattis Report, can hardly argue otherwise. That report,

12  in exempting current servicemembers from its exclusionary policy, found: "*The reasonable*

13  *expectation of these Service members that the Department would honor their service on the terms*

14  *that then existed cannot be dismissed.*" Dkt. 31-10 at 48 (emphasis added).

15  Defendants' cited authority acknowledges that, even absent a freestanding property

16  interest, Active-Duty Plaintiffs have a claim under the "stigma plus" test where they are

17  "stigmatized in connection with the denial of a more tangible interest." *Fikre v. Fed. Bureau of*

18  *Investigation*, 35 F.4th 762, 776 (9th Cir. 2022) (quotation omitted), *aff'd*, 601 U.S. 234 (2024);

19  *Smith v. Harvey*, 541 F.Supp.2d 8, 16 (D.D.C. 2008). In *Smith*, the court observed that, even absent

20  a general right to be enlisted or reenlisted in the military, the Due Process Clause is implicated

21  where the government "impugns" a person's reputation, honor, or integrity by "excluding" her

22  from a "range of employment opportunities with the government." 541 F.Supp.2d at 16.

23  Defendants wrongly argue that Active-Duty Plaintiffs cannot establish a "stigma plus"

24  claim if their discharge records do not reiterate the stigmatizing basis for their discharge. There is

---

25

26  [6] *Christofferson v. Washington State Air National Guard*, 855 F.2d 1437, 1443 (9th Cir. 1988), which involved reservists who were reviewed annually for retention, did not involve separation for previously approved acts and did not discuss stigma plus claims.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  no basis to find that the Ban and its guidance are not public "stigmatizing statement[s] by the
2  government" connected to Plaintiffs' separations, which is all that is required. *Ulrich v. City &*
3  *County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002); *see Smith*, 541 F.Supp.2d at 16. The
4  fact that Plaintiffs were categorically stigmatized early in the process—rather than after an
5  individual investigation—makes Defendants' position weaker, not stronger.

6  Nor can Defendants cure this constitutional violation by offering sham proceedings to
7  Active-Duty Plaintiffs. Dkt. 76 at 30-31; *see also* **Exhibit 35**, ¶¶9, 15. Active-Duty Plaintiffs do
8  not challenge the procedures that will be used to determine whether, for example, a particular
9  individual has a history of gender dysphoria. Each Active-Duty Plaintiff has transitioned to a sex
10  other than their birth sex (*see* Dkt. 24, ¶10; Dkt. 25, ¶9; Dkt. 26, ¶10; Dkt. 27, ¶8; Dkt. 28, ¶11;
11  Dkt. 30, ¶3; Dkt. 39, ¶13; Dkt. 62, ¶14; Moran Decl. ¶13). Based on the guidance, that fact alone
12  makes them ineligible for a waiver, regardless of service, deployability, medical needs, or any
13  other factor. Dkts. 64-1; 58-7, §4.3(c)(2). As a result, no other fact remains to be determined by
14  any administrative body. As such, Plaintiffs challenge the basis of Defendants' pre-ordained
15  disqualification as unconstitutional—a legal issue ripe for review and not curable by meaningless
16  process. *See Downen*, 481 F.2d at 643 (claim founded on constitutional right is "singularly suited"
17  to judicial forum and inappropriate to military board).

18  **E. Defendants Should be Estopped from Retroactively Discharging Active-Duty**
19  **Plaintiffs.**

20  Defendants ask the Court to disregard that the Ninth Circuit has established a specific test
21  for applying estoppel against the government, which protects against its application to mere policy
22  changes.[7] *See Watkins v. U.S. Army*, 875 F.2d 699, 706-07 (9th Cir. 1989). By seeking an

23

24  [7] Defendants' out-of-circuit cases do not meaningfully discuss the issue of policy
   discretion. *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) states the general principle
25  that government should not be "unduly hindered" in changing policy, but it does not analyze an
   equitable estoppel claim. In *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1416 (10th
26  Cir. 1984), the court merely found it was not reasonable to rely on government conduct that was
   contrary to law.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

exemption even from this more stringent test, Defendants seek an exemption from even the minimum standards of decency and fair play that apply in the military context. *Id.* This is especially true here, where Defendants seek to purge the same servicemembers it previously found had reasonably relied on terms of service that allowed them to take irreversible steps to transition. Dkt. 31-10 at 48.

Defendants' reliance on *Doe 1 v. Trump*, 275 F.Supp.3d 167 (D.D.C. 2017), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019), is misplaced. There, the court found the broad 2016 Carter Policy itself did not constitute a "definite representation to any of the individual Plaintiffs." *Id.* at 206. The court distinguished *Watkins*, which had involved "representations … directed at the plaintiff." *Id.* Here, Active-Duty Plaintiffs have each cited direct action by Defendants to approve their personal transition plans, upon which they detrimentally relied in taking steps now being used as a retroactive basis for separation. Dkt. 23 at 34 (collecting record cites). For example, Commander Shilling postponed coming out in the workplace until the DoD provided "transition procedures that would allow [her] to continue serving indefinitely." Dkt. 24, ¶10. That assurance allowed her to feel "confident that [she] could continue [her] career to at least 20 years, and beyond" without fear of reprisal. *Id.*

Active-Duty Plaintiffs have satisfied the traditional elements of estoppel: They reasonably relied upon individual approval of their transition plans, as Defendants have admitted. Dkt. 31-10 at 48. The previous policy changes cited by Defendants do not change the reasonableness of their reliance, as each of those iterations (until 2025) allowed transgender servicemembers who had previously transitioned to remain in service. Take, for example, Plaintiffs Dremann and Schmid, who transitioned in the military in 2015 and 2016, respectively, and have been serving continually since that time. Dkt. 25, ¶8; Dkt. 39, ¶13.

Defendants' attempt to insert a more stringent misconduct requirement also fails. In *Watkins*, the Ninth Circuit clarified that there is no single test for the "affirmative misconduct" element, which can be satisfied by a misrepresentation of material facts, and that the government

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1  need not have intended to mislead. 875 F.2d at 707. Here, it is a material representation for a

2  commanding officer to formally approve an individual plan of action that is then retroactively used

3  to mandate a servicemember's discharge.

4  ### F. Plaintiffs Are Suffering Irreparable Harms.

5  Defendants fundamentally fail to appreciate the enormity of irreparable harm that the Ban

6  will inflict on Plaintiffs if preliminary relief is not granted. Dkt. 23, at 35-36. Notably, Defendants

7  fail to even address the fact that constitutional violations result in immediate irreparable injury *as

8  a matter of law* and instead assert two woefully deficient arguments.

9  First, Defendants seek to reduce Plaintiffs' harms to the loss of employment and other

10  collateral consequences common to most terminated employees. But Plaintiffs' harms are

11  different: The Ban severely disrupts the chain of command and erodes unit cohesion and trust.

12  Skelly Suppl. Decl. ¶5. The Ban also cuts off access to necessary health care for transgender

13  servicemembers, which itself constitutes irreparable harm. *Id.* ¶¶10-11; *see also PFLAG, Inc. v.*

14  *Trump*, 2025 WL 685124, at *28 (D. Md. Mar. 4, 2025); *Washington v. Trump*, 2025 WL 659057,

15  at *26 (W.D. Wash. Feb. 28, 2025). And in Plaintiff Medina's case, the loss of the "opportunity to

16  pursue" his chosen profession in the military also "constitutes irreparable harm." *See Ariz. Dream*

17  *Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (limiting of professional opportunities

18  and loss of opportunity to pursue chosen professions constituted irreparable harm).

19  Second, Defendants claim any injuries can be remedied through back pay, time in service

20  credit, and review by the administrative separation board. "Back pay and other monetary damages

21  proposed by Defendants will not remedy the stigmatic injury caused by the policy, reverse the

22  disruption of trust between service members, nor cure the medical harms caused by the denial of

23  timely health care." *Karnoski*, 2017 WL 6311305, at *9. As noted, Plaintiffs' injuries go well

24  beyond economic injuries to constitutional deprivations that may forever constrain Plaintiffs'

25  professional careers. The idea that monetary relief can repair a military career built on the

26  intangible qualities of patriotism, loyalty, and trust is severely misplaced. As for the administrative

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    separation board, as explained, this "remediation" pathway is futile, making Plaintiffs' injuries

2    irreparable. *See supra* Section II.D.

3        Absent an injunction, Plaintiffs will be irreparably harmed. Plaintiffs have already

4    explained why all the remaining equitable factors favor injunctive relief. Dkt. 23 at 37-38.

5    **III.    CONCLUSION**

6        For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary

7    injunction.

8        Pursuant to Local Rules W.D. Wash. LCR 7(e)(6), I certify that this memorandum

9    contains 6,487 words, in compliance with the word limit set forth in the Court's order.

10       Dated this 19th day of March 2025.

11

12                 Respectfully submitted,

13                 By:   <u>s/ *Matthew P. Gordon*</u>
                         Matthew P. Gordon, WSBA No. 41128
                         MGordon@perkinscoie.com

14

15                 By:   <u>*s/Abdul Kallon*</u>
                         Abdul Kallon, WSBA No. 60719
                         AKallon@perkinscoie.com

16

17                 **Perkins Coie LLP**

18                 1201 Third Avenue, Suite 4900
                   Seattle, Washington 98101-3099

19                 Telephone: 206.359.8000
                   Facsimile: 206.359.9000

20

21                 Danielle Sivalingam (*pro hac vice*)
                   Perkins Coie LLP

22                 505 Howard Street, Suite 1000
                    San Francisco, CA 94105-3204

23                 Telephone: 415.344.7000
                   Facsimile: 415.344.7050

24                 Email: DSivalingam@perkinscoie.com

25                 Mary Grace Thurmon (*pro hac vice*)
                    Bo Yan Moran (*pro hac vice*)

26                 Perkins Coie LLP

1  3150 Porter Drive
   Palo Alto, CA 94304-1212
2  Telephone: 650.838.4300
   Facsimile: 650.838.4350
3  Email: MThurmon@perkinscoie.com
4  Email: BMoran@perkinscoie.com

5  Gabriella Romanos Abihabib (*pro hac vice*)
   Perkins Coie LLP
6  1155 Avenue of the Americas, 22nd Floor
   New York, NY 10036-2711
7  Telephone: 212.262.6900
   Facsimile: 212.977.1649
8  Email: GRomanos@perkinscoie.com

9
   *Attorneys for Plaintiffs*
10

11 Sasha Buchert (*pro hac vice*)
   Lambda Legal Defense and Education Fund, Inc.
12 815 16th St. NW, Suite 4140
   Washington, DC 20006
13 Telephone: 202.804.6245
   Facsimile: 855.535.2236
14 Email: SBuchert@lambdalegal.org

15
   Jennifer C. Pizer (*pro hac vice*)
16 Lambda Legal Defense and Education Fund, Inc.
   800 South Figueroa Street, Suite 1260
17 Los Angeles, CA 90017
   Telephone: 213.382.7600
18 Facsimile: 855.535.2236
   Email: JPizer@lambdalegal.org
19

20 Camilla B. Taylor (*pro hac vice*)
   Kenneth Dale Upton, Jr. (*pro hac vice*)
21 Lambda Legal Defense and Education Fund, Inc.
   3656 N Halsted St.
22 Chicago, IL 60613
   Telephone: 312.663.4413
23 Facsimile: 855.535.2236
   Email: CTaylor@lambdalegal.org
24 Email: KUpton@lambdalegal.org
25

26 Omar Gonzalez-Pagan (*pro hac vice*)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212.809.8585
Facsimile: 855.535.2236
Email: OGonzalez-Pagan@lambdalegal.org

Kell Olson (*pro hac vice*)
Lambda Legal Defense and Education Fund, Inc.
3849 E Broadway Blvd, #136
Tucson, AZ 85716
Telephone: 323.370.6915
Facsimile: 855.535.2236
Email: KOlson@lambdalegal.org

*Attorneys for Plaintiffs*


Sarah Warbelow (*pro hac vice*)
Cynthia Cheng-Wun Weaver (*pro hac vice*)
Ami Rakesh Patel (*pro hac vice*)
Human Rights Campaign Foundation
1640 Rhode Island Ave. N.W.
Washington, DC 20036
Telephone: 202.527.3669
Facsimile: 202.347.5323
Email: Sarah.Warbelow@hrc.org
Email: Cynthia.Weaver@hrc.org
Email: Ami.Patel@hrc.org

*Attorneys for Plaintiffs*

PLS.' REPLY IN SUPP. OF MOT.
FOR PRELIM. INJ. - 21
(CASE NO. 2:25-CV-241 BHS)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762