# EXHIBIT 36

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, et al,<br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>UNITED STATES, et al,<br>　　　　*Defendants*. | Civil Action No. 25-cv-00240 (ACR) |

## <u>MEMORANDUM OPINION</u>

In Executive Order No. 14183, President Donald J. Trump focuses on "Prioritizing Military Excellence and Readiness." 90 Fed. Reg. 8757 (Jan. 27, 2025). The military's "clear mission" is to "protect the American people and our homeland as the world's most lethal and effective fighting force." *Id.* § 1. Service by transgender persons[1] is "inconsistent" with this mission because they lack the "requisite warrior ethos" to achieve "military excellence." *Id.* §§ 1, 2. On February 26, 2025, Secretary of Defense Peter B. Hegseth issued a policy to implement EO14183's directives. Dkt. 63-1 (Hegseth Policy). It disqualifies "[t]ransgender troops . . . from service without an exemption."[2]

The President has the power—indeed the obligation—to ensure military readiness. At times, however, leaders have used concern for military readiness to deny marginalized persons

---

[1] EO14183 does not employ the word "transgender." But Defendants concede the term it does use—those with a gender identity that diverges from their biological sex—refers to transgender persons. *See* Docket (Dkt.) 58, Transcript to Court Hearing (Tr.) (Feb. 18, 2025) at 44.

[2] The Hegseth Policy also studiously does not employ the word "transgender," but as issued it bans transgender persons. Both the Department of Defense and Secretary Hegseth announced this inescapable fact via social media. @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025) (repost).

the privilege of serving.  "[Fill in the blank] is not fully capable and will hinder combat effectiveness; [fill in the blank] will disrupt unit cohesion and so diminish military effectiveness; allowing [fill in the blank] to serve will undermine training, make it impossible to recruit successfully, and disrupt military order."[3]  First minorities, then women in combat, then gays filled in that blank.  Today, however, our military is stronger and our Nation is safer for the millions of such blanks (and all other persons) who serve.[4]

Currently before the Court is Plaintiffs' Renewed Application for Preliminary Injunction. Dkt. 72 (App.).  Plaintiffs, who are transgender, claim that EO14183 and the Hegseth Policy (together, the Military Ban) treats them as today's "fill in the blank" group.  Seeking nothing more than to serve their country, they ask the Court to enjoin the Military Ban.  App. at 26.  They claim that the Hegseth Policy was rushed and reached a preordained result, contains no analysis, and has an exemption in name only.  *Id.* at 56.  The Ban at bottom invokes derogatory language to target a vulnerable group in violation of the Fifth Amendment.  *Id.* at 29, 35–37; *see* U.S. Const. amend. V.

Not at all, say Defendants.  They assert that the Military Ban is necessary because transgender persons undermine "military readiness" and disrupt "[u]nit cohesion, good order, and discipline."  Dkt. 81 (Opp.) at 40–54.  Being transgender is "inconsistent" with "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  Hegseth Policy at 3.  Gender ideology activists are "unconcerned with the requirements of military service like physical and mental health, selflessness, and unit cohesion."

---

[3] Beth Bailey, Introduction, *Integrating the U.S. Military* 3 (Beth Bailey ed., 2017) (brackets in original).  *See also* Dkt. 77-1 (Amicus Br. of Const. Accountability Ctr.) at 14–23.

[4] *See* Dkt. 47-1 (Amicus Br. of Former Military Dep't Heads) at 5–12; Dkt. 82 (Amicus Br. of Const. Accountability Ctr.) at 14–23.

EO14183 § 1.  Transgender persons cannot maintain "an honorable, truthful, and disciplined lifestyle."  *Id.*  Their expression of sexual identity "is not consistent with [] humility and selflessness."  *Id.*  They also cost too much.  Opp. at 49.

Plaintiffs beg to differ.  And differ they can.  Together they have provided over 130 years of military service.  They have served in roles ranging from Senior Military Science Instructor to Artillery Platoon Commander to Intelligence Analyst to Satellite Operator to Operations Research Analyst to Naval Flight Officer to Weapons Officer.  They have deployed around the globe, from Afghanistan to Poland to Korea to Iraq to Kuwait to the USS Ronald Reagan and USS George W. Bush.  One is presently deployed to an active combat zone.  They have earned more than 80 commendations including: a Bronze Star; two Global War on Terrorism Service Medals; two Global War on Terrorism Expeditionary Medals; numerous Meritorious Service Medals; numerous Commendation Medals; Air and Space Outstanding Unit Awards; and the Military Outstanding Volunteer Service Medal, among many others.

Defendants rejoin that these service records are inapposite.  The Court must ignore them and instead "defer to the military's judgment."  Tr. (Mar. 12, 2025) at 180.  Yes, the Court must defer.  But not blindly.  The President issued EO14183 within seven days of taking office, and Secretary Hegseth issued the Policy thirty days later.  There is no evidence that they consulted with uniformed military leaders before doing so.  Neither document contains any analysis nor cites any data.  They pronounce that transgender persons are not honorable, truthful, or disciplined—but Defense counsel concedes that these assertions are pure conjecture.

> THE COURT: Is saying that transgender people or people with gender dysphoria, [that] their inherent identity is inconsistent with a commitment to an honorable, truthful, and disciplined lifestyle, is that demeaning to them?
>
> DEFENSE COUNSEL: I don't have a characterization for that, Your Honor.

3

THE COURT: Okay. And if I asked you about all the other words in [the Military Ban], with respect to the characterization of transgender people or people with gender dysphoria, you would have the same answer?

DEFENSE COUNSEL: Yes, Your Honor.

THE COURT: There's nothing [supporting these assertions] in the studies; right?

DEFENSE COUNSEL: That says those same things, no, Your Honor, not that I know of.

THE COURT: [No study] says anything close to those things; correct?

DEFENSE COUNSEL: Not that I know of, Your Honor.

Tr. (Mar. 12, 2025) at 188–89. An "Action Memo" claims the Policy "was informed through consideration of" three studies and cost data. Dkt. 73-23 (Action Memo) at 4. *Who* considered the information, however, is anyone's guess; Defendants do not know. Maybe no one, because one study is eight years old and the other two support Plaintiffs' position.

Transgender persons have served openly since 2021, but Defendants have not analyzed their service. That is unfortunate. Plaintiffs' service records alone are Exhibit A for the proposition that transgender persons can have the warrior ethos, physical and mental health, selflessness, honor, integrity, and discipline to ensure military excellence. ***Defendants agree.*** They agree that Plaintiffs are mentally and physically fit to serve, have "served honorably," and "have satisfied the rigorous standards" demanded of them. Tr. (Feb. 18, 2025) at 9–14, 148; *see also* Tr. (Mar. 12, 2025) at 130. Plaintiffs, they acknowledge, have "made America safer." Tr. (Feb. 18, 2025) at 10. So why discharge them and other decorated soldiers? Crickets from Defendants on this key question.

Plaintiffs have also introduced declarations from the military leaders responsible for integrating transgender persons into open military service. Each declarant attests that our military has not fallen into an "existential" crisis since transgender persons began serving openly

in 2021. Nor have our "lethal and effective" soldiers come unglued when asked to use preferred pronouns, which the Hegseth Policy also bans. To the contrary, they each testify that recruiting, unit cohesion, and military readiness have improved since 2021.

To obtain an injunction, Plaintiffs must establish a likelihood of success on the merits. They have done so. The Court's factual findings, the vast majority conceded by Defendants and all supported by the Record, make it highly unlikely that the Military Ban will survive judicial review, whether it be rational basis or intermediate scrutiny. Plaintiffs must also show irreparable harm and that the balance of the equities and the public interest favor an injunction. On the former, Plaintiffs face a violation of their constitutional rights, which constitutes irreparable harm. Indeed, the cruel irony is that thousands of transgender servicemembers have sacrificed—some risking their lives—to ensure for others the very equal protection rights the Military Ban seeks to deny them. On the latter, Defendants have not shown they will be burdened by continuing the status quo pending this litigation, and avoiding constitutional violations is always in the public interest.

The Court therefore **GRANTS** Plaintiffs' Renewed Application for Preliminary Injunction. Dkt. 72. The Court details the scope of the injunction in the Order that accompanies this Opinion. The Court, on its own motion, stays its Order until March 21, 2025, at 10:00 am eastern, to provide Defendants time to consider filing an emergency stay with the D.C. Circuit.

* * * * *

The Court does not issue this preliminary injunction lightly. Judicial overreach is no less pernicious than executive overreach. But the coordinate branches must, "by their mutual relations, be the means of keeping each other in their proper places." The Federalist No. 51 (James Madison). The President and Defendants could have crafted a policy that balances the

5

Nation's need for a prepared military and Americans' right to equal protection. They still can. The Military Ban, however, is not that policy. The Court therefore must act to uphold the equal protection rights that the military defends every day.

The Court's opinion is long, but its premise is simple. In the self-evident truth that "all people are created equal,"[5] *all* means *all*. Nothing more. And certainly nothing less.

## BACKGROUND

### I.    OBAMA—TRANSGENDER PERSONS CAN SERVE[6]

Before 2014, the United States precluded transgender persons from military service. Dkt. 69 (Third Amend. Compl.) ¶ 225. This changed during President Barack Obama's second term. In 2014, the Department of Defense (DoD) eliminated its categorical ban on service by transgender persons and instructed each branch of the Armed Forces to reassess the ban's rationales. *See* Dkt. 72-86 (DoDI 1332.18).

In 2015, then-Secretary of Defense Ashton B. Carter established a working group to identify issues related to open military service by transgender persons. Dkt. 72-70 (RAND Report) at 4. To aid its work, the group commissioned the RAND Corporation's National Defense Research Institute to study the issue.[7] *Id.* After a year of research, RAND concluded that allowing transgender persons to serve openly would have "minimal impact on unit

---

[5] Women were "included in the sequel" when passage of the Nineteenth Amendment granted them the right to vote in 1920. *See* Lin-Manuel Miranda, *Hamilton: An American Musical* (2016); *compare* U.S. Declaration of Independence (1776) *with* U.S. Const. amend. XIX (1920). That right is one of the many that thousands of transgender persons serve to protect.

[6] For an in-depth history, see *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177–85 (D.D.C. 2017), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).

[7] The National Defense Research Institute is not a fly-by-night operation. It is "a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community." RAND Report at 4–5.

cohesion" and estimated the "impact [of transgender persons serving openly] on readiness to be negligible." *Id.* at 13, 91. It further found that extending health care coverage for gender transition-related treatments represented an "exceedingly small proportion" of health care expenditures: between $2.4 million and $8.4 million out of $49.3 billion, or 0.017%—at most—of the Unified Medical Program budget. *Id.* at 12–13, 91. Relying in part on that report, the working group "unanimously concluded that transgender people should be allowed to serve openly in the military." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 179 (D.D.C. 2017). It found that "*prohibiting* transgender people from serving undermines military effectiveness and readiness." *Id.* (emphasis in original). Such a policy "excludes qualified individuals on a basis that has no relevance to one's fitness to serve[] and creates unexpected vacancies requiring expensive and time-consuming recruitment and training of replacements." *Id.*

To implement the working group's recommendation, in 2016, Secretary Carter issued Directive-Type Memorandum 16-005, titled "Military Service of Transgender Service Members." Dkt. 72-60 (Carter Policy). The Carter Policy stated that "open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity." *Id.* at 3.

Both the Army and the Air Force issued guidance allowing transgender individuals to serve openly starting in July and October 2016. *Doe 1*, 275 F. Supp. 3d at 182. The Carter Policy for acceding transgender persons to the military was set to take effect on June 30, 2017. *Id.* at 181. However, President Trump took office in January 2017, and on June 30—the date

accessions were to start—then-Secretary of Defense James Mattis deferred acceding transgender individuals into the military until January 1, 2018. *Id.* at 182.

## II.    TRUMP I—TRANSGENDER PERSONS CANNOT SERVE

### A.    President Trump Orders a Ban on Transgender Service

On August 25, 2017, President Trump issued a memorandum entitled "Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security" (2017 Memorandum). *Doe 1*, 275 F. Supp. 3d at 183. The 2017 Memorandum called for a ban on members of the military from serving in a sex different from their birth sex, stopped the accession of transgender persons, and halted funding for gender-affirming care. *Id.* at 183–84. It instructed Secretary Mattis to gather a working group to review the 2017 Memorandum and advise if the group disagreed with the Memorandum's conclusions. *Id.* at 185.

### B.    Courts Enjoin the 2017 Memorandum

Litigation ensued. Several transgender persons then serving or hoping to enlist challenged President Trump's 2017 Memorandum. *Id.* at 175–76. On October 30, 2017, Judge Colleen Kollar-Kotelly of this Court entered a preliminary injunction, effectively barring any change from the status quo as it related to service and accession. *See id.* at 177. She dismissed the claims relating to gender affirming care based on a lack of standing. *Id.* The D.C. Circuit declined to stay the injunction pending appeal. *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017). Around the same time, three other federal courts also enjoined the 2017 Memorandum. *See Stone v. Trump*, 280 F. Supp. 3d 747 (D. Md. 2017); *Karnoski v. Trump*, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017); *Stockman v. Trump*, 2017 WL 9732572 (C.D. Cal Dec. 22, 2017).

### C.    DoD Recommends Revisions to the 2017 Memorandum

DoD subsequently issued a report that addressed transgender military service. Dkt. 73-8 (2018 Report) at 5–49. The report concluded that transgender persons undermine military preparedness. *See id.* at 37–38. It likened gender dysphoria to "bipolar disorder, personality disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder." *Id.* at 25. It claimed that individuals with gender dysphoria were more likely to have substance abuse issues and commit suicide and that they would inflict excessive costs on the military. *Id.* at 26, 46. It emphasized that the "uncertainty" surrounding the view of medical professionals meant that the military should "proceed with caution." *Id.* at 11.

Based on this report, on February 22, 2018, Secretary Mattis presented a memorandum (Mattis Policy) to President Trump that proposed an alternative to the enjoined 2017 Memorandum. *See generally id.* at 2–4. The Mattis Policy would not have banned service to all transgender persons. *Id.* at 3. Instead, it recommended banning anyone who had undergone gender transition and those with a history or current diagnosis of gender dysphoria, except in some limited circumstances. *Id.* It allowed transgender persons already in the military—who did not have gender dysphoria and were otherwise qualified for service—to serve, but only in their biological sex. *Id.* at 3–4.

President Trump issued a memorandum on March 23, 2018, revoking the 2017 Memorandum and delegating authority to DoD and Department of Homeland Security to implement the Mattis Policy. Third Amend. Compl. ¶ 256.

### D.    The Mattis Policy Takes Effect

Following publication of the Mattis Policy, the *Doe 1* plaintiffs amended their complaint. Again, the government moved to dismiss and asked the court to dissolve the existing preliminary

injunction.  *Doe 2 v. Trump*, 315 F. Supp. 3d 474, 479 (D.D.C. 2018).  The district court declined to do so.  *Id.* at 480.  The government again appealed—this time successfully.  *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019).  In an unpublished opinion on January 4, 2019, the D.C. Circuit reversed the district court's denial of the government's motion to dissolve the preliminary injunction and vacated the preliminary injunction without prejudice.[8]  *Id.*  The D.C. Circuit held that "[i]t was clear error [for the district court] to say there was no significant change" in military policy—from the genesis of the 2017 Memorandum to the issuance of the Mattis Policy—and so vacatur of the preliminary injunction was warranted.  *Id.* at 23.

The Mattis Policy went into effect after the dissolution of the preliminary injunction.  It remained in place until the beginning of the Biden administration in 2021.  App. at 14.

### III.    BIDEN—TRANSGENDER PERSONS CAN SERVE

On January 25, 2021, President Joseph R. Biden issued Executive Order 14004, "Enabling All Qualified Americans [t]o Serve Their Country in Uniform."  86 Fed. Reg. 7471 (Jan. 25, 2021) (EO14004).  EO14004 directed the Secretaries of Defense and Homeland Security to take necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination."  *Id.* § 1.

EO14004 cited its reliance on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces."  *Id.*  This included "a meticulous, comprehensive study requested by [DoD]," testimony to Congress by the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the

---

[8] As acknowledged by both parties, *Doe 2* is not binding on this Court, but it is persuasive.  *See* Fed. R. App. P. 32.1; *see also* Tr. (Feb. 19, 2025) at 5–7.

Marine Corps, and Chief of Staff of the Air Force that "they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service." *Id.* (cleaned up). It also included a statement by former United States Surgeons General, who served under both Democratic and Republican Presidents, "that transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason— including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care." *Id.* (cleaned up).

The Office of the Undersecretary of Defense for Personnel and Readiness convened a working group tasked with "formulat[ing] policy options for DoD regarding transgender service members." Dkt. 72-59 ¶ 9. After the group "collect[ed] and consider[ed] evidence from a variety of sources, including a careful review of all available scholarly evidence and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders whose units included transgender service members," it concluded that "banning service by transgender persons would harm the military by excluding qualified individuals based on a characteristic with no relevance to a person's fitness to serve." *Id.* ¶¶ 10, 12.

In March 2021, the Office of the Undersecretary of Defense for Personnel and Readiness issued guidance on accession. Dkt. 73-9 (DoDI 6130.03, Vol 1). In addition to meeting standard accession requirements, transgender persons with a history of gender dysphoria could enlist if they had been stable in their gender identity for at least 18 months prior to enlistment. *Id.* On April 30, 2021, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members." Dkt. 72-63 (DoDI 1300.28). A servicemember could serve in their preferred sex by changing their

"DEERS Marker" (Defense Enrollment Eligibility Reporting System) to reflect their gender identity.[9] *Id.* at 7.

In short, the Austin Policy allowed transgender persons to enlist and serve openly.

## IV.    TRUMP II—TRANSGENDER PERSONS CANNOT SERVE

### A.    President Trump Again Orders a Ban on Transgender Service

On the first day of his second term, President Trump issued Executive Order 14168, "Defending Women [f]rom Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (EO14168). That Order provides that the federal government will recognize only two sexes: male and female. *Id.* § 2. EO14168 defines a "male" as a "a person belonging, at conception, to the sex that produces the small reproductive cell," and a "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.*

EO14168 requires federal agencies to ignore conflicting provisions of related executive orders from the previous administration, including Executive Orders: 13988, on preventing and combating discrimination based on gender identity or sexual orientation; 14004, on enabling transgender persons to serve openly in the military; 14020, which established the White House Gender Policy Council; 14021, addressing the need for a comprehensive approach to gender equity and equality; and 14075, on advancing equity for all individuals. *Id.* § 7(b). EO14183 also directed federal agencies to rescind guidance documents, such as "The White House Toolkit on Transgender Equality," "Supporting Transgender Youth in School," and "Back-to-School

---

[9] DoDI 1300.28 explains that "[g]ender transition in the military begins when a Service member receives a diagnosis from a military medical provider indicating the Service member's gender transition is medically necessary, and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender." Dkt. 72-63 at 20.

Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS," among others relating to the LGBTQ+ community.  *Id.* § 7(c).

On January 27, 2025, President Trump issued EO14183, which incorporates by reference the definitions in EO14168.  EO14183 § 3.  The Order revokes President Biden's Executive Order 14004, which allowed transgender persons to serve openly in the military.  *Id.* § 5.  It describes the U.S. military's mission as "protect[ing] the American people and our homeland as the world's most lethal and effective fighting force."  *Id.* § 1.  But it adds that "the Armed Forces have been afflicted with radical gender ideology to appease activists unconcerned with the requirements of military service."  *Id.*  It claims that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life.  A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."  *Id.*

EO14183 declares that it is U.S. Government policy "to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  *Id.* § 2.  "This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex."  *Id.*  EO14183 therefore requires: DoD to revise its medical standards (DoDI 6130.03 Volume 1 and Volume 2) within 60 days to reflect the purpose and policy of the Order, *id.* § 4(a); the Defense Secretary to end identification-based pronoun usage, *id.* § 4(b); and within 30 days to identify guidance to implement the Order, *id.* § 4(c); and the Armed Forces to prohibit servicemembers born male to use or share facilities for those born female and vice versa, *id.* § 4(d).

13

The White House also provided an accompanying fact sheet that reiterated EO14183's

goal of "RESTORING SANITY IN OUR MILITARY: During the Biden Administration, the

Department of Defense allowed gender insanity to pervade our military organizations."  Fact

Sheet: President Donald J. Trump Ensures Military Excellence and Readiness, The White House

(Jan. 27, 2025).

On February 7, 2025, the Secretary of Defense issued a memorandum that "paused" all

activities under the Austin Policy pending his forthcoming policy implementing EO14183.  Dkt.

33-1 (Feb. 7 Memo).

### B.     Litigation Ensues

On January 28, 2025, one day after President Trump issued EO14183, eight transgender

persons filed a Complaint for Declaratory and Injunctive Relief.  Dkt. 1.  The current operative

complaint is the Third Amended Complaint.  Dkt. 69.  Plaintiffs Nicolas Talbott, Erica Vandal,

Kate Cole, Gordon Herrero, Dany Danridge, Jamie Hash, Minerva Bettis, Audrie Graham, Roan

Pickett, Amiah Sale, Quinn Tyson, Michelle Bloomrose, Vera Wolf, and Regan Morgan are

transgender active-duty servicemembers.  *Id.* ¶¶ 21–168.  Plaintiff Miriam Perelson is enlisted in

U.S. Army basic training.  *Id.* ¶ 87.  Plaintiffs Samuel Ahearn, Clayton McCallister, Greyson

Shishkina, Koda Nature, and Cael Neary are transgender persons in the process of enlisting.  *Id.*

¶¶ 169–206.

Collectively, the active-duty Plaintiffs have served in the U.S. military honorably and

with distinction for over 130 years.  Third Amend. Compl. ¶¶ 22, 33, 44, 53, 65, 77, 88, 106,

114, 122, 134, 146, 153, 160, 166.[10]  The Court cites some of their accolades above; there are

---

[10] All Plaintiffs submitted sworn declarations, which Defendants do not contest.  Dkts. 72-18–72-
58.  The Court accepts and incorporates them into the factual record.

many more.  *Id.* ¶¶ 36, 46, 56, 69, 80, 108, 135, 147, 155, 162.  The Government concedes that

each active-duty Plaintiff is honorable, truthful, and disciplined, and that each is currently

physically and mentally fit to serve.  Tr. (Feb. 18, 2025) at 9.  They have "served honorably" and

"have satisfied the rigorous standards" of military service.  *Id.* at 9, 14, 148.  The Government

also concedes that, together, Plaintiffs have made America safer.  *Id.* at 10.  The active-duty

Plaintiffs have adhered to all military standards and serve without accommodation.  *See, e.g.*,

Dkt. 72-27 (Herrero Second Supp. Decl.) ("I meet all standards applicable to male service

members."); Dkt. 72-58 (Wolf Decl.) ¶ 18 ("I meet all standards applicable to female service

members."); Tr. (Mar. 12, 2025) at 130.  Yet there is no dispute that the Military Ban's directives

would prohibit Plaintiffs from serving.  Tr. (Mar. 12, 2025) at 167.

Defendants are the United States of America, Secretary of Defense Peter B. Hegseth,

Secretary of the Army Daniel P. Driscoll, the Department of the Army, Acting Secretary of the

Navy Terence G. Emmert, the Department of the Navy, Acting Secretary of the Air Force Gary

A. Ashworth, the Department of the Air Force, Director of the Defense Health Agency Telita

Crosland, and the Defense Health Agency.[11]  *Id.* ¶¶ 207–16.  Plaintiffs sue the individual

Defendants in their official capacities.  *Id.* ¶ 217.

Plaintiffs allege that the Military Ban, "[r]ather than being based on any legitimate

governmental purpose, . . . reflects animosity toward transgender people because of their

transgender status."  *Id.* ¶ 314.  They claim that the Military Ban violates the equal protection

component of the Due Process Clause of the Fifth Amendment.  *Id.* ¶¶ 317–31.  They also allege

that the Military Ban violates the currently serving Plaintiffs' procedural due process rights

---

[11] Upon agreement of the parties, the Court dismissed President Trump as a defendant on
February 13, 2025.  Dkt. Notice (February 13, 2025).

under the Fifth Amendment. *Id.* ¶¶ 332–39. And because some Plaintiffs "reasonably relied on the Austin Policy" when they transitioned, some also bring an estoppel claim.[12] *Id.* ¶¶ 340–45.

On February 3, 2025, Plaintiffs filed an Application for Preliminary Injunction followed by an Application for Temporary Restraining Order the next day. Dkts. 13, 14. At a status conference on February 4, the Court explained that it could not grant the TRO because it addressed harm to a non-plaintiff. Tr. (Feb. 4, 2025) at 42–43. After further discussion, the parties agreed to follow the briefing and hearing schedule the Court had originally set for the preliminary injunction application. Dkt. Notice (Feb. 4, 2025).

On February 13, 2025, the Court previewed for the parties, at length, the legal issues and cases it expected to address at the formal preliminary injunction hearing. Tr. (Feb. 13, 2025). On February 15, 2025, the Government confirmed that it would neither present any affirmative witnesses nor cross-examine any of Plaintiffs' declarants at the preliminary injunction hearing.[13] At that point, Plaintiffs notified all parties that it would not call on any of its declarants.[14] The Court held oral argument on February 18 and 19, 2025. At the February 18 hearing, the Court granted the Government's request that it refrain from ruling until after DoD released its implementing policies. Tr. (Feb. 18, 2025) at 113–14. On March 4, 2025, Plaintiffs filed their Third Amended Complaint. Dkt. 69. They filed a Renewed Application for Preliminary Injunction on March 7, 2025. Dkt. 72. Defendants filed their Opposition to Plaintiffs' Application on March 11, 2025. Dkt. 81. The Court heard oral argument on the renewed Application on March 12, 2025.

---

[12] Since Plaintiffs have established likelihood of success on their equal protection claim, the Court does not address the procedural due process or estoppel claims.

[13] Email from Defs.' Counsel to Court and Pls.' Counsel (Feb. 15, 2025).

[14] Email from Pls.' Counsel to Court and Defs.' Counsel (Feb. 15, 2025).

### C.     The Hegseth Policy Issues

DoD implemented EO14183 on February 26, 2025, in a memorandum entitled

"Additional Guidance on Prioritizing Military Excellence and Readiness."  Dkt. 63-1 (Hegseth

Policy).  Secretary Hegseth issued the Policy "pursuant to Executive Order 14183, 'Prioritizing

Military Excellence and Readiness.'"  *Id.* at 1.  The Policy states that "[m]ilitary service by

Service members and applicants for military service who have a current diagnosis or history of,

or exhibit symptoms consistent with, gender dysphoria is incompatible with military service."

*Id.* at 3.  Consequently, "[i]ndividuals who have a current diagnosis or history of, or exhibit

symptoms consistent with, gender dysphoria are no longer eligible for military service."  *Id*.

The Hegseth Policy directs the Secretaries of the Military Departments to "[e]stablish

procedures and implement steps to identify Service members who have a current diagnosis or

history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this

memorandum."  *Id.* at 5.  Next, "[w]ithin 30 days of identification," the Departments must

"begin separation actions . . . for Service members who have a current diagnosis or history of, or

exhibit symptoms consistent with, gender dysphoria and are not granted a waiver."  *Id.*

Regarding retention policies, "[s]ervice members who have a current diagnosis or history of, or

exhibit symptoms consistent with, gender dysphoria are disqualified from military service."  *Id.*

at 8.  In addition, "[s]ervice members who have a history of cross-sex hormone therapy or a

history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria

or in pursuit of a sex transition, are disqualified from military service."  *Id.*

The Hegseth Policy purports to allow exemptions "on a case-by-case basis, provided

there is a compelling Government interest in retaining the Service member that directly supports

warfighting capabilities" and the servicemember meets the following three conditions: he or she

17

(1) "demonstrates 36 consecutive months of stability in [his or her] [birth] sex without clinically significant distress or impairment," (2) "demonstrates that he or she has never attempted to transition to any sex other than their [birth] sex," and (3) "is willing and able to adhere to all applicable standards, including the standards associated with the Service member's [birth] sex." *Id.* Any transgender person who cannot satisfy these conditions is disqualified from service.

With respect to separation policies, the Hegseth Policy provides that "[s]ervice members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance." *Id.* at 9. Those who do so "may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43 . . . at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29." *Id.* The Policy provides that those "choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(l)." *Id.* On the other hand, "[t]he Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated." *Id.*

On the same day that DoD issued the Hegseth Policy, the Under Secretary of Defense for Personnel and Readiness also distributed "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order," also called the Action Memo. Dkt. 73-23 (Action Memo). The Action Memo repeats the purposes and policies President Trump outlined in EO14183 and reiterates the main points of the Hegseth Policy. *Id.* It lists four "consideration[s]" that "informed" the Hegseth Policy: (1) the Mattis Policy, (2) a 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical

Standards Analysis and Research Activity, (3) a 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs, and (4) a review of cost data. *Id.* at 4–5.

Based on these reviews, DoD concluded that "[w]hile Service members with gender dysphoria volunteered to serve their country, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force." *Id.* at 5.

## FINDINGS OF FACT

"A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Courts, for example, permit hearsay evidence in the form of sworn affidavits in considering an application for preliminary injunction. *See e.g.*, *Karem v. Trump*, 404 F. Supp. 3d 203 (D.D.C. 2019) (citing *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases from six other circuits)).

The Court makes its factual findings based on the entire record, including the Third Amended Complaint, documents cited in the Complaint, exhibits to the preliminary injunction application and opposition, the declarations the parties submitted, and concessions[15] or points of agreement made by the parties at oral argument (altogether, the Record). *See American Foreign Service Ass'n, et al. v. Trump et al.*, 2025 WL 573762, at *1 (D.D.C. Feb. 21, 2025). It is early

---

[15] Over three hearings on Plaintiffs' motion, Defendants made numerous concessions concerning the scope and application of EO14183 and the Hegseth Policy. When citing a concession, the Court cites "Defs. Concession" and then the transcript cite.

19

days for this litigation, however.  Things change.  If new developments cause Defendants to move to dissolve this injunction, the Court will hear that motion expeditiously.

## I.    THE HEGSETH POLICY BANS ALL TRANSGENDER TROOPS

Secretary Hegseth issued the Hegseth Policy on February 26, 2025.  Dkt. 63-1.  The next day, the Department of Defense and Secretary Hegseth publicly announced that under it: "Transgender troops are disqualified from service without an exemption."[16]  Defense counsel contends that the Court must ignore Secretary Hegseth's public description of the policy he wrote and that he is responsible for implementing.  Tr. (Mar. 12, 2025) at 19–22.  Secretary Hegseth used the word "transgender," defense counsel claims, only as "shorthand" for gender dysphoria.  *Id.* at 22.  Seriously?  These were not off-the-cuff remarks at a cocktail party.  DoD and Secretary Hegseth used official government accounts to announce a new policy affecting the entire U.S. Military.  The Court presumes that in doing so they did not use loose or misleading language.  Indeed, if the Hegseth Policy addressed only gender dysphoria, the post would have read, "Gender dysphoria is a disqualifying medical condition for service."  Both sentences contain nine words, belying counsel's "shorthand" excuse.

DoD and Secretary Hegseth announced that the Policy bans "transgender troops" because that is precisely what it does.  To be sure, the word transgender does not appear on its pages.  It is nonetheless aimed squarely at transgender persons, banning everyone:

- with a current diagnosis of gender dysphoria;
- with a history of gender dysphoria;
- who exhibits symptoms consistent with gender dysphoria;
- with a history of cross-sex hormone therapy (as treatment for gender dysphoria or in pursuit of sex transition);

---

[16] @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025).  The Court has taken judicial notice of their posts.  *See* Dkt. Notice (Mar. 7, 2025); Fed. R. Evid. 201(b)(2).

20

- with a history of sex reassignment or genital reconstruction surgery (same);
- who has transitioned or attempted to transition to a sex other than their birth sex; and,
- who is not willing to serve in their birth sex.

Hegseth Policy at 3–6.

There is an exemption, but it is one in name only. Individuals can obtain a waiver if there "is a compelling government interest in retaining them that directly supports warfighting capabilities." *Id.* at 6. That includes only those with "special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department, if such experience, training, and education is directly related to the operational needs of the Military Service concerned." Dkt. 70-1 (Clarifying Guidance on Hegseth Policy) at 1. Even if someone stumbled into this elite cadre, she could continue to serve only if: (1) she has been stable in her *birth* sex for 36 consecutive months; (2) she has never transitioned or attempted to transition to anything other than her birth sex; and (3) she is willing (against medical advice) to serve in her birth sex.[17] *Id.* at 1–2. Virtually no one can meet all these criteria. The Court finds that Plaintiffs, for their part, do not. *See* Third Amend. Compl. ¶¶ 27, 38, 48, 58, 71, 82, 88, 109, 115, 124, 136, 148, 157, 163, 167, 170, 185, 186, 198, 206.

---

[17] Medical experts, including the American Psychological Association, agree that "[f]orcing transgender individuals to suppress their gender identity and live according to their birth sex is not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions." Dkt. 72-78 (Brown Decl.) ¶ 10.

## II.    THE MILITARY BAN IS BASED ON CONJECTURE

### A.    The Administration Rushed the Hegseth Policy

President Trump issued EO14183 seven days after taking office.  No one knows what he relied on, if anything.  Tr. (Feb. 18, 2015) at 117.  EO14183 commanded DoD to craft the implementing policy within 30 days of that Order.  EO14183 § 4.  This was rushed by any measure.  By comparison, DoD spent 12 months to craft the Carter Policy, 7 months to craft the Mattis Policy, and 8 months to craft implementing guidance on the Austin Policy.  *See* Third Amend. Compl. ¶¶ 229, 237, 254–56, 262–66.

Alex Wagner, the former Assistant Secretary of the Air Force for Manpower and Reserve Affairs, notes that the "rushed and haphazard manner" in which Defendants "issued and implemented" the Military Ban is "highly unusual."  Dkt. 72-68 (Wagner Second Supp. Decl.) ¶ 10.  "Ordinarily, the reversal of an existing [military] policy—especially one [like the Austin Policy] adopted after careful study and review—would take place only in response to significant, documented problems with existing policy, after careful consideration and review including an explanation of what led to the problematic outcomes, and would be rolled out in a careful, orderly fashion that provided commanders and members clear guidance."  *Id.*  The "abrupt reversal" of the Austin Policy, without comprehensive review, "is unprecedented" and "an extreme departure from how military policy is typically made."  Dkt. 72-74 (Cisneros Decl.) ¶ 21.

Former Deputy Undersecretary of Defense for Personnel and Readiness Shawn Skelly has "significant concerns about the immediate and long-term harms" of the Hegseth Policy and "the ways in which it conflicts with established military policy and practices."  Dkt. 72-73 ¶ 1.  Based on his experience, he believes that this "categorical approach to administratively separate an entire class of people who demonstrate their ability to serve and meet military standards

22

represents a significant departure from military practice." *Id.* ¶ 2. "There are no other circumstances where service members with a treatable condition that allows them to deploy and meet all readiness standards are nevertheless deemed categorically incapable of service." *Id.* ¶¶ 2.[18] In his view, this Policy—not transgender service—"will severely disrupt the chain of command and erode unit cohesion and trust," and "[t]he rollout of this policy is unprecedented in the chaos and confusion associated with it." *Id.* ¶¶ 5, 15.

### B.    Defendants' Evidence Supports Plaintiffs' Application

EO14183 and the Hegseth Policy provide nothing to support Defendants' view that transgender military service is inconsistent with military readiness. So instead, Defendants turn to the Action Memo. *See* Tr. (Mar. 12, 2025) at 136. The Action Memo, an internal document accompanying the Hegseth Policy, explains that the Military Ban "was informed through consideration of, among other things," EO14183, the Hegseth Policy, and the following: (1) the "SecDef Memorandum" from February 22, 2018 (*i.e.*, the Mattis Policy); (2) "a 2021 review conducted by . . . the Accession Medical Standards Analysis and Research Activity," (AMSARA Report), (3) "[a] 2025 medical literature review," (Medical Literature Review), and (4) "a review of cost data." Action Memo at 4–5.

After listing the sources the Military Ban relies on, the Action Memo concludes that

> [w]hile Service members with gender dysphoria volunteered to serve their country, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force.

---

[18] Mr. Skelly claims that the Hegseth Policy is "both punitive and based on animus." Dkt. 72-73 ¶ 3. Because the parties have not briefed whether this is a legal conclusion, the Court does not accept his assertion as a finding of fact.

*Id.* at 5.  This claim is belied by the evidence the Action Memo itself cites.

### 1. *The Mattis Policy*

Defendants contend that "[m]any of the rationales justifying the 2018 [Mattis] policy—

which was approved by President Trump as the Commander in Chief in 2018—would apply

here."  Dkt. 38 at 34.  The Court, they contend on repeat, must defer to the Hegseth Policy's

adoption of the Mattis Policy's findings.  *See, e.g.*, Opp. at 12, 13, 14, 18, 28, 29, 30, 32–39, 40,

44, 47, 48, 50.  The Mattis Policy's findings, they claim, support the Action Memo's conclusion.

Action Memo at 5; *see also* Tr. (Mar. 12, 2025) at 135.  It does not.

The Mattis Policy resulted from the work over many months of "a Panel of Experts

comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders."

Dkt. 73-8 at 2.  It "included combat veterans to ensure that our military purpose remained the

foremost consideration."  *Id*.  And it "met with and received input from transgender Service

members, commanders of transgender Service members, military medical professionals, and

civilian medical professionals with experience in the care and treatment of gender dysphoria."

*Id.* at 2–3.  No panel of experts—or any other kind—informed the Hegseth Policy.  The Record

reflects only that it "was informed through consideration."  Action Memo at 4 (cleaned up).  But,

again, Defendants do not even know *who* undertook the "consideration."  Tr. (Mar. 12, 2025) at

38–39.

By its own terms, moreover, the Mattis Policy's findings were limited by "uncertainty."

Transgender persons had not served openly previously.  *Id.* at 11.  And the medical literature

concerning "the study and treatment of gender dysphoria" was then also in a state of flux.  *Id.*

This mandated "caution."  *Id.*  That uncertainty no longer exists.  Transgender persons have

served openly in the U.S. military since the Austin Policy issued in 2021, and medical studies

now overwhelmingly conclude that gender dysphoria is "highly treatable."  Dkt. 72-77 ¶ 17.

General Mattis explained that "[u]nlike past reviews, the [Mattis] Panel's analysis was

informed by the Department's own data and experience obtained since the Carter Policy took

effect."  *Id.* at 23; *see also* Tr. (Mar. 12, 2025) at 11.  Here, Defendants did not analyze the

"Department's own data and experience since the [Austin] Policy took effect."

### 2. *2021 Psychological Health Center Review*

The Action Memo references and attaches a 2021 review conducted by DoD's

Psychological Health Center of Excellence and the Access Medical Standards Analysis and

Research Activity (the Center, AMSARA Report).  Dkt. 73-24.  The Center studied medical

issues relating to accession of persons with a history or diagnosis of gender dysphoria.  The

Center compared the available accessions records of transgender service persons to a cohort of

other servicemembers.  *Id.* at 5.

The Action Memo's entire discussion of the AMSARA Report is:

> A 2021 review conducted by DoD's [AMSARA team] found that "rates of
> disability *evaluation* were estimated to be higher [about 12%] among
> [transgender] service members [1%].  Additionally, this review found that
> nearly 40% of Service members with gender dysphoria in an observed
> cohort were non-deployable over a 24 month period.  This level of non-
> deployability creates significant readiness risk and places additional
> burdens on Service members without gender dysphoria to meet
> requirements.

Action Memo at 4 (emphasis added).

No one who has read the AMSARA Report could find that it supports this conclusion.

To start, the Action Memo fails to mention the Report's key finding: rates of transgender persons

experiencing the conditions of the cohort group (*psychiatric, musculoskeletal, and neurological*)

"were comparable to those of all service members evaluated for disability."  Dkt. 73-24 at 6

(emphasis added).  The other rates the Center studied were "similar" between the transgender cohort and the other servicemember cohort as to: (1) the proportion with history of any accession medical disqualification status; (2) the distribution of specific medical disqualifications; (3) the rates of adverse attrition; and (4) the rates of existing prior to service discharge.  *Id*. at 4.  The Action Memo quotes the *only* rate that was higher for transgender persons, and that was a rate of *evaluation*, not occurrence.  Action Memo at 4.

With respect to non-deployability, the Action Memo also ignores that "data w[as] not available from non-transgender service members that could serve as a basis for comparison to indicate if supposed non-deployability rates amongst the transgender cohorts differed from the overall non-deployability rate."  Dkt. 86-1 (AMSARA Parts I-III) at 11–12.  Without comparator data, the non-deployability rate for the transgender cohort is not informative, something the Report highlights.  Dkt. 73-24 at 6.

The Center also conducted a medical literature review as part of its work that the Action Memo ignores altogether.  One study stands out.  The AMSARA Report cited, without criticism, a 2014 study that summarized "and challenge[d] [] common notions to justify barring transgender individuals from Service which are actually not supported by research and not internally consistent with other DoD policies."  Dkt. 86-1 at 2.  "The most notable challenge to these assumptions is falsely equating transgender identify with mental health disorders, which has become a debunked connection broadly in the field."  *Id.*

The Court does not question military judgment broadly as to acceptable non-deployment rates.  The Court instead finds that the Action Memo's summary of the AMSARA Report is inexplicably misleading.  Further, the Report contradicts, rather than supports, the conclusions the Action Memo draws from it.  These findings support Plaintiffs' contention that Defendants

did not exercise military judgment to which the Court can defer on the narrow question of whether the Hegseth Policy comports with the Fifth Amendment.

### 3.    2025 Medical Literature Review

The Action Memo also references the 2025 Medical Literature Review conducted by the Office of the Assistant Secretary of Defense for Health Affairs.  The Action Memo's entire discussion of the Medical Literature Review is that it:

> Included findings that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime...[and] the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts," "transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals," and that the strength of the evidence on transgender mental health and gender-affirming care is low to moderate.

Action Memo at 4–5 (quoting Dkt. 73-25 (Med. Lit. Rev.) at 2–3).

No one summarizing the Review in good faith could draw these conclusions.  To start, the Medical Literature Review did not survey studies on transgender persons in military service: *i.e.*, individuals already found to be physically and mentally fit.  Dkt. 73-25 at 2; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 116–17.  So it can shed little light on how transgender persons fare in the military.  *See also* Defs. Concession, Tr. (Mar. 12, 2025) at 117.  For that analysis, the Court refers to the AMSARA Report, which, again, found similar rates of psychotherapy for transgender and other servicemembers.

Second, the suicide conclusions of the Medical Literature Review undercut banning transgender persons from the military.  To start, the military already restricts individuals with suicidal tendencies from enlisting.  *See* DoDI 6130.03, Vol. 1, at 6.28(m).  Moreover, the studies under review confirm that transgender persons are not inherently mentally unfit.  Instead, the studies cited find that transgender suicide rates are influenced by external factors, such as

"gender identity-related disparities, discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence and victimization."  Dkt. 73-25 at 3.  The studies also show "that suicide risk among transgender . . . individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination."  *Id.*; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 118–19.

Third, each meta-study cited found that Gender-Affirming Hormone Treatment and Gender-Affirming Surgery treatment improves psychological well-being, mental health, and quality of life.  *See id*. at 4–6.  Each treatment method reduces gender dysphoria, depression, anxiety, psychological distress, and depressive symptoms.  *Id.*  Further, "long-term studies show that regret rates are extremely low, with most individuals reporting improved quality of life, body image satisfaction, and overall well-being."  *Id.* at 5.

The Court does not question military judgment as to what constitutes as disqualifying medical events.  The Court instead finds that the Action Memo's summary of the 2025 Medical Literature Review is inexplicably misleading.  Further, the Review contradicts, rather than supports, the conclusions the Action Memo draw from it.  These findings support Plaintiffs' contention that Defendants did not exercise military judgment to which the Court can defer on the narrow question of whether the Hegseth Policy comports with the Fifth Amendment.

### 4.    *Military Costs*

The Action Memo concludes that "the costs associated with [gender-affirming] health care," which it estimates at $52 million over 10 years, make service by transgender members incompatible with military readiness.  Action Memo at 5; Dkt. 66 at 5.  It is impossible to see

28

how.  Assuming $5.2 million per year, estimated transgender care costs was fifty-seven hundred-thousandths of a percent (00.00057%) of total military spending for 2024.[19]  Perhaps understandably, then, Former Deputy Undersecretary Skelly testified, and Defendants do not rebut, that under the Austin Policy, the Assistant Secretary for Health Affairs or Defense Health Agency staff raised no concerns about the cost of treating transgender servicemembers.  *See* Dkt. 72-73 ¶ 14; *see also* Dkt. 72-68 ¶¶ 8–9.

Defendants could fairly respond that whether $5.2 million per year is a "rounding error" of the overall budget is not the right comparator.  Instead, they could argue, the number must be compared to similar costs the military incurs.  Had Defendants done that comparison—indeed, had they done *any* comparison—they might have a point.  But the Action Memo makes no comparison.  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 144–45.  It states that the amount to treat gender dysphoria is $52 million over ten years and that this amount is too high.  Action Memo at 5.  Comparisons are important, though.  For example, the Department spent approximately $41 million for Viagra in 2023, compared to an estimated $5.2 million for gender-affirming care.  *See* Dkt. 72-68 ¶ 9.[20]  Defendants do not explain why the former (and every other medical cost) is acceptable while the latter requires banning transgender persons from military service.  Tr. (Mar. 12, 2025) at 150–54.

Nor do Defendants analyze the costs of discharging and replacing thousands of trained servicemembers, many with decades of experience and specialized skills.  This is not an idle

---

[19] From January 1, 2016, to May 14, 2021, the military provided gender-affirming care to 1,892 active duty servicemembers.  Dkt. 66-1 at 2.  That number represents about two hundredths of one percent (0.02%) of the 9.5 million beneficiaries TRICARE covered in 2024.  *See id*.

[20] *See also Beyond the Budget: Addressing Financial Accountability in the Department of Defense: Joint Hearing Before the Subcomm. on Nat. Sec., the Border, & Foreign Affairs & the Subcomm. on Gov't Operations & the Fed. Workforce*, 118th Cong. 49 (2023).

question.  The military's practice of discharging gay and lesbian servicemembers under "Don't Ask, Don't Tell" "cost taxpayers more than $600 million."  Dkt. 77-1 at 19 (cleaned up).  Even a sixth of that number would be twenty times the annual cost of care for gender dysphoria.  Nor do Defendants analyze whether the military could save the same costs, or more, in other areas and without excluding a class of people.

The Court does not question military judgment concerning how it should apportion its funds.  Nor does the Court find that the military must undertake an entire budget review before concluding some costs are unacceptably high.  But there must be *some* benchmark.  Citing a number—devoid of any context or analysis—and concluding that the number is too high does not support banning transgender persons from military service.  If it did, courts would have to accept *any* cost amount the military cites to justify any policy.

### 5.    *Missing Evidence*

If the Military Ban goes into effect, it will upend lives and ruin the careers of thousands of persons.  Given this potential impact, the evidence *not* in the record is striking.  Defendants claim transgender persons impact military readiness, but they acknowledge the DoD does not track individuals "by gender identity and has no means of searching for [the number of] 'transgender individuals.'"  Dkt. 66 at 5; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 173.  Not only that, but DoD's own Public Affairs Guidance on the Military Ban acknowledges that "[w]e [DoD] do not have an exact number of active-duty Service members diagnosed with gender dysphoria."  Dkt. 79-1 at 6.  And it admits that "[w]e [DoD] do not have [a breakdown of individuals in the military by service, gender, race, and occupation] readily available."  *Id.*

Without answers to these basic questions, Defendants cannot explain how transgender persons impact military readiness.  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 46–47.  How

have they done so?  Is that impact positive or negative?  Is it material?  How many have, like

Plaintiffs, served with distinction and are fit for continued service?  How many are stable after a

gender dysphoria diagnosis?  How many have had deployment issues?  How many will be

eligible for an exemption?  How many will be discharged?  What amount of irreplaceable

experience will the military then lose?  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 136–37.

Who knows?  Not Defendants.

The Hegseth Policy also does not contain: (1) evidence that transgender persons are

inherently unfit to serve; (2) evidence that being transgender is inconsistent with "honesty,"

"humility," and "integrity," EO14183 § 2; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 191;

(3) evidence that being transgender "conflicts with a soldier's commitment to an honorable,

truthful, and disciplined lifestyle," EO14183 § 1; *see also* Defs. Concession, Tr. (Mar. 12, 2025)

at 187; (4) analysis of whether the costs of discharging and replacing transgender

servicemembers outweigh the costs of retaining them; (5) analysis of the effect on military

readiness of losing thousands of servicemembers; or, among numerous other holes, (6) the

criteria of "exhibiting evidence of gender dysphoria," *see generally* Hegseth Policy, much less

how such behavior will be policed.  Defendants also concede that they have no *post hoc* evidence

(assuming the Court could even consider it) to justify the Military Ban.  Defs. Concession, Tr.

(Feb. 18, 2025) at 146–48.

To contextualize this absence, consider, by contrast, Executive Order 14208, "Ending

Procurement and Forced Use of Paper Straws."  90 Fed. Reg. 9585 (Feb. 10, 2025) (EO14208).

EO14208 makes it "the policy of the United States to end the use of paper straws."  *Id.* § 1.

EO14208 provides clear and articulable reasons to support its conclusions.  Paper straws: (1)

"are nonfunctional," (2) "use chemicals that may carry risks to human health," (3) "are more

expensive to produce than plastic straws," (4) "often force users to use multiple straws," and (5) "sometimes come individually wrapped in plastic, undermining the environmental argument for their use." *Id.* The White House also provided a fact sheet supporting EO14208, citing multiple studies supporting these claims. *See* Fact Sheet: President Donald J. Trump Ends the Procurement and Forced Use of Paper Straws, The White House (Feb. 2025). No such rationale, much less supporting data, is anywhere to be found in EO14183.

Presumably, a policy that bans transgender persons from military service—individuals who have served honorably and "made American safer"—should result from study at least comparable to one that bans paper straws.

### C.    Defendants' Failure to Consider the Military's Experience with Transgender Persons Serving Openly Undercuts the Military Ban

The Austin Policy—which the Hegseth Policy supersedes—"was based on years of thoughtful policymaking supported by peer-reviewed scientific research" and "has resulted in a stronger, not a weaker military." Dkt. 13-28 ¶ 34. High-ranking military leaders who implemented the Austin Policy have submitted sworn declarations in which they testify, from personal experience, that transgender persons serving openly has improved, not decreased, military preparedness. Of the four declarations by high-ranking military leaders, Defendants rebut only one aspect of one of them. The Court briefly reviews that testimony, including Defendants' sole rebuttal, here.

#### 1.    *Plaintiffs' Declarants*

Declarant Carlos Del Toro was the 78th Secretary of the Navy. Dkt. 72-79 ¶ 1. Former Secretary Del Toro had "oversite [sic] responsibilities over all personnel matters affecting the Navy and Marine Corps, including implementation of . . . policies regarding service by transgender personnel." *Id.* ¶ 6. Secretary Del Toro testifies that "[b]ased on [his] direct

experience and observation, transgender service members who meet the standards required for their positions serve effectively and contribute positively to unit readiness." *Id.* ¶ 7.  Notably, during Secretary Del Toro's "three and a half years as Secretary," he "reviewed thousands of disciplinary cases and personnel matters," yet he cannot "recollect a single disciplinary case or performance issue related directly to a service member's transgender status." *Id.* ¶ 8.

Former Secretary Del Toro testifies that "being transgender does not inherently affect a service member's ability to meet [military] standards or to deploy worldwide," and that "[a]ny suggestion to the contrary contradicts the actual documented performance of transgender service members in our forces." *Id.* ¶ 10.  He further testifies that "[t]here is no evidence-based justification for excluding from service someone who meets all applicable standards merely because they are transgender," and that "[s]uch exclusion would harm military readiness by depriving our force of qualified personnel who have proven their ability to serve." *Id.* ¶ 13.  "Contrary to speculative concerns, [he] has observed that allowing transgender individuals to serve strengthens unit cohesion by fostering honesty and mutual trust," and that "excluding transgender individuals from military service is destabilizing to good order and discipline." *Id.* ¶¶ 15, 17.

Declarant Alex Wagner is the former Assistant Secretary of the Air Force for Manpower and Reserve Affairs.  Dkt. 72-59 ¶ 1.  Mr. Wagner was a member of the working group convened by the Acting Undersecretary of Defense for Personnel and Readiness "to formulate policy options for DoD regarding transgender service members." *Id.* ¶ 9.  Mr. Wagner testifies that he is "not aware of any negative impact . . . on . . . our overall military readiness." *Id.* ¶ 27.  Rather, he testifies that the Austin Policy "foster[ed] openness and trust among team members . . . thereby engender[ing] stronger unit cohesion." *Id.* ¶ 28.  He is "not aware of any complaints

regarding unit cohesion" or "readiness." *Id.* ¶¶ 32, 33.  It is "patently clear" to him that "the Austin Policy [did] not negatively impact[]" these objectives. *Id.* ¶ 32.

Declarant Yvette Bourcicot is the former Acting Assistant Secretary of the Army for Manpower and Reserve Affairs and former Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs.  Dkt. 72-69 ¶ 1.  Ms. Bourcicot also served on the working group convened to study the new policy allowing transgender persons to serve.  *Id.* ¶ 12.  Ms. Bourcicot testifies that she reviewed each request submitted by a transgender servicemember wishing to transition and that she "made a recommendation on whether to grant the service member's request." *Id.* ¶ 19.  To her "best recollection," "every request [she] received met the requirements of the policy, and every requesting service member met the necessary standards for serving." *Id.*  Ms. Bourcicot "observed no negative impact from permitting transgender service in the Army [] on our military capabilities" and is "unaware of any complaints regarding unit cohesion resulting from permitting transgender people to serve." *Id.* ¶¶ 23, 26.

Declarant Shawn G. Skelly is the former Deputy Under Secretary of Defense for Personnel and Readiness and Assistant Secretary of Defense for Readiness.  Dkt. 72-72 ¶ 1.  Mr. Skelly's responsibilities "included implementing the policy permitting service by transgender troops." *Id.* ¶ 8.  Mr. Skelly testifies that the Austin Policy "enable[d] [the] military to retain highly trained and experienced service members by applying the same standards to transgender service members that are applied to others." *Id.* ¶ 10.  He further testifies that "[t]he transgender service policy has not negatively impacted readiness," *id.* ¶ 11, and that he is "not aware of any complaints regarding unit cohesion resulting from the Austin [P]olicy," *id.* ¶ 13.  "To the extent the Austin [P]olicy has had any appreciable impact on unit cohesion, it has improved unit cohesion by fostering increased trust among team members." *Id.*  "Personnel

policies that allow transgender service members to be evaluated based on skill and merit . . . do not jeopardize the military's mission of protecting the United States, but strengthen it." *Id.* ¶ 14.

### 2.    *Challenge to One Declarant's Testimony*

The Court informed Defendants that, if not challenged, it would accept the testimony contained in Plaintiffs' third-party declarations as findings of fact. Min. Order Feb. 10, 2025. It repeatedly informed Defendants that they had a right to cross-examine these witnesses, but Defendants declined to do so. Tr. (Feb. 18, 2025) at 121–22; Tr. (Mar. 12, 2025) at 128–29.

Defendants did file the sworn declaration of Timothy D. Dill, Assistant Secretary of Defense for Manpower and Reserve Affairs, Dkt. 52, to challenge the sworn declaration of Gilbert R. Cisneros, Jr., former Under Secretary of Defense for Personnel and Readiness, Dkt. 13-30, filed by Plaintiffs. Mr. Cisneros was responsible for overseeing implementation of the Austin Policy and testifies that, "[i]f there were complaints or problems about transgender service members, I would have known of them through my role as Under Secretary of Defense for Personnel and Readiness." Dkt. 13-30 ¶¶ 12, 17. He further testifies that "[i]n that role, I did hear complaints about some other issues, but I never received or heard about a single complaint relating to transgender service members." *Id.* To rebut this, Mr. Dill testifies that "it would be highly unusual for individualized service member complaints regarding unit cohesion, military readiness, medical readiness, deployability, and lethality to reach the level of the Under Secretary [Mr. Cisneros]." Dkt. 52-1 ¶ 6. In response, Mr. Cisneros testifies that:

> [Mr. Dill's statement] does not accurately describe my degree of awareness of these matters as Under Secretary of Defense for Personnel and Readiness. As the Under Secretary in charge of readiness, it was my responsibility to be aware of unit cohesion, military readiness, medical readiness, deployability, and lethality. If a unit or service was dealing with readiness issues due to the service by transgender service members, that would have been brought to my attention.

Dkt. 53-1 ¶ 4.  Mr. Cisneros provides an example concerning his oversight of Junior ROTC units to support this testimony.  *Id.* ¶ 6.  As between Mr. Cisneros, who testifies under oath as to his own experience, and Mr. Dill, who testifies under oath as to what he thinks Mr. Cisneros's personal experience would have been, the Court naturally credits Mr. Cisneros.  That said, the Court would reach the same conclusions even if it did not credit this part of Mr. Cisneros's testimony.

Defendants argue generally that the declarants cannot have personal knowledge that "no complaint" was ever filed concerning a transgender servicemember.  Tr. (Feb. 18, 2025) at 124–26.  The Court accepts that contention and will not rely on these declarations for the proposition that *no* complaint anywhere in the Armed Forces ever arose.  However, as former high-ranking officials at DoD directly involved in either drafting or implementing the Austin Policy, Plaintiffs' declarants have personal knowledge concerning the impact of transgender persons serving openly on military preparedness.  And they unanimously conclude that they have had either no detrimental effect or have had a positive one.  Defendants concede that they have proffered no evidence to contradict these assertions.  Tr. (Feb. 18, 2025) at 120.

The Court, at this early stage of the litigation, accepts Plaintiffs' declarants' uncontested testimony as part of its findings of fact.

## STANDARD OF REVIEW

The "traditional goal of a preliminary injunction is to preserve [the] status quo," which is "the last *uncontested* status which preceded the pending controversy."  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022).  A party seeking preliminary injunctive relief must show that the following factors, taken together, weigh in favor of an injunction: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence

of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors "merge" into one "when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Circuits differ in their reading of *Winter*'s four factor test; some allow a strong showing of one factor to make up for a weaker showing on another, *see, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011) (employing this sliding-scale approach), while others require each element to be proven independently, *see, e.g.*, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Powell*, 915 F.3d 197, 215 n.7 (4th Cir. 2019).

Historically, this Circuit evaluated the factors on a sliding scale. *See, e.g.*, *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). But it has read *Winter* "at least to suggest if not hold" that the moving party faces "a more demanding burden" under which "a likelihood of success is an independent, freestanding requirement for a preliminary injunction." *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (cleaned up). Yet it has repeatedly "declined to take sides" on whether *Winter* so held. *Am Meat Inst. v. USDA*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022).

Because each of the four factors favors granting preliminary injunctive relief, Plaintiffs would prevail under either the sliding-scale or independent-factor approach. The Court therefore remains on the sidelines of this ongoing debate.

## PRELIMINARY INJUNCTION ANALYSIS

### I.    PLAINTIFFS' COMPLAINT IS RIPE

Defendants contend that this Court lacks jurisdiction because Plaintiffs did not exhaust their administrative remedies. Opp. at 26–28. Because some Plaintiffs are current military

37

personnel, they claim, those Plaintiffs must exhaust military tribunals before involving "civilian courts." *Id*. at 27 (quoting *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) (cleaned up)).  Not so.

Plaintiffs claim the Military Ban violates the Fifth Amendment.  Defendants cite no support for their contention that exhaustion is required for claims that raise a constitutional challenge to agency action.  Opp. at 15-18.  In *Axon Enter. Inc. v. FTC*, the Supreme Court held that petitioners could raise, without exhausting their remedies, a challenge "collateral to any decisions the [agencies] could make in individual enforcement proceedings."  598 U.S. 175, 195 (2023).  *Axon* involved a challenge to the constitutionality of the agency itself, but its reasoning is informative here.  Plaintiffs claim that subjecting them to discharge proceedings, verbal degradation, and reputational damage, though they are physically and mentally fit to serve, are "here-and-now" injuries of being subjected to an unconstitutional policy.  *Id.* at 192.  No relief ordered by a military tribunal can remedy such harm.  *Id.*

Exhaustion is also futile.  Defendants push back by stating: "[t]he [obviously futile] exception applies only when 'the agency will most certainly deny any relief … because it has a preconceived notion on … the matter.'"  Opp. at 17 (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986)).  They claim the relief here is not preordained.  It is.  The Hegseth Policy lays out in detail the military's "preconceived notion" on Plaintiffs' service.

Defendants finally claim that "development of a factual record" by the military will assist the Court in its analysis of the involuntary separation.  Opp. at 17.  What more facts does the Court need as to the individual Plaintiffs?  Each active-duty Plaintiff is subject to the Hegseth

Policy, no Plaintiff is eligible for a waiver, and the military will discharge each one.  Defs.

Concession, Tr. (March 12, 2025) at 160–63.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Deference to the Military

#### 1.    *Defendants Seek Too Broad an Application of Deference*

The Court agrees that "courts [are] ill-equipped to determine the impact upon discipline

that any particular intrusion upon military authority might have" and that "the military

authorities [not courts] have been charged by the Executive and Legislative Branches with

carrying out our Nation's military policy."  *Goldman v. Weinberger*, 475 U.S. 503, 507–08

(1986) (cleaned up).  Often, courts accept "the reasoned, professional analysis of Congress and

the Executive on matters strictly within the realm of military expertise."  *Doe 2 v. Shanahan*, 917

F.3d 694, 702 (D.C. Cir. 2019) (Wilkins, J., concurring).

Defendants carry deference too far, however.  By "defer" they basically mean the Court

must side with the military's position, end-stop.  And they contend the Court must defer even if

the judgment, as here, does not make sense.

> THE COURT: [F]or every 1 thousand people we can expect less
> than 2 will require care for gender dysphoria.  Can you explain to
> me, please, how two out of 1 thousand people negatively impact
> unit cohesion?
>
> DEFENSE COUNSEL: I don't have an answer for that beyond
> what's in the record.
>
> THE COURT: Well, there's no answer in the record.  If there's an
> answer in the record, tell me what the answer in the record is, if
> there is no answer, [and] you can't answer, that is fine.
>
> DEFENSE COUNSEL: These are judgments the military has
> made.

Tr. (Mar. 12, 2025) at 175–76.

Must defer even if prior military judgment supported by extensive study and data will go, as here, by the wayside.

> THE COURT:  [Can] you point to me any case in American history that says to a [c]ourt you should defer on a military policy [that replaces] another military policy that was put in place after review by the President of the United States and careful review by military leaders[.  You] should ignore [the latter] and defer instead to a policy put in place by an individual who has been the Secretary of Defense for about 30 days and who cited in his reasoning, two studies that undercut what he is doing.
>
> . . .
>
> DEFENSE COUNSEL:  I don't have a case that has every specific fact that's at issue here.
>
> THE COURT:  …[A]nything remotely close to this?
>
> DEFENSE COUNSEL:  I mean, I think every single of the Supreme Court's and Courts of Appeals military deference doctrines are deference to the current military…I think by definition, these are Courts that are deferring to current military judgments about an issue.

Tr. (Mar. 12, 2025) at 132–33.

Must defer even if the military judgment, as here, is not supported by "actual data."

> THE COURT: How can someone decide that a group of people are hurting unit cohesion and discipline if we have no records of them doing so and we don't even know who they are?
>
> DEFENSE COUNSEL: The person and the people who are entrusted to decide that question are the military and the president. And if there's not actual data to back something up, the question is a professional military judgment.  Again, as I said, a prediction.

Tr. (Mar. 12, 2025) at 137–38.

### 2.    *Courts Do Not Owe the Military Blind Deference*

Defendants' position does not urge judicial deference to military judgment.  It urges judicial abdication.  No.  The law does not demand that the Court rubber-stamp illogical judgments based on conjecture.  In fact, it requires the opposite because the executive does not

enjoy a "wholesale license to discriminate in matters of military policy." *Doe 2*, 917 F.3d at 704 (Wilkins, J., concurring).

The D.C. Circuit's recent decision in *Singh v. Berger* is informative. 56 F.4th 88 (D.C. Cir. 2022). *Singh* reversed a district court's denial of a preliminary injunction against a Marine Corps' standard grooming and dress policy that plaintiffs claimed violated their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq*. *Id.* at 91. The D.C. Circuit acknowledged that "[t]o inculcate the importance to service members of sacrificing personal preferences and identifies in favor of the overall group mission, the military has long had an interest in the strict enforcement of its uniform dress requirements." *Id.* (cleaned up). And it "indulge[d] the widest latitude in considering the Marine Corps' interests in fostering cohesion and unity among its members, which surely qualifies as compelling." *Id.* at 99 (cleaned up). But it also highlighted that "the cost of military service has never entailed the complete surrender of all basic rights." *Id.* at 92 (citing cases) (cleaned up). The D.C. Circuit analyzed the military's justifications and found that "the Marine Corps [had] come up very short." *Id.* at 107.

Defendants relegate *Singh* to a footnote. They claim it is inapposite because it involved RFRA, which contains a strict scrutiny standard. Opp. at 38 n.8. It does. But even employing a lower scrutiny standard, Plaintiffs retain their constitutional rights. Notwithstanding the deference the Court owes it, the military still must show that burdening these Plaintiffs' equal protection rights is related to furthering a government interest. And as discussed throughout this opinion, the military's justifications "come up very short." *Singh*, 56 F.4th at 107.

*Singh* also instructed the district court to enter a preliminary injunction that altered the status quo. That itself is rare because "courts are institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the

41

non-movant ultimately wins on the merits." *Id.* at 95. Here, the Military Ban—not an injunction—would upend the status quo. Further, if Defendants later prevail on the merits, they will not be prejudiced as was the case in *Singh*.

Sidestepping *Singh*, Defendants point instead to *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981), in which the Supreme Court upheld a law that required only men to register for the draft. Without question, *Rostker* is an example of the Supreme Court showing deference to military judgment, even when it implicates sex-based distinctions. Defendants, overstep, however, in claiming that in *Rostker* "the Court's approach most closely resembles rational-basis review." Opp. at 38. Even in *Rostker*, the Supreme Court deferred because it found that Congress had acted with "deliberate consideration," rather than "unthinkingly" or "reflexively." *Id.* at 72, 83. The Military Ban's 30-day incubation period pales next to the "hearings, floor debate, and in committee" discussions that precipitated the law in *Rostker*. *Id.* at 72.

Further, the Supreme Court's later-decided *United States v. Virginia* (*VMI*) decision "drastically revise[d] [the Court's] established standards for reviewing sex-based classifications." 518 U.S. at 566 (Scalia, J., dissenting). When reviewing sex-based classifications, "the reviewing court must determine with the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533. That is intermediate, not rational, review.

Defendants' reliance on *Goldman v. Weinberger* is similarly unpersuasive. 475 U.S. 503 (1986). Defendants argue that judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." Opp. at 37–38; *see also* 475 U.S. at 507. Sure. But this is not a First Amendment case. And the facts of *Goldman* bear no relation to those here.

*Goldman* asked whether an Orthodox Jewish servicemember "can wear a yarmulke while in uniform." *Id.* at 504. The question here is whether transgender persons can wear the uniform at all. The Supreme Court would likely not have signed off on the military banning all Orthodox Jews who had ever worn a yarmulke from service.

### 3. Trump v. Hawaii *Confirms that the Military Is Not Owed Blind Deference*

To argue the Court must defer to the military's judgment here, Defendants rely heavily on *Trump v. Hawaii*. *See* Opp. at 39, 50–52; 585 U.S. 667 (2018). That reliance is misplaced.

A week after taking office in 2017, President Trump issued what he had previously called a "Muslim Ban." By executive order, he limited entry into the United States by foreign nationals from Muslim-majority countries. *Id.* at 676. A month and a half later, after an injunction blocked the policy, President Trump replaced his first executive order with a second executive order. *Id.* The second order restricted entry of foreign nationals from six of the original seven countries, though it allowed waivers on a case-by-case basis. *Id.* After lower courts again enjoined the order, the Supreme Court stayed the injunctions. *Id.* at 677.

In September 2017, after the Secretary of Homeland Security completed a review of the policy, President Trump issued yet another iteration, Proclamation No. 9645. *Id.* The Proclamation implemented entry restrictions for foreign nationals from eight countries "whose systems for managing and sharing information about their nationals the President deemed inadequate." *Id.* Plaintiffs in *Trump v. Hawaii* challenged it as a violation of the Establishment Clause, alleging that it was "motivated not by concerns pertaining to national security but by animus toward Islam." *Id.* at 681. They were unsuccessful.

The Supreme Court rejected Plaintiffs' contention that the new policy simply continued the animus they claimed permeated the first one. *Id.* at 706. First, Proclamation No. 9645

"sa[id] nothing about religion." *Id.* at 706. It was a "facially neutral policy denying certain foreign nationals the privilege of admission" to the United States. *Id.* at 710. It did not mention Islam or any other religion. Additionally, the first ban went into effect seven days after President Trump was inaugurated. *Id.* at 676. Proclamation No. 9645 came 8 months later and "reflect[ed] the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies." *Id.* at 707. Because of the "thoroughness" of the "multi-agency review," the Supreme Court ultimately deferred to the Executive's determination that the ban was important for national security. *Id.* at 707–08.

Second, Proclamation No. 9645 restricted entry for foreign nationals from some Muslim majority countries, but not all, and it applied to foreign nationals of all religions. *Id.* at 707. Because the policy did not encompass all Muslim majority countries, the Supreme Court reasoned that "the determinations were justified by the distinct conditions in each country." *Id.* Third, it found Proclamation No. 9645 to be "expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices." *Id.* at 706. It found that the restrictions reflected in the Proclamation were designed to achieve those purposes. *Id.* at 708–09.

Comparing the facts of the policy upheld in *Hawaii* to the ones here is informative.

| *Trump v. Hawaii* | Military Ban |
|---|---|
| Facially neutral | Not facially neutral |
| Months and numerous working groups removed from "Muslim ban" tweets | "Transgender ban" tweet posted the day after the Hegseth Policy issued |
| Multiple iterations of the ban | One iteration of the ban |
| No derogatory characterizations | Derogatory characterizations |
| Alleged animus statements were outside the proclamation's text | Animus in the ban's text |
| Legitimate waiver program | Waivers in name only |
| World-wide review process | No discernable review process |

This Court has the same obligation here as the Supreme Court did in *Hawaii* and the D.C. Circuit in *Singh* to test the military's assertion of its interests. It does so in the rest of this Opinion.

### B.    Intermediate Scrutiny

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. While "not as explicit a guarantee of equal treatment as the Fourteenth Amendment," the Supreme Court has held that "the Constitution imposes upon federal, state, and local government actors the *same* obligation to respect the personal right to equal protection of the laws." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 231–32 (1995) (emphasis added).

The parties dispute whether the Military Ban denies Plaintiffs equal protection as a quasi-suspect class. Laws that do not classify based on a suspect or quasi-suspect class "[are]

presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Laws that discriminate based on a quasi-suspect classification must survive intermediate scrutiny. The government "must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (quoting *VMI*, 518 U.S. at 533).

Plaintiffs are likely to succeed on their claim that the Military Ban is subject to intermediate scrutiny because it classifies based on sex and transgender status, two distinct quasi-suspect classes. Plaintiffs are also likely to succeed on their claim that the Military Ban fails intermediate scrutiny.

### 1.    *The Military Ban Classifies on the Basis of Sex*

The Supreme Court has recognized that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Plaintiffs claim that the logic of *Bostock* applies in the equal protection context; Defendants disagree. Plaintiffs have the better argument.

### a.    *The Logic of* **Bostock** *Applies to the Equal Protection Analysis*

In *Bostock*, the Supreme Court considered whether firing an employee for being transgender or homosexual constituted sex discrimination. *Bostock*, 590 U.S. at 650–52. The case arose under Title VII, which prohibits discrimination "because of . . . sex." *Id.* at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). In holding that firing an employee for being transgender did in fact constitute sex discrimination, Justice Neil M. Gorsuch asserted that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating

46

against that individual based on sex." *Id.* at 660.  To illustrate this point, Justice Gorsuch offered

a hypothetical involving an employer and two employees.  *See id.*  The two hypothetical

employees were identical in every way except that one was a transgender woman and the other a

cisgender woman.  *See id.*  Justice Gorsuch explained that if the hypothetical employer fires only

the transgender woman because she is transgender, it has "intentionally penalize[d]" her "for

traits or actions that it tolerates in an employee identified as female at birth."  *Id.*  He concluded

that "if changing the employee's sex would have yielded a different choice by the employer,"

then the discrimination is based on sex.  *Id.* at 659–60.

The Court agrees with Defendants that *Bostock*'s holding is cabined to Title VII.  *Id.* at

660; Opp. at 34.  But its reasoning is not.  The Supreme Court deduced it *impossible*—end

stop—to discriminate against a transgender person without discriminating against that person

based on sex.  *Bostock*, 590 U.S. at 660*.*  Three circuit courts have applied that same logic in the

Fifth Amendment context.  The Fourth Circuit *en banc* has held that: "discriminating on the basis

of [a gender dysphoria] diagnosis *is* discriminating on the basis of gender identity and sex."

*Kadel v. Folwell*, 100 F.4th 122, 141 (4th Cir. 2024) (en banc) (cleaned up).  Ditto the Ninth

Circuit.  *See Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024).  Ditto the Tenth Circuit.  *See*

*Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024).

On the other hand, the Sixth and Eleventh Circuits have declined to borrow *Bostock*'s

discrimination analysis because of "[d]ifferences between the language of [Title VII] and the

Constitution."  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023); *see also*

*Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228–29 (11th Cir. 2023).  First, "Title VII

covers disparate impact claims" while "the [Fifth] Amendment does not."  *L.W.*, 83 F.4th at 485.

Second, Title VII is limited to certain classifications, and it does not incorporate tiers of scrutiny.

*Bostock*, 590 U.S. at 655.  In contrast, the Fifth Amendment "addresses all manner of distinctions between persons" and "implies different degrees of judicial scrutiny."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring).  Third, Title VII also contains many defenses—such as "bona fide occupational qualifications and bona fide seniority and merit systems"—that the Fifth Amendment does not.  *L.W.*, 83 F.4th at 485.

All true.  But a distinction is not necessarily one with a difference.  "[N]othing about these differences [] prevent[s] *Bostock*'s commonsense reasoning—based on the inextricable relationship between transgender status and sex—from [being] appl[ied] to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context."  *Fowler*, 104 F.4th at 790 (citing *Bostock*, 590 U.S. at 660).  "Adopting *Bostock*'s commonsense explanation for how to detect a sex-based classification does not require us to import Title VII's test for liability."  *Fowler*, 104 F.4th at 790–91 (cleaned up).  That Title VII's defenses are codified in separate provisions of Title VII, arguably "bel[ies] any notion that those defenses must apply in equal-protection cases."  *L.W.*, 83 F.4th at 503 n.7 (White, J., dissenting).

The differences between the provisions—material as they may be in some situations—have no bearing on the Supreme Court's careful step-by-step reasoning on the "inextricable relationship" that exists between transgender status and sex.  *See Fowler*, 104 F.4th at 790.  The Court therefore applies *Bostock*'s reasoning to analyze the Military Ban.  In doing so, it does not "import[] the Title VII test for liability," *L.W.*, 83 F.4th at 485, into the equal protection guarantee of the Fifth Amendment.  Rather, it borrows Justice Gorsuch's reasoning to conclude that transgender discrimination is a form of sex discrimination for purposes of the equal protection inquiry.

b.    *Application of the Military Ban to Both Males and Females Does Not Negate Plaintiffs' Individual Rights to Equal Protection*

The Military Ban's *raison d'être* is to exclude transgender persons from military service on the basis of their sex.  EO14183 posits that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." EO14183 § 1.  The Hegseth Policy declares that the DoD "only recognizes two sexes: male and female," and that "[a]n individual's sex is immutable, unchanging during a person's life." Hegseth Policy at 3.  It demands that "[a]ll Service members [] serve in accordance with their [biological] sex."  *Id.*

The Military Ban excludes from service transgender women because they are biologically male but identify as women.  Had those very same servicemembers been born female, the military would not ban them.  Is this discrimination on the basis of sex?  The test is simple: would changing that transgender soldier's sex lead to a different decision by the military?  Yes, a biological female who identifies as a woman is not banned.  Ergo, discrimination.  To adopt Justice Gorsuch's analysis to this case:

> [T]ake … a transgender person [discharged from the military] who was identified as a male at birth but who now identifies as a female.  If the [military] retains an otherwise identical [soldier] who was identified as female at birth, the [military] intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in [a soldier] identified as female at birth. Again, the individual [soldier's] sex plays an unmistakable and impermissible role in the discharge decision.

*Bostock*, 590 U.S. at 660.

To this, Defendants have no answer.  They argue instead that because the Military Ban "applies equally to males and female servicemembers," it does not discriminate based on sex. Dkt. 38 at 14; *see also id.* at 33.  They focus on Justice Gorsuch's assertion in *Bostock* that "[t]he

employers might be onto something if Title VII only ensured equal treatment between groups of men and women . . . Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups." *Bostock*, 590 U.S. at 671; Dkt. 38 at 33; Tr. (Feb. 19, 2025) at 35–39.

Defendants' argument "misreads the Equal Protection Clause to protect particular groups, a construction that [the Supreme Court has] tirelessly repudiated in a long line of cases understanding equal protection as a personal right." *Schuette v. Coalition to Def. Affirmative Action*, 572 U.S. 291, 324 (2014) (Scalia, J., concurring) (cleaned up). Instead, it is a "basic principle that the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*." *Adarand Constructors*, 515 U.S. at 227 (considering race classification) (emphasis in original). Government actions based on sex "should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Id*. Thus, in *Loving v. Virginia*, the Supreme Court rejected "the notion that the mere equal application of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discrimination." 388 U.S. 1, 8 (1967) (cleaned up).[21] And in *J.E.B. v. Alabama ex rel. T.B.*, the Supreme Court held that the Equal Protection Clause prohibits discrimination in jury selection on the basis of sex even though the challenged practice applied equally to both sexes. 511 U.S. 127, 131, 146 (1994).

Defendants' final push to distinguish *Bostock* centers on the "premise" from which *Bostock* proceeds. Opp. at 23. "While in the Title VII context individuals are generally similarly

---

[21] Granted, race-based claims are subject to a higher level of scrutiny than sex-based claims in an equal protection inquiry. *See Cleburne*, 473 U.S. at 440–41. But neither the Supreme Court nor the D.C. Circuit have said that the initial question—whether there is a classification—differs depending on the classification at issue.

situated because an individual's homosexuality or transgender status is not relevant to employment decisions, . . . men and women are not similarly situated when it comes to certain military standards." *Id.* at 23–24 (cleaned up). True. But again, the Court here does not apply *Bostock* or "import[] the Title VII test for liability." *L.W.*, 83 F.4th at 485. It instead borrows Justice Gorsuch's logic to conclude that transgender discrimination is a form of sex discrimination. And because the Military Ban targets transgender persons for disparate treatment, it creates an explicit sex-based classification that requires application of intermediate scrutiny. *See VMI*, 518 U.S. at 531.

### 2.    Transgender Persons are a Quasi-Suspect Group

Plaintiffs argue that the Military Ban is also subject to intermediate scrutiny because transgender persons are a quasi-suspect class. Neither the Supreme Court[22] nor the D.C. Circuit has addressed this contention. But the relevant test is well established. *See Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987). Quasi-suspect classes have historically been subject to discrimination, *Cleburne*, 473 U.S. at 440–41; they have a defining characteristic that bears no relation to ability to contribute to society, *id.*; they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics, *Bowen*, 483 U.S. at 602; and they lack political power, *id.*

The Court addresses each factor in turn. But, first, it acknowledges that the bar for recognizing a new quasi-suspect class is high. As Defendants emphasize, Opp. at 35, the Supreme Court "has not recognized any new constitutionally protected classes in over four decades[] and instead has repeatedly declined to do so." *L.W.*, 83 F.4th at 486. But the bar—no

---

[22] A case pending before the Supreme Court might settle the question. *See United States v. Skrmetti*, No. 23-477 (U.S. argued Dec. 4, 2024). But the Court cannot read tea leaves, so it will not speculate about the outcome there in reaching its decision.

matter how high—is not insurmountable.  *See Padula*, 822 F.2d at 102.  Indeed, many Circuit

Courts have held that the transgender community clears it.  *See Hecox*, 104 F.4th at 1079; *Grimm*

*v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) *as amended* (Aug. 28, 2020) [23];

*but see L.W.*, 83 F.4th at 486–87.

### a.    *Transgender Persons Face Discrimination*

Transgender persons, "[a]s a class[,] . . . have suffered, and continue to suffer, severe

persecution and discrimination."  *Doe 1*, 275 F. Supp. 3d at 208–09.  Other executive orders

issued by President Trump seek to deny them necessary medical care (and threaten those who

help them with potential civil and criminal liability), erase them from all government websites,

and refuse them access to homeless shelters.  *See infra* Analysis II.C.3.  Dozens of state laws

also target transgender persons.  *See* Dkt. 73-15.  These bills span transgender rights to

education, healthcare, birth certificates, employment, bathroom access, incarceration, marriage,

civil rights, adoption, child abuse, pronouns, and the military.  *See id.*  Taken together, these

actions show government hostility—and at times outright discrimination—against transgender

persons.

This discrimination is not new.  *See Grimm*, 972 F.3d at 612.  The transgender

community has historically "suffer[ed] from high rates of employment discrimination, economic

instability, and homelessness."  *Id.* at 611.  According to a 2011 National Transgender

---

[23] Numerous district courts, including this one, have also held that transgender persons constitute a quasi-suspect class.  *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017), *vacated on other grounds by Doe 2 v. Shanahan*, 755 Fed. Appx. 19 (D.C. Cir. 2019); *Evancho v. Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 872–74 (S.D. Ohio 2016); *Adkins v. City of New York.*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

Discrimination Survey (NTDS), transgender persons are twice as likely as the general population to experience unemployment. *Id.* at 611–12.  When employed, 97% of NTDS respondents reported experiencing some mistreatment at work or having to conceal their transition to avoid mistreatment.  *Id.* at 612.  Transgender persons frequently experience harassment, and at times physical assault, in schools, medical settings, and retail stores.  *Id.*  They are also "more likely to be [victims] of violent crimes" than the general population.  *Id.*; *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).  For good reason, then, in 2009, the House Judiciary Committee "recognized the extreme bias against gender nonconformity" and the "particularly violent crimes perpetrated against transgender persons." *Grimm*, 972 F.3d at 612 (cleaned up).

This discrimination has not been without effect.  The medical literature review study the Action Memo cites concludes that transgender persons have a higher rate of mental health episodes because of the pervasive discrimination they face.  *See supra* Findings of Fact II.B.  For these reasons, the Court finds that transgender persons, as a class, satisfy this factor.

### b.    *Transgender Persons Contribute to Society*

Being transgender bears no relation to one's ability to perform or contribute to society. *Grimm*, 972 F.3d at 612.  Plaintiffs' service—exemplary service that Defendants recognize— proves as much.  Dr. Brown,[24] Plaintiffs' expert, confirms that "there is no medical or scientific basis for the assertion that being transgender conflicts with military standards of troop readiness, lethality, cohesion, honesty, humility, uniformity, or integrity."  Dkt. 72-77 at 4.  Seventeen of

---

[24] Dr. Brown earned his Doctor of Medicine from the University of Rochester School of Medicine in 1983.  Dkt. 72-77 ¶ 4.  He has three decades of experience researching, teaching, and consulting about transgender health issues, including gender dysphoria.  *Id.* ¶ 2.  He has authored well over a hundred publications on the subject and received dozens of awards for his work.  Dkt. 32-1 at 9–10, 14–22.

the foremost medical, mental health, and public health organizations agree that being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[25]  While some transgender persons experience gender dysphoria, and that could cause some level of impairment, not all transgender persons have gender dysphoria.  Those who do can obtain effective treatment.  Dkt. 32-2 at 6, 9, 15.  Defendants offer no rebuttal to this evidence.  For these reasons, the Court finds that transgender persons, as a class, satisfy this factor.

### c.    *Transgender Persons Have Immutable Characteristics*

The Court agrees with the holdings of other courts that transgender persons constitute a discrete group with immutable characteristics.  "Gender identity is formulated for most people at a very early age."  *Grimm*, 972 F.3d at 612.  It is also "not a choice."  *Id.*  "Rather, it is as natural and immutable as being cisgender."  *Id.*; *see also Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1087 (9th Cir. 2000).

Plaintiffs cite numerous studies to support their immutability argument.  First, those studies show that "transgender women and non-transgender women have similar brain structures, specifically in the volume of the bed nucleus of the stria terminalis."  Dkt. 57 at 5.  Second, they show "that if one identical twin is transgender, the other is much more likely to be transgender compared to fraternal twins."  *Id*.  And third, they show that scientists are now investigating differences in specific genes associated with being transgender.  *Id.* at 5–6.  These studies highlight that biology likely plays a role shaping a person's transgender identity.

---

[25] Am. Psychiatric Ass'n, Position Statement on Discrimination Against Transgender and Gender Non-Conforming Individuals 1 (2024), https://www.psychiatry.org/getattachment/ad686aa4-8ca9-4a92-b007-cf05a50f8e78/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

Defendants disagree.  Citing the Sixth Circuit's *L.W.* decision, they claim that transgender identity "is not necessarily immutable, as the stories of detransitioners indicate." Opp. at 36 (citing *L.W.*, 83 F.4th at 487) (cleaned up).  If people can detransition, being transgender is not immutable.  Case closed, Defendants say.  Not so fast, Plaintiffs shoot back. A detransition is not always voluntary and does not dispel gender dysphoria.  Indeed, "no available research indicates that change efforts are effective in altering gender identity."  Dkt. 72-3 at 3 (cleaned up).  To the contrary, individuals who detransition "have reported harm resulting from these experience[s] such as emotional distress, loss of relationships, and low self-worth."  *Id.* at 4 (cleaned up).  Gender identity change efforts "are associated with harmful social and emotional effects for many individuals, including but not limited to, the onset or increase of depression, anxiety, suicidality, loss of sexual feeling, impotence, deteriorated family relationships, a range of post-traumatic responses, and substance abuse."  *Id.* (cleaned up). "Leading medical and mental health professional associations agree."  *Id.*  Defendants offer no rebuttal.

Defendants also cite *L.W.*'s statement that "[t]ransgender status [] is not characterized by a specific defining feature, but instead may be said to include 'a huge variety of gender identities and expressions.'"  Opp. at 36 (citing *L.W.*, 83 F.4th at 487).  But neither Defendants nor Plaintiffs assert such a broad definition of "transgender."  *See* Third Amend. Compl. ¶¶ 218–23. The parties' definitions cover individuals that either *live or wish to live in* (according to Plaintiffs, Third Amend. Compl. ¶ 218) or *identify as* (according to Defendants, Tr. (Feb. 18, 2025) at 45) a sex different than their birth sex.  These definitions are consistent with each other and with the American Psychological Association's definition of "transgender."  *See* Dkt. 57-3 at 2.  The Court finds that, as a class, transgender persons satisfy this factor.

### d. *Transgender Persons Constitute a Minority Lacking Political Power*

Defendants deem it "untenable" to claim that transgender persons cannot attract the attention of lawmakers, and they cite federal and state laws protecting transgender persons in the employment setting.  Opp. at 36–37.  They also claim that transgender persons "achieved at least some version of their desired military policy from the last two Democratic Administrations and can reasonably be expected to do so again from the next Democratic Administration." *Id.* at 36.  Likewise, the Sixth Circuit has stated that it is "difficult to maintain that the democratic process remains broken on this issue today" in part because "[t]he President of the United States [Biden] and the Department of Justice support the [transgender] plaintiffs." *L.W.*, 83 F.4th at 487.  But that support was new, and the Trump Administration quickly withdrew that support when it re-assumed office.[26]

The question, however, is not whether the political process is broken on any given day on a given issue.  The question is whether transgender persons—who comprise approximately 0.6% of the adult population in the United States[27]—have been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  This Memorandum Opinion's sub-headings concerning military service alone answer it:

> Part I.A. Obama—Transgender Persons Can Serve
> Part I.B. Trump I—Transgender Persons Cannot Serve
> Part I.C. Biden—Transgender Persons Can Serve

---

[26] *United States v. Skrmetti*, No. 23-477 (U.S. argued Dec. 4, 2024) (Feb. 7, 2025 Letter from Deputy Solicitor General).

[27] Grace Abels, *How many trans people are there in the U.S., and why do we overestimate it?*, PolitiFact (July 13, 2023), https://www.politifact.com/article/2023/jul/13/how-many-trans-people-are-there-in-the-us-and-why/.

Part I.D. Trump II—Transgender Persons Cannot Serve.

Being kicked around like a football by whatever team has possession is the opposite of meaningful political power. The Court finds that transgender persons, as a class, satisfy this factor.

### 3.    *Application of Intermediate Scrutiny*

Intermediate scrutiny is a "demanding" standard. *VMI*, 518 U.S. at 533. The burden "rests entirely on the State" to demonstrate an "exceedingly persuasive" justification for its differential treatment. *Id.* The Government must show "that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (cleaned up). The justification for a law that discriminates against a quasi-suspect class "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* "And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*

Defendants suggest that "ample evidence supports the military's judgment on this issue." Opp. at 40. They divide their evidence into three categories: (1) military readiness, (2) unit cohesion, good order, and discipline, and (3) disproportionate costs. Below, the Court addresses the lack of any connection between Defendants' evidence and the Military Ban's directives. In a separate section below, *see infra* Analysis II.C., the Court finds that the Military Ban is littered with animus and pretext. That discussion is equally applicable in assessing why the Military Ban does not survive intermediate scrutiny.

### a.    *Military Readiness*

Defendants first argue that DoD "is concerned about subjecting those with a history of gender dysphoria to the unique stresses of military life." Opp. at 41. They explain that "any mental-health condition characterized by clinically significant distress or impairment in

functioning raises readiness concerns." *Id.* And because there is an "absence of evidence on the impact of deployment on individuals with gender dysphoria," DoD "concluded that this condition posed readiness risks." *Id.* (cleaned up). Defendants also argue that "it remains the case that transition-related medical treatment . . . could render transitioning servicemembers non-deployable for a potentially significant amount of time," which could create "harmful effects on transitioning servicemembers' units as a whole." *Id.* at 42–43 (cleaned up).

To support these conclusions, Defendants "expressly relied" on the 2018 Mattis Policy, the 2021 AMSARA Report, and the 2025 Medical Literature Review. Opp. at 41–44. Not one of these supports a finding that the discriminatory means employed (banning transgender persons from serving) are substantially related to the achievement of the Ban's objectives (military readiness). First, citing the Mattis Policy, Defendants claim that there is an "'absence [of experience] on the impact of deployment on individuals with gender dysphoria.'" *Id*. at 41 (quoting Mattis Policy at 39). Therefore, gender dysphoria "pose[s] readiness risks." *Id.* But there is no absence. There *may* have been one *in 2018* when the Mattis Policy issued. Since then, however, persons with gender dysphoria have been deployed under the Austin Policy. *See supra* Background III. That Defendants did not review the impact of their service does not mean it does not exist.

Second, the AMSARA Report supports *retaining* transgender persons in the military. *See id.* Of the eleven categories it studied, in ten transgender persons' statistics were similar to or better than those for other servicemembers. *Id*.; *see also* Tr. (Mar. 12, 2025) at 78. The Action Memo picked the one outlier: transgender persons are *evaluated* more. Tr. (Mar. 12, 2025) at 47. But their *occurrence* rates, including in psychotherapy and surgery, are similar. *Id.* at 68. Defendants' argument that the Report found that transgender persons' non-deployment rates

were unacceptable is incorrect. The Report expressly found that more study was needed before anyone could reach such a conclusion because comparator data for other servicemembers had not been collected. Dkt. 73-24 at 6.

Third, the 2025 Medical Literature Review does not include studies that address military servicemembers. It therefore does not study the effect of service on active-duty transgender servicemembers, all of whom have met the military's mental fitness requirements to accede. *See* Tr. (Mar. 12, 2025) at 130. Indeed, Defendants cite no contemporaneous support for their purported concern that those with a history of gender dysphoria are more prone to the unique stresses of military life. To the contrary, the Review confirms that—contrary to the presumption that those who have ever had gender dysphoria cannot serve—gender dysphoria is highly treatable. *See id.*

Plaintiffs, for their part, have provided evidence that disproves any relation between the Military Ban's methods and goals. Five military leaders in charge of implementing the Austin Policy each conclude that the Austin Policy was "based on years of thoughtful policymaking supported by peer-reviewed scientific research" and that it "has resulted in a stronger, not a weaker military." Dkt. 72-69 ¶ 34. Based on their first-hand knowledge, they each also testify that the Austin Policy "fosters openness and trust among team members, thereby enhancing unit cohesion." Dkt. 72-74 ¶ 13; *see also* Dkt. 72-72 ¶ 9. They testify that the Military Ban—not the Austin Policy—"is harmful to the military" and "undermines unit readiness." Dkt. 72-59 ¶ 38; *see also* Dkt. 72-72 ¶ 21 ("[A] prohibition on service by transgender individuals would degrade military readiness and capabilities."). Other than a limited foundation objection as to one declarant, Defendants do not rebut this testimony.

### b.        Unit Cohesion, Good Order, and Discipline

Defendants further contend that "DoD reasonably determined that exempting individuals

with gender dysphoria who have undergone gender transition or seek to do so from the military's

sex-based standards would undermine good order, discipline, steady leadership, unit cohesion,

and ultimately military effectiveness and lethality." Opp. at 45 (cleaned up). They speculate that

"a contrary approach would risk, among other things, eroding reasonable expectations of privacy

by other servicemembers." *Id.* (cleaned up). Defendants also assert that "DoD has expressed

concerns that exempting servicemembers from sex-based standards in training and athletic

competitions on the basis of gender identity would generate perceptions of unfairness in the

ranks." *Id.* at 47. And per Defendants, "DoD is also concerned that exempting servicemembers

from uniform and grooming standards based on gender identity would create friction in the

ranks." *Id.*

These justifications fail. To start, the Military Ban covers those who even "exhibit

symptoms *consistent with*[] gender dysphoria." Hegseth Policy at 1 (emphasis added). Because

it has no guard rails—*i.e.*, what these symptoms include, how often they can be exhibited, who

decides whether they are being exhibited, Def. Concession Tr. (March 12, 2025) at 14–15—this

exclusion is so broad as to capture persons who have never had gender dysphoria, and therefore

do not even possibly present the same "concerns."

Defendants again rely almost exclusively on the Mattis Policy. *See id.* at 45–49. But, yet

again, the Mattis Policy is woefully stale. *See supra* Findings of Fact II.B.1. Further, the

Military Ban's justifications impermissibly rely on "overbroad generalizations about the different

talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 533. They also

impermissibly rely on not only overbroad, but also derogatory generalizations about the different

talents, capacities, or preferences of transgender persons.  Such overbroad generalizations do not suffice to show that a sweeping discriminatory ban is substantially related to military readiness and unit cohesion.

Even if the Military Ban had focused solely on those diagnosed with gender dysphoria, Defendants do not identify any problem that needs a new solution.  Appropriate treatment for gender dysphoria is both "effective" and "no more specialized or difficult than other sophisticated medical care the military system routinely provides."  Dkt. 32-2 at 6, 9, 15.  The 2025 Medical Literature Review the Action Memo cites concludes that gender-affirming medical care is highly effective.  *See supra* Findings of Fact II.B.3.  And recall that already under DoD Instruction 6130.0 (Medical Standards for Appointment, Enlistment, or Induction into the Military Services), individuals with a history of gender dysphoria seeking to enlist must be "stable" in their gender identity for 18 months before enlistment.  Third Amend. Compl. ¶ 263. Defendants do not explain why addressing a *treatable* condition requires excluding all persons who have ever had—or even exhibited symptoms of—it.  Nor do they explain why the constraint already in place, 18 months of stability, is insufficient.

These overbroad generalizations are also contradicted by the Record.  Plaintiff Talbott testifies: "In each military setting I have worked in so far—basic training, Officer Candidate School, and my Reserve unit—I have been open about my transgender status and have felt welcomed by my peers and supervisors."  Dkt. 72-18 ¶ 18.  Plaintiff Vandal testifies that after coming out she "received nothing but support and acceptance from my command and others who learned I was transgender.  Since then, I have been promoted to my current rank of Major."  Dkt. 72-20 ¶ 14–15.  Plaintiff Herrero testifies: "The support of my leaders, peers, and subordinates throughout my transition has not only made our units stronger but has also made me a more

effective leader." Dkt. 72-25 ¶ 16. Plaintiff Danridge testifies: "In my time as both a Reservist and on active duty, my transgender status has rarely come up and has never been an issue. In fact, I received overwhelming support from my unit's Commanding Officer to apply for OCS." Dkt. 72-28 ¶ 24.

This testimony—which Defendants do not rebut—is a credit to the military's ability to welcome all those capable of serving. Indeed, had Defendants conferred with transgender servicemembers and those who serve with them, instead of making specious generalizations, they might have learned that the Military Ban is little more than a solution in search of a problem.

### c.    *Disproportionate Costs*

Defendants argue that "DoD reasonably concluded that its disproportionate expenditures on facilitating gender transition should be better devoted elsewhere." Opp. at 50. They explain that "between 2015 and 2024, DoD spent $52,084,407 providing care to active-duty Service members to treat gender dysphoria" and that "medical costs for servicemembers with gender dysphoria was nearly three times compared to servicemembers without this condition." *Id.* at 49.

To support this "three times" conclusion, Defendants rely on the Mattis Policy's assessment of costs from the time before the Carter Policy was instituted through to the issuance of the Mattis Report (2014 to 2018). Dkt. 73-8 at 46. But the Mattis findings show that costs spiked after the military first began covering gender-affirming costs in September 2015, no doubt because of pent up demand. Dkt. 38-4 at 32. They began returning to baseline thereafter. *Id.* That trend indicates two things. First, the Mattis Policy findings are outdated. Second, costs are likely no longer disproportionate. This is confirmed by the AMSARA Report's findings that

occurrence rates for common medical events are similar between transgender and non-transgender service members.  Dkt. 73-24 at 4.

As discussed in the Findings of Fact, Defendants cannot explain how transgender care has resulted in "disproportionate" costs for the military.  *See supra* Findings of Fact II.B.4.  When asked to provide the overall medical, psychotherapy, and surgical costs for all servicemembers so that some comparison could be made, Defendants could not answer.  *See* Tr. (Mar. 12, 2025) at 144–50.  Without any source of comparison or benchmark, Defendants cannot claim that allowing transgender persons to serve results in "disproportionate" costs for the military.

### d.    The Hegseth Policy's Exemption Provision

Defendants contend that the Hegseth Policy's exemption provision addresses any potential issue.  Opp. at 22–23.  Hardly.  Transgender servicemembers can obtain an exemption if they show that they can safely perform all military tasks, and if retaining the servicemember would support warfighting capabilities.  Hegseth Policy at 8.  Even then, the transgender person can only continue to serve if: (1) they have been stable in their birth sex for 36 consecutive months, (2) they have never transitioned *or even attempted to transition* to any sex but their birth sex, and (3) they agree to serve in their birth sex.  *Id.*  Under this test, none of the Plaintiffs would be eligible for an exemption.  Indeed, it is hard to imagine anyone who could or, given the constraints, would want to do so.  Even with this non-exemption exemption, the Military Ban is not even remotely, much less rationally or substantially, related to the Government's goals.  *See supra* Findings of Fact II.

The Military Ban also prohibits the use of "invented" pronouns used to "identify" persons because they too are inconsistent with military readiness.  EO14183 § 4(b).  This assertion makes

no sense as written—all pronouns are invented and used to identify persons. That aside, Defendants could not even begin to identify how pronoun usage affects military readiness. Tr. (Mar. 12, 2025) at 198. The Court gave defense counsel the opportunity to present a witness—any witness—to state under oath that it does. *Id.* None materialized.

* * * * *

Defendants have articulated important government objectives in military readiness, unit cohesion, and saving costs. But the Fifth Amendment requires more than pointing to such "broadly formulated interests." *Singh*, 56 F.4th at 97. Defendants must show that the discriminatory Military Ban is in some way substantially related to the achievement of those objectives. And they must do so without relying on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 538. They do not come close. Plaintiffs are likely to succeed on their claim that the Military Ban fails intermediate scrutiny review.

### C.    Animus

In our constitutional republic, citizens are free to hold and express divergent views. But when "sincere, personal opposition [to a group of people] becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). Such is the case here. The Military Ban is soaked in animus and dripping with pretext. Its language is unabashedly demeaning, its policy stigmatizes transgender persons as inherently unfit, and its conclusions bear no relation to fact. Thus, even if the Court analyzed the Military Ban under rational basis review, it would fail.

### 1.    *The Military Ban Is Fueled by Animus*

Plaintiffs contend that because the Military Ban is fueled by animus, it fails any level of scrutiny.  They stand on solid legal ground.  *Romer v. Evans*: a law that "seems inexplicable by anything but animus toward the class it affects [] lacks a rational relationship to legitimate state interests."  517 U.S. 620, 632 (1996).  *Lawrence v. Texas*: "[m]oral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause."  539 U.S. 558, 583 (2003) (O'Connor, J., concurring).  *United States v. Windsor*:  legislation intended to "injure," "stigma[tize]," "demean," and "degrade" does not survive scrutiny.  570 U.S. 744, 769, 770, 772, 774 (2013).  *Cleburne*: a law that "rest[s] on irrational prejudice" cannot stand.  473 U.S. at 450.  And *U.S. Dep't of Agric. v. Moreno*: "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  413 U.S. 528, 534 (1973).

Defendants respond that the Court cannot probe "government officials' subjective intentions."  Dkt. 38 at 27.  True, the Court cannot read minds.  But it can read.  EO14183 and the Hegseth Policy tag transgender persons as weak, dishonorable, undisciplined, boastful, selfish liars who are mentally and physically unfit to serve.[28]  Its accompanying Fact Sheet piles on, further calling transgender persons insane, not resilient, unhealthy, and unfit.  Dkt. Notice (Mar. 7, 2025).  Hardly subtle.  Refusing to give up the ghost, however, Defendants refused to answer whether this language evinces animus.  Tr. (Feb. 18, 2025) at 155–56; *see also id.* at 154–59; Tr. (Mar. 12, 2025) at 192.  But the Court has no such problem.  It finds that the

---

[28] The Court reaches this conclusion by mirroring the Ban's language.  For example, in stating that transgender persons cannot maintain discipline, the Ban necessarily asserts that transgender persons are undisciplined.

Military Ban's language evinces the "bare…desire to harm a politically unpopular group."
*Moreno*, 413 U.S. at 534.

  Faced with incontrovertible facts, Defendants do not contend that the Military Ban is an animus-free zone. They argue instead that the Military Ban must be impossible to justify based on anything but animus to be unconstitutional. Tr. (Feb. 19, 2025) at 63–64, 87. "If," Defendants claim, "there is a facially legitimate, bona fide reason, then perceived animus is not a ground on which the courts can second-guess the political branches in the national security space." *Id.* at 90. Defendants have not provided a legitimate reason for banning all transgender troops.

  That aside, animus alone has never been the standard. The Colorado law at issue in *Romer*, for example, prohibited the state or any municipalities from enacting laws designed to protect members of the LBGTQ community. 517 U.S. at 624. The state offered a legitimate, bona-fide reason for the law: "respect for other citizens' freedom of association." *Id.* at 635. Nonetheless, because the "breadth of the amendment [wa]s so far removed from these particular justifications," the Supreme Court "f[ou]nd it impossible to credit them." *Id.* Thus, even though the state alleged a legitimate interest, the Court held that the law "classifie[d] homosexuals not to further a proper legislative end but to make them unequal to everyone else." *Id.* The Military Ban does the same.

  The Military Ban is also unique in its unadulterated expression of animus—an expression of animus that no law the Supreme Court has struck down comes close to matching. Though the law at issue in *Romer* directly addressed "homosexuals," it did not include any demeaning or derogatory language. *Id.* at 624. In *Cleburne*, a Texas city required a special permit for "hospitals for the insane or feeble-minded," but the zoning ordinance said nothing about the

character of mentally ill persons.  473 U.S. at 436.  The provision at issue in *Moreno*, which

involved a challenge to a food stamp restriction aimed at hippies, required only that food stamp

recipients living in the same household be related.  413 U.S. at 531.  Even the Defense of

Marriage Act was silent as to any negative stereotypes or generalizations about gay people.

*Windsor*, 570 U.S. at 752.  Yet the Supreme Court struck down each of these laws.

  Defendants also argue that once the government identifies a legitimate interest, a court's

inquiry stops.  Tr. (Feb. 18, 2025) at 158–59; Tr. (Feb. 19, 2025) at 63–64.  Not so.  The city in

*Cleburne* argued that the special permit requirement was related to its interest in "the safety and

fears of residents in the adjoining neighborhood."  473 U.S. at 437.  These safety concerns were

not entirely unfounded—the city was worried about "negative attitudes" of local property

owners, the location of the mental institution near a school, fire hazards, and traffic congestion.

*Id.* at 448–50.  But the Supreme Court did not simply take the city at its word.  Instead, it found

that these rationales "fail[ed] rationally to justify" the special permit restriction.  *Id.* at 450.

  The *Moreno* Court scrutinized the government's stated interest even further.  The

government maintained that the food stamps restriction was meant to minimize fraud.  *Moreno*,

413 U.S. at 535.  But the Supreme Court noted that there were already provisions in place to

minimize fraud, and whatever fraud did occur was subject to criminal prosecution.  *Id.* at 536.

Thus the Court had "considerable doubt" that the restriction was "rationally . . . intended to

prevent those very same abuses."  *Id.* at 537.

  Peeling back other stated rationales of the Military Ban reveals pretext for animus.  To

start, Defendants concede that DoD has never identified any "mental health constraint" other

than gender dysphoria that is wholly inconsistent with characterizations such as "honesty,

humility, and integrity" and therefore with military service.  Dkt. 66 at 3.  Moreover, current

military policies already address gender dysphoria. *See* Dkt. 72-67 (DoDI 6130.03, Vol. 2);

DoDI 6130.03, Vol. 1 at 6.28(t). If gender dysphoria were a genuine concern, the Policy would

cover a narrow set of individuals with gender dysphoria. Instead, the Policy reaches everyone

who has ever "exhibit[ed] symptoms consistent with[] gender dysphoria." Hegseth Policy at 3.

Because this "breadth" is "so far removed" from military health concerns, it is "impossible to

credit" Defendants' justifications. *Romer*, 517 U.S. at 635.

Defendants claim more generally that the Ban is needed because every servicemember

must meet the military's rigorous physical and mental fitness requirements. *See* Dkt. 72-67; Dkt.

72-82 ¶ 20. But such standards are already in place, and each active-duty Plaintiff already meets

them. *See, e.g.*, Dkt. 72-27 ¶ 4 ("I meet all standards applicable to male service members.");

Dkt. 72-58 ¶ 18 ("I meet all standards applicable to female service members."); Defs.

Concession, Tr. (Mar. 12, 2025) at 130. And if the concern were genuine, the Policy would

permit waivers for anyone who could demonstrate an "ability to safely complete common

military tasks at a general duty level." DoDI 6130.03, Vol. 2, at 3.2(a). Or, to use the Policy's

own language, it would allow for waivers "provided there is a compelling Government interest in

retaining the Service member that directly supports warfighting capabilities." *See* Hegseth

Policy at 4. So, like in *Moreno*, the Court has "considerable doubt" that this rationale is driving

the Military Ban.

If the fitness concern were genuine, the Policy would also be limited to addressing health

concerns. Yet the policy makes some assertions that can be explained only by pretext, *e.g.*, that

pronoun usage in some (still unfathomable) way impacts military readiness. *Id.* at 3. Defendants

also make a passing reference that the military must address suicide ideation. Fair, but again, the

military already bars individuals with suicidality from enlisting. *See* DoDI 6130.03, Vol. 1, at

6.28(m).  Additionally, if the health concern were genuine, the Policy would apply to all people

who have received any kind of hormone therapy or genital reconstruction surgery.  But it does

not.  It applies only to those who have received such care "as treatment for gender dysphoria or

in pursuit of a sex transition."  Hegseth Policy at 6; *see also* Defs. Concession, Tr. (Mar. 12,

2025) at 120.

      Defendants claim the Military Ban is necessary to ensure all servicemembers' privacy,

such as in sleeping and showering arrangements.  *See* Hegseth Policy at 4.  If this concern were

genuine, barrack assignments would be based on anatomical (phenotypic) sex, not reproductive

(gonadal) sex.  For intersex individuals, who can present in about forty different ways,[29] the two

are not necessarily aligned.  A person with ovotestes has both ovarian and testicular tissue and so

presumably could not be assigned to either male or female barracks, regardless of their

anatomical sex.[30]  A person with male genitalia but female reproductive anatomy would be put in

female barracks, undoing the very privacy concern the Military Ban purports to address.[31]  And

how will the military assure persons are tucked away in barracks without causing "privacy"

---

[29] The Cleveland Clinic's intersex internet page addresses some of these presentations. *Intersex*, Cleveland Clinic (last visited Mar. 16, 2025),
https://my.clevelandclinic.org/health/articles/16324-intersex.

[30] *Id.*

[31] To be sure, being intersex is rare—about 1.7% of the U.S. adult population.  But then again, being transgender is more so—about 0.6% of the U.S. adult population.  *See* Rebecca Boone & Jeff McMillan, *How many transgender and intersex people live in the U.S.?*, US News (July 27, 2023, 10:31 AM), https://apnews.com/article/how-many-transgender-intersex-laws-0218b75a197f07d8c51620bb73495d55.

concerns?  Presumably, by looking at them.  So why not base barrack assignments on anatomical sex?  Because doing so would not exclude transgender persons from serving.[32]

Lastly, Defendants' cost concerns make clear that the Ban is purposely targeting transgender individuals.  As discussed, the cost of medical care for transgender troops is de minimis.  *See supra* Findings of Fact II.B.4.  And Defendants have not explained why *these* costs are of more concern than other costs.  "Many service members receive medical care for far more common medical conditions, at a far greater cost and with a significant impact on the military budget."  Dkt. 72-76 ¶ 13.  For example, Viagra cost the DoD $41,000,000 in 2023 alone— nearly eight times what the DoD spends on transgender medical care each year.  *See* Dkt. 72-68 ¶ 9.  Additionally, "the same medications (hormone therapies) and surgeries (mastectomies, hysterectomies, genital reconstruction)" that Defendants claim are too costly "are provided to non-transgender service members."  Dkt. 72-78 ¶ 65.  But the Hegseth Policy does not ban those treatments.  So why pay for hormone therapy for some servicemembers but not others?  Because the Policy clearly targets *transgender* medical care costs.  It "rest[s] on irrational prejudice."  *Cleburne*, 473 U.S. at 450.

### 2.    *Defendants Misread* Trump v. Hawaii *Again*

Defendants rely on *Trump v. Hawaii* to argue that the Court must defer to the military even if it finds the military ban is fueled by animus.  They assert that because the government has offered what—on their face—appear to be legitimate reasons for the ban (i.e., troop readiness and unit cohesion), the Court must uphold the Ban.  Opp. at 50–54.

---

[32] Courts have rejected privacy as a rationale for discrimination against transgender persons.  *See A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772–73 (7th Cir. 2023); *Grimm*, 972 F.3d at 613–14; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018).

As discussed above, this has never been the Supreme Court's approach in animus cases. The *Hawaii* Court cited *Moreno*, *Cleburne*, and *Romer* as examples of laws that could *not* "reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705, 706. Yet the defendants in those cases did not fail to proffer independent justifications. Rather, the Supreme Court found those purported justifications to be lacking. *See supra* Analysis II.C.1. So, too, does this Court find Defendants' justifications empty.

Defendants further argue that, to find animus, the *Hawaii* Court required that a law be "inexplicable by anything but animus." Opp. at 51 (quoting *Hawaii*, 585 U.S. at 706). But this quote is inapposite for two reasons. First, this is not what the Supreme Court said. Rather, it concluded that the entry restriction proclamation "d[id] not fit the pattern" of previous animus cases because it was neither "impossible to discern a relationship to legitimate state interests" nor was it "inexplicable by anything but animus." *Hawaii*, 585 U.S. at 706 (cleaned up). Thus, at the very least, the *Hawaii* Court offered two paths to a finding of animus: the lack of a relationship to a legitimate state interest or the inability to explain by anything but animus. *Id.* This Court, as discussed above, cannot conclude that the Military Ban is related to the government's interests in military readiness, unit cohesion, and cost reduction. So, applying the *Hawaii* Court's own language, Defendants' argument fails.

Second, even if a law *had to be* inexplicable by anything but animus, the Court here has no trouble finding that the Military Ban fits this description. To recap, the Military Ban: disqualifies all "[t]ransgender troops . . . without an exemption"; contains an exemption in name only; relies on derogatory generalizations Defendants concede are pure conjecture; reflects no study of the service of transgender persons since 2021 and instead relies on "predictions" made

in 2018; egregiously misquotes studies and ignores data supporting service by transgender persons; asserts "justifications" untethered to fact except insofar as Defendants' own evidence contradicts them; and bans certain medical treatments only when prescribed to transgender individuals. The Court could go on. Suffice it to say, at this early stage, Plaintiffs are likely to prevail on their claim that the Military Ban is driven exclusively by animus.

### 3.    The Government Has Targeted Transgender Persons Writ Large

The Court could stop here in its analysis and comfortably conclude that Plaintiffs are likely to succeed on their claim that the Military Ban is motivated by animus and is not tailored to meet its stated goals. But, as they say, there is more, for the Military Ban does not stand alone. President Trump has signed an executive order recognizing the existence of only two sexes;[33] blocked schools from using federal funds to promote the idea that gender can be fluid;[34] directed the State Department to stop issuing documents that allow a third "X" gender marker;[35] changed references to "LGBTQI+" on government websites to "LGB," erasing not just transgender persons, but intersex people as well;[36] revoked the ability of transgender federal employees to receive gender-affirming care;[37] and directed that all incarcerated transgender

---

[33] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[34] Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025).

[35] Shannon K. Kingston & Kiara Alfonseca, *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025, 11:27 AM), https://abcnews.go.com/US/state-department-halts-passport-gender-marker-applications/story?id=118062178.

[36] Dkt. 74-8 at 8.

[37] *See* Lauren Clason, *Trump EOs Cast Doubt on Benefits for Transgender Federal Workers*, Bloomberg Law (Jan. 31, 2025, 10:38 AM), https://news.bloomberglaw.com/daily-labor-report/trump-eos-cast-doubt-on-benefits-for-transgender-federal-workers (discussing President Trump's revocation of Biden-era executive orders that expanded federal employee health coverage for gender-affirming care).

persons be denied medical treatments and be housed by birth sex,[38] where they are nine times more susceptible to violence.[39]

The Office of Personnel Management has issued a memo directing all agencies to "take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology,"[40] resulting in vital Centers for Disease Control pages on contraception guidelines, vaccine information, and HIV data, among some 8,000, being taken down.[41]  The Office of Management and Budget—following the President's directives—issued a memo promising to stop the use of federal funds to promote "transgenderism."[42]

The federal government removed all references to LGBTQ+ youth from the website for the National Center for Missing and Exploited Children, including a page on the suicide rates of missing children and one on male victims of sex trafficking.[43]  It also removed references to LGBTQ+ youth from stopbullying.gov, including a 2016 study that showed the disproportionate rates at which LGBTQ+ students are bullied and a tipsheet on how to prevent such discrimination in schools.[44]  Apparently, bullying and exploiting children is okay if they are gay,

---

[38] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[39] Nora Neus, *Trans women are still incarcerated with men and it's putting their lives at risk*, CNN (June 23, 2021, 2:54 PM), https://www.cnn.com/2021/06/23/us/trans-women-incarceration/index.html.

[40] U.S. Off. of Pers. Mgmt., Initial Guidance Regarding President Trump's Executive Order *Defending Women* (Jan. 29, 2025).

[41] Dkts. 74-2, 74-7, 74-8.

[42] Matthew J. Vaeth, Off. of Mgmt. & Budget, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs (Jan. 27, 2025).

[43] Dkt. 74-3 at 4.

[44] Dkt. 74-8 at 8.

transgender, or intersex.  And the National Park Service removed references to "transgender" from its webpage about the Stonewall National Monument.[45]

This Court does not opine on the constitutionality of these actions.  That said, the flurry of government actions directed at transgender persons—denying them everything from necessary medical care to access to homeless shelters—must give pause to any court asked to consider whether one such order under review furthers a legitimate government interest free of animus.

### III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Irreparable harm is "a high standard."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The harm "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Id.* (cleaned up).  But it must also be "beyond remediation," meaning "the possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm."  *Id.* at 297–98 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).

Plaintiffs readily meet these criteria.  "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (cleaned up).  Suits

---

[45] *Id.* at 4.  Stonewall is an inn in New York City where LBGTQ+ rioters, including trans activists, sparked the gay rights movement.  Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025, 12:52 PM), https://www.npr.org/2025/02/14/g-s1-48923/stonewall-monument-transgender-park-service. The Stonewall Uprising "is regarded as a turning point in sparking a nationwide movement for the equal treatment of gay, lesbian, bisexual and transgender Americans."  *Id.*  To stress how ahistorical this change is, the Wikipedia page for Stonewall uses the word "transgender" (or its variations) fifty-three times.  *Stonewall riots*, Wikipedia, https://en.wikipedia.org/wiki/Stonewall_riots (last visited Mar. 13, 2025).

involving "the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). Separately, all transgender servicemembers suffer from the irreparable reputational stigma the Military Ban espouses and forced separation from their positions. *See Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (reputational harm is irreparable); *McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (irreparable harm in military context); *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (same).

Plaintiffs also allege that their removal from military service would deprive them of steady income and medical care and that the order brands them as less capable solely because of their transgender status. Dkt. 72-1 at 75. Courts in this District have held such losses to be irreparable harms. *See McVeigh*, 983 F. Supp. at 221 (finding that the loss of "benefits attendant with being a Naval officer" constituted irreparable harm); *Elzie*, 841 F. Supp. at 443 (finding that a Marine suffered irreparable harm when he was "labeled as unfit for service solely on the basis of his sexual orientation").

## IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS

The final two factors—the balance of equities and the public interest—favor Plaintiffs. The balance of equities weighs the harm to plaintiffs absent a preliminary injunction against the harm to defendants if the court grants the motion. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). When the government is a party to the case, as it is here, this balancing test and the public interest merge into one factor. *Id.* ("the government's interest *is* the public interest").

Defendants will not suffer any harm if this Court grants the preliminary injunction. In *Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court emphasized the deference afforded to the judgment of military officials "concerning the relative importance of a particular military interest." *Winter*, 555 U.S. 7, 24 (2008) (cleaned up). In finding that the balance of equities and consideration of the public interest "tip[ped] strongly in favor of the Navy," the Court gave significant weight to officers' statements regarding the burden a preliminary injunction would place on the Navy's ability to conduct training exercises and the resulting adverse impact on national security. *Id.* at 24–26.

Defendants have provided no testimony. That is so most likely because no such burden exists here. Granting the preliminary injunction would maintain the status quo of policies that have governed the military for years. *See* Dkt. 72-1 at 12–15, 28. The accession policy has been in place since 2021, *id.* at 14–15, and the retention policy has been in place for nearly a decade (though it was interrupted by the first Trump Administration's Mattis Plan), *id.* at 2–6, 28. The Military Ban does not cite, and Defendants have not provided, any studies or declarations that explain why maintaining the status quo pending litigation would unfairly burden the military.

In contrast, Plaintiffs will be subject to the irreparable harm discussed above absent a preliminary injunction. And absent one, Plaintiffs will also face significant hardship because the Military Ban puts to them a Hobson's choice[46]: either immediately conform with the grooming and appearance standards for their birth sex or choose separation, either voluntarily or by removal proceedings. Dkt. 72-1 at 74. Since Plaintiffs cannot physically conform to those

---

[46] A "Hobson's choice" is a free choice in which there is only one real option. The term traces its origin to Thomas Hobson, a sixteenth-century English stable owner who notoriously offered his customers a "choice" of taking the horse closest to the door (so all would get equally used) or leaving without a horse—essentially, no choice for those who needed a horse. *See* H.W. Fowler, *Hobson's Choice, in The King's English* 203 (2d ed. 1908).

standards and would have to do so against medical advice even if they could, they have no

choice but to separate. *See, e.g.*, Dkts. 72-19 ¶ 8; 72-22 ¶ 6; 72-24 ¶ 6.  This then puts to

Plaintiffs a Sophie's choice.[47]  If they separate voluntarily, they will leave a career that they have

no desire to end.  If they opt for removal proceedings, they may be discharged dishonorably and,

per the Hegseth Policy, will be required to repay the military their bonuses and other amounts.

Hegseth Policy at 7; Dkt. 79-1 at 7.  Permitting the Hegseth Policy to remain in place during

litigation, therefore, will work an obvious hardship to the Plaintiffs.

Public interest considerations also support granting the preliminary injunction.  For one

thing, "[e]nforcement of an unconstitutional law is always contrary to the public interest."

*Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).  As discussed above, Plaintiffs have

shown they are likely to succeed on their Fifth Amendment claim.  And Plaintiffs point to

potential harm to military cohesion and capability should the ban go into effect.  Dkt. 72-1 at 75.

Plaintiffs have carried their burden under all four preliminary injunction factors by

showing their likely success on the merits, the threat of irreparable harm, and that the public

interest and equities support an injunction.

---

[47] A "Sophie's choice" is a dilemma between two equally devastating options.  In the novel
*Sophie's Choice*, a camp doctor at Auschwitz makes Sophie choose which of her two children
would be gassed and which would live.  Sophie chooses to save her son, Jan, so that the family
name can continue through him.  She releases her daughter, Eva, and watches as she is taken
away to be killed in a gas chamber.  Sophie, unable to live with the guilt, later commits suicide.
*See* William Styron, *Sophie's Choice* (Random House 1979).  So, not a pick-me-up.

## SCOPE OF THE INJUNCTION

Considering the full Record and for the reasons stated above, the Court hereby **GRANTS** Plaintiffs' Renewed Application for Preliminary Injunction. The Court details the scope of the injunction in the Order that accompanies this Opinion. On its own motion, the Court stays this injunction until March 21, 2025, at 10:00 am eastern, to provide Defendants time to consider filing a motion for an emergency stay in the D.C. Circuit.

Defendants claim that any injunction must be limited to the Plaintiffs. Opp. at 61. It cannot be, rationally or logistically. Other transgender servicemembers face the same irreparable harms as Plaintiffs. Any transgender person affected by the Ban would need only to file a "me too" complaint in this Court to obtain the same relief. The Court and Defendants then would have to deal with a never-ending conveyor belt of claims. A limited injunction would also cause havoc for the Armed Forces. Some transgender persons would be permitted to serve and accede, others would not. Depending on what happened at the permanent injunction phase, one group or the other would be affected. Superiors and colleagues would need to keep track of ongoing litigation docket updates to understand who was covered. Notably, the government has reiterated that "uniformity" is one of the key goals of the Military Ban multiple times throughout this litigation. *See* EO14183 § 2; Hegseth Policy at 3; Action Memo at 2.

**CONCLUSION**

The Court knows that this opinion will lead to heated public debate and appeals.  In a healthy democracy, both are positive outcomes.  We should all agree, however, that every person who has answered the call to serve deserves our gratitude and respect.  For, as Elmer Davis observed, "[t]his nation will remain the land of the free only so long as it is the home of the brave."

The Court extends its appreciation to every current servicemember and veteran.  Thank you.

Date: March 18, 2025

_____
ANA C. REYES
United States District Court Judge