The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| COMMANDER EMILY SHILLING; *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, <br><br> *Defendants*. | No. 2:25-cv-00241 BHS <br><br> **SUPPLEMENTAL DECLARATION OF ALEX WAGNER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Alex Wagner, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and competently as to the matters stated herein.

**Accession and Retention Standards**

3. The military maintains different medical standards for accession (entry into service) versus retention (continued service). For accessions, the standards are deliberately and appropriately stringent because the military makes a substantial long-term commitment to each service member it accepts, including comprehensive medical care that may extend throughout their lifetime.

4. The military must ensure that newly accessed service members can fulfill their initial contract term and potentially serve for many years beyond. Given the significant financial

SUPPLEMENTAL DECLARATION
OF ALEX WAGNER - 1
Case No. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

and resource investment the military makes in training and developing each recruit, it can only accept individuals whose potential service value will equal or exceed the resources invested in them. This creates a necessarily high bar for medical qualification at accession.

5. The 18-month stability requirement for transgender individuals seeking to enter military service, as set forth in Volume 1 of DOD Instruction 6130.03, Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 28, 2024) ("DoDI 6130.03 Vol. 1") (a copy of which is filed as ECF No. 31-12), is based on the same considerations applied to other treatable medical conditions at accession, reflecting standard military medical policy rather than any unique restriction on transgender service.

6. In contrast, retention medical standards, as set forth in Volume 2 of DOD Instruction 6130.03, *Medical Standards for Military Service: Retention* (Jun. 6, 2022) ("DoDI 6130.03 Vol. 2") (a copy of which is filed as ECF No. 73-5), focus on a service member's ability to perform their duties, deploy when required, and contribute effectively to the military mission. (*See* DoDI 6130.03 Vol. 2 at 1.2.) The military recognizes that there are numerous roles and positions within its ranks, and importantly, it has made a commitment to those who have already chosen to serve.

7. This is why DoDI 6130.03 Vol. 2 explicitly requires that every medical condition be evaluated on a case-by-case basis to determine if continued service is appropriate. (*See* DoDI 6130.03 Vol. 2 at 1.2.b(1), 3.2, 3.3.a(1).) The instruction specifically mandates consideration of each service member's ability to safely complete common military tasks at their grade level, their specific duty requirements, and whether they can serve in deployed or garrison conditions. (*See* DoDI 6130.03 Vol. 2 at 3.2.a.)

8. I can't think of any medical condition that bars continued service—rather, the impact of the condition on the individual service member's ability to perform their duties must be evaluated. In my experience, it would be highly unusual, and I cannot think of another example,

SUPPLEMENTAL DECLARATION OF ALEX WAGNER - 2
CASE NO. 2:25-CV-00241 BHS

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1 where a medical condition would result in a categorical bar to retention without such individualized assessment.

9. For transgender service members, service in the military means serving in a sex different from their sex assigned at birth. The process for gender transition is detailed in DOD Instruction 1300.28, *In-Service Transition for Transgender Service Members* (Dec. 20, 2022) ("DoDI 1300.28") (Exhibit D to my initial declaration, filed as ECF No. 33-4), which establishes a protocol for transgender service members. This includes notifying their command, obtaining a medical diagnosis from a military medical provider, developing and completing an approved medical treatment plan for gender transition, and changing their sex designation in the Defense Enrollment Eligibility Reporting System (DEERS). (*See* DoDI 1300.28 at 3.3.)

10. Once a transgender service member has changed their sex marker in DEERS, they live and serve fully in the sex designated on the DEERS marker. This means they are referred to by the pronouns associated with their DEERS marker, use facilities consistent with their DEERS marker, are assigned berthing consistent with their DEERS marker, and have to meet all of the military standards consistent with their DEERS marker.

11. If a transgender service member were prevented from serving in accordance with their DEERS marker, that individual could not serve in the military as a transgender person.

12. Based on my knowledge, many of the medications that transgender service members may take as part of their medical care are also prescribed to numerous non-transgender service members for various medical conditions, demonstrating that these medications are compatible with military service.

13. As is generally true, there are different criteria for accessions than for retention for transgender service members. For accession into the military, a transgender person must be stable for 18 months following completion of gender transition before they can enter service. (*See* DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1).)

SUPPLEMENTAL DECLARATION OF ALEX WAGNER - 3
CASE NO. 2:25-CV-00241 BHS

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

14. However, for retention of currently serving transgender service members, there is no set time period during which a person must be stable following gender transition. Instead, consistent with the case-by-case assessment required by DoDI 6130.03 Vol. 2, the determination of stability and readiness for duty is individualized and based on each service member's specific medical circumstances and needs.

15. In fact, for most transgender service members, there is often no period of non-deployability associated with their gender transition. This reflects the military's recognition that medical needs vary among individuals and that blanket time requirements are neither necessary nor appropriate for retention determinations.

**The February 26, 2025 Memorandum**

16. According to the February 26, 2025, policy providing additional guidance on implementing the transgender military ban announced by President Trump, transgender service members will face dismissal though administrative separation.

17. Consistent with the purpose and policy of the Order, which is to bar transgender people from military service, the "waiver" in Section 4.3(c) of the Implementing Guidance creates barriers that make it impossible for a transgender person to qualify by excluding anyone who has transitioned or who cannot demonstrate three years of serving in their birth sex without clinically significant distress.

18. The "waiver" for accession in 4.1(c) also fails to provide transgender applicants with any avenue for service because it similarly requires that an individual must serve in their birth sex—i.e., must suppress or deny their transgender identity.

19. In my experience, dismissal through administrative separation is typically used for misconduct or failing to meet standards, not for treatable medical conditions where the service member meets the requirements for service, including both job performance and fitness standards.

20. I am not aware of administrative separation ever being used to separate service members with a medical condition which can be successfully managed via treatment, and

SUPPLEMENTAL DECLARATION OF ALEX WAGNER - 4
CASE NO. 2:25-CV-00241 BHS

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

moreover where, when treated, the medical condition does not interfere with a member's ability to deploy and meet standards.

21. Normally, when a service member has a medical condition that would limit their ability to serve or deploy, they go through a medical review, not administrative separation.

22. My understanding is that administrative separation is most often used as disciplinary procedure to effect eventual military discharge. The ordinary path for evaluating impacts from medical conditions is the Disability Evaluation Service (DES) with administrative separation largely reserved for misconduct (including drug abuse) or repeated failure to meet standards, given the significant financial investment the military has already made in the member.

23. In addition, based on my experience, individual or aggregated costs associated with medication or medical procedures is not a justification for administrative separation. Transgender service members constitute a small fraction of military personnel, and their health care costs represent a de minimis amount of overall health care spending. In fact, non-transgender service members may be prescribed the same medications transgender service members need for gender transition. There is no reason for this group to bear the burden of cost cutting measures when other service members have similar medical needs.

24. I am aware of congressional testimony that coverage for Viagra for service members in 2023 accounted for $41M of the Department of Defense's budget. These expenditures are important investments and just one of many examples of the full spectrum health care that represents a benefit of service necessary to maintaining an all-volunteer force. I raise this only to note that the relative costs associated with providing essential health care for transgender troops represents a miniscule part of the defense budget for the years they have been permitted to serve.

25. The rushed and haphazard manner in which this policy has been issued and implemented is highly unusual. Ordinarily, the reversal of an existing policy—especially one adopted after careful study and review—would take place only in response to significant, documented problems with existing policy, after careful consideration and review including an

SUPPLEMENTAL DECLARATION OF ALEX WAGNER - 5
CASE NO. 2:25-CV-00241 BHS

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

explanation of what led to the problematic outcomes, and would be rolled out in a careful, orderly fashion that provided commanders and members clear guidance.

26. The process leading to the Order and Implementing Guidance has taken a very different and, in my experience, highly unusual course. The decision to target and purge transgender troops was not based on any documented problem. It was not based on a careful study and review. It has been rolled out on an extremely expedited timeline that puts the affected service members under enormous pressure to make life-altering decisions without adequate time to seek counsel or reflect. It comes with no guidance on how units should adapt, reconfigure, or adjust to the loss of a teammate performing an important role.

27. The issuance of a series of vague and in some cases conflicting directives undermines confidence in civilian leadership.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SUPPLEMENTAL DECLARATION OF ALEX WAGNER - 6
CASE NO. 2:25-CV-00241 BHS

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   I declare under penalty of perjury under the laws of the United States that the foregoing is
2   true and correct.
3   Dated: March _18__, 2025.

_____
Alex Wagner

SUPPLEMENTAL DECLARATION OF ALEX WAGNER - 7
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762