1

2

3

4

5

6

7

8

The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11

12

13

14

| | |
|---|---|
| COMMANDER EMILY SHILLING; *et al.*, | No. 2:25-cv-00241 BHS |
| *Plaintiffs*, | **SUPPLEMENTAL DECLARATION OF DR. RANDI C. ETTNER, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*, | |
| *Defendants*. | |

15    I, Randi C. Ettner, hereby declare as follows:

16    1.    I am over 18 years of age, of sound mind, and in all respects competent to testify.

17    2.    I have been retained by counsel for Plaintiffs as an expert in connection with the

18 above-captioned litigation.

19    3.    I have actual knowledge of the matters stated herein. If called to testify in this

20 matter, I would testify truthfully and competently as to the matters stated herein.

21    4.    My background, qualifications, and the bases for my opinions are set forth my

22 initial declaration.

23    5.    I provide this supplemental declaration in response to some arguments made and

24 documents issued by Defendants in connection with this litigation and as part of their

25 implementation of Executive Order 14183.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

6.      Since my initial declaration I have provided expert testimony via deposition in *Wagoner v. Dahlstrom*, No. 3:18-cv-00211-MMS (D. Alaska).

7.      In preparing this supplemental declaration, I have relied on my education, training, and years of experience, as set out in my curriculum vitae attached to my initial declaration as **Exhibit A** (ECF No. 37-1), and on the materials listed therein; the materials referenced in my initial declaration and listed in the bibliography attached thereto as **Exhibit B** (ECF No. 37-2); and the materials referenced herein and listed in the supplemental bibliography attached hereto as **Exhibit D**.  The sources cited in each of these are the same types of materials that experts in my field regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

8.      I have also reviewed the following documents:

a.  The memorandum titled "Additional Guidance on Prioritizing Military Excellence and Readiness" from the Office of the Under Secretary of Defense for Personnel and Readiness, dated February 26, 2025 (ECF No. 58-7) (hereafter the "February 26 Guidance");

b.  The Action Memo titled "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order (EO)" from the Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs to Office of the Under Secretary of Defense for Personnel and Readiness, dated February 26, 2025 (ECF No. 71-1) (hereafter the "February 26 Action Memo");

c.  The memorandum titled "Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers" from the Office of the Under Secretary of Defense for Personnel and Readiness, dated March 4, 2025 (ECF No. 64-1) (hereafter the "March 4 Clarifying Guidance");

d.  The February 22, 2018 Memorandum "Military Service by Transgender Individuals" by Secretary of Defense John Mattis and the accompanying

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    February 2018 Department of Defense Report and Recommendations on

2    Military Service by Transgender Persons (ECF No. 71-2) (hereafter the "2018

3    Mattis Report");

4    e.    The report titled "Analysis of Medical Administrative Data on Transgender

5    Service Members" by Accession Medical Standards Analysis and Research

6    Activity (AMSARA), dated July 14, 2021 (contained in ECF No. 71-3)

7    (hereafter the "2021 AMSARA Analysis"); and

8    f.    The report titled "Literature Review: Level of Evidence for Gender-Affirming

9    Treatments" by the Office of the Assistant Secretary of Defense for Health

10    Affairs (ECF No. 71-3) (hereafter the "February 2025 Literature Review").

11    9.    I reserve the right to revise and supplement the opinions expressed in this

12    declaration or the bases for them if any new information becomes available in the future, including

13    as a result of new scientific research or publications or in response to statements and issues that

14    may arise in my area of expertise.

15    **OPINIONS**

16    **A.  The EO and Implementing Guidance Bar Military Service by Transgender Persons.**

17    10.    The February 26 Guidance and the Action Memo effectively bar any transgender

18    person from joining or remaining in the military.  It prohibits military service by all transgender

19    individuals under the pretense of targeting only those who display "symptoms" of gender

20    dysphoria, undertake steps toward gender transition, or have a diagnosis of gender dysphoria.

21    However, this distinction is meaningless in practice. The mere acknowledgment of being

22    transgender inherently reveals a disconnect between one's gender identity and assigned birth sex,

23    which would be considered a "symptom" of gender dysphoria and implies the potential for

24    transition. Even if an individual continues to serve in their birth-assigned sex without outward

25    signs of transition, their transgender identity alone signals this incongruity.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

11.     This approach overlooks the fundamental reality that transgender identity is not just about visible transition—it is about an internal sense of self that, when suppressed, can cause significant distress. Requiring transgender individuals to serve in accordance with their birth-assigned sex is not a neutral policy; it is a demand for self-denial that imposes psychological harm. This parallels the well-documented damage caused by efforts to suppress sexual orientation, which I noted on my initial declaration. Just as forcing someone to suppress their sexual identity is recognized as harmful, compelling transgender individuals to suppress their gender identity is equally damaging.

12.     By purporting to allow only those individuals who never acknowledge or act upon their identity incongruent with their birth-assigned sex to remain in service, the policy ensures that any openly transgender individual will ultimately be pushed out from or be unable to join the military. This is not a meaningful distinction—it is simply an indirect way of achieving the same result.

13.     The guidance purports to have a "waiver" process for some transgender individuals to access or remain in the military. However, all transgender persons are ineligible for this purported "waiver." By its terms, no person who has *ever* "attempted to transition to any sex other than their sex" is eligible for the waiver. February 26 Guidance § 4.3(c)(2); *see also* March 4 Clarifying Guidance, at 1.  But acknowledgement and disclosure of one's identity, which is a definitional aspect of being transgender, is a critical step in any person's gender transition, which is ultimately individualized.

14.     In addition, to be eligible for the waiver, an individual must "demonstrates 36 consecutive months of stability in the individual's [birth-assigned] sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning" and "must be willing and able to adhere to all applicable standards, including the standards associated with his or her [birth-assigned] sex." March 4 Clarifying Guidance, at 1-2; *see also* February 26 Guidance §§ 4.1(c), 4.3(c)(2). A transgender person is defined by their having an

1    identity that is incongruent with their birth-assigned sex and literature documents that being unable

2    to live in manner inconsistent with one's identity leads to significant psychological harm and

3    distress (Cooper, et al., 2020; Turban, et al., 2020; Drydakis, 2019; Bauer, et al., 2015; Budge, et

4    al., 2013). While not every transgender person may suffer distress to a degree that it meets the

5    diagnostic criteria for a gender dysphoria diagnosis under the DSM-5, they nonetheless suffer

6    distress when forced to live in accordance to their birth-assigned sex as opposed to their identity.

7    Thus, by requiring a person to live and serve incongruent with their identity in all aspects of their

8    life in order to serve in the military effectively renders any transgender person ineligible for the

9    purported "waiver" and bars all transgender people from serving in the military.

10    **B. Responses to the February 26 Guidance and Action Memo**

11    15.    The February 26 Action Memo specifically cites to the 2018 Mattis Report, the

12    2021 AMSARA Analysis, and the February 2025 Literature Review as support for the February

13    26 Guidance prohibiting military service by "individuals with gender dysphoria or who have a

14    current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria."

15    **(1) Response to concerns about the mental health utilization patterns and**
16    **mental health co-morbidities.**

17    16.    The Action Memo cites the February 2025 Literature Review for the proposition

18    that transgender individuals are purportedly "approximately twice as likely to receive a psychiatric

19    diagnosis compared to cisgender individuals." But in the matter of evaluating the mental health

20    utilization patterns of transgender individuals, it is necessary to distinguish between administrative

21    healthcare requirements and genuine mental health treatment. As a clinician with experience

22    treating more than 3,000 transgender individuals, I submit that the elevated engagement of

23    transgender persons with mental health providers does not inherently correlate with increased rates

24    of mental illness or suicidality.

25    17.    A substantial portion of mental health interactions among transgender individuals

26    is attributable to institutional and regulatory requirements. Many transgender individuals seeking

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

gender-affirming care are required to obtain psychological evaluations, document gender dysphoria, and maintain ongoing provider engagement as a prerequisite for accessing hormone therapy and related medical interventions. In military and other institutional settings, such administrative mandates significantly increase recorded mental health visits, thereby creating a misrepresentation of mental health co-morbidities within the transgender population.

18.    The February 26 Action Memo, citing the February 2025 Literature Review, exemplifies this misrepresentation by citing findings that transgender individuals experience disproportionately high rates of suicidal ideation and psychiatric diagnoses. However, this is not necessarily attributable to a higher presence of mental health co-morbidities in the transgender population, but rather to the higher frequency of interactions with mental health and medical providers. The Action Memo fails to account for the fact that mental health visits for transgender service members are often necessary, even required, to medically transition. In other words, many of these visits occur not for the treatment of mental health disorders but as a prerequisite for obtaining gender-affirming medical care. The omission of this distinction leads to a misleading portrayal of transgender mental health and inflates the perception of psychiatric morbidity within this population.

19.    While data indicate that transgender individuals receive psychiatric diagnoses at higher rates than their cisgender counterparts, this does not inherently reflect a greater prevalence of mental illness (Pinna et al., 2022). Increased engagement with medical and mental health providers inherently increases the likelihood of receiving a diagnosis, regardless of whether the individual is experiencing substantial psychological distress. Without delineating between administrative visits and clinically necessary mental health treatment, conclusions drawn regarding transgender mental health remain methodologically unsound.

20.    The Action Memo also misleadingly cites the February 2025 Literature Review for the proposition that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime, … [and] the suicide attempt rate is estimated to be 13 times

higher among transgender individuals compared to their cisgender counterparts." But these mental health disparities are not inherent to transgender individuals, rather, as the February 2025 Literature Review explicitly states: "***Mental Health Disparities are Driven by Discrimination and Minority Stress***." (emphasis added). Indeed, the February 2025 Literature Review forthrightly acknowledges that this is "largely driven by minority stress, discrimination, social rejection, lack of access to gender-affirming care, and increased exposure to violence and victimization." And contrary to the misleading picture portrayed by the Action Memo, the February 2025 Literature Review documents that "[r]esearch demonstrates that suicide risk among transgender and gender-diverse (TGD) individuals is ***mitigated by access to gender-affirming care***, strong social and family support, ***legal and social recognition***, affirming mental health services, community connectedness, and ***protections against discrimination***." (emphasis added).

21.     Indeed, peer-reviewed research consistently demonstrates that disparities in mental health outcomes among transgender individuals are primarily driven by external sociocultural and institutional factors rather than inherent psychological conditions. Systematic reviews confirm that discrimination, social rejection, barriers to gender-affirming care, and exposure to violence and victimization contribute to heightened incidences of anxiety, depression, and suicidal ideation (Pinna, et al., 2022; Drabish & Theeke, 2022; Gosling, et al., 2022). The minority stress model provides a well-substantiated framework that explains how these external stressors adversely affect mental health.

22.     It is also critical to differentiate between suicidal ideation and suicide attempts. The February 2025 review cites data suggesting that transgender service members are at significantly higher risk of suicide attempts; however, the underlying studies often fail to distinguish between ideation and attempts, leading to erroneous conclusions. Suicidal ideation, defined as thoughts of self-harm, does not equate to actual suicide attempts or completed suicides. Moreover, many studies fail to specify whether reports of suicidal ideation predate or postdate the receipt of gender-affirming care. Notably, as the February 2025 Literature Review acknowledges, the extant

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    evidence indicates that access to appropriate medical and psychological care is associated with a

2    significant reduction in suicide risk (Pellicane & Ciesla, 2022; Expósito-Campos, et al., 2023).

3    23.    The pathologization of transgender identities through misrepresented statistical

4    analyses serves to obscure the systemic and institutional barriers that shape transgender mental

5    health outcomes. As a clinician with extensive direct experience treating transgender individuals,

6    I can attest that mental health outcomes improve markedly when gender-affirming care is

7    accessible and when systemic barriers are mitigated. Future assessments of transgender mental

8    health must accurately contextualize utilization rates and recognize the pivotal role of societal and

9    institutional factors rather than perpetuating misleading interpretations of healthcare engagement

10    data.

### (2) Response to concerns about the quality of evidence for gender-affirming medical interventions.

13    24.    The Action Memo raises concerns about the quality of evidence for the medical

14    treatment of gender dysphoria (also known as a gender-affirming care) because the February 2025

15    Literature Review found that the studies pertaining to gender-affirming treatment are

16    predominantly of low to moderate certainty. The emphasis on the limitations of current evidence

17    must be considered in the broader context of medical decision-making.

18    25.    The consensus within the medical community affirms that gender-affirming

19    medical care is safe, effective, and essential for the well-being of transgender individuals. Indeed,

20    the February 2025 Literature Review recognized that research findings consistently support the

21    benefits of gender-affirming care.  For example, the February 2025 Literature Review found that

22    the "*literature on [gender-affirming hormone therapy] GAHT consistently demonstrates*

23    *improvements in mental health, gender dysphoria, and body composition*" and "*highlight[ed]*

24    *that [gender-affirming surgery] GAS is associated with high patient satisfaction, reduced gender*

25    *dysphoria, and improvements in mental health, including decreased anxiety, depression, and*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1    *suicidality*." (emphasis added). This is consistent with the well-established body of medical and

2    scientific literature documenting the efficacy of these treatments.

3        26.    Additionally, the Action Memo misapprehends what quality of evidence means,

4    and its characterization of evidence as "low to moderate" is misleading when interpreted outside

5    the methodological framework of evidence grading systems like GRADE. Many widely accepted

6    and routinely performed medical interventions do not meet the threshold for "high-quality"

7    evidence, which is typically defined by randomized controlled trials (RCTs), yet they remain the

8    standard of care. The evidence base supporting gender-affirming medical and surgical

9    interventions is robust and dates back over decades.  It is in fact as robust as many other common

10   medical interventions.  Evidence of high quality is uncommon (less than 1 in 10) for medical and

11   health-related interventions assessed with GRADE criteria within the Cochrane Database of

12   Systematic Reviews.[1]

13       27.    In fact, based on national guidelines and clinical recommendations, but absent high-

14   quality evidence to support them, many orthopedic surgeries such as rotator cuff repair and

15   arthroscopic knee repair are routinely performed. Tonsillectomy, despite being one of the most

16   common surgical procedures for children, lacks high-quality, double-blind RCTs (Baugh, et al.,

17   2011). Similarly, studies comparing appendectomy to antibiotic treatment have been inconclusive,

18   yet surgical removal remains the primary intervention (Doleman, et al., 2024). Even

19   recommendations to take vitamin D lacks high quality evidence.

20       28.    Given this context, requiring an exceptionally high level of evidence for gender-

21   affirming care—when such a standard is not applied to other medical treatments—is inconsistent

22   with standard medical practice.

23   _____

[1]    Howick, J., Koletsi, D., Ioannidis, J. P. A., Madigan, C., Pandis, N., Loef, M.,
24   Walach, H., Sauer, S., Kleijnen, J., Seehra, J., Johnson, T., & Schmidt, S. (2022). Most healthcare
     interventions tested in Cochrane Reviews are not effective according to high quality evidence: a
     systematic review and meta-analysis. *Journal of clinical epidemiology*, *148*, 160–169; Fleming, P.
25   S., Koletsi, D., Ioannidis, J. P., & Pandis, N. (2016). High quality of the evidence for medical and
     other health-related interventions was uncommon in Cochrane systematic reviews. *Journal of*
26   *clinical epidemiology*, *78*, 34–42.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

29.     Furthermore, it is important to note that RCTs, which are typically considered the gold standard for medical research, are not always feasible or ethical for certain interventions.[2] This is particularly true in cases where:

- Withholding treatment would cause harm, making a placebo-controlled trial unethical;

- The nature of the intervention makes blinding impossible, as is the case with gender-affirming hormone therapy and surgeries; and

- The study population is limited, making it difficult to conduct large-scale RCTs.

30.     The February 2025 Literature Review acknowledges this, stating "there are little to no randomized controls trials for transgender health due to ethical concerns and methodological challenges."

31.     For these reasons, much of the research on gender-affirming care relies on observational studies, longitudinal cohort studies, and systematic reviews. However, these methodologies do not equate to an absence of reliable evidence. On the contrary, studies consistently show that gender-affirming hormone therapy and surgeries significantly improve mental health outcomes, reducing rates of depression, anxiety, and suicidality.[3]

---

[2]     For example, practice guidelines published in 2013 by the Royal College of Psychiatrists indicated that a randomized controlled study to evaluate feminizing vaginoplasty would be "impossible to carry out." *Good Practice Guidelines for Assessment and Treatment of Adults with Gender Dysphoria,* pp.1-59.

[3]     *See, e.g.,* What We Know Project, Cornell University, (2018). "What Does the Scholarly Research Say about the Effect of Gender Transition on Transgender Well-Being?" (online literature review), https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/; van de Grift, T. C., Elaut, E., Cerwenka, S. C., Cohen-Kettenis, P. T., De Cuypere, G., Richter-Appelt, H., & Kreukels, B. P. C. (2017). Effects of Medical Interventions on Gender Dysphoria and Body Image: A Follow-Up Study. *Psychosomatic medicine, 79*(7), 815–823.

For gender-affirming hormone therapy, see for example: Doyle, D.M., Lewis, T.O.G. & Barreto, M. (2023). A systematic review of psychosocial functioning changes after gender-affirming hormone therapy among transgender people. *Nat Hum Behav* 7, 1320–1331; Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review. *Journal of the Endocrine Society, 5*(4), bvab011; Colizzi, M., Costa, R., & Todarello, O.

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 10
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

32.     The demand for "high-quality" RCT evidence for gender-affirming care contradicts standard medical practice, where many interventions proceed despite similar evidence limitations.

### (3) Misrepresentations about the AMSARA Analysis.

33.     I have reviewed the 2021 AMSARA Analysis, which the Action Memo misleadingly cites in support of the ban on service by transgender individuals. Upon careful examination, the document fails to provide a reliable basis for the implications drawn regarding transgender service members.

34.     The Action Memo cites the AMSARA Analysis for the proposition that nearly 40% of transgender service members were non-deployable over a 24-month period. However, AMSARA Analysis only "estimate[d] that *fewer than* 40% of the transgender service members identified as part of this study would have been deemed non-deployable due to mental health reasons *at some time* during the 24 months following initial diagnosis." (emphasis added). In other words, the data actually indicates that fewer than 40% were estimated to be non-deployable at any

(2014). Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*, *39*, 65–73; Gorin-Lazard, A., Baumstarck, K., Boyer, L., Maquigneau, A., Penochet, J. C., Pringuey, D., Albarel, F., Morange, I., Bonierbale, M., Lançon, C., & Auquier, P. (2013). Hormonal therapy is associated with better self-esteem, mood, and quality of life in transsexuals. *The Journal of nervous and mental disease*, *201*(11), 996–1000; and Gorin-Lazard, A., Baumstarck, K., Boyer, L., Maquigneau, A., Gebleux, S., Penochet, J. C., Pringuey, D., Albarel, F., Morange, I, Loundou, A., Berbis, J., Auquier, P., Lançon, C., & Bonierbale, M. (2012). Is hormonal therapy associated with better quality of life in transsexuals? A cross-sectional study. *The journal of sexual medicine*, *9*(2), 531–541.

For gender-affirming surgery, see for example: Swan, J., Phillips, T. M., Sanders, T., Mullens, A. B., Debattista, J., & Brömdal, A. (2022). Mental health and quality of life outcomes of gender-affirming surgery: A systematic literature review. *Journal of Gay & Lesbian Mental Health*, *27*(1), 2–45; Jarolím, L., Šedý, J., Schmidt, M., Naňka, O., Foltán, R., & Kawaciuk, I. (2009). Gender reassignment surgery in male-to-female transsexualism: A retrospective 3-month follow-up study with anatomical remarks. *The journal of sexual medicine*, *6*(6), 1635–1644.; Smith, Y. L., Van Goozen, S. H., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological medicine*, *35*(1), 89–99; Pfäfflin, Friedemann & Junge,. (1998). Sex Reassignment. Thirty Years of International Follow-up Studies after Sex Reassignment Surgery. A Comprehensive Review, 1961-1991.

1  point during that timeframe, not that they remained non-deployable for the full duration. This

2  distinction is critical, as the misstatement significantly overstates the impact on military readiness.

3       35.    The AMSARA Analysis also does not include a valid comparison to non-

4  transgender service members, making it impossible to assess whether transgender personnel

5  experience disproportionately higher rates of non-deployability or attrition. Without such

6  comparative data, any conclusions regarding the relative impact of gender dysphoria on military

7  service remain speculative and unsupported.   Indeed, the AMSARA Analysis explicitly

8  acknowledges this by stating: "Importantly, data were not available from non-transgender service

9  members that could serve as a basis for comparison to indicate if supposed non-deployability rates

10  amongst the transgender cohort differed from the overall non-deployability rate."

11      36.    Notably, the AMSARA Analysis did compare retention and deployability for the

12  limited cohort of transgender service members it looked at to a cohort of service members, who

13  presumably were not transgender given the comparison, who had been diagnosed with depression.

14  Based on this comparison, the AMSARA Analysis found that "the transgender cohort stayed in

15  service longer, on average, than did the depression cohort" and "also had a greater proportion of

16  members available for deployment than the depression cohort."   In other words, the analysis found

17  that "*members of the transgender cohort are more deployable than members of the matched*

18  *cohort of service members with depressive disorders*." (emphasis added).

19      37.    While the AMSARA Analysis notes a higher rate of disability evaluation among

20  transgender service members, it simultaneously indicates that they **remain in service for longer**

21  **durations than individuals with other medical conditions, including common psychiatric**

22  **diagnoses**. This directly undermines any claim that gender dysphoria or related medical treatment

23  is inherently incompatible with military service.

24      38.    The AMSARA Analysis does not establish that gender-affirming medical

25  treatments, including hormone therapy, adversely affect deployability. In fact, the findings

26  suggest no meaningful difference in deployability rates between transgender service members

SUPPLEMENTAL DECLARATION
OF RANDI C. ETTNER, PH.D. - 12
CASE NO. 2:25-CV-00241 BHS

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1   undergoing hormone therapy and those who are not, stating: "***Transgender service members with***

2   ***hormone therapy did not appear to differ meaningfully in their deployability from those without***

3   ***hormone therapy***." (emphasis added).

4          39.     Based on the foregoing, not only does the Action Memo misleadingly cite the 2021

5   AMSARA Analysis, but the AMSARA Analysis fails to substantiate its conclusions. The Action

6   Memo relies on misleading interpretations of data, fails to account for the lack of appropriate

7   comparative benchmarks, and omits findings that contradict its implied policy concerns.

8

9

10                  [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762

1        I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct.

3        Dated: March 18, 2025.

4                                        Randi C. Ettner

5    Randi C. Ettner

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY. 10005-3919
Telephone: 212-809-8585

**Human Rights Campaign
Foundation**
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762