# EXHIBIT 38

```
1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF COLUMBIA
2

3   NICOLAS TALBOTT, et al.      ) CIVIL NO.:
                                 ) 25-0240-ACR
4           Plaintiff,           )
        vs.                      )
5                                )
    UNITED STATES OF AMERICA,    )
6   et al.,                      ) March 21, 2025
            Defendant.           ) Washington, D.C.
7   _____) 11:00 a.m.

8

9                 Transcript of Motions Hearing
              Before the Honorable Ana C. Reyes
                 United States District Judge
10

11  APPEARANCES:

12  For the Plaintiffs:

13       Jennifer Levi, Esquire
         GLBTQ Legal Advocates & Defenders
14       18 Tremont Street
         Suite 950
15       Boston, MA 02108

16  For the Defendants:

17       Jason C. Lynch, Esquire
         Jean Lin, Esquire
18       U.S. Department of Justice
         1100 L Street NW
19       Washington, DC 20005

20

21  Reported by:  Christine T. Asif, RPR, FCRR
                  Federal Official Court Reporter
22                333 Constitution Avenue, NW
                  Washington, D.C. 20001
23                (202) 354-3247

24

    Proceedings recorded by machine shorthand; transcript produced
25  by computer-aided transcription
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

P R O C E E D I N G S

1

THE CLERK:  This is civil action 25-240, Nicolas Talbott, et al., versus United States of America, et al.

Counsel, please state your appearances for the record.

MS. LEVI:  Hi, this is Jennifer Levi for the plaintiffs.

MS. LIN:  And Jean Lin and Jason Lynch for the defendants.

THE COURT:  All right.  Defense, whoever's arguing come on up.

Mr. Manion only lasted one hearing?  That was all he could handle?

MS. LIN:  Yup.

THE COURT:  Okay.  Well, we've gone through Mr. Lynch.  We've gone through Mr. Manning.  Let's see how you do.

MS. LIN:  It wasn't clear Mr. Lynch was going to be able to make it, because he was coming from somewhere else.

THE COURT:  All right.  Well, I'm always glad to have Mr. Lynch here.  So, first of all, I have a motion to dissolve or stay.  Right now the injunction is ongoing.  It's not stayed right now.  You all understand that; right?

MS. LIN:  Understood.

THE COURT:  All right.  So secondly, the last time

1    we were here, we spoke about a tweet that the Department of

2    Defense sent out, saying that all transgender troops were --

3    are disqualified absent exemption; right?

4              MS. LIN:  Yes.

5              THE COURT:  Okay.  And Secretary Hegseth retweeted

6    that; right?

7              MS. LIN:  Yes.

8              THE COURT:  And he's the guy who wrote the policy;

9    right?

10             MS. LIN:  The DoD policy was written based on

11   delegated authority, um --

12             THE COURT:  He -- Secretary Hegseth didn't issue his

13   policy?  I thought it came under his name?

14             MS. LIN:  Um -- the February 26th policy was issued

15   by undersecretary.  It was --

16             THE COURT:  Secretary Hegseth saw the policy and

17   signed off it; right?  It didn't go out without him looking at

18   it?

19             MS. LIN:  I don't know the deliberative process for

20   that aspect.

21             THE COURT:  You don't even know if Secretary Hegseth

22   has seen his own policy?

23             MS. LIN:  If authority to issue a policy is

24   delegated to a subordinate, the subordinate would then have

25   the same authority as the secretary to issue the policy.

1          THE COURT:  Am I seriously hearing from you all

2     right now that sitting here today, you all can't tell me

3     whether the Secretary of Defense has seen the policy to ban

4     transgender troops?

5          MS. LIN:  Your Honor, my assumption is that he has.

6     But I'm just saying, based on the documentary information we

7     have before us, we know who issued the policy.

8          THE COURT:  All right.  Well, I would like an answer

9     by the end of the day as to whether or not we can all agree

10    that Secretary Hegseth has seen and signed off on this policy,

11    okay?  End of the day, 5:00 o'clock, I want confirmation, or

12    not confirmation.

13         In any event, Secretary Hegseth who is the top

14    person at the Defense Department, right, pentagon, whatever,

15    he's the top person?

16         MS. LIN:  Yes.

17         THE COURT:  What he says goes, subject to the

18    Constitution; right?  And the president, I guess.

19         MS. LIN:  If Your Honor's referring to the tweet --

20         THE COURT:  I'm asking a question.  I'm not

21    referring to anything right now.  I'm asking a question.  He's

22    the head guy; right?

23         MS. LIN:  Yes.

24         THE COURT:  Everyone in the Department of Defense

25    reports to Secretary Hegseth; right?

1          MS. LIN:  Correct.

2          THE COURT:  If there are questions about how a

3    policy is to be interpreted and implemented, the one who has

4    the final say, other than the president is Secretary Hegseth;

5    right?

6          MS. LIN:  If he was consulted.  I mean, there are a

7    lot of decisions being made every single day, not every

8    decision --

9          THE COURT:  Right.  But at the end of the day -- at

10   the end of the day what he says goes.  If a policy is being

11   interpreted in a way that he doesn't like, he can say no

12   that's the wrong interpretation; right?

13         MS. LIN:  That's my understanding.

14         THE COURT:  Okay.  And he retweeted that this was a

15   quote, transgender -- that all transgender troops are

16   disqualified absent exemption; right?

17         MS. LIN:  That's what the tweet said.

18         THE COURT:  Well, he tweeted that, right, it went

19   under his name?

20         MS. LIN:  Yes.

21         THE COURT:  And when we were here on March 12th, you

22   all told me never you mind, Your Honor, he said it but he

23   didn't really mean it.  And I said, no, I'm going to take him

24   at his word.  And I said, if the policy is not -- does not

25   cover all transgender troops, get me a declaration.  I gave

1    you until Monday.  We had -- the hearing was on what

2    Wednesday?  Thursday.  I gave you until Monday.  Give me a

3    decision from Secretary Hegseth, or someone else with

4    authority, that says that tweet was wrong.  And then I'll take

5    into consideration in my opinion.  I said that; right?

6              MS. LIN:  Yes, you did, Your Honor.

7              THE COURT:  And I didn't get a decision, did I?

8              MS. LIN:  No, but we did submit a notice to the

9    Court explaining that we stand by our brief.  And that further

10   guidance was going to come out by no later than March 26th.

11             THE COURT:  Okay.  Well, that wasn't an answer to my

12   question.  I mean, I guess you did answer my question.

13   There's no -- there is no decision from Secretary Hegseth or

14   anyone else contradicting the Department of Defense's tweet

15   from an official account that was retweeted by Secretary

16   Hegseth, from his original tweet, from his government account,

17   that this covers all transgender troops; right?

18             MS. LIN:  Right, but Your Honor, may I respond?  I

19   have two responses to that.

20             THE COURT:  No, I'm going to let -- you know, how

21   this works, Ms. Lin.  I'm going to let you talk as much as you

22   want after I finish asking my questions.

23             I want someone to explain to me -- I mean the last

24   time we were here, the excuse was it was shorthand.  And then

25   in my opinion, I'm sure you've read it, I was like, well, that

1    doesn't make any sense because transgender troops are

2    disqualified absent exemption a nine words.  And I gave a nine

3    word hypothetical tweet that said gender dysphoria is a

4    disqualifying medical condition, also nine words.  So the

5    short form excuse was, I mean, laughable, and frankly,

6    ridiculous.  And what's the excuse now?

7            MS. LIN:  Your Honor, the government doesn't operate

8    by tweets, right, so we consistent --

9            THE COURT:  No, no, it does --

10           MS. LIN:  The --

11           THE COURT:  Ms. Lin -- I am not going to abide by

12   government officials saying one thing to the public, but --

13   saying what they really mean to the public and then coming in

14   here to court and telling me something different like I'm an

15   idiot.  Okay.  I'm not an idiot.

16           MS. LIN:  With all due respect, Your Honor, the

17   operative document is the guidance that's issued.  And so --

18           THE COURT:  Well, we're going to get to the

19   operative documents, because even if I don't pay attention to

20   the tweet, even if I disregard the tweet, it still covers all

21   transgender people.  And we're going to get to that in a

22   moment.

23           I want someone in the government to explain to me

24   why the Department of Defense and the Secretary of Defense are

25   saying one thing on government channels to millions and

1    millions of Americans, and then coming into court and saying

2    something different.  Why is that happening?

3              MS. LIN:  Your Honor, the guidance document --

4              THE COURT:  That's not -- Ms. Lin, that is not

5    answering my question.  I want an answer to my question.  Why

6    is that happening?  Why are people saying one thing to the

7    public, our elected officials saying one thing to the public

8    and other things in court?

9              MS. LIN:  Your Honor, I can't explain why the tweet

10   wasn't elaborate --

11             THE COURT:  Well, if the tweet was wrong -- if the

12   argument is the tweet was wrong and it was too broad, and

13   Secretary Hegseth was just being inexact, because sometimes

14   people are inexact, why did I not get a declaration saying

15   that?

16             MS. LIN:  Your Honor, as we said in our filing that

17   day, we stand by --

18             THE COURT:  I understand you stand by the brief, Ms.

19   Lin.  What I'm saying is that there's a disconnect between

20   what the Secretary of Defense and the president are saying to

21   the public and what you are telling me here in court.  And I'm

22   sorry, but no.  No.  Enough.

23             MS. LIN:  Your Honor, even if there were a

24   disconnect, the guidance memo this morning clarified that.

25   And Your Honor's bound by the policy that the DoD actually is

1    going to implement, not a policy that Your Honor thought

2    should be the one that --

3              THE COURT:  Oh, I'm sorry, Ms. Lin, if you hear --

4    are you saying that I'm the one who is saying that this is a

5    transgender ban?

6              MS. LIN:  We consistently --

7              THE COURT:  I'm sorry, Ms. Lin, did you just say

8    that I am the one who called this a transgender ban?

9              MS. LIN:  That's what Your Honor's opinion said

10   and --

11             THE COURT:  Ms. Lin, it was a tweet by the Secretary

12   of Defense.

13             MS. LIN:  Your Honor, I --

14             THE COURT:  It was a tweet by the Secretary of

15   Defense.  The idea that I'm the one who said this, I have no

16   words for.  The Secretary of Defense called it a transgender

17   ban.  I gave him the opportunity, I gave you the opportunity

18   to have anyone from the Department of Defense send me a sworn

19   declaration saying that it was not a transgender ban, saying

20   that the Secretary of Defense misspoke.  And I very carefully

21   waited to issue my opinion until Tuesday because I had given

22   you all until Monday to get me a declaration that it is wrong.

23   So you are saying one thing in public.  You're saying a

24   different thing in court.  And I gave you the opportunity to

25   correct the thing in public and you didn't take it.  That is

1    the evidence before me in the record, right?  So what am I --

2    what inference am I supposed to draw from that, Ms. Lin?

3              MS. LIN:  Your Honor, we respectfully submit that

4    the inference that this is a broad transgender ban is

5    incorrect --

6              THE COURT:  Okay.  Fine, Ms. Lin, perfect.  I want a

7    declaration from the Secretary of Defense that says that.

8              MS. LIN:  Your Honor, the -- cabinet secretaries are

9    dealing with lots and lots of busy things on a daily basis

10   and --

11             THE COURT:  Fine.  Get me the declaration from

12   undersecretary who issued the policy.

13             MS. LIN:  That --

14             THE COURT:  Ms. Lin, you're not going to get a

15   declaration, because no one is going to give me a sworn

16   declaration.  Just like no one gave me a sworn declaration

17   when I offered it that pronouns affect military readiness.

18             MS. LIN:  Your Honor --

19             THE COURT:  -- no one is going to say that under

20   oath.

21             MS. LIN:  And I'm sorry I'm just repeating myself,

22   but the document, the guidance documents speak for

23   themselves.

24             THE COURT:  The documents do speak for themselves

25   and we're going to get to the documents.  But do you know who

1    also speaks for himself?  The Secretary of Defense.

2           You know, this idea that you all can just come in

3    here and pretend or have us pretend that what's happening

4    isn't actually happening, is totally unacceptable.  It is -- I

5    mean, it's just -- everyone knows what this ban is intended to

6    do.  Everyone knows.  Everyone knows.  And Mr. -- Secretary

7    Hegseth said it.  He said what a bunch of lawyers tried to

8    keep out of the policy, which was using the word

9    "transgender."  And Secretary Hegseth said it.  Because that

10   is obviously what it does.  And we're about to get to how it

11   does exactly that even without the tweet.

12          But, Ms. Lin, I am not going to abide by people

13   coming in here and lying to me.  Okay.  I'm not going to abide

14   by people coming in here and telling me that I'm supposed to

15   not pay attention to what's happening in the real world.  And

16   I'm sorry, I take it back, I didn't mean you were lying to me.

17   That's the wrong word.  I take that back.  Please strike that

18   from the record, Ms. Asif.  I take that back.  I'm not going

19   to come here and have people tell me that what I'm seeing and

20   what I'm hearing is not what I'm seeing and what I'm hearing.

21   The Court is not going to be gas lit, okay?

22          MS. LIN:  Your Honor, the tweet was not filed in

23   this court --

24          THE COURT:  I took notice of the tweet, so it's in

25   the record and I gave you all a chance to object.

1      MS. LIN:  And we explained at the last hearing the

2  significance or the lack thereof of the tweet.

3      THE COURT:  Okay.  Well, you and I are going to have

4  to agree to disagree on whether or not the tweet has meaning.

5  So here's my -- I mean, you know, what do I know, right?  When

6  the Secretary of Defense says something is a transgender ban,

7  I assume the Secretary of Defense means it's a transgender

8  ban.  I mean, I'm just that simple of a person, I guess.  I

9  don't think it's that complicated.

10      But let's get to the actual -- well, before I get to

11  the policy, tell me what part of my opinion is now wrong

12  because of the interpretation -- let's assume that --

13      MS. LIN:  Your Honor, may I pause that, I'm getting

14  message that the public line is not working, is that --

15      THE COURT:  Can we put the public line back on,

16  please?

17      THE CLERK:  It's going to be hard to connect it

18  because we're going to lose Ms. Levi and we're going to lose

19  audio.

20      (Discussion off the record.)

21      THE COURT:  What part of my opinion is wrong because

22  of -- well, let me rephrase this, I know you view the whole

23  thing as wrong.  What part of the opinion is different, or

24  should I reanalyze because of this new policy update?

25      MS. LIN:  Well, Your Honor's opinion's premise on

1    the idea that this is a broad scope --

2         THE COURT:  No, it's not.  It's not premised on

3    that, because I was very careful not to premise on that.  So I

4    just I want you to go through the opinion for me and tell me

5    sort of section-by-section, and tell me which section changes.

6         MS. LIN:  So the first thing that comes to mind, of

7    course, is the idea that this is a classification based on

8    trans identifying people being disqualified from military

9    service.  So and our position remains consistently has been

10   that it's the medical condition of gender dysphoria that is

11   the basis for disqualification from military service, so

12   there's --

13        THE COURT:  Right.  But it's still sex-based; right?

14   I mean gender dysphoria is still sex based.

15        MS. LIN:  We disagree --

16        THE COURT:  It's still -- I mean you still can't

17   discuss it without discussing sex or gender.  I mean, if you

18   tell me how you can discuss this ban without using the word

19   "sex," female or male, go ahead.

20        MS. LIN:  Your Honor, I think we went over the

21   disagreement with the Court that we do not believe that it is

22   sex discrimination because it's a --

23        THE COURT:  Okay.  But --

24        MS. LIN:  -- medical condition.

25        THE COURT:  Right.  So now I'm testing that, right,

1    I'm asking questions about it so that I understand, maybe

2    you'll convince me that I'm wrong.  Explain to me how a

3    diagnosis of gender dysphoria or keeping out everyone with

4    gender dysphoria is not sex-based?

5           MS. LIN:  Because every service member who has that

6    condition, whether the service member is male or female, is

7    disqualified unless a waiver applies.

8           THE COURT:  Okay.  But it's still a sex

9    classification.  I mean, you disagree with me if it's

10   transgender or if it's gender dysphoria, but the same analysis

11   applies; right?

12          MS. LIN:  If I understand Your Honor correctly.  So

13   we think that regardless of the service member's gender, if

14   the service members has gender dysphoria then that's a

15   disqualifying medical condition.  And that's why we think

16   that --

17          THE COURT:  Okay.  Because your argument is this is

18   all just about a medical condition; right?

19          MS. LIN:  That's correct.

20          THE COURT:  Okay.  All right.  What other part -- so

21   let's just go through my opinion.  So the legal analysis of

22   military deference won't change; right?

23          MS. LIN:  Correct.

24          THE COURT:  Okay.  The analysis of how quickly the

25   policy issued doesn't change; right?

1          MS. LIN:  Correct.

2          THE COURT:  The discussion of the studies doesn't

3    change; right?

4          MS. LIN:  Correct.

5          THE COURT:  All right.  The fact that the Mattis

6    policy is eight years outdated doesn't change; right?

7          MS. LIN:  Correct.  But if I may just interject, you

8    know, so if this is not a sex classification or a

9    quasi-suspect classification, then the then the level of

10   judicial scrutiny --

11         THE COURT:  I understand, Ms. Lin --

12         MS. LIN:  That's how it infects all the other

13   considerations.

14         THE COURT:  Well, we're actually going to get to

15   that, but just humor me because I spent a lot of time on this.

16   So the discussion of the Mattis policy and the fact that it's

17   seven or eight years out of date doesn't change; right?

18         MS. LIN:  Correct the Psychological Health Center

19   review doesn't change; right?

20         MS. LIN:  Right.

21         THE COURT:  The 2025 medical literature review

22   doesn't change; right?

23         MS. LIN:  Right.

24         THE COURT:  The cost analysis doesn't change at all;

25   right?

1          MS. LIN:  Right.

2          THE COURT:  In fact, it's exactly on point because

3    the cost that we analyzed in the cost was cost for gender

4    affirming care for gender dysphoria; right?

5          MS. LIN:  I'm sorry was --

6          THE COURT:  The cost discussion that I had in my

7    opinion, that doesn't change because that was actually based

8    just on gender dysphoria cost; right?

9          MS. LIN:  Correct.

10         THE COURT:  The discussion involving missing

11   evidence doesn't change; right?

12         MS. LIN:  So I mean, I think that was premised on

13   the idea that -- I believe this is the section where Your

14   Honor said that the DoD doesn't even know how many people who

15   identify as trans individuals and so, you know --

16         THE COURT:  How many people identify with -- how

17   many people have gender dysphoria right now in the military?

18   You don't know that either.

19         MS. LIN:  It's something that can be more

20   ascertainable based on the code --

21         THE COURT:  We're going to get to how it's

22   ascertained, but right now you don't know how many people with

23   gender dysphoria are in the military; right?

24         MS. LIN:  I personally don't, but --

25         THE COURT:  No one knows.

1          MS. LIN:  -- I don't think so.

2          THE COURT:  No, no one knows because I asked and you

3     all gave me stats from 2017 -- from 2017 to 2021, right, and

4     it was under 2,000 for that five-year --

5          MS. LIN:  That's the data we had.

6          THE COURT:  Okay.  So you don't know today how many

7     people have gender dysphoria in the military; right?

8          MS. LIN:  That's correct.

9          THE COURT:  Because you don't track that; right?

10         MS. LIN:  Correct.

11         THE COURT:  And because there's no wealth of

12    complaints about people with gender dysphoria, right, you

13    don't have a -- you don't have a problem that you're looking

14    at saying we have all these complaints of people with gender

15    dysphoria; right?

16         MS. LIN:  I can't agree with that characterization,

17    Your Honor, because --

18         THE COURT:  Oh, you do have a database of

19    complaints?

20         MS. LIN:  Not database of complaints, but we haven't

21    investigated -- or there --

22         THE COURT:  You haven't investigated, that's my

23    whole point.  That's the whole point of the opinion.

24         MS. LIN:  I haven't, but I don't know if DoD has.

25         THE COURT:  Well, there's been no investigation in

1    anything I've seen.  And I asked you all this question and you

2    told me you didn't know.

3              MS. LIN:  The idea that complaints filed at the low

4    levels of the military structure that didn't rise up to the

5    leadership level is something that just is a fact.

6              THE COURT:  Well, that's not actually --

7              MS. LIN:  -- complaints.

8              THE COURT:  Okay.  I understand that's the

9    government's position, but if there are low-level complaints

10   and they're not getting raised, then they can't be that

11   serious of a low level complaint; right?

12             MS. LIN:  Your Honor, I don't think the seriousness

13   is the kind that --

14             THE COURT:  Okay.  In any event --

15             MS. LIN:  -- to the top.

16             THE COURT:  In any event, you can't tell me right

17   now, there's nothing in the record right now that tells me how

18   many complaints there have been with respect to unit cohesion

19   and military readiness, right, with respect to gender

20   dysphoria?

21             MS. LIN:  It's not in the record.  But I was just

22   pointing out that in this section this is where Your Honor

23   said we didn't even have information about --

24             THE COURT:  Okay.  Well, let's go through the

25   missing evidence section bit-by-bit, okay.  You don't track

1    individuals by gender identity; right?

2              MS. LIN:  Correct.

3              THE COURT:  All right.  You don't know how many

4    people with gender dysphoria are in the military correct;

5    right?

6              MS. LIN:  We don't have that number, but if they

7    have a diagnostic code, that corresponds to gender dysphoria,

8    then that can be determined.

9              THE COURT:  Okay.  But you don't have -- you didn't

10   have that before you issued the policy, because you don't have

11   it now; right.

12             MS. LIN:  I don't have it now, correct.

13             THE COURT:  Okay.  You don't have a breakdown of

14   people in the military by gender, race, service or occupation;

15   right?

16             MS. LIN:  I don't know the answer to that.

17             THE COURT:  Okay.  You don't have any evidence that

18   people with gender dysphoria are inherently unfit to serve;

19   right?

20             MS. LIN:  Correct.

21             THE COURT:  Okay.  You don't have any evidence at

22   all that having gender dysphoria is inconsistent with honesty,

23   humility, and integrity; right?

24             MS. LIN:  Right.  Your Honor, I think --

25             THE COURT:  Ms. Lin --

1          MS. LIN:  My apologies.

2          THE COURT:  You don't have any evidence that having

3     gender dysphoria conflicts with a soldier's commitment to an

4     honorable, truthful, and disciplined lifestyle; right?

5          MS. LIN:  Other than the determination by military

6     leaders how --

7          THE COURT:  We don't even know what military leaders

8     made this determination.  Right now you can't even tell me

9     that the Secretary of Defense made this determination.  By the

10    way, who did make this determination?  Who in the military was

11    responsible for determining that this policy to exclude gender

12    dysphoria -- people with gender dysphoria is necessary?

13         MS. LIN:  So the policy itself has the letterhead of

14    the office and the official who has been designated to issue

15    the policy.

16         THE COURT:  Okay.  And who is that?

17         MS. LIN:  It was at the time Mr. Dill, D-i-l-l.

18         THE COURT:  Mr. Dill has left or where is Mr. Dill

19    now?

20         MS. LIN:  Mr. Dill has a different position now.

21    And the person who holds that same position is the official

22    that issued the policy this morning.

23         THE COURT:  Okay.  Who did those -- who did Mr. Dill

24    confer with before issuing the policy?

25         MS. LIN:  I'm not in a position to talk about the

1    government's deliberative process.

2         THE COURT:  No, this isn't about deliberative

3    process, Ms. Lin.  This is about you all are telling me this

4    is considered military judgment and I'm just asking who was

5    part of that judgment.  It's the same information that you

6    would have if you had a privilege discussion, who was in the

7    room.  I'm not asking what the discussion was, just who was

8    part of the discussion.

9         MS. LIN:  I'm not -- I don't have the information

10   about who all were involved in the deliberation.

11        THE COURT:  You know, what, no.  You can't come in

12   here and say one -- we don't know if the Secretary of Defense

13   even looked at this policy, one person issued the policy, and

14   it was deliberated.  When you can't tell me who deliberated

15   with Mr. Dill, if anyone.

16        MS. LIN:  Your Honor, I mean, there is a

17   long-standing doctrine of according good faith to the

18   government function and the processes, there is a official --

19        THE COURT:  Okay.

20        MS. LIN:  -- delegated the authority to issue this

21   declaration.  And I respectfully ask the Court not to assume

22   that is just pulled out of thin air --

23        THE COURT:  Well --

24        MS. LIN:  -- because there are people that were

25   part of the delib --

```
1              THE COURT:  Well, fine.  Tell me who the people are.
2    Tell me who the people are.
3              MS. LIN:  I don't have that information now and we
4    don't --
5              THE COURT:  How do you not have that information
6    after three hearings of this, of me basically -- and an entire
7    opinion, saying that you all can't even tell me who was part
8    of this?
9              MS. LIN:  Your Honor, even if this were an APA case,
10   which this is not, and we have an administrative record, we
11   have the documents, we don't then say and tell us everybody
12   who might be part of -- who touched this administrative
13   record --
14             THE COURT:  I'm not asking for everybody.  I'm just
15   asking for two names.  We have Mr. Dill, just give me one more
16   name.  Just give me one more name.
17             MS. LIN:  That was part of --
18             THE COURT:  Part of deliberating this policy.
19             MS. LIN:  I don't have that information now.
20             THE COURT:  Okay.  You don't have any information on
21   the analysis on military readiness of losing potentially
22   thousands of people with gender dysphoria, if that's how many
23   there are; right?
24             MS. LIN:  Your Honor, those sections of your opinion
25   didn't change; correct.
```

1          THE COURT:  Okay.  You still don't have any response

2     to all the plaintiffs declarants; right?

3          MS. LIN:  What does that mean?

4          THE COURT:  The plaintiff's put in a number of

5     declarations from the people who were involved in integrating

6     transgender people into the military.  And they all uniformly

7     testified that they did not create any issues.  And I still

8     don't have any evidence from the defense on that; right?

9          MS. LIN:  Correct.

10         THE COURT:  Okay.  The ripeness discussion stays the

11    same; right?

12         MS. LIN:  Yes.

13         THE COURT:  The -- my analysis of the deference to

14    the military stays the same; right?

15         MS. LIN:  Yes.

16         THE COURT:  You guys disagree on *Bostock*; right?

17         MS. LIN:  Yes.

18         THE COURT:  Okay.  And you disagree -- I guess the

19    question on whether people with gender dysphoria are a suspect

20    class might change, but you would agree with me that everyone

21    with gender dysphoria is transgender; right?

22         MS. LIN:  Yes.

23         THE COURT:  Okay.  There might be some people with

24    transgender -- there might be some people who are transgender

25    who never had gender dysphoria; right?

1          MS. LIN:  Correct.

2          THE COURT:  But you don't know what percentage that

3     is; right?

4          MS. LIN:  Correct.

5          THE COURT:  All right.  And certainly gender

6     dysphoria is not going to -- banning gender dysphoria is not

7     going to ban any class of individuals other than transgender

8     people; right?

9          MS. LIN:  They overlap, but it is not the same

10    class.

11         THE COURT:  People with gender dysphoria are a

12    subset of transgender people; right?

13         MS. LIN:  Yes.

14         THE COURT:  Okay.  So when you are getting rid of

15    everybody with gender dysphoria, everybody that you are

16    getting rid of is transgender; right?

17         MS. LIN:  That they're trans identifying, yes.

18         THE COURT:  And you have not been able to point to

19    me any other medical classification that the military uses

20    that impacts one class of people; right?

21         MS. LIN:  I mean, we treat the medical condition not

22    the class --

23         THE COURT:  No, I understand you quote, unquote,

24    treat the medical condition --

25         MS. LIN:  So if it's talking about heart disease,

1    the class of people would be ones with the heart disease in

2    the class.

3            THE COURT:  Right.  The people with heart disease

4    can be black or white, gay or straight, transgender or not,

5    male or female; right?

6            MS. LIN:  Right.

7            THE COURT:  There's no other quote, unquote, medical

8    condition that you're trying to treat that gets rid of a

9    suspect -- gets rid of a class of people; right?

10           MS. LIN:  That's my un --

11           THE COURT:  And when you said that people with

12   gender -- gender dysphoria lack humility and honesty and

13   integrity, you all agreed with me that you have never for any

14   other medical condition undertaken such a view; right?  Making

15   those aspersions against people with a classification?  It's

16   docket 66.  You haven't ever done that; right?

17           MS. LIN:  I don't know.

18           THE COURT:  Okay.  When you told me -- when I asked

19   you this in writing you all told me no, we haven't done this

20   before.  This is the first time the military is arguing --

21   with by the way what you have admitted is zero evidence --

22   that a condition makes people dishonest or lacking integrity.

23           MS. LIN:  I mean, I think that the DoD policy as

24   issued stated the standard by which all military service

25   people need to meet.

1              THE COURT:  Yeah.  And you say that people with

2     gender dysphoria inherently cannot meet that standard.

3              MS. LIN:  That's not in the DoD policy, the DoD

4     policy states what the policy is.

5              THE COURT:  The policy.

6              MS. LIN:  That includes the ability --

7              THE COURT:  Have you read the policy, Ms. Lin,

8     because it has that language in it?

9              MS. LIN:  Yeah, it's stating the policy.

10             THE COURT:  The policy is that only people who are

11    honest, selfless, have integrity, are disciplined, et cetera,

12    et cetera, et cetera, can serve.  Therefore, people with

13    gender dysphoria can't serve.  Now what does that tell us

14    about what the policy says about people with gender dysphoria?

15    It tells us that the policy is, is that people with gender

16    dysphoria inherently are not honest, do not have integrity,

17    and are not disciplined.

18             MS. LIN:  Your Honor, I mean, the policy also talks

19    about military readiness, talking about, you know, without the

20    need for special accommodation.  So for every characterization

21    that doesn't mean that they meet all of the characterizations.

22    So I guess --

23             THE COURT:  Oh, so they might be -- so some

24    transgender might lack integrity and other people might lack

25    discipline?

1          MS. LIN:  We're focusing on unit cohesion and

2    military readiness --

3          THE COURT:  All right.  Let's get to unit cohesion

4    and military readiness.

5          So with respect to military readiness, those are

6    pages 57, 58, 59 of my opinion.  And --

7          MS. LIN:  Your Honor, can you give me a second,

8    because I have the Westlaw version of your opinion.  So which

9    sections are you getting to?

10         THE COURT:  Application of intermediate scrutiny.

11         MS. LIN:  Okay.  Got it.

12         THE COURT:  It says, defendant's first argue that

13   DoD, quote, is concerned about subjecting those with a history

14   of gender dysphoria to the unique stresses of military life.

15   And then I go on to explain what you all agree, and everything

16   with respect to military deference was with respect to gender

17   dysphoria; right?  What you all argued?

18         MS. LIN:  Yes.

19         THE COURT:  Okay.  So my response was based on

20   gender dysphoria, because as we agreed, my response is that

21   the Mattis policy is outdated with respect to gender

22   dysphoria, because the treatment was not as well known in

23   2018, and because people who are transgender or with gender

24   dysphoria have not openly served.  That all remains correct,

25   right, or the same?

1          MS. LIN:  Yes.

2          THE COURT:  The same with respect to the discussion

3    of the AMSARA report, you still only identified one of 11

4    issues.  The ten other issues supported people with gender

5    dysphoria and transgender serving in the military; right?

6    That entire discussion hasn't changed; right?

7          MS. LIN:  Correct, other than the standard of

8    review, because this is Your Honor is applying the

9    intermediate scrutiny.

10         THE COURT:  I understand.  But even if we have

11   rational review, you have to have some something.  I just want

12   to make sure that when I'm sort of drafting what I draft after

13   this that we are all on page that with respect to the

14   argument, the argument stays the same.  You have no evidence

15   of issues with military readiness and people with gender

16   dysphoria; right?

17         MS. LIN:  Right, Your Honor.  I think we would --

18         THE COURT:  Ms. Lin, I'm going to do this, okay.

19         MS. LIN:  Okay.

20         THE COURT:  Now, with respect to unit cohesion, we

21   say DoD reasonably determining that exempting individuals with

22   gender dysphoria, who have undergone gender transition or seek

23   to do so, would undermine good order and discipline, et

24   cetera, et cetera, a contrary approach would risk eroding

25   reasonable expectations of privacy by other crew members;

```
1    right?

2              MS. LIN:  Your Honor's reading from your own

3    opinion?

4              THE COURT:  Yeah.

5              MS. LIN:  Yes.

6              THE COURT:  Okay.  And then the next paragraph,

7    obviously would fail, would be taken out if -- would change

8    based on "exhibits symptoms consistent with gender dysphoria,"

9    because you've now told me what that means; right?  So the

10   paragraph on page 60, the second paragraph of unit cohesion,

11   good order, and discipline would presumably change; right?

12   The paragraph starting "These justifications fail."

13             MS. LIN:  And Your Honor's assessment is that --

14             THE COURT:  This paragraph would actually -- this is

15   the one paragraph we've identified so far, other than the

16   level of review, you claim that we would have to change --

17   that I would have to change in my opinion; right?

18             MS. LIN:  Yes.

19             THE COURT:  But even then I went on to address the

20   other unit cohesion policies with respect to the Mattis

21   policy; right?

22             MS. LIN:  Yes.

23             THE COURT:  And then -- and we're going to get to

24   this a bit more, even if the military ban had focused solely

25   on those diagnosed with gender dysphoria, defendants do not
```

1    identify any problem that needs a new solution, right?  See

2    that paragraph?

3                MS. LIN:  The -- this is the paragraph starting with

4    "Even if the military ban."

5                THE COURT:  Yeah.  We're going to get to that in a

6    moment, but that obviously wouldn't change, because that's

7    assuming that the policy only covered people with gender

8    dysphoria.

9                MS. LIN:  Correct.

10                THE COURT:  And then the discussion of what the

11    plaintiffs have testified from their own personal experience

12    that wouldn't change; right?

13                MS. LIN:  Right.

14                THE COURT:  And the disproportionate costs wouldn't

15    change; right?

16                MS. LIN:  Right.

17                THE COURT:  The exemption provision wouldn't change;

18    right?

19                MS. LIN:  The exemption --

20                THE COURT:  -- provision, my discussion of it

21    wouldn't change; right?

22                MS. LIN:  I think there was -- and I'm not sure if I

23    recall this, but the exemption, I think there was discussion

24    before what -- what --

25                THE COURT:  -- attempted to transition means.

1          MS. LIN:  Correct.

2          THE COURT:  And you still don't have a answer for

3     me; right?

4          MS. LIN:  So our position remains that because the

5     DoD policy is only trying to address a medical condition,

6     we're only talking about people who are transitioning in the

7     context of having had gender dysphoria.  So people who had

8     gender dysphoria and who had then transitioned or attempt to

9     transition, then that would be the ones that fall within the

10    three items under the waiver provision.

11         THE COURT:  But the policy also requires them to

12    live in their biological sex; right?  So you would cover

13    anyone who has transitioned.  That would cover anyone who has

14    transitioned or has attempted to transition even

15    non-medically.

16         MS. LIN:  Yes.  I'm talking about a disqualifying

17    portion of the DoD policy.

18         THE COURT:  Okay.  I just want to make sure that the

19    DoD policy, the Hegseth policy, putting the exemption aside,

20    excludes from military service anyone who won't live in their

21    biological sex; right?  It's one of the criteria.

22         MS. LIN:  Correct.

23         THE COURT:  Okay.  All right.  The animus section

24    wouldn't change, right?  I mean, you still have the same words

25    in it.

1          MS. LIN:  Yes.

2          THE COURT:  You're still calling them all these

3     names; right?

4          MS. LIN:  Right.  But I think it's a little bit

5     different when the presumption or the assumption was that

6     we're talking --

7          THE COURT:  Ms. Lin, stop saying it was a

8     assumption.  Stop.  I didn't assume anything.  I took the

9     Secretary of Defense at his word.  So if you want to say to

10     me, I guess -- so stop staying it was an assumption.  Okay.

11     Say, if you decided to take Secretary of Defense at his word

12     then blah.

13          MS. LIN:  Okay.

14          THE COURT:  If I decide to take -- if I decide I

15     won't take Secretary of Defense at his word, if I decided that

16     he was either lying to the American people or just being very

17     loose with his language or didn't know what he was talking

18     about, if I make one of those assumptions, then we still have

19     animus, right, because we still -- I know you don't think that

20     there was animus initially, but the analysis is still the

21     same.  We still have all the negative connotations.  We still

22     have pure conjecture as to all those negative connotations.

23     We still have no support that people with gender dysphoria

24     impact military readiness.  We still have no support for the

25     fact -- the allegation, that people with gender dysphoria

1    impact unit cohesion.  And we still don't have any evidence

2    about your cost concerns.

3            So -- and the most important thing, which we're

4    going to get to now is everything that this policy does, if

5    all it does is address gender dysphoria, it's already

6    accounted for in the policies that were in existence on

7    January 19th, 2025.  So if this only covers people with gender

8    dysphoria, explain to me why it's needed.  Because the

9    policies already in place account for every single thing that

10   is in the guidance that you just gave me this morning.

11           MS. LIN:  This is more restrictive than the prior

12   policy.

13           THE COURT:  Yeah, but --

14           MS. LIN:  So that's why it's needed.

15           THE COURT:  No, no, that's not why it's needed,

16   that's what it does.  But why is it needed?  Why does it need

17   to be more restrictive?  The current policies already deal

18   with suicide ideation before you get into the military.  The

19   current policies already require a period of stability once

20   you're in the military; right?  And they require you to be

21   physically and mentally fit already.  So explain to me -- and

22   by the way, I looked at this new guidance this morning, which

23   I have here somewhere.

24           All right.  If you go to the guidance, Ms. Lin.

25           MS. LIN:  I have the guidance in front of me.

1    Unfortunately, it's just on a iPad.

2              THE COURT:  Okay.  That's fine.

3              Okay.  Let's go to page 2.  It says -- it's the

4    second full paragraph "Per DoD"; right?

5              MS. LIN:  Per DoD instruction.

6              THE COURT:  Yeah.

7              MS. LIN:  Okay.  So I'm there.

8              THE COURT:  Per DoD instruction 6025.19, quote,

9    Individual Medical Readiness Program, July 13, 2022, IMR is a

10   military service command and individual service member

11   responsibility.  As a condition of continued participation in

12   military service, service members have a responsibility to

13   report medical issues, including physical, dental, and mental

14   behavioral health that may affect their readiness to deploy,

15   ability to perform their assigned mission, or fitness for

16   retention in military service to their chain of command.  Did

17   I read that correctly?

18             MS. LIN:  Yes.

19             THE COURT:  How does that not already capture anyone

20   who might be having issues because of gender dysphoria?

21             MS. LIN:  Your Honor, the department wants to make

22   it clear what the -- I mean, this is issued today, but, you

23   know, it is reaffirming a prior standard, but that doesn't

24   mean --

25             THE COURT:  Ms. Lin, look, according to a lot of

1    people, I'm like a total moron.  So since I'm a total moron,

2    please explain to me, because maybe I'm just not getting it,

3    how the Individual Medical Readiness Program, which already

4    requires service members or their commanders to report anyone

5    who has a medical issue with respect to mental or behavioral

6    health, why we need to get rid of all people with gender

7    dysphoria if that's already in place?  It's already covering

8    anyone who might create issues because of gender dysphoria.

9            MS. LIN:  Your Honor, I'm -- I think, you know, the

10   government disagrees with the Court as to how best implement a

11   DoD policy or what that policy should say or whether the

12   policy is even warranted.

13           THE COURT:  But tell me why you disagree.  Just tell

14   me why.  I know that you disagree, but it's not enough.  You

15   can't just say, you know, what we decided that -- we decided

16   that all people from Uruguay are inherently mentally disabled,

17   so we're going to get rid of all people from Uruguay, right.

18   You could say that.  But I would ask, don't you already have a

19   policy that addresses that?  If everyone from Uruguay was

20   mentally unfit, they would already be covered, they would

21   already be ferreted out by the 6025.19.

22           MS. LIN:  But the policy is changing the scope,

23   so --

24           THE COURT:  Right.  And so my question is -- the

25   question from me on the record is, is that changed because a

1    deliberative process that the military actually thinks is

2    needed to ensure military readiness or unit cohesion or is it

3    pretext, is it basically just a excuse?  See, that's why I'm

4    asking these questions.  I'm not doing it for sport.  That's

5    the question.  And yet right now everything in the record is

6    that it's pretext.  There is nothing in the record that this

7    was a deliberative function.  As of today, you can't even tell

8    me if Secretary Hegseth looked at this.

9            MS. LIN:  Your Honor, let me just clarify, as to

10   Secretary Hegseth, I mean, we're not going to be providing a

11   declaration --

12           THE COURT:  No, I know you're not --

13           MS. LIN:  -- this is deliberative process and we

14   think --

15           THE COURT:  No.  Ms. Lin, you're not going the hide

16   behind deliberative process.  No.

17           MS. LIN:  I think Your Honor disagrees --

18           THE COURT:  -- I'm not asking you what the

19   deliberation was, although I'm pretty sure I could.  I'm

20   asking you who did the deliberating and you won't tell me

21   because you don't know.

22           MS. LIN:  Your Honor, I think if you construe -- and

23   it sounds like you are construing the scope of the DoD policy

24   to be broader than, you know -- then we appeal from that

25   interpretation.  But our guidance today was merely to tell you

1   that we -- our position is consistent, has been consistent

2   since the beginning, which is that we're only addressing

3   people with gender dysphoria.  That's all we're trying to do

4   today.  If Your Honor disagrees still and still wants to take

5   into account the Secretary's tweet, then that's where we are,

6   but --

7          THE COURT:  I'm not just taking into account the

8   Secretary's tweet, I'm taking into account the policy, all

9   right.  And I am going to issue a further opinion on this to

10  take into account this new guidance, which is why I'm asking

11  these questions.  All right.

12         So please explain to me how people with gender

13  dysphoria are causing problems that require a new policy given

14  that DoD instruction 6025.19 already requires commanders to

15  report people who are -- who have any mental or behavioral

16  health issues.

17         MS. LIN:  Your Honor, are you talking about why this

18  policy today is necessary or whether -- why the DoD policy

19  from February 26th is necessary --

20         THE COURT:  -- February 26th policy as now -- with

21  new guidance.

22         MS. LIN:  So that policy, again, like I mentioned

23  before is to make it more -- is stricter than the prior

24  policy.

25         THE COURT:  I understand it's stricter.

 1          MS. LIN:  That was the purpose of that that's why it

 2     was necessary.

 3          THE COURT:  No, no, the fact that it's stricter

 4     doesn't make it necessary.  The fact that it's stricter just

 5     makes it stricter.  I'm trying to get at what makes it

 6     necessary.

 7          So answer my question.  DoD instruction 6025.19,

 8     Individual Medical Readiness Program says it is the command's

 9     responsibility and the individual service person's

10     responsibility, as a condition of continued participation in

11     military service, service members have a responsibility to

12     report medical issues, including physical, dental, and mental

13     or behavioral health that may affect their readiness to

14     deploy, ability to perform their assigned mission, or fitness

15     for retention in military service to their chain of command.

16          If I have gender dysphoria, and I'm not getting

17     treatment, and so it's very bad and it's affecting my ability

18     to serve, I would already be covered by 6025.19, wouldn't I?

19          MS. LIN:  Your Honor, under the prior policy,

20     though, I'm not positive that gender dysphoria, given the

21     exemptions and --

22          THE COURT:  No, no, I understand --

23          MS. LIN:  -- the policy, so there's no need for them

24     to identify themselves, but I honestly do not know whether --

25          THE COURT:  Just read it.  If someone has a

1    mental -- see here's the disconnect, Ms. Lin, people with

2    gender dysphoria in treatment no longer have gender dysphoria

3    after they're treated.  The 2025 medical literature review

4    that was cited by the Action Memo says quite clearly that

5    gender dysphoria is highly treatable.  Highly treatable.

6    And --

7           MS. LIN:  Your Honor, that's a matter of scientific

8    debate or --

9           THE COURT:  Ms. Lin, I'm not -- I'm not the one who

10   put that medical literature review into the policy.  The

11   defense did.  You did that.

12          MS. LIN:  Yes.  And those documents are the

13   documents --

14          THE COURT:  -- asking for document --

15          MS. LIN:  -- that doesn't mean we ascribe to every

16   sentence in those documents.  A decision maker could consider

17   documents, that doesn't mean that everything in the document

18   is something that they attest to.

19          THE COURT:  Okay.  But overall the document has to

20   support the conclusion; right?

21          MS. LIN:  And we think it did.

22          THE COURT:  Okay.  Well, then you haven't read the

23   studies, because you hadn't read them the last time you were

24   before me.  Maybe you guys have taken the time now to actually

25   read them.  But trust me, those policies do not support the

1    conclusions that the Action Memo took from them.  But put that

2    aside for a moment, answer my question.  Why is stricter rules

3    necessary for gender dysphoria if 6025.19 already covers

4    commanders and service people reporting people with mental or

5    behavioral health issues.

6           MS. LIN:  Yeah, Your Honor, this provision is

7    talking about that they may affect readiness, deployability,

8    to perform their assigned missions, and the prior policy

9    seemed to be operating under the assumption that that was not

10   the case --

11          THE COURT:  It wasn't an assumption.

12          MS. LIN:  -- gender dysphoria.

13          THE COURT:  Ms. Lin, answer my question.

14          MS. LIN:  I'm trying to answer my question.

15          THE COURT:  No, you're not, Ms. Lin.  Let me make it

16   more clear for you, I can have gender dysphoria, be under

17   treatment, and be physically and mentally fit to serve.  Have

18   no mental issues, problems, have no deployment problems, have

19   no problems for fitness for retention.  And this policy would

20   still get rid of me.  And what I'm asking is why is that

21   necessary?  And you all say it's necessary because it's

22   necessary, because we need to make it more strict.  And I'm

23   saying if I have gender dysphoria, and I'm in the military,

24   and I am showing signs of distress, I'm mentally unfit because

25   my gender dysphoria is not getting treated or for whatever

1   other reason, 6025.19 would already usher me out of the

2   military.

3          So why do we need more -- why do we need to get rid

4   of people with gender dysphoria, who have been successfully

5   treated if they're not presenting physical, dental, and mental

6   behavioral health issues, and if they are presenting physical,

7   dental, and mental behavioral health issues why aren't they

8   already covered by 6025.19?

9          MS. LIN:  And I can only repeat what I've said

10  before, which is that the prior policy was much more generous

11  in terms of -- it reflected the military decision at that time

12  that gender dysphoria didn't necessarily cause the same level

13  of readiness or unit cohesion or lethality issues as the

14  current military decision.  So that's why we need to clarify.

15  I mean, it's always good for the Government to clarify to the

16  people governed by a new policy as to why --

17         THE COURT:  Ms. Lin, you're still not answering my

18  question.  You're still not answering my question.

19         MS. LIN:  I mean --

20         THE COURT:  Mr. Lynch, do you understand my

21  question?

22         MS. LIN:  I understand the question, Your Honor.

23  Yes.

24         THE COURT:  Okay.  What's the answer?

25         MR. LYNCH:  I'm not sure I have --

1          THE COURT:  You guys are saying that we need to get

2     rid of people with gender dysphoria and who have ever had a

3     history of gender dysphoria; right?  And I'm asking why.  And

4     you're saying that because they cause deployment issues, even

5     though you have no evidence that they do.  They might cause

6     problems performing their assigned mission -- you can be

7     seated, Mr. Lynch -- even though you have no evidence that

8     they do, et cetera, et cetera.  You have no evidence that they

9     do any of that.  And I'm saying, okay, let's pretend you're

10    right, they would already be covered by a policy.  And the

11    reason I'm asking this is because it was *City of Moreno*,

12    right, Sam?  The Supreme Court took into account the fact that

13    the policy -- the law they were striking down was basically

14    trying to do something that the laws on the books already

15    did.

16          MS. LIN:  Yeah, I mean, Your Honor, I think that you

17    made the decision you did.  And I can't provide anymore

18    information than what all --

19          THE COURT:  Because there is no answer, Ms. Lin.

20    Because there is no answer to the question.

21          MS. LIN:  The answer, Your Honor, is that the

22    military judgment in this case, is that people with gender

23    dysphoria poses concerns.  And this is a predictive judgment

24    as well.  And more importantly, this is a rational basis

25    review in the rational basis review realm.  They could even

1    come up with hypothetical justifications to justify.  And I

2    understand Your Honor ruled what you did in terms of the cases

3    where is it really pretext or is it not pretext or whether

4    there's legitimate government interest, and Your Honor has

5    already ruled on that.  So I don't want to keep repeating the

6    same thing Your Honor has already done.  But we just

7    respectfully submit that under the rational basis review, and

8    plus the military deference combined, puts a very high

9    threshold for the Court, to allow the Court to go and reweigh

10    the evidence, to rebalance the information that the military

11    leaders had before them --

12         THE COURT:  You said leaders, right now we only have

13    one person who's --

14         MS. LIN:  Decision maker, I'm sorry.

15         THE COURT:  Decision maker, one.  That's all that's

16    in the record is one person.

17         MS. LIN:  I think that the presumption of good faith

18    in government activities should be taken into account as well.

19    We'd certainly --

20         THE COURT:  Sure, tell me who -- tell me who --

21         MS. LIN:  The fact that there are people that are

22    involved in this deliberation is not negated by my inability

23    to tell you the names of those people.

24         THE COURT:  How is it not?  You guys have been --

25    this is the fourth hearing we've had on this.  You guys keep

1    telling me I need to defer to the military.  You guys keep

2    telling me that I don't know what I'm doing --

3              MS. LIN:  We certainly did not do that, Your

4    Honor.

5              THE COURT:  No, you're right.  You haven't.  Sorry,

6    lots of people in the world.  Not you guys.  I take that back.

7    Strike that too.

8              But you guys certainly contend that I'm not supposed

9    to be involved in military matters.  And what I'm saying is

10   there's literally nothing in the record that A, people with

11   gender dysphoria in the military is even a problem.  B, who is

12   trying to solve for that problem.  Or three, why the solution

13   is the right solution.  There's just no evidence.

14             MS. LIN:  To be clear, Your Honor, we did not raise

15   the justiciability argument.  So the way that you characterize

16   our argument, I don't necessarily agree.  So, Your Honor,

17   clearly is reviewing the policy --

18             THE COURT:  Yeah, and you're saying I shouldn't.

19             All right.  First of all, also you said it was

20   predictive.  It's still the case, right, that you all haven't

21   reviewed the service record of people with gender dysphoria;

22   right?  You don't know sitting here today --

23             MS. LIN:  I do not know.

24             THE COURT:  Right?  Because no one has looked at

25   that information.  The only information you have is from 2018;

1    right?

2          MS. LIN:  And the sub -- the other data that Your

3    Honor does not believe supports the ultimate conclusion.

4          THE COURT:  Yeah, I don't believe it does because I

5    read, because I'm literate and I read the studies.  All right.

6          Let me also ask you this, this says this policy is

7    getting rid of anyone with gender dysphoria or who's ever had

8    a history of it; right?

9          MS. LIN:  Correct.

10         THE COURT:  And if I go to the *DSM-5* I can learn

11   that people can have gender dysphoria as young children;

12   right?

13         MS. LIN:  Yes.

14         THE COURT:  And I can also learn that gender

15   dysphoria is treatable; right?  And if I looked at the 2025

16   literature review that was in the Action Memo I would learn

17   that gender dysphoria is highly treatable -- let me finish my

18   question -- and I would learn that gender affirming care is

19   quite helpful for people who have gender dysphoria.  And that

20   people who have had gender affirming care are much, much

21   better off after that care.

22         Now, why are people who have a condition that is

23   treated and has been treated, and are no longer suffering from

24   that condition not allowed to serve?

25         MS. LIN:  Your Honor, I think that's the kind of

1    medical debate that is beyond my knowledge here.  But just to

2    say that they are -- they're treatable or that they could be

3    treated, I think there's also a debate about whether that are

4    in fact treatable.  There is treatment, but that doesn't mean

5    that they could be -- that somehow people -- I mean, maybe

6    it's possible that people who had gender dysphoria no longer

7    suffer from it, and that's -- we don't dispute that and that's

8    why there is -- the waiver talks about some levels -- time

9    period of stability is recognizing that fact.

10              THE COURT:  -- talking about people --

11              MS. LIN:  I'm sorry.

12              THE COURT:  The waiver says period of stability in

13   their biological sex.  And all of the studies will tell you

14   that not providing people with gender affirming care, not

15   providing them with hormone therapy actually makes them

16   depressed.  Do you know what your policy does in effect?  Do

17   you realize what it does if we limit to people with gender

18   dysphoria, it says you can serve if you serve in your

19   biological sex.  Do you know what all of the studies say about

20   a what happens to people who live in their biological sex,

21   that's when they get gender dysphoria.  You're basically

22   creating a policy that the 2025 medical literature review that

23   you all put into this record, not me, says will make people

24   who don't currently have gender dysphoria, make them have

25   gender dysphoria.  Now, how is that sensical?

1          MS. LIN:  I mean, I disagree with that

2     characterization, but --

3          THE COURT:  Well, all right, let's look at the

4     *DSM-5*, I'm not making this stuff up.

5          MS. LIN:  If I could respond to Your Honor's

6     question --

7          THE COURT:  Stop.  Stop.  I'm going to quote from

8     the *DSM-5* and then I'm going to let you say whatever you want.

9          Go ahead.  I'm still looking for this, but I don't

10    want to keep you.  So go ahead.

11         MS. LIN:  My only point was that gender dysphoria is

12    a condition that is also classified with significant clinical

13    distress for at least six months.  And so the legitimate

14    government interest here is that people who have this type of

15    significant clinical distress and, therefore, are unable to

16    function in various areas of functioning, is a legitimate

17    grounds for disqualifying.  And that's all we're trying to do

18    here.  And Your Honor is talking about forcing people to serve

19    in a sex that they do not want to do --

20         THE COURT:  I'm not talking about that, that's what

21    the policy says.

22         MS. LIN:  That's Your Honor's interpretation of the

23    policy (Cross-talk) doesn't do anything.  People could just --

24    if they have gender dysphoria they will be disqualified.

25         THE COURT:  Ms. Lin, the policy says that they have

1    to live in their biological sex.  I don't --

2             MS. LIN:  Those who are not disqualified.  Right.

3             THE COURT:  But if you don't live in your biological

4    sex you're disqualified.

5             MS. LIN:  That's a disciplinary issue separate from

6    a disqualification.  So the way I understand it is that if

7    someone has a current gender dysphoria diagnosis and is

8    disqualified -- then the person is disqualified unless a

9    waiver applies.  Then there will be -- this person would then

10   not be trying to serve in a sex that is of their biological

11   sex.

12            THE COURT:  But someone who has gender dysphoria is

13   under distress, is already banned by the current policy.  That

14   person is already banned so we're not talking about that

15   person anymore.  We're talking about people who have never had

16   a history of gender dysphoria that has ever been treated or

17   who are stable in their -- in the sex that they identify

18   with.

19            MS. LIN:  But we do have people who are newly

20   diagnosed past few years --

21            THE COURT:  But those people are still covered by

22   the current policy.  If I get diagnosed with gender dysphoria

23   tomorrow and I'm a major in the Air Force, I'm already covered

24   by the current policy.  I'm also already going to be found out

25   or analyzed by 6025.19.  So it just goes back to my question

1    as to why this is needed.  And I think you and I both know the

2    answer to that, and it's because this isn't about addressing a

3    medical condition.

4              MS. LIN:  That is not my understanding, Your Honor.

5    That's not the government's position --

6              THE COURT:  Okay.  Well, then explain to me -- then

7    explain to me --

8              MS. LIN:  I cannot --

9              THE COURT:  No, someone has to tell me why.  I mean,

10   someone has to tell me why this policy is necessary to achieve

11   the ends of military readiness and unit cohesion.  And what

12   you're saying is we need to get rid of people who have current

13   gender dysphoria.  And what I'm saying is the current policy

14   already does that.  And what you haven't told me is why we

15   need to get rid of people who have ever had gender dysphoria

16   or who have transitioned, or who have been stable in their

17   diagnosis for over 18 months, and just give me a reason.

18             MS. LIN:  Your Honor, that process is being

19   determined through the administrative separation board as to

20   whether someone who should be disqualified subject to the

21   scope of the DoD policy.  And I fully understand Your Honor

22   disagree with why the government is doing this.  Your Honor

23   believe that this is done because of reasons other than the

24   legitimate government interest that we proffered.

25             THE COURT:  It's not what I believe.

1          MS. LIN:  Your opinion certainly says that.

2          THE COURT:  Hold on.  Hold on, Ms. Lin.  Hold on.  I

3    did not write about what I believed, just to be absolutely

4    crystal clear.  I wrote about what was in the record and

5    what's not in the record.  Every single thing in my opinion,

6    every single sentence was supported by a case cite or a record

7    cite --

8          MS. LIN:  My apologies, Your Honor.

9          THE COURT:  That --

10          MS. LIN:  My apologies characterizing Your Honor's

11    opinion, the opinion -- your opinion says what it says.

12          THE COURT:  My opinion is based on -- no, I want to

13    be crystal clear about this.  My opinion is based on the

14    evidence in the record before me.  If there is a single part

15    of my opinion, if there's a single sentence that you think is

16    unsupported by the evidence, if it's a factual question, let

17    me know.

18          MS. LIN:  And we did today about the scope of the

19    DoD policy.

20          THE COURT:  Yes.  And I'll change that, obviously,

21    but I didn't have that when I wrote my opinion.

22          MS. LIN:  Fair enough, Your Honor.

23          THE COURT:  Hold on.  All right.  So I'm just

24    looking at the opinion, which does not allow -- and the

25    policy, which does not allow for transgender people, or people

1    with gender dysphoria who have been treated for gender

2    dysphoria, who have received treatment for it, or people who

3    have had gender affirming care to live in the barracks of

4    their gender identity, it requires them to have the grooming

5    standards, et cetera, et cetera, for people of their

6    biological sex; right?

7              MS. LIN:  Correct.

8              THE COURT:  Okay.  All right.  Can we get to the

9    policy now, the guidance, because I don't understand this.  If

10   you look at the first page of the policy.

11             MS. LIN:  Yes.

12             THE COURT:  It says, if you look at records

13   review.

14             MS. LIN:  Oh, I'm sorry, which policy March --

15             THE COURT:  Today's guidance.

16             MS. LIN:  Today's policy.  Okay.  What are you

17   directing my attention to?

18             THE COURT:  The first page where it says "Records

19   review."

20             MS. LIN:  Yes, got it.

21             THE COURT:  The primary means of identifying service

22   members who have a current diagnosis or history of or exhibit

23   symptoms consistent with gender dysphoria who are no longer

24   eligible for military service will be through reviewing

25   medical records.  Did I read that correctly?

1          MS. LIN:  Yes.

2          THE COURT:  So you guys are what, now going to go

3   through 1.3 million medical records to see if someone has

4   diagnosed gender dysphoria?

5          MS. LIN:  I don't know how that process is going to

6   be implemented.

7          THE COURT:  Well, how else could it be implemented?

8   Unless you're going to target certain people?

9          MS. LIN:  The policy says they will be reviewing

10  medical records.

11         THE COURT:  The policies are big on passive tense,

12  someone reviewed, someone considered evidence, someone will

13  review, who will be reviewing medical records?  Are we

14  seriously going to spend -- now much money is that going to

15  cost, by the way?  Because I bet you it's going to cost more

16  than $5.2 million.

17         MS. LIN:  Your Honor's cost benefit analysis is what

18  it is and we don't -- you know, sometimes it's just the mere

19  fact that -- well, let me strike that --

20         THE COURT:  I just want to make sure I understand

21  this -- you're the one who's pointing me to this new guidance;

22  right?

23         MS. LIN:  Correct.

24         THE COURT:  So are you all saying that every

25  service -- that we're going to, I don't know, go through every

```
 1    single person's medical records to determine whether they have

 2    a history of gender dysphoria?

 3              MS. LIN:  We're not saying that.

 4              THE COURT:  Well --

 5              MS. LIN:  It's not saying that, but I think there

 6    will be a process.  Remember, this is a guidance to the

 7    military departments --

 8              THE COURT:  Yeah, so how --

 9              MS. LIN:  -- services.

10              THE COURT:  How do you review medical records other

11    than by reviewing them?  I mean, one thing I assume you're

12    going to do is you're going to have a tag that you do for

13    people who have gotten treatment for gender dysphoria in the

14    past, you're going to get rid of all those people.  But how

15    else are you going to do this?

16              MS. LIN:  I don't know the implementation steps.

17    And, Your Honor, honestly I don't think this is relevant to

18    the idea that --

19              THE COURT:  I think it's quite relevant, because

20    here's why, if these people were actually creating problems

21    you wouldn't have to go looking in medical records for them.

22    You all are saying that people with gender dysphoria are

23    causing such a military readiness problem that we need to get

24    rid of all of them, and yet you all don't even know how many

25    you have and you don't know who they are.  The only way you're
```

1    going to find out who they are is by going through the medical

2    records of presumably hundreds of thousands of soldiers.

3              Now, doesn't it look to you, that you all or the

4    defendants, are potentially looking for a problem where one

5    doesn't exist?  So why are you going to go to Sam's medical

6    records, Sam who is mentally and physically fit, Sam who has a

7    Bronze Star, Sam who has combat experience, we're going to go

8    to her medical records to find out if she has a history of

9    gender dysphoria.  Even though, right now, today, she's in

10   active combat as is one of the plaintiffs.  And then if they

11   have a history of gender dysphoria, even though today they're

12   mentally and physically fit, they're in combat, they've got

13   medals, we're going the get rid of them.  Explain to me how

14   that passes rational basis?  And by the way, if she is

15   exhibiting symptoms you're already going to get rid of them

16   based on 6025.19.

17             MS. LIN:  Your Honor, the commanders are able to

18   access medical records even before today's policy.

19             THE COURT:  Exactly.  Bingo.  But more to the point,

20   why are we getting rid of Sam?  Sam was perfectly --

21             MS. LIN:  This policy is not saying getting rid of

22   Sam.  This policy is looking at the medical record to

23   determine who falls within the scope.

24             THE COURT:  And then you get rid of them.

25             MS. LIN:  In fact, we don't know how that's going --

1    there is the --

2          THE COURT:  Well, hold on.  Hold on.  We do know,

3    because this policy guidance says somewhere that anyone with

4    this history must be removed.  One second.

5          So if you go to page 2 of the record, on the second

6    to last paragraph, if a service member is identified as having

7    a current diagnosis or history of or exhibiting symptoms --

8    I'm sorry, if during a PHA.

9          MS. LIN:  Second page of the policy?

10          THE COURT:  The policy from today.

11          MS. LIN:  Yeah, and --

12          THE COURT:  If during a PHA.

13          MS. LIN:  Okay.  Got it.

14          THE COURT:  A service member is identified as having

15    a history of gender dysphoria; do you see that?

16          MS. LIN:  Yes.

17          THE COURT:  They'll get a medical evaluation, have

18    to serve -- have to notify command.  Further, such a service

19    member must, M-u-s-t, be categorized as, quote, not medically

20    ready and not deployable.  And then they're going to be

21    recommended for administrative separation; right?

22          MS. LIN:  Correct.

23          THE COURT:  Okay.  Why are we getting rid of Sam?

24    Why is she nondeployable?  She's in combat right now.  She's

25    been treating her gender dysphoria.  She's been treating her

1    gender dysphoria for three years.  She's living in her

2    preferred identify.  It has caused no unit cohesion issues,

3    because you would have heard about it if they had.  Why are we

4    getting rid of her?

5            MS. LIN:  Your Honor, I think -- I don't have more

6    explanations to offer, other than that this is also a

7    predictive judgment about people who have gender dysphoria,

8    what kind of impact that will have --

9            THE COURT:  Okay.  Well, first of all, you keep

10   saying predictive even though we have experience.  We don't

11   need a modern day Nostradamus.  We have four years of

12   experience, you guys just haven't looked at it.  But my bigger

13   question is if she does start creating problems, why don't we

14   address it then?  Why are we pre-emptively getting rid of her?

15           MS. LIN:  And that is the military leaders decision.

16   I mean, I understand that, you know, Your Honor would run the

17   military differently --

18           THE COURT:  I wouldn't run the military at all.

19           MS. LIN:  Understood.

20           THE COURT:  I would be -- but that's not my

21   question.  My question is, there has to be a rational basis

22   between what the government is doing and the goals it seeks

23   even if I just go to rational basis.

24           I'm just asking you -- I'm just asking you, we have

25   potentially hundreds if not thousands of people in the

1    military who are serving today, who are serving their country,

2    who have done it for years and decades some of these

3    plaintiffs.  They've done it honorably.  And they've had no

4    problems.  And the people who had problems, they've already

5    been ushered out or they will be ushered out if they present

6    new problems.  And the government is telling them you are

7    inherently unfit to serve.

8         And you know what is -- it's like I think people --

9    I mean, I think we sometimes forget when we're having these

10   discussions that there are people involved.  There are people

11   who put on the uniform every day because they love their

12   country.  And they're being told that you are inherently

13   mentally and physically unfit to serve, even though there is

14   nothing in the record that says it.  And what you're telling

15   me is I just have to trust the people who did this, even

16   though you don't know who did it, even though you don't know

17   how they did it, and even though we all know that it was done

18   very, very quickly.

19        MS. LIN:  Your Honor, I don't have more explanations

20   to offer other than, you know, we've gone through the three

21   days of hearing, we provided the answers that we did have.  So

22   we respect Your Honor's decision and, you know, we are here

23   really to ask the Court to dissolve the injunction based on

24   this guidance today, but if Your Honor does not want to do

25   that then you would obviously deny that motion to dissolve.

1    But we would ask that the stay be extended until Your Honor

2    decides on the question of the motion to dissolve.

3            THE COURT:  I'm not extending the stay.

4            MS. LIN:  Understood.  Would Your Honor then be

5    willing to grant us a stay -- the alternative question of a

6    stay pending appeal?

7            THE COURT:  No, I'm not going to grant a stay

8    pending appeal.  No.  You want to get that -- if the D.C.

9    Circuit thinks they -- it needs to be stayed pending appeal,

10   you can ask them.

11           MS. LIN:  So is the -- Your Honor is your oral

12   ruling --

13           THE COURT:  No, I haven't made a oral ruling yet.

14   I'm not making --

15           MS. LIN:  Okay.  I just want to be clear.

16           THE COURT:  I'm going to make a written ruling.

17           MS. LIN:  Do you have an expected time, Your Honor,

18   when you expect to issue your written ruling -- you have no

19   ruling, so just trying to determine the timing, especially

20   given that you are also going to deny us the stay pending

21   appeal, and pursuant to Rule A we do have to ask Your Honor.

22   So I don't mean to continuously ask the Court the same

23   question.

24           THE COURT:  No, it's fine.  So what's going on right

25   now?  Ms. Levi, by the way, do you want to say anything.

1          MS. LEVI:  Well, I do want to address the timing

2     issue that's just been raised by Ms. Lin.  Yeah, I mean

3     plaintiffs absolutely oppose the motion to dissolve the

4     preliminary injunction.  And we, of course, oppose the motion

5     to stay the Court's preliminary injunction pending appeal.  We

6     do ask for an opportunity to address the motion and the newly

7     issued guidance.  And we want to do it in a way that is both

8     reasonable in light of the evolving situation that the

9     plaintiffs are facing.  And we want to do it in a way that

10    minimizes the burden to this court and to the Court of Appeals

11    as well.  And we want to make sure that plaintiffs have an

12    opportunity to both respond and ensure that there is, included

13    in the record, a response to the directive that we just

14    received this morning.

15         THE COURT:  Well, what's the situation with the

16    plaintiffs now, are they now off administrative leave?

17         MS. LEVI:  The ones that have been put in

18    administrative, to my knowledge have not been.  But, Your

19    Honor, as you know your order went into effect at 10:00 a.m.

20    and I haven't had an opportunity to hear from all of the

21    plaintiffs.

22         THE COURT:  All right.  I want all of them off of

23    administrative leave today, Ms. Lin.  They're off

24    administrative leave.  I mean, that's the -- the injunction,

25    the injunction was very clear on the fact that I want the

1    plaintiffs restored to what their status was before all

2    this.

3              MS. LIN:  Understood, Your Honor.

4              THE COURT:  Here's what I'm -- I'm not going to --

5    I'm not going to dissolve it right now.  I need to give

6    plaintiffs a chance to respond.

7              MS. LEVI:  -- Your Honor.

8              MS. LIN:  And without extending the stay.

9              THE COURT:  Well, I'm trying to figure out what to

10   do here.

11             MS. LIN:  I see.

12             THE COURT:  I mean, I want anyone who was on

13   administrative leave taken off of leave and put back where

14   they were.  I'm not staying that.  If -- I guess what I could

15   do is, unless Ms. Levi, you want me to do that, to give you

16   know I don't -- I am willing to put off when you guys have to

17   send a letter to everyone, that was part of my injunction,

18   which you have to notify everyone today about the order.  And

19   then you have to sort of confirm with me that you did it.  I'm

20   willing to move that back.

21             MS. LIN:  But the PI still went into effect this

22   morning already.  This is just notification portion that

23   you're addressing; right?

24             THE COURT:  Yeah, I'm trying to figure out how to

25   give people more time here, while getting the plaintiffs and

1    other transgender people back in service.

2              MS. LIN:  In their biological sex --

3              THE COURT:  No.  No.  No.

4              MS. LIN:  Okay.  So the PI is in place.  Got it.

5              THE COURT:  I mean, Ms. Levi, one thing we could do

6    is keep people in administrative leave, except for the

7    plaintiffs.  And otherwise, you know, give you until Monday to

8    respond and -- mainly what I don't want to go into effect is

9    whatever's going to happen on March 26th.  So if we can push

10   that -- Ms. Levi.

11             MS. LEVI:  Yes, I want -- the plaintiffs are in

12   agreement with that, Your Honor.  We really do want this to be

13   an orderly process.  And I think given what we've seen, we

14   actually anticipate service branch directives following from

15   the directive that was issued today.  And we don't want to

16   have to come back to the Court on any temporary orders.  So we

17   really are looking to be reasonable, if we can get an

18   appropriate schedule to respond and to have the Court

19   consideration of the plaintiff's response and issuing a

20   written opinion, which we also understand will be appealed.

21   So appreciate you offering the opportunity to come up with --

22   we are open to something that would be reasonable and that

23   would do that.

24             THE COURT:  Ms. Lin, do you have any ideas?

25             MS. LIN:  I think it's fair for plaintiffs to

1    request a time -- some time to respond to our motion to

2    dissolve.  We just ask that be very expeditious, but we also

3    would like to have the stay extended.  And I'm not sure the

4    plaintiffs have concerns about continuing on the

5    administrative absence for a few days or until the Court can

6    rule on the motion to dissolve, only because there's also

7    issues about serving in the biological sex and you know

8    because they might not even have -- well, I mean, Your Honor's

9    PI is in place now, so they could serve in their preferred

10   gender, but it's creating issues for us.  And that's why we

11   are urgently hoping to appeal Your Honor's decision, but we

12   want --

13           THE COURT:  Well, I gave you guys 63 hours to

14   appeal.  I mean, you guys could have -- first of all, I gave

15   you all plenty of notice.  I told you exactly what day, I said

16   it was going to be the 18th or 19th.  I gave it to you on the

17   18th.  I said I was going to give you 48 hours to appeal.  I

18   gave you 63 hours to appeal.  That was not on me.  I have not

19   granted a TRO in this action.  I have bent over backwards to

20   sort of make this as transparent a process as I humanly

21   could --

22           MS. LIN:  We appreciate Your Honor's three days and

23   we definitely recognize that, even though initially you said

24   one day, then you said two days, and you ultimately gave us

25   three days, we certainly appreciate that.  But we also

1    indicated that to the extent that Your Honor disagrees with us

2    as to how you read the scope of the DoD policy, a new policy

3    was forthcoming that could confirm our position.  And that's

4    why we're in the position we are in today.

5           So we didn't intend to delay, it was just that we

6    want to make sure when we go to the Court of Appeals, Your

7    Honor has had the benefit of our latest guidance and

8    everyone's looking at a more streamlined record or decision

9    from this court.

10          THE COURT:  Well -- Ms. Levi.

11          MS. LEVI:  Yeah, the plaintiffs are willing to agree

12   to a very short extension of this Court's temporary stay, if

13   it gives -- if it will include an opportunity for the

14   plaintiffs, in a reasonable way --

15          THE COURT:  What timing do you want, Ms. Levi?

16          MS. LEVI:  Appreciate the question.

17          THE COURT:  Well, let me ask, before you answer

18   that, Ms. Lin, if we push back the March 26th date that's

19   currently in the policy, I'm willing to give you a couple more

20   days.  I mean, my concern right now is I don't want the March

21   26th date going into effect, because that is what we have

22   been, you know, working towards getting an answer on before

23   then.  So if you guys are -- if the plaintiffs are willing to

24   keep the administrative stays or whatever going a few more

25   days, for everyone except the plaintiffs, or even with the

1    plaintiffs, and you all are willing to push March 26th back

2    sounds like that's where we can have some agreement.

3              MS. LIN:  We're not going to be able to agree to

4    extend the March 26th date.

5              THE COURT:  Okay.  Well, then you're stuck.

6              MS. LIN:  Understood.

7              THE COURT:  Because I'm not staying this past March

8    25th.  So --

9              MS. LEVI:  Your Honor, could I ask for the record,

10   because what the plaintiffs -- plaintiffs could agree to a

11   schedule if the defendants would agree not to put anyone -- to

12   initiate in any way anyone in administrative separation.  But

13   I want to get some -- if it's possible, clarity from the

14   defendants what their position --

15             THE COURT:  Ms. Lin.

16             MS. LIN:  Your Honor, I'm not authorized to agree to

17   the proposal, to not --

18             THE COURT:  What --

19             MS. LIN:  -- separating.  I'm not saying anyone -- I

20   don't know what the process for when the plaintiffs are going

21   to be -- when their separation process will begin, but I'm not

22   in a position to agree to extend any such separation

23   proceedings, the Administrative Board proceedings or

24   separation process.

25             THE COURT:  Well, why not?  Like, you just haven't

1    asked yet or there's a reason it has to start on the 26th.

2              MS. LIN:  The process will begin on March 26th.

3              THE COURT:  Okay.  But it's in the like, you know,

4    aliens are coming down from outer space and forcing us to

5    start this process; right?  I know that you might not have

6    agreement from your clients right now, but if you already know

7    from your client under no circumstances they're going to push

8    it back, do you know why?

9              MS. LIN:  I'm not going to speculate, Your Honor.

10             THE COURT:  All right.  Well, we're going to do

11   this -- Ms. Levi?

12             MS. LEVI:  Your Honor, I mean, the -- just to

13   suggest the Court could order that administrative separations

14   not begin by a specified date.  And if we -- if plaintiffs

15   knew that that order was forthcoming, then again we could be

16   reasonable --

17             THE COURT:  That order is already in place, I mean

18   that order is already in place.

19             MS. LEVI:  Yes, Your Honor.

20             THE COURT:  So --

21             MS. LIN:  Yeah.  And then because there is no stay

22   we may imminently go up on appeal.  I'm not, you know, the --

23   so that decision is also out there.  So I'm not saying that we

24   would just wait while things happen.  Sorry, I'm not being

25   very clear.  I don't have any decision making authority as to

1   when we might appeal, but just wanted to flag that an appeal

2   could be imminent as well.

3           THE COURT:  All right.  Ms. Lin, I would like you to

4   go back to your clients and say to them that the Court is

5   willing to keep the current posture going for a few more days

6   if --

7           MS. LIN:  You mean reinstitute the stay, because the

8   current posture is that the stay is lifted?

9           THE COURT:  We put the stay back in place for a few

10  days to give Ms. Levi a chance to brief this, to give me a

11  chance to write on it, and to give you all a chance to go up

12  to the Court of Appeals and not put them on a turn around of

13  like five minutes, because that's not good for anybody, if

14  they push back the March 26th date.

15          Now, if they're not willing to do that, on a time

16  schedule that you and Ms. Levi agree to, then I'll have Ms.

17  Levi file a opposition by Sunday at noon and I will get an

18  opinion out when I get the opinion out, probably on the 24th

19  or 25th.

20          But at that point you all, defendants, not me, not

21  Ms. Levi, are putting the D.C. Circuit in a very unpleasant

22  situation for them, because you're asking them to look at

23  something that's complicated, potentially, on a very short

24  turn around.  And if that happens I just want the record to be

25  crystal clear it's because of defendants.  Because I was

1    willing to move -- I was willing to extend the stay and it

2    sounds like Ms. Levi was willing to extend the stay by a few

3    days to give everyone a chance to do this.

4         MS. LIN:  If the government agrees to push back the

5    March 26th date for the plaintiffs or for --

6         THE COURT:  For everyone.

7         MS. LIN:  For everyone.

8         THE COURT:  I mean, so at this point whether or not

9    the D.C. Circuit is crunched for time is entirely in the hands

10   of the defendants.  And I just want the record to be as

11   humanly clear on that as possible.  And when you all seek --

12   you know, if you all refuse to push it back and seek an appeal

13   I'm ordering you to put in the record that this was offered to

14   make it so we're not all dealing with a fire drill.

15        MS. LIN:  Yes.  And Your Honor, and what is the

16   second option if we don't agree to extend the March 26th,

17   which I think is highly likely.

18        THE COURT:  Well --

19        MS. LIN:  What's the alternative schedule?

20        THE COURT:  What would be -- I just don't understand

21   what the problem is for extending it.  Like, why is it highly

22   unlikely?  Right now it's extended.  So why is it a burden on

23   you all to extend it a few more days?

24        MS. LIN:  I'm sorry, the -- you are going to issue

25   an opinion saying that the stay is reinstated, if we agree?

1          THE COURT:  I don't understand -- you just said it's

2     highly unlikely the defendants will agree to push back the

3     March 26th date.

4          MS. LIN:  Right, because I thought we had offered

5     that exchange for Your Honor to continue -- to re-up the stay,

6     but if we don't agree to the March 26th what is the scenario

7     in that situation?

8          THE COURT:  Well, I don't know a scenario at that

9     point.  I don't know what the scenario is at that point.  But

10    you said it was highly unlikely that you all would agree to

11    move the stay and can you explain to me why it's highly

12    unlikely, I mean, to move the March 26th date.

13         MS. LIN:  I'm going to check, Your Honor.  But this

14    is a coordinated, significant government operation and --

15         THE COURT:  Well, now it's already on pause, so

16    what's the problem with pausing it a few more days?

17         MS. LIN:  I'm going to have to check with the

18    client.

19         THE COURT:  All right.  Well, if you all aren't

20    willing -- Ms. Levi.

21         MS. LEVI:  I just -- I do want to ask for at least

22    until Monday at 6:00 p.m., we would ask for Tuesday at 9:00

23    p.m. to respond.  I understand that that puts the Court in a

24    challenging situation.  And I understand how it will jam up

25    the Court of Appeals.  We were given this policy that includes

1    extended references to other military policies 40 minutes

2    before the preliminary injunction went into effect.  And we

3    would just ask for additional time beyond Sunday at noon, Your

4    Honor.

5              THE COURT:  Okay.  I want an answer by 2:30 as to

6    whether you all are -- if I extend the stay, whether you

7    all -- the defendants will push backward the March 26th date

8    until whatever date we need to, to give me a chance to write

9    an opinion and the Court of appeals to at least take up an

10   emergency stay decision.  And if you are not willing to move

11   back the March 26th date, Ms. Lin, you better have a heck of a

12   reason.  Because if you're not willing to push back the March

13   26th date, I am -- I'm not going to allow -- I'm not going to

14   remove the injunction.

15             MS. LIN:  So if we do not push back March 26th --

16             THE COURT:  I just want to make clear that if you

17   don't push it back, and Ms. Levi has until Monday or Tuesday

18   morning to file an opposition.  And I file my opinion on

19   Tuesday or the 26th, you're still going to be subject to it.

20   You might get an emergency stay today.  But I want it in the

21   notice of appeal, if you guys file an emergency stay, that we

22   had an offer on the table that would have allowed the stay to

23   continue, would have allowed this to proceed in a considered

24   manner and you all refused.

25             MS. LIN:  Your Honor, I'm not sure that's what we

1    put in the notice of appeal --

2          THE COURT:  I'm ordering you to or some attachment.

3    I'm ordering someone to notify --

4          MS. LIN:  Okay.  Pursuant to Judge Reyes's order

5    we're providing this information in the notice of appeal, but

6    I'm not positive that I understand the full scope of the

7    Court's point.  You're saying the Court is willing to extend

8    the stay if the government agrees to move back the March 26th

9    deadline, but because assuming in that situation, the

10   defendants are not willing to push back 26th deadline, Your

11   Honor therefore did not -- did not re-up the stay.

12         THE COURT:  Right?

13         MS. LIN:  And hence the notice of appeal.

14         THE COURT:  Right?

15         MS. LIN:  And any associated -- got it.

16         THE COURT:  Ms. Levi?

17         MS. LEVI:  I do want the Court to know that the

18   defendants have extended the date for voluntary separations

19   beyond the March 26th deadline.  So I just want that to be in

20   the record if the defendants will not agree to extend the date

21   for the involuntary separation.

22         MS. LIN:  I'm not sure whether the representation

23   about what DoD is doing is accurate, but I'm going to confirm.

24   I have not heard an extension of the voluntary, but anyways

25   that's a separate process, because that would allow people to

1    have double the payment for separation, so that's --

2            MS. LEVI:  -- it is not the same, but that is not a

3    separate process.  That is part of the same executive order

4    and its implementation.  And the plaintiffs will endeavor to

5    get that policy submitted to the Court if directed, but

6    defendants have closest access to those.

7            THE COURT:  I thought everything was supposed to

8    already be put on my record?  Anyway, here's what we're going

9    to do:  Ms. Lin, everyone, you are going to go back to your

10   defendants, your clients, and you're going to say to them,

11   Judge Reyes, whatever we think of her opinion, has at least

12   been fair in not granting a TRO on three different occasions,

13   telling us exactly when she was going to rule so we had a

14   heads up, so we could prepare appeals and what not, and gave

15   us 63 hours for a stay.

16           Judge Reyes wants this to be an orderly process,

17   which is why she's done all of those things, and wants to give

18   plaintiffs an opportunity to respond to this new guidance,

19   wants to have a chance to have a written on it, and most

20   importantly wants the D.C. Circuit not to be jammed up on

21   timing.  And so is saying she will extend the current -- she

22   will reinstate the stay until a date that you and Ms. Levi

23   agree upon if we push back the March 26th date.

24           If they do not -- you keep nodding your head no at

25   everything, Ms. Lin, I would strongly urge you to strongly

1    urge your clients to do that.  If they don't do that, then we

2    will -- I will enter an order for a schedule based on that

3    and, you know, I can't rule before I get Ms. Levi's response,

4    so --

5              MS. LIN:  What's the response date from --

6              THE COURT:  Well, it depends on whether we move back

7    the March 26th date, if we don't move back the March 26th date

8    it will be 6:00 p.m. on Monday.

9              But I just want to make very clear, Ms. Lin, if you

10   all take that route, if you all refuse to cooperate, you all,

11   defendants, are the ones creating the fire drill.  You all,

12   defendants, are the ones putting a time pressure on the D.C.

13   Circuit, not me and not Ms. Levi.

14             MS. LIN:  Your Honor, but we are agreeing to -- I

15   mean, I guess if Your Honor doesn't want to extend the stay,

16   we are in a position -- okay.  I see.  I understand your

17   order.

18             THE COURT:  I just want to make sure you're clear on

19   it.

20             MS. LIN:  We'll order this transcript because

21   there's a lot of instructions so far.  I hope I caught all of

22   them, but in our notice to appeal, if we do appeal, we're

23   going to obviously endeavor to allow Ms. Levi a chance to

24   respond to our motion to dissolve.  And we're also hoping to

25   get the Court's written opinion on deciding on our motion,

1    but, you know, they're --

2           THE COURT:  You will have the Court's written

3    opinion within 24 to 36 hours of whenever I get Ms. Levi's

4    brief.  All right.

5           MS. LIN:  So that's -- I see Tuesday, 6:00 p.m. or

6    possibly the next morning.

7           THE COURT:  But here's the thing:  We're all up

8    against a deadline because -- go ahead, Ms. Levi.

9           MS. LEVI:  The Navy has already extended, based on

10   the policies that have been issued by the defendants, the date

11   for the involuntary separation to March 28th, Your Honor.

12          THE COURT:  When did that happen?

13          MS. LEVI:  I don't have the date of that --

14          THE COURT:  Here's what we're going to do.  I'm

15   done.  You all meet and confer.  You all figure out a time

16   line.  If there are new policies, they were supposed to be put

17   on the docket.  I don't know why I don't have them.  Someone

18   put on the docket, someone send to me an email or joint status

19   report as to when this is supposed to start, whether you all

20   are willing to push it back if I reinstate the stay.  And if

21   not, Ms. Levi, you guys come up with agreement that get your

22   brief in with enough time for me to write something.  Okay?

23          I don't want to jam up the D.C. Circuit.  That's my

24   like main concern here.  That's why I was so -- I worked --

25   our chambers worked incredibly hard to get this opinion out

1  when we did, so that we would not jam up the D.C. Circuit.  So

2  that we gave you all plenty of time to get and seek an

3  emergency stay.  And that's what we're here for, I'm not

4  complaining about it.  But what I don't want is to now jam up

5  the D.C. Circuit any way.  All right.

6          MS. LIN:  Understood, Your Honor.

7          THE COURT:  You guys talk.  You guys send me an

8  email or some sort of update by 2:30, by 3:00 o'clock to see

9  where we are.  If we need to get back on the phone, we'll just

10 get back on the phone.  No need to come back in.  All right.

11         MS. LIN:  So the deadline is 3:00 p.m. not 2:30?

12         THE COURT:  Yes.  Ms. Lin, Mr. Lynch, use your

13 considerable charm and skills to get your clients to agree to

14 this.

15         All right.  Anything else?

16         MS. LIN:  We'll do our best, Your Honor.

17         THE COURT:  All right.

18         MS. LIN:  Thank you.

19         (The proceedings were concluded at 12:41 p.m.)

20

21         I, Christine Asif, RPR, FCRR, do hereby certify that
   the foregoing is a correct transcript from the stenographic
22 record of proceedings in the above-entitled matter.

                    _____/s/_____
23                      Christine T. Asif
                     Official Court Reporter

24

25

< Dates >.
6025.19.
    48:25.
February 26th
    3:14, 37:19,
    37:20.
January 19th,
    2025.
    33:7.
July 13, 2022,
    34:9.
March  51:14,
    61:9, 64:7.
March 12th,
    5:21.
March 21,
    1:11.
March 26th
    6:10, 63:18,
    63:20, 64:1,
    64:4, 65:2,
    66:14, 67:5,
    68:3, 68:6,
    68:12, 69:7,
    69:11, 69:12,
    69:15, 70:8,
    70:19, 71:23,
    72:7.
March 26th,
    67:16.
March 28th,
    73:11.
$5.2 52:16.
.
.
< 0 >.
00 1:13, 4:11,
    59:19, 68:22,
    72:8, 73:5,
    74:8,
    74:11.
000 17:4.
02108 1:29.
.
.
< 1 >.
1.3 52:3.
10 59:19.
11 1:13,
    28:3.

1100 1:36.
12 74:19.
18 1:27,
    49:17.
18th 62:16,
    62:17.
19th 62:16.
.
.
< 2 >.
2 17:4, 34:3,
    55:5, 69:5,
    74:8.
20001 1:44.
20005 1:37.
2017 17:3.
2018 27:23,
    44:25.
202 1:45.
2021 17:3.
2025 1:11,
    15:21, 39:3,
    45:15,
    46:22.
24 73:3.
24th 66:18.
25-0240-ACR
    1:6.
25-240 2:2.
25th 64:8,
    66:19.
26th 61:9,
    65:1, 69:19,
    70:10.
2:30 74:11.
.
.
< 3 >.
3 74:8,
    74:11.
30 69:5,
    74:8.
333 1:43.
354-3247
    1:45.
36 73:3.
.
.
< 4 >.
40 69:1.

41 74:19.
48 62:17.
.
.
< 5 >.
5 4:11.
57 27:6.
58 27:6.
59 27:6.
.
.
< 6 >.
6 68:22, 72:8,
    73:5.
60 29:10.
6025.19 34:8,
    35:21, 37:14,
    38:7, 38:18,
    40:3, 41:1,
    41:8,
    54:16.
63 62:13,
    62:18,
    71:15.
66 25:16.
.
.
< 9 >.
9 68:22.
950 1:28.
_____/s/___
    _____
    74:25.
.
.
< A >.
a.m. 1:13,
    59:19.
abide 7:11,
    11:12,
    11:13.
ability 26:6,
    34:15, 38:14,
    38:17.
able 2:19,
    24:18, 54:17,
    64:3.
above-entitled
    74:23.
absence 62:5.

absent 3:3,
    5:16, 7:2.
absolutely
    50:3, 59:3.
access 54:18,
    71:6.
accommodation
    26:20.
according
    21:17,
    34:25.
account 6:15,
    6:16, 33:9,
    37:5, 37:7,
    37:8, 37:10,
    42:12,
    43:18.
accounted
    33:6.
accurate
    70:23.
achieve
    49:10.
Action 2:2,
    39:4, 40:1,
    45:16,
    62:19.
active 54:10.
activities
    43:18.
actual 12:10.
actually 8:25,
    11:4, 15:14,
    16:7, 18:6,
    29:14, 36:1,
    39:24, 46:15,
    53:20,
    61:14.
additional
    69:3.
address 29:19,
    31:5, 33:5,
    56:14, 59:1,
    59:6.
addresses
    35:19.
addressing
    37:2, 49:2,
    60:23.
Administrative

22:10, 22:12,
49:19, 55:21,
59:16, 59:18,
59:23, 59:24,
60:13, 61:6,
62:5, 63:24,
64:12, 64:23,
65:13.
admitted
25:21.
Advocates
1:26.
affect 10:17,
34:14, 38:13,
40:7.
affecting
38:17.
affirming 16:4,
45:18, 45:20,
46:14,
51:3.
agree 4:9,
12:4, 17:16,
23:20, 27:15,
44:16, 63:11,
64:3, 64:10,
64:11, 64:16,
64:22, 66:16,
67:16, 67:25,
68:2, 68:6,
68:10, 70:20,
71:23,
74:13.
agreed 25:13,
27:20.
agreeing
72:14.
agreement
61:12, 64:2,
65:6,
73:21.
agrees 67:4,
70:8.
ahead 13:19,
47:9, 47:10,
73:8.
Air 21:22,
48:23.
al 1:11, 2:3.
aliens 65:4.

allegation
32:25.
allow 43:9,
50:24, 50:25,
69:13, 70:25,
72:23.
allowed 45:24,
69:22,
69:23.
alternative
58:5,
67:19.
although
36:19.
America 2:3.
American
32:16.
Americans
8:1.
AMSARA 28:3.
Ana C. Reyes
1:17.
analysis 14:10,
14:21, 14:24,
15:24, 22:21,
23:13, 32:20,
52:17.
analyzed 16:3,
48:25.
animus 31:23,
32:19,
32:20.
answer 4:8,
6:11, 6:12,
8:5, 19:16,
31:2, 38:7,
40:2, 40:13,
40:14, 41:24,
42:19, 42:20,
42:21, 49:2,
63:17, 63:22,
69:5.
answering 8:5,
41:17,
41:18.
answers
57:21.
anticipate
61:14.
anybody

66:13.
Anyway 71:8.
anyways
70:24.
APA 22:9.
apologies 20:1,
50:8,
50:10.
appeal 36:24,
58:6, 58:8,
58:9, 58:21,
59:5, 62:11,
62:14, 62:17,
62:18, 65:22,
66:1, 67:12,
69:21, 70:1,
70:5, 70:13,
72:22.
appealed
61:20.
Appeals 59:10,
63:6, 66:12,
68:25, 69:9,
71:14.
APPEARANCES
1:21, 2:4.
Application
27:10.
applies 14:7,
14:11,
48:9.
applying
28:8.
Appreciate
61:21, 62:22,
62:25,
63:16.
approach
28:24.
appropriate
61:18.
areas 47:16.
argue 27:12.
argued 27:17.
arguing 2:10,
25:20.
argument 8:12,
14:17, 28:14,
44:15,
44:16.

around 66:12,
66:24.
ascertainable
16:20.
ascertained
16:22.
ascribe
39:15.
aside 31:19,
40:2.
Asif 1:41,
11:18, 74:21,
74:26.
aspect 3:20.
aspersions
25:15.
assessment
29:13.
assigned 34:15,
38:14, 40:8,
42:6.
associated
70:15.
assume 12:7,
12:12, 21:21,
32:8,
53:11.
assuming 30:7,
70:9.
assumption 4:5,
32:5, 32:8,
32:10, 40:9,
40:11.
assumptions
32:18.
attachment
70:2.
attempt 31:8.
attempted
30:25,
31:14.
attention 7:19,
11:15,
51:17.
attest 39:18.
audio 12:19.
authority 3:11,
3:23, 3:25,
6:4, 21:20,
65:25.

authorized
   64:16.
Avenue 1:43.
.
.
< B >.
backward
   69:7.
backwards
   62:19.
bad 38:17.
ban 4:3, 9:5,
   9:8, 9:17,
   9:19, 10:4,
   11:5, 12:6,
   12:8, 13:18,
   24:7,
   29:24.
ban. 30:4.
banned 48:13,
   48:14.
banning 24:6.
barracks
   51:3.
based 3:10,
   4:6, 13:7,
   13:14, 16:7,
   16:20, 27:19,
   29:8, 50:12,
   50:13, 54:16,
   57:23, 72:2,
   73:9.
basically 22:6,
   36:3, 42:13,
   46:21.
basis 10:9,
   13:11, 42:24,
   42:25, 43:7,
   54:14, 56:21,
   56:23.
begin 64:21,
   65:2,
   65:14.
beginning
   37:2.
behavioral
   34:14, 35:5,
   37:15, 38:13,
   40:5, 41:6,
   41:7.

behind 36:16.
believe 13:21,
   16:13, 45:3,
   45:4, 49:23,
   49:25.
believed
   50:3.
benefit 52:17,
   63:7.
bent 62:19.
best 35:10,
   74:16.
bet 52:15.
better 45:21,
   69:11.
beyond 46:1,
   69:3,
   70:19.
big 52:11.
bigger 56:12.
Bingo 54:19.
biological
   31:12, 31:21,
   46:13, 46:19,
   46:20, 48:1,
   48:3, 48:10,
   51:6, 61:2,
   62:7.
bit 29:24,
   32:4.
bit-by-bit
   18:25.
black 25:4.
blah 32:12.
Board 49:19,
   64:23.
books 42:14.
Bostock
   23:16.
Boston 1:29.
bound 8:25.
branch 61:14.
breakdown
   19:13.
brief 6:9,
   8:18, 66:10,
   73:4,
   73:22.
broad 8:12,
   10:4, 13:1.

broader
   36:24.
Bronze 54:7.
bunch 11:7.
burden 59:10,
   67:22.
busy 10:9.
.
.
< C >.
C. 1:12, 1:33,
   1:44, 58:8,
   66:21, 67:9,
   71:20, 72:12,
   73:23, 74:1,
   74:5.
cabinet 10:8.
called 9:8,
   9:16.
calling 32:2.
capture
   34:19.
care 16:4,
   45:18, 45:20,
   45:21, 46:14,
   51:3.
careful 13:3.
carefully
   9:20.
case 22:9,
   40:10, 42:22,
   44:20,
   50:6.
cases 43:2.
categorized
   55:19.
caught 72:21.
cause 41:12,
   42:4, 42:5.
caused 56:2.
causing 37:13,
   53:23.
Center 15:18.
certain 52:8.
certainly 24:5,
   43:19, 44:3,
   44:8, 50:1,
   62:25.
certify
   74:21.

cetera 26:11,
   26:12, 28:24,
   42:8, 51:5.
chain 34:16,
   38:15.
challenging
   68:24.
chambers
   73:25.
chance 11:25,
   60:6, 66:10,
   66:11, 67:3,
   69:8, 71:19,
   72:23.
change 14:22,
   14:25, 15:3,
   15:6, 15:17,
   15:19, 15:22,
   15:24, 16:7,
   16:11, 22:25,
   23:20, 29:7,
   29:11, 29:16,
   29:17, 30:6,
   30:12, 30:15,
   30:17, 30:21,
   31:24,
   50:20.
changed 28:6,
   35:25.
changes 13:5.
changing
   35:22.
channels
   7:25.
characterizatio
   n 17:16,
   26:20,
   47:2.
characterizatio
   ns 26:21.
characterize
   44:15.
characterizing
   50:10.
charm 74:13.
check 68:13,
   68:17.
children
   45:11.
Christine 1:41,

74:21,
74:26.
Circuit 58:9,
66:21, 67:9,
71:20, 72:13,
73:23, 74:1,
74:5.
circumstances
65:7.
cite 50:6,
50:7.
cited 39:4.
City 42:11.
CIVIL 1:5,
2:2.
claim 29:16.
clarified
8:24.
clarify 36:9,
41:14,
41:15.
clarity
64:13.
class 23:20,
24:7, 24:10,
24:20, 24:22,
25:1, 25:2,
25:9.
classification
13:7, 14:9,
15:8, 15:9,
24:19,
25:15.
classified
47:12.
clear 2:18,
34:22, 40:16,
44:14, 50:4,
50:13, 58:15,
59:25, 65:25,
66:25, 67:11,
69:16, 72:9,
72:18.
clearly 39:4,
44:17.
client 65:7,
68:18.
clients 65:6,
66:4, 71:10,
72:1,

74:13.
clinical 47:12,
47:15.
closest 71:6.
code 16:20,
19:7.
cohesion 18:18,
27:1, 27:3,
28:20, 29:10,
29:20, 33:1,
36:2, 41:13,
49:11,
56:2.
COLUMBIA 1:2.
combat 54:7,
54:10, 54:12,
55:24.
combined
43:8.
comes 13:6.
coming 2:19,
7:13, 8:1,
11:13, 11:14,
65:4.
command 34:10,
34:16, 38:8,
38:15,
55:18.
commanders
35:4, 37:14,
40:4,
54:17.
commitment
20:3.
complaining
74:4.
complaint
18:11.
complaints
17:12, 17:14,
17:19, 17:20,
18:3, 18:7,
18:9,
18:18.
complicated
12:9,
66:23.
computer-aided
1:49.
concern 63:20,

73:24.
concerned
27:13.
concerns 33:2,
42:23,
62:4.
concluded
74:19.
conclusion
39:20,
45:3.
conclusions
40:1.
condition 7:4,
13:10, 13:24,
14:6, 14:15,
14:18, 24:21,
24:24, 25:8,
25:14, 25:22,
31:5, 34:11,
38:10, 45:22,
45:24, 47:12,
49:3.
confer 20:24,
73:15.
confirm 60:19,
63:3,
70:23.
confirmation
4:11, 4:12.
conflicts
20:3.
conjecture
32:22.
connect
12:17.
connotations
32:21,
32:22.
consider
39:16.
considerable
74:13.
consideration
6:5, 61:19.
considerations
15:13.
considered
21:4, 52:12,
69:23.

consistent 7:8,
29:8, 37:1,
51:23.
consistently
9:6, 13:9.
Constitution
1:43, 4:18.
construe
36:22.
construing
36:23.
consulted
5:6.
contend 44:8.
context 31:7.
continue 68:5,
69:23.
continued
34:11,
38:10.
continuing
62:4.
continuously
58:22.
contradicting
6:14.
contrary
28:24.
convince
14:2.
cooperate
72:10.
coordinated
68:14.
Correct 5:1,
9:25, 14:19,
14:23, 15:1,
15:4, 15:7,
15:18, 16:9,
17:8, 17:10,
19:2, 19:4,
19:12, 19:20,
22:25, 23:9,
24:1, 24:4,
27:24, 28:7,
30:9, 31:1,
31:22, 45:9,
51:7, 52:23,
55:22,
74:22.

correctly
  14:12, 34:17,
  51:25.
corresponds
  19:7.
cost 15:24,
  16:3, 16:6,
  16:8, 33:2,
  52:15,
  52:17.
costs 30:14.
Counsel 2:4.
country 57:1,
  57:12.
couple 63:19.
course 13:7,
  59:4.
cover 5:25,
  31:12,
  31:13.
covered 30:7,
  35:20, 38:18,
  41:8, 42:10,
  48:21,
  48:23.
covering
  35:7.
covers 6:17,
  7:20, 33:7,
  40:3.
create 23:7,
  35:8.
creating 46:22,
  53:20, 56:13,
  62:10,
  72:11.
crew 28:25.
criteria
  31:21.
Cross-talk
  47:23.
crunched
  67:9.
crystal 50:4,
  50:13,
  66:25.
current 33:17,
  33:19, 41:14,
  48:7, 48:13,
  48:22, 48:24,

49:12, 49:13,
  51:22, 55:7,
  66:5, 66:8,
  71:21.
currently
  46:24,
  63:19.
.
.
< D >.
D-i-l-l
  20:17.
daily 10:9.
data 17:5,
  45:2.
database 17:18,
  17:20.
date 15:17,
  63:18, 63:21,
  64:4, 65:14,
  66:14, 67:5,
  68:3, 68:12,
  69:7, 69:8,
  69:11, 69:13,
  70:18, 70:20,
  71:22, 71:23,
  72:5, 72:7,
  73:10,
  73:13.
day 4:9, 4:11,
  5:7, 5:9,
  5:10, 8:17,
  56:11, 57:11,
  62:15,
  62:24.
days 57:21,
  62:5, 62:22,
  62:24, 62:25,
  63:20, 63:25,
  66:5, 66:10,
  67:3, 67:23,
  68:16.
DC 1:37.
deadline 70:9,
  70:10, 70:19,
  73:8,
  74:11.
deal 33:17.
dealing 10:9,
  67:14.

debate 39:8,
  46:1, 46:3.
decades 57:2.
decide 32:14.
decided 32:11,
  32:15,
  35:15.
decides 58:2.
deciding
  72:25.
Decision 5:8,
  6:3, 6:7,
  6:13, 39:16,
  41:11, 41:14,
  42:17, 43:14,
  43:15, 56:15,
  57:22, 62:11,
  63:8, 65:23,
  65:25,
  69:10.
decisions
  5:7.
declarants
  23:2.
declaration
  5:25, 8:14,
  9:19, 9:22,
  10:7, 10:11,
  10:15, 10:16,
  21:21,
  36:11.
declarations
  23:5.
Defendant 1:12,
  27:12.
Defendants
  1:31, 2:9,
  29:25, 54:4,
  64:11, 64:14,
  66:20, 66:25,
  67:10, 68:2,
  69:7, 70:10,
  70:18, 70:20,
  71:6, 71:10,
  72:11, 72:12,
  73:10.
Defenders
  1:26.
Defense 2:10,
  3:2, 4:3,

4:14, 4:24,
  6:14, 7:24,
  8:20, 9:12,
  9:15, 9:16,
  9:18, 9:20,
  10:7, 11:1,
  12:6, 12:7,
  20:9, 21:12,
  23:8, 32:9,
  32:11, 32:15,
  39:11.
defer 44:1.
deference
  14:22, 23:13,
  27:16,
  43:8.
definitely
  62:23.
delay 63:5.
delegated 3:11,
  3:24,
  21:20.
delib 21:25.
deliberated
  21:14.
deliberating
  22:18,
  36:20.
deliberation
  21:10, 36:19,
  43:22.
deliberative
  3:19, 21:1,
  21:2, 36:1,
  36:7, 36:13,
  36:16.
dental 34:13,
  38:12, 41:5,
  41:7.
deny 57:25,
  58:20.
Department
  1:35, 3:1,
  4:14, 4:24,
  6:14, 7:24,
  9:18,
  34:21.
departments
  53:7.
depends 72:6.

deploy 34:14, 38:14.
deployability 40:7.
deployable 55:20.
deployment 40:18, 42:4.
depressed 46:16.
designated 20:14.
determination 20:5, 20:8, 20:9, 20:10.
determine 53:1, 54:23, 58:19.
determined 19:8, 49:19.
determining 20:11, 28:21.
diagnosed 29:25, 48:20, 48:22, 52:4.
diagnosis 14:3, 48:7, 49:17, 51:22, 55:7.
diagnostic 19:7.
different 7:14, 8:2, 9:24, 12:23, 20:20, 32:5, 71:12.
differently 56:17.
Dill 20:17, 20:18, 20:20, 20:23, 21:15, 22:15.
directed 71:5.
directing

51:17.
directive 59:13, 61:15.
directives 61:14.
disabled 35:16.
disagree 12:4, 13:15, 14:9, 23:16, 23:18, 35:13, 35:14, 47:1, 49:22.
disagreement 13:21.
disagrees 35:10, 36:17, 37:4, 63:1.
disciplinary 48:5.
discipline 26:25, 28:23, 29:11.
disciplined 20:4, 26:11, 26:17.
disconnect 8:19, 8:24, 39:1.
discrimination 13:22.
discuss 13:17, 13:18.
discussing 13:17.
Discussion 12:20, 15:2, 15:16, 16:6, 16:10, 21:6, 21:7, 21:8, 23:10, 28:2, 28:6, 30:10, 30:20, 30:23.
discussions 57:10.
disease 24:25, 25:1, 25:3.
dishonest

25:22.
disproportionate 30:14.
dispute 46:7.
disqualification 13:11, 48:6.
disqualified 3:3, 5:16, 7:2, 13:8, 14:7, 47:24, 48:2, 48:4, 48:8, 49:20.
disqualifying 7:4, 14:15, 31:16, 47:17.
disregard 7:20.
dissolve 2:22, 57:23, 57:25, 58:2, 59:3, 60:5, 62:2, 62:6, 72:24.
distress 40:24, 47:13, 47:15, 48:13.
District 1:1, 1:2, 1:18.
docket 25:16, 73:17, 73:18.
doctrine 21:17.
document 7:17, 8:3, 10:22, 39:14, 39:17, 39:19.
documentary 4:6.
documents 7:19, 10:22, 10:24, 10:25, 22:11, 39:12, 39:13, 39:16, 39:17.
Dod 3:10, 8:25, 16:14, 17:24,

25:23, 26:3, 27:13, 28:21, 31:5, 31:17, 31:19, 34:4, 34:5, 34:8, 35:11, 36:23, 37:14, 37:18, 38:7, 49:21, 50:19, 63:2, 70:23.
doing 36:4, 44:2, 49:22, 56:22, 70:23.
done 25:16, 25:19, 43:6, 49:23, 57:2, 57:3, 57:17, 71:17, 73:15.
double 71:1.
down 42:13, 65:4.
draft 28:12.
drafting 28:12.
draw 10:2.
drill 67:14, 72:11.
DSM-5 45:10, 47:4, 47:8.
due 7:16.
during 55:8, 55:12.
.
.
< E >.
effect 46:16, 59:19, 60:21, 61:8, 63:21, 69:2.
eight 15:6, 15:17.
either 16:18, 32:16.
elaborate 8:10.
elected 8:7.
eligible 51:24.

email 73:18,
    74:8.
emergency
    69:10, 69:20,
    69:21,
    74:3.
End 4:9, 4:11,
    5:9, 5:10.
endeavor 71:4,
    72:23.
ends 49:11.
Enough 8:22,
    35:14, 50:22,
    73:22.
ensure 36:2,
    59:12.
enter 72:2.
entire 22:6,
    28:6.
entirely
    67:9.
eroding
    28:24.
especially
    58:19.
Esquire 1:25,
    1:33, 1:34.
et 1:11, 2:3,
    26:11, 26:12,
    28:23, 28:24,
    42:8, 51:5.
evaluation
    55:17.
event 4:13,
    18:14,
    18:16.
everybody
    22:11, 22:14,
    24:15.
Everyone 4:24,
    11:5, 11:6,
    14:3, 23:20,
    35:19, 60:17,
    60:18, 63:8,
    63:25, 67:3,
    67:6, 67:7,
    71:9.
everything
    27:15, 33:4,
    36:5, 39:17,

71:7,
    71:25.
evidence 10:1,
    16:11, 18:25,
    19:17, 19:21,
    20:2, 23:8,
    25:21, 28:14,
    33:1, 42:5,
    42:7, 42:8,
    43:10, 44:13,
    50:14, 50:16,
    52:12.
evolving
    59:8.
Exactly 11:11,
    16:2, 54:19,
    62:15,
    71:13.
except 61:6,
    63:25.
exchange
    68:5.
exclude
    20:11.
excludes
    31:20.
excuse 6:24,
    7:5, 7:6,
    36:3.
executive
    71:3.
exempting
    28:21.
exemption 3:3,
    5:16, 7:2,
    30:17, 30:19,
    30:23,
    31:19.
exemptions
    38:21.
exhibit
    51:22.
exhibiting
    54:15,
    55:7.
exhibits
    29:8.
exist 54:5.
existence
    33:6.

expect 58:18.
expectations
    28:25.
expected
    58:17.
expeditious
    62:2.
experience
    30:11, 54:7,
    56:10,
    56:12.
Explain 6:23,
    7:23, 8:9,
    14:2, 27:15,
    33:8, 33:21,
    35:2, 37:12,
    49:6, 49:7,
    54:13,
    68:11.
explained
    12:1.
explaining
    6:9.
explanations
    56:6,
    57:19.
extend 64:4,
    64:22, 67:1,
    67:2, 67:16,
    67:23, 69:6,
    70:7, 70:20,
    71:21,
    72:15.
extended 58:1,
    62:3, 67:22,
    69:1, 70:18,
    73:9.
extending 58:3,
    60:8,
    67:21.
extension
    63:12,
    70:24.
extent 63:1.
.
.
< F >.
facing 59:9.
fact 15:5,
    15:16, 16:2,

18:5, 32:25,
    38:3, 38:4,
    42:12, 43:21,
    46:4, 46:9,
    52:19, 54:25,
    59:25.
factual
    50:16.
fail 29:7.
fail. 29:12.
Fair 50:22,
    61:25,
    71:12.
faith 21:17,
    43:17.
fall 31:9.
falls 54:23.
far 29:15,
    72:21.
FCRR 1:41,
    74:21.
Federal 1:42.
female 13:19,
    14:6, 25:5.
ferreted
    35:21.
few 48:20,
    62:5, 63:24,
    66:5, 66:9,
    67:2, 67:23,
    68:16.
figure 60:9,
    60:24,
    73:15.
file 66:17,
    69:18,
    69:21.
filed 11:22,
    18:3.
filing 8:16.
final 5:4.
find 54:1,
    54:8.
Fine 10:6,
    10:11, 22:1,
    34:2,
    58:24.
finish 6:22,
    45:17.
fire 67:14,

72:11.
First 2:21,
    13:6, 25:20,
    27:12, 44:19,
    51:10, 51:18,
    56:9,
    62:14.
fit 33:21,
    40:17, 54:6,
    54:12.
fitness 34:15,
    38:14,
    40:19.
five 66:13.
five-year
    17:4.
flag 66:1.
focused
    29:24.
focusing
    27:1.
following
    61:14.
Force 48:23.
forcing 47:18,
    65:4.
foregoing
    74:22.
forget 57:9.
form 7:5.
forthcoming
    63:3,
    65:15.
found 48:24.
four 56:11.
fourth 43:25.
frankly 7:5.
front 33:25.
full 34:4,
    70:6.
fully 49:21.
function 21:18,
    36:7,
    47:16.
functioning
    47:16.
.
.
< G >.
gas 11:21.

gave 5:25, 6:2,
    7:2, 9:17,
    9:24, 10:16,
    11:25, 17:3,
    33:10, 62:13,
    62:14, 62:16,
    62:18, 62:24,
    71:14,
    74:2.
gay 25:4.
generous
    41:10.
gets 25:8,
    25:9.
getting 12:13,
    18:10, 24:14,
    24:16, 27:9,
    35:2, 38:16,
    40:25, 45:7,
    54:20, 54:21,
    55:23, 56:4,
    56:14, 60:25,
    63:22.
Give 6:2,
    10:15, 22:15,
    22:16, 27:7,
    49:17, 60:5,
    60:15, 60:25,
    61:7, 62:17,
    63:19, 66:10,
    66:11, 67:3,
    69:8,
    71:17.
given 9:21,
    37:13, 38:20,
    58:20, 61:13,
    68:25.
gives 63:13.
glad 2:20.
GLBTQ 1:26.
goals 56:22.
gotten 53:13.
governed
    41:16.
Government
    6:16, 7:7,
    7:12, 7:23,
    7:25, 18:9,
    21:1, 21:18,
    35:10, 41:15,

43:4, 43:18,
    47:14, 49:5,
    49:22, 49:24,
    56:22, 57:6,
    67:4, 68:14,
    70:8.
grant 58:5,
    58:7.
granted
    62:19.
granting
    71:12.
grooming
    51:4.
grounds
    47:17.
guess 4:18,
    6:12, 12:8,
    23:18, 26:22,
    32:10, 60:14,
    72:15.
guidance 6:10,
    7:17, 8:3,
    8:24, 10:22,
    33:10, 33:22,
    33:24, 33:25,
    36:25, 37:10,
    37:21, 51:9,
    51:15, 52:21,
    53:6, 55:3,
    57:24, 59:7,
    63:7,
    71:18.
guy 3:8,
    4:22.
guys 23:16,
    39:24, 42:1,
    43:24, 43:25,
    44:1, 44:6,
    44:8, 52:2,
    56:12, 60:16,
    62:13, 62:14,
    63:23, 69:21,
    73:21,
    74:7.
.
.
< H >.
handle 2:13.
hands 67:9.

happen 61:9,
    65:24,
    73:12.
happening 8:2,
    8:6, 11:3,
    11:4,
    11:15.
happens 46:20,
    66:24.
hard 12:17,
    73:25.
head 4:22,
    71:24.
heads 71:14.
Health 15:18,
    34:14, 35:6,
    37:16, 38:13,
    40:5, 41:6,
    41:7.
hear 9:3,
    59:20.
heard 56:3,
    70:24.
hearing 2:12,
    4:1, 6:1,
    11:20, 12:1,
    43:25,
    57:21.
hearings
    22:6.
heart 24:25,
    25:1, 25:3.
heck 69:11.
Hegseth 3:5,
    3:12, 3:16,
    3:21, 4:10,
    4:13, 4:25,
    5:4, 6:3,
    6:13, 6:16,
    8:13, 11:7,
    11:9, 31:19,
    36:8,
    36:10.
helpful
    45:19.
hence 70:13.
hereby 74:21.
hide 36:15.
high 43:8.
Highly 39:5,

45:17, 67:17,
67:21, 68:2,
68:10,
68:11.
history 27:13,
42:3, 45:8,
48:16, 51:22,
53:2, 54:8,
54:11, 55:4,
55:7,
55:15.
Hold 50:2,
50:23,
55:2.
holds 20:21.
honest 26:11,
26:16.
honestly 38:24,
53:17.
honesty 19:22,
25:12.
Honorable 1:17,
20:4.
honorably
57:3.
hope 72:21.
hoping 62:11,
72:24.
hormone
46:15.
hours 62:13,
62:17, 62:18,
71:15,
73:3.
humanly 62:20,
67:11.
humility 19:23,
25:12.
humor 15:15.
hundreds 54:2,
56:25.
hypothetical
7:3, 43:1.
.
.
< I >.
idea 9:15,
11:2, 13:1,
13:7, 16:13,
18:3,

53:18.
ideas 61:24.
ideation
33:18.
identified
28:3, 29:15,
55:6,
55:14.
identify 16:15,
16:16, 30:1,
38:24, 48:17,
56:2.
identifying
13:8, 24:17,
51:21.
identity 19:1,
51:4.
idiot 7:15.
imminent
66:2.
imminently
65:22.
impact 32:24,
33:1, 56:8.
impacts
24:20.
implement 9:1,
35:10.
implementation
53:16,
71:4.
implemented
5:3, 52:6,
52:7.
important
33:3.
importantly
42:24,
71:20.
IMR 34:9.
in. 74:10.
inability
43:22.
include
63:13.
included
59:12.
includes 26:6,
68:25.
including

34:13,
38:12.
inconsistent
19:22.
incorrect
10:5.
incredibly
73:25.
indicated
63:1.
Individual
34:9, 34:10,
35:3, 38:8,
38:9.
individuals
16:15, 19:1,
24:7,
28:21.
inexact 8:13,
8:14.
infects
15:12.
inference 10:2,
10:4.
information
4:6, 18:23,
21:5, 21:9,
22:3, 22:5,
22:19, 22:20,
42:18, 43:10,
44:25,
70:5.
inherently
19:18, 26:2,
26:16, 35:16,
57:7,
57:12.
initially
32:20,
62:23.
initiate
64:12.
injunction
2:22, 57:23,
59:4, 59:5,
59:24, 59:25,
60:17, 69:2,
69:14.
instruction
34:5, 34:8,

37:14,
38:7.
instructions
72:21.
integrating
23:5.
integrity
19:23, 25:13,
25:22, 26:11,
26:16,
26:24.
intend 63:5.
intended
11:5.
interest 43:4,
47:14,
49:24.
interject
15:7.
intermediate
27:10,
28:9.
interpretation
5:12, 12:12,
36:25,
47:22.
interpreted
5:3, 5:11.
investigated
17:21,
17:22.
investigation
17:25.
involuntary
70:21,
73:11.
involved 21:10,
23:5, 43:22,
44:9,
57:10.
involving
16:10.
ipad 34:1.
issue 3:12,
3:23, 3:25,
9:21, 20:14,
21:20, 35:5,
37:9, 48:5,
58:18, 59:2,
67:24.

issued 3:14,
    4:7, 7:17,
    10:12, 14:25,
    19:10, 20:22,
    21:13, 25:24,
    34:22, 59:7,
    61:15,
    73:10.
issues 23:7,
    28:4, 28:15,
    34:13, 34:20,
    35:8, 37:16,
    38:12, 40:5,
    40:18, 41:6,
    41:7, 41:13,
    42:4, 56:2,
    62:7,
    62:10.
issuing 20:24,
    61:19.
items 31:10.
itself 20:13.
.
.
< J >.
jam 68:24,
    73:23, 74:1,
    74:4.
jammed 71:20.
Jason 1:33,
    2:8.
Jean 1:34,
    2:8.
Jennifer 1:25,
    2:6.
joint 73:18.
Judge 1:18,
    70:4, 71:11,
    71:16.
judgment 21:4,
    21:5, 42:22,
    42:23,
    56:7.
judicial
    15:10.
Justice 1:35.
justiciability
    44:15.
justifications
    29:12,

43:1.
justify 43:1.
.
.
< K >.
keep 11:8,
    43:5, 43:25,
    44:1, 47:10,
    56:9, 61:6,
    63:24, 66:5,
    71:24.
keeping 14:3.
kind 18:13,
    45:25,
    56:8.
knowledge 46:1,
    59:18.
known 27:22.
knows 11:5,
    11:6, 16:25,
    17:2.
.
.
< L >.
lack 12:2,
    25:12,
    26:24.
lacking
    25:22.
language 26:8,
    32:17.
last 2:25,
    6:23, 12:1,
    39:23,
    55:6.
lasted 2:12.
later 6:10.
latest 63:7.
laughable
    7:5.
law 42:13.
laws 42:14.
lawyers 11:7.
leaders 20:6,
    20:7, 43:11,
    43:12,
    56:15.
leadership
    18:5.
learn 45:10,

45:14, 45:16,
    45:18.
least 47:13,
    68:21, 69:9,
    71:11.
leave 59:16,
    59:23, 59:24,
    60:13,
    61:6.
left 20:18.
Legal 1:26,
    14:21.
legitimate
    43:4, 47:13,
    47:16,
    49:24.
lethality
    41:13.
letter 60:17.
letterhead
    20:13.
level 15:9,
    18:5, 18:11,
    29:16,
    41:12.
levels 18:4,
    46:8.
Levi 1:25, 2:6,
    12:18, 58:25,
    60:15, 61:5,
    61:10, 63:10,
    63:15, 65:11,
    66:10, 66:16,
    66:17, 66:21,
    67:2, 68:20,
    69:17, 70:16,
    71:22, 72:3,
    72:13, 72:23,
    73:3, 73:8,
    73:21.
life 27:14.
lifestyle
    20:4.
lifted 66:8.
light 59:8.
likely 67:17.
limit 46:17.
line 12:14,
    12:15,
    73:16.

lit 11:21.
literally
    44:10.
literate
    45:5.
literature
    15:21, 39:3,
    39:10, 45:16,
    46:22.
little 32:4.
live 31:12,
    31:20, 46:20,
    48:1, 48:3,
    51:3.
living 56:1.
long-standing
    21:17.
longer 39:2,
    45:23, 46:6,
    51:23.
look 34:25,
    47:3, 51:10,
    51:12, 54:3,
    66:22.
looked 21:13,
    33:22, 36:8,
    44:24, 45:15,
    56:12.
looking 3:17,
    17:13, 47:9,
    50:24, 53:21,
    54:4, 54:22,
    61:17,
    63:8.
loose 32:17.
lose 12:18.
losing 22:21.
lot 5:7, 15:15,
    34:25,
    72:21.
lots 10:9,
    44:6.
love 57:11.
low 18:3,
    18:11.
low-level
    18:9.
lying 11:13,
    11:16,
    32:16.

Lynch 1:33,
  2:8, 2:16,
  2:18, 2:21,
  41:20, 42:7,
  74:12.
.
.
< M >.
M-u-s-t
  55:19.
MA 1:29.
machine 1:48.
main 73:24.
mainly 61:8.
major 48:23.
maker 39:16,
  43:14,
  43:15.
male 13:19,
  14:6, 25:5.
Manion 2:12.
manner 69:24.
Manning 2:16.
matter 39:7,
  74:23.
matters 44:9.
Mattis 15:5,
  15:16, 27:21,
  29:20.
meaning 12:4.
means 12:7,
  29:9, 30:25,
  51:21.
medals 54:13.
medically
  55:19.
meet 25:25,
  26:2, 26:21,
  73:15.
member 14:5,
  14:6, 14:13,
  34:10, 55:6,
  55:14,
  55:19.
members 14:14,
  28:25, 34:12,
  35:4, 38:11,
  51:22.
Memo 8:24,
  39:4, 40:1,

45:16.
mental 34:13,
  35:5, 37:15,
  38:12, 39:1,
  40:4, 40:18,
  41:5, 41:7.
mentally 33:21,
  35:16, 35:20,
  40:17, 40:24,
  54:6, 54:12,
  57:13.
mentioned
  37:22.
mere 52:18.
merely 36:25.
message
  12:14.
million 52:3,
  52:16.
millions 7:25,
  8:1.
mind 5:22,
  13:6.
minimizes
  59:10.
minutes 66:13,
  69:1.
missing 16:10,
  18:25.
mission 34:15,
  38:14,
  42:6.
missions
  40:8.
misspoke
  9:20.
modern 56:11.
moment 7:22,
  30:6, 40:2.
Monday 6:1,
  6:2, 9:22,
  61:7, 68:22,
  69:17,
  72:8.
money 52:14.
months 47:13,
  49:17.
Moreno 42:11.
morning 8:24,
  20:22, 33:10,

33:22, 59:14,
  60:22, 69:18,
  73:6.
moron 35:1.
motion 2:21,
  57:25, 58:2,
  59:3, 59:4,
  59:6, 62:1,
  62:6, 72:24,
  72:25.
Motions Hearing
  1:16.
move 60:20,
  67:1, 68:11,
  68:12, 69:10,
  70:8, 72:6,
  72:7.
MR. LYNCH
  41:25.
MS. LEVI 2:6,
  59:1, 59:17,
  60:7, 61:11,
  63:11, 63:16,
  64:9, 65:12,
  65:19, 68:21,
  70:17, 71:2,
  73:9,
  73:13.
myself 10:21.
.
.
< N >.
name 3:13,
  5:19,
  22:16.
names 22:15,
  32:3,
  43:23.
Navy 73:9.
necessarily
  41:12,
  44:16.
necessary
  20:12, 37:18,
  37:19, 38:2,
  38:4, 38:6,
  40:3, 40:21,
  40:22,
  49:10.
need 25:25,

26:20, 33:16,
  35:6, 38:23,
  40:22, 41:3,
  41:14, 42:1,
  44:1, 49:12,
  49:15, 53:23,
  56:11, 60:5,
  69:8, 74:9,
  74:10.
needed 33:8,
  33:14, 33:15,
  33:16, 36:2,
  49:1.
needs 30:1,
  58:9.
negated
  43:22.
negative 32:21,
  32:22.
new 12:24,
  30:1, 33:22,
  37:10, 37:13,
  37:21, 41:16,
  52:21, 57:6,
  63:2, 71:18,
  73:16.
newly 48:19,
  59:6.
next 29:6,
  73:6.
Nicolas 2:2.
NICOLAS
  TALBOTT, et
  al. 1:5.
nine 7:2,
  7:4.
No. 1:5, 8:22,
  21:11, 36:15,
  36:16, 58:8,
  61:3.
nodding
  71:24.
non-medically
  31:15.
nondeployable
  55:24.
noon 66:17,
  69:3.
Nostradamus
  56:11.

nothing 18:17,
  36:6, 44:10,
  57:14.
notice 6:8,
  11:24, 62:15,
  69:21, 70:1,
  70:5, 70:13,
  72:22.
notification
  60:22.
notify 55:18,
  60:18,
  70:3.
number 19:6,
  23:4.
NW 1:36,
  1:43.
.
.
< O >.
o'clock 4:11,
  74:8.
oath 10:20.
object 11:25.
obviously
  11:10, 29:7,
  30:6, 50:20,
  57:25,
  72:23.
occasions
  71:12.
occupation
  19:14.
offer 56:6,
  57:20,
  69:22.
offered 10:17,
  67:13,
  68:4.
offering
  61:21.
office 20:14.
Official 1:42,
  6:15, 20:14,
  20:21, 21:18,
  74:27.
officials 7:12,
  8:7.
once 33:19.
ones 25:1,

31:9, 59:17,
  72:11,
  72:12.
ongoing 2:22.
open 61:22.
openly 27:24.
operate 7:7.
operating
  40:9.
operation
  68:14.
operative 7:17,
  7:19.
opportunity
  9:17, 9:24,
  59:6, 59:12,
  59:20, 61:21,
  63:13,
  71:18.
oppose 59:3,
  59:4.
opposition
  66:17,
  69:18.
option 67:16.
oral 58:11,
  58:13.
order 28:23,
  29:11, 59:19,
  60:18, 65:13,
  65:15, 65:17,
  65:18, 70:4,
  71:3, 72:2,
  72:17,
  72:20.
ordering 67:13,
  70:2, 70:3.
orderly 61:13,
  71:16.
orders 61:16.
original
  6:16.
otherwise
  61:7.
outdated 15:6,
  27:21.
outer 65:4.
overall
  39:19.
overlap 24:9.

own 3:22, 29:2,
  30:11.
.
< P >.
p.m. 68:22,
  68:23, 72:8,
  73:5, 74:11,
  74:19.
page 28:13,
  29:10, 34:3,
  51:10, 51:18,
  55:5, 55:9.
pages 27:6.
paragraph 29:6,
  29:10, 29:12,
  29:14, 29:15,
  30:2, 30:3,
  34:4, 55:6.
Part 12:11,
  12:21, 12:23,
  14:20, 21:5,
  21:8, 21:25,
  22:7, 22:12,
  22:17, 22:18,
  50:14, 60:17,
  71:3.
participation
  34:11,
  38:10.
passes 54:14.
passive
  52:11.
past 48:20,
  53:14,
  64:7.
pause 12:13,
  68:15.
pausing
  68:16.
pay 7:19,
  11:15.
payment 71:1.
pending 58:6,
  58:8, 58:9,
  58:20,
  59:5.
pentagon
  4:14.
Per 34:4, 34:5,

34:8.
percentage
  24:2.
perfect 10:6.
perfectly
  54:20.
perform 34:15,
  38:14,
  40:8.
performing
  42:6.
period 33:19,
  46:9,
  46:12.
person 4:14,
  4:15, 12:8,
  20:21, 21:13,
  38:9, 43:13,
  43:16, 48:8,
  48:9, 48:14,
  48:15,
  53:1.
personal
  30:11.
personally
  16:24.
PHA 55:8,
  55:12.
phone 74:9,
  74:10.
physical 34:13,
  38:12, 41:5,
  41:6.
physically
  33:21, 40:17,
  54:6, 54:12,
  57:13.
PI 60:21, 61:4,
  62:9.
place 33:9,
  35:7, 61:4,
  62:9, 65:17,
  65:18,
  66:9.
Plaintiff 1:7,
  23:4,
  61:19.
Plaintiffs
  1:23, 2:7,
  23:2, 30:11,

54:10, 57:3,
59:3, 59:9,
59:11, 59:16,
59:21, 60:1,
60:6, 60:25,
61:7, 61:11,
61:25, 62:4,
63:11, 63:14,
63:23, 63:25,
64:1, 64:10,
64:20, 65:14,
67:5, 71:4,
71:18.
Please 2:4,
11:17, 12:16,
35:2,
37:12.
plenty 62:15,
74:2.
plus 43:8.
point 16:2,
17:23, 24:18,
47:11, 54:19,
66:20, 67:8,
68:9, 70:7.
pointing 18:22,
52:21.
policies 29:20,
33:6, 33:9,
33:17, 33:19,
39:25, 52:11,
69:1, 73:10,
73:16.
portion 31:17,
60:22.
poses 42:23.
position 13:9,
18:9, 20:20,
20:21, 20:25,
31:4, 37:1,
49:5, 63:3,
63:4, 64:14,
64:22,
72:16.
positive 38:20,
70:6.
possible 46:6,
64:13,
67:11.
possibly

73:6.
posture 66:5,
66:8.
potentially
22:21, 54:4,
56:25,
66:23.
pre-emptively
56:14.
predictive
42:23, 44:20,
56:7,
56:10.
preferred 56:2,
62:9.
preliminary
59:4, 59:5,
69:2.
premise 12:25,
13:3.
premised 13:2,
16:12.
prepare
71:14.
present 57:5.
presenting
41:5, 41:6.
president 4:18,
5:4, 8:20.
pressure
72:12.
presumably
29:11,
54:2.
presumption
32:5,
43:17.
pretend 11:3,
42:9.
pretext 36:3,
36:6, 43:3.
pretty 36:19.
primary
51:21.
prior 33:11,
34:23, 37:23,
38:19, 40:8,
41:10.
privacy
28:25.

privilege
21:6.
probably
66:18.
problem 17:13,
30:1, 44:11,
44:12, 53:23,
54:4, 67:21,
68:16.
problems 37:13,
40:18, 40:19,
42:6, 53:20,
56:13, 57:4,
57:6.
proceed
69:23.
Proceedings
1:48, 64:23,
74:19,
74:23.
process 3:19,
21:1, 21:3,
36:1, 36:13,
36:16, 49:18,
52:5, 53:6,
61:13, 62:20,
64:20, 64:21,
64:24, 65:2,
65:5, 70:25,
71:3,
71:16.
processes
21:18.
produced
1:48.
proffered
49:24.
Program 34:9,
35:3, 38:8.
pronouns
10:17.
proposal
64:17.
provide
42:17.
provided
57:21.
providing
36:10, 46:14,
46:15,

70:5.
provision
30:17, 30:20,
31:10,
40:6.
Psychological
15:18.
public 7:12,
7:13, 8:7,
8:21, 9:23,
9:25, 12:14,
12:15.
pulled 21:22.
pure 32:22.
purpose 38:1.
Pursuant 58:21,
70:4.
push 61:9,
63:18, 64:1,
65:7, 66:14,
67:4, 67:12,
68:2, 69:7,
69:12, 69:15,
69:17, 70:10,
71:23,
73:20.
put 12:15,
23:4, 39:10,
40:1, 46:23,
57:11, 59:17,
60:13, 60:16,
64:11, 66:9,
66:12, 67:13,
70:1, 71:8,
73:16,
73:18.
puts 43:8,
68:23.
putting 31:19,
66:21,
72:12.
.
.
< Q >.
quasi-suspect
15:9.
question 4:20,
4:21, 6:12,
8:5, 18:1,
23:19, 35:24,

35:25, 36:5,
38:7, 40:2,
40:13, 40:14,
41:18, 41:21,
41:22, 42:20,
45:18, 47:6,
48:25, 50:16,
56:13, 56:21,
58:2, 58:5,
58:23,
63:16.
questions 5:2,
6:22, 14:1,
36:4,
37:11.
quickly 14:24,
57:18.
quite 39:4,
45:19,
53:19.
quote 5:15,
24:23, 25:7,
27:13, 34:8,
47:7,
55:19.
.
.
< R >.
race 19:14.
raise 44:14.
raised 18:10,
59:2.
rational 28:11,
42:24, 42:25,
43:7, 54:14,
56:21,
56:23.
re-up 68:5,
70:11.
read 6:25,
26:7, 34:17,
38:25, 39:22,
39:23, 39:25,
45:5, 51:25,
63:2.
Readiness
10:17, 18:19,
22:21, 26:19,
27:2, 27:4,
27:5, 28:15,

32:24, 34:9,
34:14, 35:3,
36:2, 38:8,
38:13, 40:7,
41:13, 49:11,
53:23.
reading 29:2.
ready 55:20.
reaffirming
34:23.
real 11:15.
realize
46:17.
really 5:23,
7:13, 43:3,
57:23, 61:12,
61:17.
realm 42:25.
reanalyze
12:24.
reason 41:1,
42:11, 49:17,
65:1,
69:12.
reasonable
28:25, 59:8,
61:17, 61:22,
63:14,
65:16.
reasonably
28:21.
reasons
49:23.
rebalance
43:10.
recall 30:23.
received 51:2,
59:14.
recognize
62:23.
recognizing
46:9.
recommended
55:21.
record.
12:20.
recorded
1:48.
Records 51:12,
51:18, 51:25,

52:3, 52:10,
52:13, 53:1,
53:10, 53:21,
54:2, 54:6,
54:8,
54:18.
references
69:1.
referring 4:19,
4:21.
reflected
41:11.
refuse 67:12,
72:10.
refused
69:24.
regardless
14:13.
reinstate
71:22,
73:20.
reinstated
67:25.
reinstitute
66:7.
relevant 53:17,
53:19.
remains 13:9,
27:24,
31:4.
Remember
53:6.
remove 69:14.
removed 55:4.
repeat 41:9.
repeating
10:21,
43:5.
rephrase
12:22.
report 28:3,
34:13, 35:4,
37:15, 38:12,
73:19.
Reported
1:41.
Reporter 1:42,
74:27.
reporting
40:4.

reports 4:25.
representation
70:22.
request 62:1.
require 33:19,
33:20,
37:13.
requires 31:11,
35:4, 37:14,
51:4.
respect 7:16,
18:18, 18:19,
27:5, 27:16,
27:21, 28:2,
28:13, 28:20,
29:20, 35:5,
57:22.
respectfully
10:3, 21:21,
43:7.
respond 6:18,
47:5, 59:12,
60:6, 61:8,
61:18, 62:1,
68:23, 71:18,
72:24.
response 23:1,
27:19, 27:20,
59:13, 61:19,
72:3, 72:5.
responses
6:19.
responsibility
34:11, 34:12,
38:9, 38:10,
38:11.
responsible
20:11.
restored
60:1.
restrictive
33:11,
33:17.
retention
34:16, 38:15,
40:19.
retweeted 3:5,
5:14, 6:15.
review 15:19,
15:21, 28:8,

28:11, 29:16,
39:3, 39:10,
42:25, 43:7,
45:16, 46:22,
51:13, 52:13,
53:10.
review.
  51:19.
reviewed 44:21,
  52:12.
reviewing
  44:17, 51:24,
  52:9, 52:13,
  53:11.
reweigh 43:9.
Reyes 70:4,
  71:11,
  71:16.
rid 24:14,
  24:16, 25:8,
  25:9, 35:6,
  35:17, 40:20,
  41:3, 42:2,
  45:7, 49:12,
  49:15, 53:14,
  53:24, 54:13,
  54:15, 54:20,
  54:21, 54:24,
  55:23, 56:4,
  56:14.
ridiculous
  7:6.
ripeness
  23:10.
rise 18:4.
risk 28:24.
room 21:7.
route 72:10.
RPR 1:41,
  74:21.
Rule 58:21,
  62:6, 71:13,
  72:3.
ruled 43:2,
  43:5.
rules 40:2.
ruling 58:12,
  58:13, 58:16,
  58:18,
  58:19.

run 56:16,
  56:18.
.
.
< S >.
S. 1:35.
Sam 42:12,
  54:5, 54:6,
  54:7, 54:20,
  54:22,
  55:23.
saw 3:16.
says 4:17,
  5:10, 6:4,
  10:7, 12:6,
  26:14, 27:12,
  34:3, 38:8,
  39:4, 45:6,
  46:12, 46:18,
  46:23, 47:21,
  47:25, 50:1,
  50:11, 51:12,
  51:18, 52:9,
  55:3,
  57:14.
scenario 68:6,
  68:8, 68:9.
schedule 61:18,
  64:11, 66:16,
  67:19,
  72:2.
scientific
  39:7.
scope 13:1,
  35:22, 36:23,
  49:21, 50:18,
  54:23, 63:2,
  70:6.
scrutiny 15:10,
  27:10,
  28:9.
seated 42:7.
Second 27:7,
  29:10, 34:4,
  55:4, 55:5,
  55:9,
  67:16.
secondly
  2:25.
secretaries

10:8.
section 13:5,
  16:13, 18:22,
  18:25,
  31:23.
section-by-sect
  ion 13:5.
sections 22:24,
  27:9.
seeing 11:19,
  11:20.
seek 28:22,
  67:11, 67:12,
  74:2.
seeks 56:22.
seemed 40:9.
seen 3:22, 4:3,
  4:10, 18:1,
  61:13.
selfless
  26:11.
send 9:18,
  60:17, 73:18,
  74:7.
sense 7:1.
sensical
  46:25.
sent 3:2.
sentence 39:16,
  50:6,
  50:15.
separate 48:5,
  70:25,
  71:3.
separating
  64:19.
separation
  49:19, 55:21,
  64:12, 64:21,
  64:22, 64:24,
  70:21, 71:1,
  73:11.
separations
  65:13,
  70:18.
serious
  18:11.
seriously 4:1,
  52:14.
seriousness

18:12.
serve 19:18,
  26:12, 26:13,
  38:18, 40:17,
  45:24, 46:18,
  47:18, 48:10,
  55:18, 57:7,
  57:13,
  62:9.
served 27:24.
service 13:9,
  13:11, 14:5,
  14:6, 14:13,
  14:14, 19:14,
  25:24, 31:20,
  34:10, 34:12,
  34:16, 35:4,
  38:9, 38:11,
  38:15, 40:4,
  44:21, 51:21,
  51:24, 52:25,
  55:6, 55:14,
  55:18, 61:1,
  61:14.
services
  53:9.
serving 28:5,
  57:1, 62:7.
seven 15:17.
sex 13:14,
  13:17, 13:19,
  13:22, 14:8,
  15:8, 31:12,
  31:21, 46:13,
  46:19, 46:20,
  47:19, 48:1,
  48:4, 48:10,
  48:11, 48:17,
  51:6, 61:2,
  62:7.
sex-based
  13:13,
  14:4.
short 7:5,
  63:12,
  66:23.
shorthand 1:48,
  6:24.
shouldn't
  44:18.

showing
  40:24.
signed 3:17,
  4:10.
significance
  12:2.
significant
  47:12, 47:15,
  68:14.
signs 40:24.
simple 12:8.
single 5:7,
  33:9, 50:5,
  50:6, 50:14,
  50:15,
  53:1.
sitting 4:2,
  44:22.
situation 59:8,
  59:15, 66:22,
  68:7, 68:24,
  70:9.
six 47:13.
skills 74:13.
soldier 20:3.
soldiers
  54:2.
solely 29:24.
solution 30:1,
  44:12,
  44:13.
solve 44:12.
somehow 46:5.
Someone 6:3,
  6:23, 7:23,
  38:25, 48:7,
  48:12, 49:9,
  49:10, 49:20,
  52:3, 52:12,
  70:3, 73:17,
  73:18.
sometimes 8:13,
  52:18,
  57:9.
somewhere 2:19,
  33:23,
  55:3.
Sorry 8:22,
  9:3, 9:7,
  10:21, 11:16,

16:5, 43:14,
  44:5, 46:11,
  51:14, 55:8,
  65:24,
  67:24.
sort 13:5,
  28:12, 60:19,
  62:20,
  74:8.
sounds 36:23,
  64:2, 67:2.
space 65:4.
speaks 11:1.
special
  26:20.
specified
  65:14.
speculate
  65:9.
spend 52:14.
spent 15:15.
spoke 3:1.
sport 36:4.
stability
  33:19, 46:9,
  46:12.
stable 48:17,
  49:16.
stand 6:9,
  8:17, 8:18.
standard 25:24,
  26:2, 28:7,
  34:23.
standards
  51:5.
Star 54:7.
start 56:13,
  65:1, 65:5,
  73:19.
starting 29:12,
  30:3.
state 2:4.
stated 25:24.
States 1:1,
  1:18, 2:3,
  26:4.
stating 26:9.
stats 17:3.
status 60:1,
  73:18.

stayed 2:23,
  58:9.
staying 32:10,
  60:14,
  64:7.
stays 23:10,
  23:14, 28:14,
  63:24.
stenographic
  74:22.
steps 53:16.
Stop 32:7,
  32:8, 32:10,
  47:7.
straight
  25:4.
streamlined
  63:8.
Street 1:27,
  1:36.
stresses
  27:14.
strict 40:22.
stricter 37:23,
  37:25, 38:3,
  38:4, 38:5,
  40:2.
Strike 11:17,
  44:7,
  52:19.
striking
  42:13.
strongly
  71:25.
structure
  18:4.
stuck 64:5.
studies 15:2,
  39:23, 45:5,
  46:13,
  46:19.
stuff 47:4.
sub 45:2.
subject 4:17,
  49:20,
  69:19.
subjecting
  27:13.
submit 6:8,
  10:3, 43:7.

submitted
  71:5.
subordinate
  3:24.
subset 24:12.
successfully
  41:4.
suffer 46:7.
suffering
  45:23.
suggest
  65:13.
suicide
  33:18.
Suite 1:28.
Sunday 66:17,
  69:3.
support 32:23,
  32:24, 39:20,
  39:25.
supported 28:4,
  50:6.
supports
  45:3.
supposed 10:2,
  11:14, 44:8,
  71:7, 73:16,
  73:19.
Supreme
  42:12.
suspect 23:19,
  25:9.
sworn 9:18,
  10:15,
  10:16.
symptoms 29:8,
  51:23, 54:15,
  55:7.
.

< T >.
T. 1:41,
  74:26.
table 69:22.
tag 53:12.
Talbott 2:3.
talks 26:18,
  46:8.
target 52:8.
tells 18:17,

26:15.
temporary
   61:16,
   63:12.
ten 28:4.
tense 52:11.
terms 41:11,
   43:2.
testified 23:7,
   30:11.
testing
   13:25.
THE CLERK 2:2,
   12:17.
themselves
   10:23, 10:24,
   38:24.
therapy
   46:15.
thereof 12:2.
They'll
   55:17.
They've 54:12,
   57:3, 57:4.
thin 21:22.
thinks 36:1,
   58:9.
though 38:20,
   42:5, 42:7,
   54:9, 54:11,
   56:10, 57:13,
   57:16, 57:17,
   62:23.
thousands
   22:22, 54:2,
   56:25.
three 22:6,
   31:10, 44:12,
   56:1, 57:20,
   62:22, 62:25,
   71:12.
threshold
   43:9.
Thursday 6:2.
timing 58:19,
   59:1, 63:15,
   71:21.
Today 4:2,
   17:6, 34:22,
   36:7, 36:25,

37:4, 37:18,
   44:22, 50:18,
   51:15, 51:16,
   54:9, 54:11,
   54:18, 55:10,
   57:1, 57:24,
   59:23, 60:18,
   61:15, 63:4,
   69:20.
tomorrow
   48:23.
took 11:24,
   32:8, 40:1,
   42:12.
top 4:13, 4:15,
   18:15.
total 35:1.
totally 11:4.
touched
   22:12.
towards
   63:22.
track 17:9,
   18:25.
trans 13:8,
   16:15,
   24:17.
Transcript
   1:16, 1:48,
   72:20,
   74:22.
transcription
   1:49.
transgender
   3:2, 4:4,
   5:15, 5:25,
   6:17, 7:1,
   7:21, 9:5,
   9:8, 9:16,
   9:19, 10:4,
   12:6, 12:7,
   14:10, 23:6,
   23:21, 23:24,
   24:7, 24:12,
   24:16, 25:4,
   26:24, 27:23,
   28:5, 50:25,
   61:1.
transgender.
   11:9.

transition
   28:22, 30:25,
   31:9,
   31:14.
transitioned
   31:8, 31:13,
   31:14,
   49:16.
transitioning
   31:6.
transparent
   62:20.
treat 24:21,
   24:24,
   25:8.
treatable 39:5,
   45:15, 45:17,
   46:2, 46:4.
treated 39:3,
   40:25, 41:5,
   45:23, 46:3,
   48:16,
   51:1.
treating
   55:25.
treatment
   27:22, 38:17,
   39:2, 40:17,
   46:4, 51:2,
   53:13.
Tremont 1:27.
tried 11:7.
TRO 62:19,
   71:12.
troops 3:2,
   4:4, 5:15,
   5:25, 6:17,
   7:1.
trust 39:25,
   57:15.
truthful
   20:4.
trying 25:8,
   31:5, 37:3,
   38:5, 40:14,
   42:14, 44:12,
   47:17, 48:10,
   58:19, 60:9,
   60:24.
Tuesday 9:21,

68:22, 69:17,
   69:19,
   73:5.
turn 66:12,
   66:24.
tweet 3:1,
   4:19, 5:17,
   6:4, 6:14,
   6:16, 7:3,
   7:20, 8:9,
   8:11, 8:12,
   9:11, 9:14,
   11:11, 11:22,
   11:24, 12:2,
   12:4, 37:5,
   37:8.
tweeted 5:18.
tweets 7:8.
two 6:19,
   22:15,
   62:24.
type 47:14.
.
.
< U >.
ultimate
   45:3.
ultimately
   62:24.
un 25:10.
unable 47:15.
unacceptable
   11:4.
undergone
   28:22.
undermine
   28:23.
undersecretary
   3:15,
   10:12.
understand
   2:23, 8:18,
   14:1, 14:12,
   15:11, 18:8,
   24:23, 28:10,
   37:25, 38:22,
   41:20, 41:22,
   43:2, 48:6,
   49:21, 51:9,
   52:20, 56:16,

61:20, 67:20,
  68:1, 68:23,
  68:24, 70:6,
  72:16.
understanding
  5:13, 49:4.
Understood
  2:24, 56:19,
  58:4, 60:3,
  64:6, 74:6.
undertaken
  25:14.
unfit 19:18,
  35:20, 40:24,
  57:7,
  57:13.
Unfortunately
  34:1.
uniform
  57:11.
uniformly
  23:6.
unique 27:14.
unit 18:18,
  27:1, 27:3,
  28:20, 29:10,
  29:20, 33:1,
  36:2, 41:13,
  49:11,
  56:2.
United 1:1,
  1:18, 2:3.
UNITED STATES
  OF AMERICA
  1:10.
Unless 14:7,
  48:8, 52:8,
  60:15.
unlikely 67:22,
  68:2, 68:10,
  68:12.
unpleasant
  66:21.
unquote 24:23,
  25:7.
unsupported
  50:16.
until 6:1, 6:2,
  9:21, 9:22,
  58:1, 61:7,

62:5, 68:22,
  69:8, 69:17,
  71:22.
update 12:24,
  74:8.
urge 71:25,
  72:1.
urgently
  62:11.
Uruguay 35:16,
  35:17,
  35:19.
uses 24:19.
usher 41:1.
ushered 57:5.
using 11:8,
  13:18.
.
.
< V >.
various
  47:16.
version 27:8.
versus 2:3.
view 12:22,
  25:14.
voluntary
  70:18,
  70:24.
vs 1:8.
.
.
< W >.
wait 65:24.
waited 9:21.
waiver 14:7,
  31:10, 46:8,
  46:12,
  48:9.
wanted 66:1.
wants 34:21,
  37:4, 71:16,
  71:17, 71:19,
  71:20.
warranted
  35:12.
Washington
  1:12, 1:37,
  1:44.
wealth 17:11.

Wednesday
  6:2.
Westlaw 27:8.
whatever 4:14,
  40:25, 47:8,
  61:9, 63:24,
  69:8,
  71:11.
whenever
  73:3.
whether 4:3,
  4:9, 12:4,
  14:6, 23:19,
  35:11, 37:18,
  38:24, 43:3,
  46:3, 49:20,
  53:1, 67:8,
  69:6, 70:22,
  72:6,
  73:19.
white 25:4.
whoever 2:10.
whole 12:22,
  17:23.
will 46:13,
  46:23, 47:24,
  48:9, 51:24,
  52:9, 52:12,
  52:13, 53:6,
  56:8, 57:5,
  61:20, 63:13,
  64:21, 65:2,
  66:17, 68:2,
  68:24, 69:7,
  70:20, 71:4,
  71:21, 71:22,
  72:2, 72:8,
  73:2.
willing 58:5,
  60:16, 60:20,
  63:11, 63:19,
  63:23, 64:1,
  66:5, 66:15,
  67:1, 67:2,
  68:20, 69:10,
  69:12, 70:7,
  70:10,
  73:20.
within 31:9,
  54:23,

73:3.
without 3:17,
  11:11, 13:17,
  13:18, 26:19,
  60:8.
word 5:24, 7:3,
  11:8, 11:17,
  13:18, 32:9,
  32:11,
  32:15.
words 7:2, 7:4,
  9:16,
  31:24.
worked 73:24,
  73:25.
working 12:14,
  63:22.
works 6:21.
world 11:15,
  44:6.
write 50:3,
  66:11, 69:8,
  73:22.
writing
  25:19.
written 3:10,
  58:16, 58:18,
  61:20, 71:19,
  72:25,
  73:2.
wrote 3:8,
  50:4,
  50:21.
.
.
< Y >.
years 15:6,
  15:17, 48:20,
  56:1, 56:11,
  57:2.
young 45:11.
Yup 2:14.
.
.
< Z >.
zero 25:21.