

**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

MAR 2 8 2025

PERSONNEL AND
READINESS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
    COMMANDERS OF THE COMBATANT COMMANDS
    DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:   Compliance with Federal Court Order in *Shilling v. United States*,
         No. 25-cv-241-BHS (W.D.Wash)

On Thursday, March 27, 2025, the United States District Court for the Western District of Washington issued the attached preliminary injunction order and memorandum opinion in the case of *Shilling v. United States*.

The Department is required to comply with this order immediately. Please review the attached order and take all necessary action to ensure your organization's prompt and appropriate compliance. If an appellate court stays the preliminary injunction, we will notify you promptly.

Jules W Hurst III

Jules W. Hurst III
Performing the Duties of the Under Secretary of
    Defense for Personnel and Readiness

Attachments:
As stated

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COMMANDER EMILY SHILLING, et al.,

                   Plaintiffs,

     v.

UNITED STATES, et al.,

                   Defendants.

CASE NO. 25-cv-241-BHS

ORDER

## ORDER

For the reasons set forth in its Opinion, the Court **GRANTS** plaintiffs' Motion for Preliminary Injunction, Dkt. 23. It further

**ORDERS** that all defendants **ARE PRELIMINARILY ENJOINED**, pending further order of this Court, from implementing the Military Ban—Executive Order No. 14183. This includes the Hegseth Policy—"Additional Guidance on Prioritizing Military Excellence and Readiness," Dkt. 58-7, and all other memoranda, guidance, policies, or actions issued or forthcoming implementing the Military Ban or the Hegseth Policy.

The effect of the Court's Order is to maintain the status quo of military policy regarding both active-duty and prospective transgender service that existed nationwide

1    immediately before President Trump issued the Military Ban. For example, the policies

2    described in Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical

3    Standards for Military Service: Appointment, Enlistment, or Induction," change 5, May

4    28, 2024; DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention,"

5    change 1, June 6, 2022; and DoDI 1300.28, "In-Service Transition for Transgender

6    Service Members," change 1, December 20, 2022. This Order applies to all plaintiffs and

7    any similarly situated individuals nationwide, including those serving out of country.

8        Dated this 27th day of March, 2025.

9

10

11

12    _____

BENJAMIN H. SETTLE
United States District Judge

13

14

15

16

17

18

19

20

21

22

1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8
COMMANDER EMILY SHILLING, et
al.,

9
                           Plaintiffs,

10
        v.

UNITED STATES, et al.,

11

12
                           Defendants.

CASE NO. 25-cv-241-BHS

MEMORANDUM OPINION

13

14    The day he was inaugurated the second time, President Trump issued Executive

15   Order 14148, revoking President Biden's Executive Order 14004, which permitted

16   transgender individuals to serve openly. A week later, the President issued Executive

17   Order 14183, explaining that the United States Armed Forces had been "recently afflicted

18   with a radical gender ideology to appease activists unconcerned with the requirements of

19   military service[.]" He proclaimed that, "consistent with longstanding Department of

20   Defense policy," expressing a false "gender identity" conflicts with a soldier's

21   commitment to an "honorable, truthful, and disciplined lifestyle, even in one's personal

22   life," and that requiring others to recognize this "falsehood is not consistent with the

humility and selflessness required of a service member." The President's "Military Ban" required Secretary of Defense Hegseth to implement his policy—to root out and separate every transgender service member—within 60 days.

Hegseth issued his Policy on February 26. It requires all military branches to begin the identification and separation process on March 26.[1] Unlike President Trump's first-term 2018 Mattis Policy on transgender service, and unlike President Biden's 2021 Austin Policy, the 2025 Hegseth Policy does not rely on any recent study, evaluation, or evidence. Indeed, consistent with the Military Ban, and unlike the Mattis Policy, the Hegseth Policy imposes a *de facto* blanket prohibition on transgender service. It does so without considering the military's experience under the Austin Policy, whether positive, neutral, or negative.[2] It purports to rely on the outdated Mattis Policy, but goes further than that policy in seeking to eradicate transgender service. An active-duty transgender service member can obtain a waiver and continue to serve if and only if there is "a compelling governmental interest" in their retention *and* they have not had symptoms of gender dysphoria for 36 months, have never attempted to transition, and are willing to serve in their birth sex. The government does not contend that any of the active-duty

---

[1] There is unrebutted record evidence that this process is already underway.

[2] Plaintiffs submit evidence that their service and that of other transgender service members has not had the damaging effects that purportedly support the Military Ban. The government has in turn provided no evidence supporting the conclusion that military readiness, unit cohesion, lethality, or any of the other touchstone phrases long used to exclude various groups from service have in fact been adversely impacted by open transgender service under the Austin Policy. The Court can only find that there is none.

1   plaintiffs (or any other transgender service member) could meet this strict standard.

2   Plaintiffs contend that that is the goal: to erase them from the military.

3       Each of the seven active-duty service member plaintiffs is transgender. Each has

4   been serving openly for almost four years, and some for much longer than that.

5   Commander Emily "Hawking" Shilling, for example, transitioned within the Navy

6   beginning in the fall of 2021 in reliance on the Austin Policy. She has been a Naval

7   Aviator for 19 years. She has flown more than 60 combat missions, including in Iraq and

8   Afghanistan, and was a Navy test pilot. She has 1750 flight hours in high performance

9   Navy jets—including the F/A-18 Super Hornet—and has earned three air medals. She

10  asserts without contradiction that the Navy already spent $20 million training her. There

11  is no claim and no evidence that she is now, or ever was, a detriment to her unit's

12  cohesion, or to the military's lethality or readiness, or that she is mentally or physically

13  unable to continue her service. There is no claim and no evidence that Shilling herself is

14  dishonest or selfish, or that she lacks humility or integrity. Yet absent an injunction, she

15  will be promptly discharged solely because she is transgender.

16      Plaintiffs ask the Court[3] to preliminarily enjoin implementation of the Military

17  Ban and the ensuing Hegseth Policy as a violation of their constitutional rights, and of

18

---

19      [3] This suit is one of three challenging the Military Ban and the Hegseth Policy. Like the
    parties, the Court has been following the parallel proceeding in *Talbott v. United States*, No.
20  C25-00240-ACR, 2025 WL 842332 (D.D.C. Mar. 18, 2025). It has read the briefing, the
    transcripts, and Judge Reyes's thorough memorandum opinion preliminarily enjoining
    implementation and enforcement of the Military Ban and the Hegseth Policy. The active-duty
21  plaintiffs in each case are separate (though similarly situated) individuals, but other than
    plaintiffs' declarations, the rest of the evidence appears to be essentially identical. Judge Reyes's
22  factual findings are consistent with that evidence, and the Court similarly finds as facts for

ORDER - 3

1    fundamental, established principles of fairness, pending a trial on the merits. They assert

2    Equal Protection, First Amendment, Procedural Due Process, and equitable estoppel

3    claims. They argue that under clear, binding precedent, they are likely to succeed on the

4    merits of each of these claims, and that in the absence of injunctive relief, they face

5    imminent, irreparable harm. They argue there is no creditable claim that the balance of

6    equities or the public interest supports allowing the Military Ban to immediately

7    terminate their honorable service to this country.

8         The government responds primarily that the Court must defer to the military's

9    (current) judgment; if it says that unit cohesion and readiness, etc., requires the exclusion

10   of—as Judge Reyes aptly phrases it, "fill in the blank"—from military service, then the

11   Court has no authority or ability to question it. Thus, it argues, plaintiffs are unlikely to

12   succeed on the merits of any of their claims. It also argues that plaintiffs face no threat of

13   irreparable injury because, in the military context, a plaintiff must make a much higher

14   showing of such harm than is required in the ordinary case.

15        It argues that any service member is free to administratively challenge their

16   impending discharge and thus their failure to exhaust such remedies is itself a ripeness

17   bar to their claims. It contends that equity and the public interest are served by exclusion

18   of transgender service members because the Commander in Chief has "determined" that,

19

20   _____

     purposes of this motion the unrefuted factual assertions in the record. A similar suit was filed in

21   the District of New Jersey on March 17. *Ireland v. Hegseth et al.*, No. 25-01918-CPO (D.N.J.).

22

1    as a class, they lack honesty, humility, and integrity,[4] and there is a strong public interest

2    in deferring to his judgment on which military policies would best protect the nation.

3         The government's arguments are not persuasive, and it is not an especially close

4    question on this record. The government's unrelenting reliance on deference to military

5    judgment is unjustified in the absence of any evidence supporting "the military's" new

6    judgment reflected in the Military Ban—in its equally considered and unquestionable

7    judgment, that very same military had only the week before permitted active-duty

8    plaintiffs (and some thousands of others) to serve openly. Any evidence that such service

9    over the past four years harmed any of the military's inarguably critical aims would be

10   front and center. But there is none.

11        Plaintiffs' motion for a preliminary injunction is **GRANTED**. The Court's

12   reasoning is outlined below.[5] To be clear: the government's implementation of the

13   Military Ban and the Hegseth Policy, and any other attempt to identify and separate

14   transgender service members for being transgender is **PRELIMINARILY ENJOINED**,

15   **NATIONALLY**, pending a trial on the merits. A written Order accompanies this

16   Memorandum Opinion.

17

18        [4] This unsupported language originated in the Military Ban. It is repeated in the Hegseth

19   Policy, and again in the government's opposition to plaintiffs' motion. Dkt. 76 at 41–42. At oral
     argument, the government's attorney confirmed there was "no" support in the record that

20   transgender service members lack honesty, humility, or integrity.

          [5] This Court must make findings of fact and conclusions of law when adjudicating an

21   interlocutory injunction. Fed. R. Civ. P. 52(a)(2). The Court makes such preliminary findings
     and conclusions via this memorandum opinion. *See FTC v. H. N. Singer, Inc.*, 668 F.2d 1107,

22   1109 (9th Cir. 1982) ("explicit findings of fact were not necessary").

# I.   BACKGROUND

**A.   History of Department of Defense Transgender Policy**

**1.   Secretary Carter's Policy: 2015 to 2017**

Historically, the Department of Defense did not permit transgender personnel to serve openly in the military. In 2015, then-Secretary of Defense Ashton Carter convened a working group of military and medical experts to review this policy. Bourcicot Decl., Dkt. 32 at 4–5.

The Department of Defense also commissioned the RAND National Defense Research Institute to study the implications of allowing transgender service members to serve openly. RAND Report, Dkt. 32-1 at 4, 10. After extensive research into potential healthcare costs, military readiness, and deployability, RAND found that "a change in policy [would] likely have a marginal impact on healthcare costs and the readiness of the force." *Id.* at 90.

Carter's working group considered the RAND report, as well as expert opinions of senior uniformed and civilian officers and Surgeon Generals from each military department. Dkt. 32 at 5. It concluded that "transgender individuals who meet the standards for military service should be permitted to serve." *Id.*

In 2016, Carter directed the military and all defense organizations to allow transgender service members to serve openly. Carter Policy, Dkt. 33-1 at 2–3. The Policy stated that "open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty,

physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and strength through diversity." *Id.* at 3.

The Carter Policy modified the military's medical accession and retention standards. *Id.* at 5. Transgender individuals with a history of gender dysphoria and related medical or surgical treatment would not be medically disqualified so long as they had been stable for 18 months. *Id.* at 5–6. Transgender service members could no longer be separated or discharged solely based on their transgender status. *Id.* The Carter Policy also established gender transition processes for service members who sought to transition while serving. *Id.* at 6; 2016 DoD Implementation Handbook, Dkt. 31-5 at 15–16.

## 2. Secretary Mattis's Policy: 2017 to 2021

In 2017, President Trump "tweeted" that transgender individuals would no longer be allowed to "serve in any capacity in the U.S. Military." Dkt. 31-7. President Trump and then-Secretary of Defense James Mattis issued a memorandum announcing the military's policy would be revised accordingly. Dkt. 31-8.

Several challenges to President Trump's 2017 policy ensued, including, in this District,[6] *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. 2017). Judge Pechman preliminarily enjoined enforcement of the 2017 memorandum, concluding the plaintiffs were likely to succeed on the merits of their Equal Protection, Substantive Due Process, and First Amendment claims. *Id.* at *10.

---

[6] Three other district courts preliminary enjoined President Trump's 2017 policy: *Doe1 v. Trump*, 275 F.Supp.3d 167 (D.D.C. 2017); *Stockman v. Trump*, 331 F.Supp.3d 990 (C.D. Cal. 2017); *Stone v. Trump*, 280 F.Supp.3d 747 (D. Md. 2017).

Meanwhile, Mattis established an expert panel to review the impact of transgender service members on military readiness and lethality, citing "significant shortcomings" in the RAND report. Mattis Policy, Dkt. 31-10 at 3, 22. The panel met 13 times over 90 days. *Id.* The Department of Defense memorialized the panel's recommendations in a 2018 report that later became the Mattis Policy. *Id.* at 1; Dkt. 76 at 14.

The Mattis Policy promulgated new limitations on transgender service in the military. Transgender individuals with a history of gender dysphoria were disqualified unless they were clinically stable for 36 months, willing to serve in their birth sex, and had not gender transitioned. Mattis Policy, Dkt. 31-10 at 10. Transgender service members diagnosed with gender dysphoria after joining the military were permitted to stay in service if they adhered to their birth sex. *Id.* The Mattis Policy exempted transgender service members diagnosed with gender dysphoria by military medical providers while the Carter Policy was in effect, recognizing their reliance on it: "The reasonable expectation of these Service members that the Department would honor their service on the terms that then existed cannot be dismissed . . . the Department believes that its commitment to these Service members, including the substantial investment it has made in them, outweigh the risks identified in the [Policy]." *Id.* at 48. Existing transgender service members could "continue to receive all medically necessary care, to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commence[d]." *Id.* at 10–11.

The *Karnoski* defendants moved to dissolve the preliminary injunction based on the Mattis Policy, which the district court denied. *Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 1784464 (W.D. Wash. 2018). The Ninth Circuit vacated and remanded the decision, concluding that the Mattis Policy constituted a significant change from the 2017 memorandum that could warrant dissolution of the preliminary injunction. 926 F.3d 1180, 1199 (9th Cir. 2019). It directed the district court to give "appropriate military deference" to the Mattis Policy, which "appears to have been the product of independent military judgment." *Id.* at 1202. The parties ultimately stipulated to vacating the preliminary injunction. No. C17-1297-MJP, Dkt. 350.

### 3.   Secretary Austin's Policy: 2021 to 2025

In 2021, President Biden issued an executive order that, once again, instructed the Department of Defense to allow transgender individuals to serve openly in the military. Dkt. 31-11. Under then-Secretary of Defense Lloyd Austin, the Department of Defense reverted to the medical standards for accession and retention of transgender individuals established under the Carter Policy. DoD Instruction 1300.28 on In-Service Transition, Dkt. 33-4; DoD Instruction 6130.03 on Accession and Retention Medical Standards, Dkts. 76-3, 73-5.

Several former military officials under President Biden testify about their positive observations and experiences under the Austin Policy.

Former Navy Secretary, Carlos Del Toro, testifies that in his review of "thousands of disciplinary cases and personnel matters at the highest levels of the Department," he "cannot recollect a single disciplinary case or performance issue related directly to a

1    service member's transgender status." Del Toro Decl., Dkt. 35 at 3. His experience

2    indicates that "being transgender does not inherently affect a service member's ability to

3    meet [military] standards or to deploy worldwide." *Id.* Rather, he observed "that allowing

4    transgender individuals to serve strengthens unit cohesion by fostering honesty and

5    mutual trust," and helping service members "focus more fully on their duties and build

6    stronger bonds" with their peers. *Id.* at 4.

7         Former Assistant Air Force Secretary for Manpower and Reserve Affairs, Alex

8    Wagner, testifies he "was not aware of any negative impact that service by transgender

9    Airmen or Guardians had on the Air Force, the Space Force, or our overall military

10   readiness." Wagner Decl., Dkt. 33 at 8. Like Del Toro, Wagner observed that the "Austin

11   policy foster[ed] openness and trust among team members," resulting in "stronger unit

12   cohesion." *Id.* at 8. He did not observe any negative impact on military readiness. *Id.* at 9.

13        Former Acting Assistant Secretary of the Army for Manpower and Reserve

14   Affairs and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve

15   Affairs, Yvette Bourcicot, was responsible for reviewing gender transition requests from

16   transgender Army personnel. Bourcicot Decl., Dkt. 32 at 7. She testifies she received

17   "only or two such requests per quarter," and "every requesting service member met the

18   necessary standards for serving." *Id.* She also observed "no negative impact from

19   permitting transgender service in the Army or on our military capabilities." *Id.* at 8. In her

20   role, Bourcicot would have been "responsible for resolving" issues relating to the Austin

21   Policy. *Id.* at 9. She did not receive any complaints about transgender service negatively

22   affecting unit readiness and cohesion. *Id.* She notes that while some transgender service

members were temporarily undeployable due to medical procedures, this was "no different than the myriad medical reasons that any service member might become temporarily non-deployable." *Id.*

Former Under Secretaries of Defense for Personnel and Readiness—Gilbert Cisneros, Jr., who served from August 24, 2021 to September 8, 2023, and Ashish Vazirani, who served from September 8, 2023 to January 20, 2025—were tasked with implementing and administering the Austin Policy during virtually all of the Biden Administration. Cisneros Decl., Dkt. 36; Vazirani Decl., Dkt. 34. Cisneros testifies that in his role, he would have been apprised of any "complaints or problems about transgender service members." Cisneros Decl., Dkt. 36 at 6. He "never received or heard a single complaint relating to transgender service members." *Id.* Vazirani observed that the Austin Policy enabled the military to invest in highly trained service members and did not require "any significant changes to the DoD health care system." Vazirani Decl., Dkt. 34 at 3–4. He too did not observe any negative effects on unit readiness and saw improvements in unit cohesion. *Id.* at 5–6.

The government's only rebuttal to the declarations of these senior Department of Defense officials is that of Timothy Dill, the current Assistant Secretary of Defense for Manpower and Reserve Affairs. Dill Decl., Dkt. 76-6. Dill challenges Cisneros and Vazirani's declarations.[7] He asserts the role of Under Secretary of Defense for Personnel and Readiness is "far removed . . . from the individual command level" and that it

---

[7] Dill does not refute Bourcicot's testimony that she was directly responsible for resolving issues that would have arisen out of the Austin Policy.

1    involves "large oversight responsibilities" that make it "highly unusual for individualized

2    service member complaints regarding unit cohesion, military readiness, medical

3    readiness, deployability, and lethality to reach" the Under Secretary without "a data call

4    or a study." *Id.* at 3. He testifies that, to his knowledge, "neither Mr. Cisneros nor Mr.

5    Vazirani ever directed a study" on the effects of open transgender service on the military.

6    *Id.*

7    Cisneros rebuts Dill's assertions. *Talbott*, No. C25-00240-ACR, Cisneros Supp.

8    Decl., Dkt. 53-1.[8] He asserts that it was his "responsibility to be aware of unit cohesion,

9    military readiness, medical readiness, deployability, and lethality. If a unit or service was

10   dealing with readiness issues due to the service by transgender service members, that

11   would have been brought to my attention." *Id.* He testifies he is "aware of no study that

12   has identified a negative impact on unit cohesion, military readiness, medical readiness,

13   deployability, or lethality due to service by transgender individuals or individuals

14   diagnosed with gender dysphoria since transgender persons have been permitted to serve

15   in the last 4 years under the Austin Policy." *Id.*

16       **4.      Secretary Hegseth's Policy: 2025**

17       In January 2025, President Trump issued Executive Order No. 14168, "Defending

18   Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal

19   Government," and Executive Order No. 14183, "Prioritizing Military Excellence and

20   Readiness." Dkts. 31-1, 31-13.

21   _____

22       [8] Because Cisneros's supplemental declaration has not been filed here, the Court takes
     judicial notice of the filing in *Talbott*. Fed. R. 201(b)(2).

The President's Military Ban declares:

- "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service";

- "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"; and

- the government's policy to "establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity . . . is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" as well as "shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex."

Dkt. 31-1. It directs the Department of Defense to update its accession and retention policies accordingly. *Id.* The order relies on the Gender Ideology Executive Order to define "sex" as "an individual's immutable biological classification as either male or female," and "gender identity" as "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.*; Gender Ideology Executive Order, Dkt. 31-13.

President Trump also issued a corresponding "Fact Sheet" declaring the Biden Administration "allowed gender insanity to pervade our military organizations," by "not only permitting the military to increase the number of individuals not physically or mentally prepared to serve, but also ordering the Department of Defense to pay for servicemembers' transition surgeries . . . at a cost of millions of dollars to the American

taxpayer." Fact Sheet: President Donald J. Trump Ensures Military Excellence and

Readiness, The White House (Jan. 27, 2025).[9]

Promptly resolving to "remove all traces of gender ideology," the Department of

Defense paused all new "accessions for individuals with a history of gender dysphoria"

and "all . . . medical procedures associated with affirming or facilitating a gender

transition for Service members." Jan. 31 DoD Memorandum, Dkt. 58-2; Feb. 7 DoD

Memorandum, Dkt. 58-4. The Department of Defense posted on its official Rapid

Response X account that "Transgender troops are disqualified from service without an

exemption." Amended Complaint, Dkt. 59 at 30. Hegseth reposted the announcement on

his official X account.[10]

On February 26, 2025, Dill directed Under Secretary Darin Selnick to implement

the Military Ban. 2025 Action Memo, Dkt. 71-1. He explained that the new policy "was

informed through consideration of, among other things, the President and Secretary's

written direction, existing and prior DoD policy, and prior DoD studies and reviews of

service by individuals with gender dysphoria, including a review of medical literature

regarding the medical risks associated with presence and treatment of gender dysphoria."

*Id.* at 3.

The Department of Defense responded with guidance implementing the Military

Ban. The guidance declared that effective March 26, 2025, the policy will be that:

---

[9] The Court takes judicial notice of the Fact Sheet. Fed. R. Evid. 201(b)(2).

[10] The Court takes judicial notice of these social media posts. *See* @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025) (repost). Fed. R. Evid. 201(b)(2).

- Individuals who have a history or diagnosis of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service.

- Individuals with a history of hormone therapy or surgical treatment for gender dysphoria or sex transition are disqualified from military service.

- Current service members who have a history or diagnosis of, or exhibit symptoms consistent with, gender dysphoria will be separated from military service.

- Current service members with a history of hormone therapy or surgical treatment for gender dysphoria or sex transition are disqualified from military service.

- Pronoun usage and salutations must reflect service members' biological sex.

- No funds from the Department of Defense will be used to pay for any medical procedures and treatments associated with gender dysphoria.

Feb. 26 DoD Guidance, Dkt. 58-7.

The Department of Defense may waive these requirements on a "case-by-case basis" if there is a "compelling Government interest . . . that directly supports warfighting capabilities." *Id.* at 6. Current service members disqualified under this policy may only be eligible for a waiver if there is a "compelling Government interest in retaining [them]," they have been clinically stable for 36 months, never attempted to transition to any other sex, and are willing to adhere to their birth sex. *Id.* at 8. Service members ineligible for a waiver could choose to voluntarily separate by March 26. *Id.* at 9. Otherwise, they will be involuntarily separated and "if desired . . . , afforded an administrative separation board." *Id.* The Department of Defense intends to update its medical standards for accession and retention accordingly. *Id.* at 1–2. Service members who involuntarily separate may be

1  eligible for "involuntary separation pay," though the "Military Departments may recoup

2  any bonuses received" before February 26. *Id.* at 9.

3  A February 26 "Action Memo" on "Implementing Guidance for Prioritizing

4  Military Excellence and Readiness Executive Order (EO)" accompanied the Hegseth

5  Policy. Dkt. 71-1. It asserts the Hegseth Policy was "informed through consideration of,

6  among other things, the President and Secretary's written direction, existing and prior

7  DoD policy, and prior DoD studies and reviews of service by individuals with gender

8  dysphoria." *Id.* at 3. It cited:

9  - the Mattis Policy;

10 - the Department of Defense's 2021 Psychological Health Center of
   Excellence and the Accession Medical Standards Analysis and Research
11  Activity (AMSARA), which estimated higher rates of disability evaluation
   among transgender service members and "found that nearly 40% of service
12  members with gender dysphoria in an observed cohort were non-deployable
   over a 24 month period";

13
   - the Assistant Secretary of Defense for Health Affairs 2025 medical
14  literature review, which found:
     o "55% of transgender individuals experienced suicidal ideation and
15   29% attempted suicide in their lifetime";
     o "the suicide attempt rate is estimated to be 13 times higher among
16   transgender individuals compared to their cisgender counterparts";
     and
17   o "transgender individuals are approximately twice as likely to receive
     a psychiatric diagnosis compared to cisgender individuals," and that
18   the "strength of evidence on transgender mental health and gender-
     affirming care is low to moderate";

19
   - the Assistant Secretary of Defense for Health Affairs review of 2015 to
20  2024 cost data related to the healthcare needs of transgender service
   members, which found "DoD spent $52,084,407 providing care to active
21  duty Service members to treat gender dysphoria, including $15,233,158 for

22

psychotherapy; $3,135,593 for hormone therapy, and $14,324,739 for surgical care."

*Id.* at 3–4 (citing Mattis Policy, Dkt. 71-2; AMSARA Report, Dkt. 71-3; literature review, Dkt. 71-4).

The Action Memo does not accurately summarize the AMSARA report's findings and limitations. *See Talbott*, 2025 WL 842332, at *12–13. AMSARA studied the psychological stability and deployability of individuals with a history or diagnosis of gender dysphoria by comparing available accession records of transgender service members with those of a cohort of other service members with depression. Dkt. 71-3 at 1–2, 8. It confirms that transgender service members were subject to disability *evaluations* far more than all other service members—likely because "members of the transgender community are encouraged (and in many cases required)" to be evaluated more frequently than their cisgender peers. *Id.* at 8, 24 (rate of disability evaluation for transgender service members was 12%, compared to 1–2% among all service members).

One of AMSARA's "key findings" is that rates of transgender service members *experiencing* disability conditions—psychiatric, musculoskeletal, and neurological— were "comparable to those of all service members evaluated for disability." *Id.* at 24. AMSARA acknowledges that the study has several limitations, including that "data w[as] not available from non-transgender service members that could serve as a basis for comparison to indicate if supposed non-deployability rates amongst the transgender cohorts differed from the overall non-deployability rate." *Id.* at 11–12.

The 2025 medical literature review is not specific to military data. Dkt. 71-4.
Instead, it compiles 34 prior national and international studies about the "level of
evidence for gender-affirming treatments for gender dysphoria." *Id.* at 1. The literature
review highlights that "suicide risk among transgender . . . individuals is mitigated by
access to gender-affirming care strong social and family support, legal and social
recognition, affirming mental health services, community connectedness, and protections
against discrimination." *Id.* at 3–4.

Judge Reyes asked the government to submit additional data on the Department's
spending and budgets. *Talbott*, No. C25-00240-ACR, Dkts. 66, 66-1.[11] The government
responded that in fiscal year 2024, the Department of Defense was appropriated $918.1
billion, stipulating that "the amount cited in the Action Memo"— $52,084,407 spent in
treating gender dysphoria—is "but a small fraction of DoD's overall budget." *Id.*, Dkt. 66
at 2. That amounts to approximately $5.2 million per year on average spent on gender
dysphoria treatment between 2015 and 2024. If the Department of Defense spent $5.2
million on treating gender dysphoria in 2024, that was about 0.00057% of its 2024
budget. It provided gender-affirming care to 1,892 active-duty service members—less
than 0.02% of the 9.5 million beneficiaries covered under the military's TRICARE health

---

[11] The Court takes judicial notice of the government's filing, Dkt. 66, as to the
Department of Defense's budgets and costs in *Talbott*. Fed. R. Evid. 201(b)(2).

1    system, assuming coverage under TRICARE was similar from 2016 to 2021 to that in

2    2024. [12] *Id.*, Dkt. 66-1 at 1–2.

3          Three days after the *Talbott* preliminary injunction and hours before it was to go

4    into effect, the Department of Defense issued new "guidance to assist the Military

5    Departments in identifying" service members who will be affected by the Military Ban.

6    Dkt. 92-1. It clarifies that "[t]he phrase 'exhibit symptoms consistent with gender

7    dysphoria' refers to the diagnostic criteria outlined in the [DSM-5]" and that "[t]his

8    language applies only to individuals who exhibit such symptoms as would be sufficient to

9    constitute a diagnosis." *Id.* at 1 n.2. The military plans to identify such service members

10   "through reviewing medical records," as well as a "Period Health Assessment" in which

11   service members must "attest whether they have a current diagnosis or history of, or

12   exhibit symptoms consistent with, gender dysphoria." *Id.* at 2. Significantly, the March

13   21 Guidance also reiterates that service members must serve in their birth sex. *Id.* at 1.

14         Following its March 21 Guidance, the Department of Defense extended its

15   deadline for implementing the Hegseth Policy to March 28, 2025. Dkt. 94-1.

16   **B.    The Parties**

17         Plaintiffs include seven transgender service members who have served honorably

18   for years. Plaintiffs Commander Emily Shilling, Commander Blake Dremann, Lieutenant

19

---

20         [12] The Court (gratefully) adopts Judge Reyes's math on this subject: "From January 1, 2016, to May 14, 2021, the military provided gender-affirming care to 1,892 active duty
21   servicemembers. Dkt. 66-1 at 2. That number represents about two hundredths of one percent (0.02%) of the 9.5 million beneficiaries TRICARE covered in 2024. *See id.*" 2025 WL 842332,
22   at *14 n.19.

Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Sergeant First Class Sierra Moran, and Staff Sergeant Videl Leins are openly transgender active-duty service members. Amended Complaint, Dkt. 59. Throughout their 115 years of collective military service, they have been awarded over 70 medals for their honorable service and distinctive performance—in many instances after coming out as transgender. *Id.* at 10, 12, 17, 18; Shilling Decl., Dkt. 24; Dremann Decl., Dkt. 25; Morgan Decl., Dkt. 26; Doe Decl., Dkt. 27; Leins Decl., Dkt. 28; Schmid Decl., Dkt. 39; Moran Decl., Dkt. 87.[13] Many have been deployed on significant domestic and overseas missions after transitioning. *See, e.g.,* Doe Decl., Dkt. 27 at 3.

Each plaintiff testifies that serving openly has improved their focus on their military careers, forged stronger relationships with their peers and commands, and improved trust and transparency among their units, ultimately making each of them a "stronger asset to the military." Dremann Decl., Dkt. 25 at 3; Plaintiffs' Decls., Dkts. 24–28, 39, 87. Plaintiffs assert they would like to continue serving openly in the military in the gender they transitioned to. *Id.* They fear the effect separation would have on their careers, lives, and families. *Id.*

Accession plaintiff Matthew Medina is a 23-year-old transgender man who seeks to join the Marine Corps. Medina Decl., Dkt. 29. Because the Marines "have an age cap

---

[13] All plaintiffs have submitted declarations, which the government does not contest. The Court provided the parties the opportunity to cross examine any witnesses, Dkt. 65, and the government declined to do so. Dkt. 66. None of the parties requested to present live testimony.

of 28-years-old," Medina fears he will not be eligible to enlist if he waits for the next administration to change its policy on open service by transgender individuals. *Id.* at 3.

Plaintiff Gender Justice League is a human rights organization whose members include openly transgender service members and transgender individuals seeking to join the military. *Id.*

21 States and the Constitutional Accountability Center join as amici. Dkts. 53 and 42.

Defendants include the United States, the Army, the Navy, the Air Force, Secretary of Defense Peter Hegseth, Secretary of the Army Daniel Driscoll, Acting Secretary of the Navy Terence Emmert, and Acting Secretary of the Air Force Gary Ashworth.

## C. Challenges to the Military Ban and Hegseth Policy

Plaintiffs assert that the Military Ban violates their constitutional Equal Protection, First Amendment, and Procedural Due Process rights. Active-duty plaintiffs also assert they reasonably and detrimentally relied on the Austin Policy that permitted them to enlist and serve openly, and that equitable estoppel and fundamental fairness preclude the government from this sort of "bait and switch." Dkt. 23 at 32.

They ask the Court to enjoin the military's impending implementation of the Military Ban, arguing that they are likely to succeed on the merits of their claims, that the

balance of hardships weighs in their favor, and that maintaining the status quo pending a

trial is equitable and in the public interest. *Id.* at 20.

The government argues that because its military judgment is entitled

"unquestionable" deference, plaintiffs are unlikely to succeed on the merits of their

claims. Dkt. 76. at 8, 10, 21, 34. It also contends plaintiffs' claims are unripe because

they have failed to exhaust the Military Ban's administrative remedies. *Id.* at 19.

Although the Department of Defense's guidance set March 26, 2025, as the

effective date of the Military Ban, plaintiffs testify that the Hegseth Policy has already

adversely affected them. They have had career opportunities rescinded, had flights

booked home from overseas deployment, and been placed on involuntary administrative

leave. *See, e.g.,* Moran Decl., Dkt. 87 at 2–3 (Sergeant First Class Moran's application

for Officer Candidate School was effectively denied due to the 2025 Military Ban);

Morgan Supp. Decl., Dkt. 88 at 1–2 (Lieutenant Commander Morgan's duty assignment

to the Armed Forces Radiobiology Research Institute, a significant career milestone that

increases chances of promotion to Navy Commander, was rescinded); Leins Supp. Decl.,

Dkt. 89 at 1–2 (Staff Sergeant Leins was placed on involuntary administrative absence

and told she must attend a course to prepare for civilian life); Morgan Supp. Decl., Dkt.

62 at 3–4 (Staff Sergeant Regan Morgan was removed from her forward operating base in

a combat zone and was booked on a flight back from overseas deployment).[14]

The government does not challenge this evidence.

---

[14] Staff Sergeant Morgan is a member of the organizational plaintiff, Gender Justice
League. Dkt. 60 at 8.

# II.   DISCUSSION

## A.   Plaintiffs' claims are ripe.

The government argues as a threshold matter that active-duty plaintiffs' claims are not ripe because they have failed to exhaust the Hegseth Policy's administrative remedies: "All enlisted Service members who are involuntarily separated . . . will, if desired by the Service member, be afforded an administrative separation board." Dkt. 76 at 19 (citing Feb. 26 DoD Guidance, Dkt. 58-7 at 9).

It asks the Court to accept *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002) as authority for the proposition that "an internal military decision is unreviewable unless the plaintiff alleges . . . exhaustion of available intraservice remedies." Dkt. 76 at 19. A closer look, however, reveals that *Wenger* itself expressly obviates the need for exhaustion in this case.

*Wenger* indeed provides, "'An internal military decision is unreviewable unless the plaintiff alleges (a) a violation of [a recognized constitutional right], a federal statute, or military regulations; and (b) exhaustion of available intraservice remedies.'" 282 F.3d at 1072 (quoting *Khalsa v. Weinberger*, 779 F.2d 1393, 1398 (9th Cir. 1985)). However, it also makes clear that exhaustion is not required if "administrative appeal would be futile; or . . . if substantial constitutional questions are raised." *Id.* (citing *Muhammad v. Sec'y of Army*, 770 F.2d 1494, 1495 (9th Cir. 1985)). Both are true here.

Active-duty plaintiffs' constitutional assertions about the Hegseth Policy are substantial. They also demonstrate that any internal remedies would be futile. Dkt. 23 at 32–33 (citing *Watkins v. United States Army*, 875 F.2d 699, 705 (9th Cir. 1989)); *see also*

1   *Se. Alaska Conservation Council v. Watson*, 687 F.2d 1305, 1309 (9th Cir. 1983)

2   (exhaustion not required "where pursuit of administrative remedies would be a futile

3   gesture"). The Hegseth Policy provides that transgender service members will only be

4   exempt from disqualification if, among other requirements, they have "never attempted to

5   transition" *and* are willing to serve in their birth sex. Feb. 26 DoD Guidance, Dkt. 58-7 at

6   8. All active-duty plaintiffs have taken steps to transition and seek to continue serving

7   openly. As the Policy stands, any attempt to seek internal review necessarily would be

8   fruitless, and thus futile.

9        The government's opposition falls flat at the outset. Plaintiffs' claims are ripe.

10   **B.    Preliminary Injunction Standard.**

11        A party seeking a preliminary injunction "must establish that it is likely to succeed

12   on the merits, that it is likely to suffer irreparable harm in the absence of preliminary

13   relief, that the balance of equities tips in its favor, and that an injunction is in the public

14   interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). The last two

15   factors merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

16   1073, 1092 (9th Cir. 2014). When considering whether to grant this "extraordinary

17   remedy, . . . courts must balance the competing claims of injury and consider the effect of

18   granting or withholding the requested relief, paying particular regard to the public

19   consequences." *Winter*, 555 U.S. at 24.

20        The Ninth Circuit recently reiterated that even after *Winter*, its alternate "serious

21   questions" preliminary injunction standard remains viable. *Flathead-Lolo-Bitterroot*

22   *Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (citing *All. for the*

1  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) ("[T]he 'serious questions'
2  version of the sliding scale test for preliminary injunctions remains viable after
3  [*Winter*].")).

4      Under this test, a party is entitled to a preliminary injunction if it demonstrates (1)
5  serious questions going to the merits, (2) a likelihood of irreparable injury, (3) a balance
6  of hardships that tips sharply towards the plaintiff, and (4) the injunction is in the public
7  interest. *Id.* at 1190 (citing *Cottrell*, 632 F.3d at 1135). As to the first factor, the serious
8  questions standard is "a lesser showing than likelihood of success on the merits." *Id.*
9  (citing *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

10      "Serious questions" are ones that "cannot be resolved one way or the other at the
11  hearing on the injunction because they require more deliberative investigation." *Id.*
12  (citation omitted). They "need not promise a certainty of success, nor even present a
13  probability of success, but must involve a fair chance of success on the merits." *Id.* at
14  1192 (cleaned up).

15      A preliminary injunction "prohibits a party from taking action" and preserves the
16  *status quo ante litem*, which refers not simply to any situation before the lawsuit was
17  filed, but instead to the "last uncontested status which preceded the pending controversy."
18  *Id.* at 1191.

19      The parties here seek a preliminary injunction as to all active-duty and accession
20  plaintiffs. Medina and the other accession plaintiffs would still be subject to all other

21
22

ORDER - 25

standards for accession into the Armed Forces.[15] They instead seek to enjoin the

Department of Defense from disqualifying them based on their transgender identity—the

status quo.

Here, that status quo is before January 20, 2025—before President Trump's first

day in office, when he issued Executive Order No. 14148. The last uncontested status

preceding this controversy is the Austin Policy, that, for almost four years, had allowed

active-duty transgender plaintiffs to serve openly.

**C.    Likelihood of Success on the Merits.**

**1.    Plaintiffs are Likely to Succeed on the Merits of their Equal Protection Claim.**

Plaintiffs' primary claim is that the Military Ban, and the Hegseth Policy and other

guidance implementing it, violate their Fifth Amendment constitutional right to Equal

Protection under the law. They argue that the government is not free to disregard this

protection even when it acts in the area of military affairs; there is no "different equal

protection test" for the "military context." Dkt. 23 at 20 (citing *Rostker v. Goldberg*, 453

U.S. 57, 67 (1981)). They argue that the February 26 Guidance does not warrant any

deference because it is not the product of a meaningful exercise of independent military

judgment. Dkt. 60 at 9.

They argue that the Hegseth Policy is subject to, and cannot survive, heightened

scrutiny because it facially classifies and purposefully discriminates based on their

transgender status. *Id*. at 20–21 (citing *United States v. Virginia*, 518 U.S. 515, 555

---

[15] Oral Argument Transcript, Dkt. 102 at 49.

1   (1996) (heightened scrutiny applied to military college co-education); *Karnoski*, 926 F.3d

2   at 1201 (heightened scrutiny applied to the previous transgender military service ban);

3   and *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (heightened scrutiny

4   applied to military's former "Don't Ask, Don't Tell" policy on an as applied basis)).[16]

5       They also argue that because the Hegseth Policy classifies based on sex, it is also

6   subject to heightened scrutiny, and that it cannot in any event survive even rational basis

7   review. *Virginia*, 518 U.S. at 555.

8       Finally, plaintiffs argue that the Military Ban "drips with contempt" and that it,

9   the Hegseth Policy, and related federal policy and directives "reflect and are based on

10  impermissible animus towards transgender people, which renders them invalid as a

11  whole" under any standard of review. Dkt. 59 at 33; Dkt. 23 at 21; Dkt. 82 at 9.

12      The government denies that the Hegseth Policy discriminates on either transgender

13  or sex status. Dkt. 76 at 15. Instead, it insists it discriminates on gender dysphoria,

14  triggering only rational basis review. But its primary argument, here and elsewhere, is

15  that the Court is ill-equipped to second guess the military's judgment, and if there is a

16  rational basis for its judgment, it is not subject to challenge. *Id*. at 19. It insists that its

17  judgment is entitled to deference. *Id*. at 14. It does not strenuously dispute that the

---

18

19

20      [16] The Constitutional Accountability Center's amicus brief emphasizes that the military

21  has long relied on concerns about "unit cohesion" and "military effectiveness" to bar racial integration, gay and lesbian service members, and women in combat. Dkt. 42 at 8–9. It asserts "military experts agree that ending those discriminatory policies and ensuring diversity in the

22  military's ranks actually strengthened the military." *Id.* at 9.

1  Military Ban was motivated by animus towards transgender people, but does contend that

2  even so, there are legitimate reasons for it. *Id.* at 34.

3     The Fifth Amendment provides that "[n]o person shall . . . be deprived of life,

4  liberty, or property, without due process of law[.]" U.S. Const. amend. V. "The Due

5  Process Clause of the Fifth Amendment contains an equal protection component

6  prohibiting the United States from invidiously discriminating between individuals or

7  groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). "The Constitution's guarantee

8  of equality 'must at the very least mean that a bare [governmental] desire to harm a

9  politically unpopular group cannot' justify disparate treatment of that group." *United*

10 *States v. Windsor*, 570 U.S. 744, 770 (2013) (quoting *Dep't of Agric. v. Moreno*, 413 U.S.

11 528, 534–35 (1973)).

12     The first step in evaluating an Equal Protection claim is to "determine what level

13 of scrutiny applies to a classification under a law or policy, and to then decide whether

14 the policy at issue survives that level of scrutiny." *Hecox v. Little*, 104 F.4th 1061, 1073

15 (9th Cir. 2024). The government urges that courts owe deference to its judgment in

16 evaluating Equal Protection claims in the military context. When a policy results from the

17 "professional judgment of military authorities concerning the relative importance of a

18 particular military interest," courts generally defer to the military's determination.

19 *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986); *see also Rostker*, 453 U.S. at 67-

20 72 (1981) ("judicial deference ... is at its apogee when legislative action under the

21 congressional authority to raise and support armies and make rules and regulations for

22 their governance is challenged."). But "deference does not mean abdication" and the

1    court need not defer to unreasonable uses or *omissions in evidence*. *Id.* at 68–70; *see also*

2    *Witt*, 527 F.3d at 821.

3    Although they are conceptually distinct, scrutiny and deference are "intertwined"

4    where, as here, the Court considers "the propriety of a military decision concerning

5    transgender persons." *Karnoski*, 926 F.3d at 1199.

### a.    The Military Ban and Hegseth Policy trigger intermediate scrutiny

### (i)    The Hegseth Policy discriminates against transgender status

8    The government argues that the Hegseth Policy does not discriminate against

9    transgender people, but rather only against people who have or have had gender

10   dysphoria. Dkt. 76 at 15. Their efforts are unavailing. Unlike the Mattis Policy, the text of

11   Hegseth Policy scrupulously avoids using the word "transgender"—the word does not

12   appear in the Hegseth Policy. But common sense and binding authority defeat the

13   government's claim that it does not discriminate against transgender people.

14   The Hegseth Policy uses gender dysphoria as a proxy to ban all transgender

15   service members. Even if transgender service members somehow slip through the current

16   policy, a "law is not immune to an equal protection challenge if it discriminates only

17   against some members of a protected class but not others." *Hecox*, 104 F.4th at 1079. In

18   *Talbott*, the government essentially conceded that "gender dysphoria" and transgender

19   are interchangeable. During oral argument its counsel there asserted that Hegseth likely

20   used "transgender" as "shorthand" for gender dysphoria in his tweet that reads

21   "Transgender troops are disqualified from service without an exemption." *Talbott*, No.

22

C25-00240-ACR, Dkt. 90, Tr. Mar. 12, 2025, at 19–22. Furthermore, the government here does not dispute that the Hegseth Policy would exclude each plaintiff.

Gender dysphoria is plainly "closely correlated" with being transgender.[17] The Military Ban and Hegseth Policy are certainly not the first attempt to discriminate against disfavored groups by targeting conduct or characteristics "closely correlated" with the group. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689, (2010) (citing *Lawrence*, 539 U.S. 558, 583 (2003)) (O'Connor, J., concurring) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class.") (alteration in original). Ample other authority has reached the same conclusion. *See C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022) (Bryan, J.) ("A person cannot suffer from gender dysphoria without identifying as transgender.") (cleaned up); *Kadel v. Folwell*, 100 F.4th 122, 146 (4th Cir. 2024) (en banc) ("gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it."). In sum, the government's attempt to evade the strictures of intermediate scrutiny by using the term

---

[17] *Karnoski* did not conduct this analysis because the Mattis Policy used the term transgender. 926 F.3d at 1201 n.18 ("Because the 2018 Policy discriminates on the basis of transgender status on its face, we need not address whether it constitutes discrimination against transgender persons on the alternative ground that gender dysphoria and transition are closely correlated with being transgender").

1    gender dysphoria fails. The Hegseth Policy plainly discriminates on basis of transgender

2    status.

3         The Ninth Circuit has repeatedly affirmed that classifications based on

4    transgender status warrant heightened or intermediate scrutiny, and that transgender is at

5    least a quasi-suspect class. [18] *See Karnoski*, 926 F.3d at 1200; *Doe v. Horne*, 115 F.4th

6    1083, 1102 (9th Cir. 2024); *Hecox*, 104 F.4th at 1079, *as amended* (June 14, 2024); *see*

7    *also Roe v. Critchfield*, No. 23-2807, -- F.4th--, 2025 WL 865721, at *17 (9th Cir. Mar.

8    20, 2025) (law regulating transgender bathroom usage discriminates on the basis of

9    transgender status and sex and triggers intermediate scrutiny). The government's primary

10   response to *Karnoski* is that it was wrongly decided. Dkt. 76 at 23. It provides no binding

11   authority or persuasive arguments compelling the Court to break from that precedent. To

12   the contrary, the history the government provides showing how various presidential

13   administrations have given and taken away transgender rights illustrate the "political

14   powerlessness" of the group, one of the factors in determining a quasi-suspect class. Dkt.

15   76 at 24; *see Lying v. Castillo*, 477 U.S. 635, 638 (1986) (political powerlessness part of

16   quasi suspect class analysis).

17        *Talbott* also demonstrates the flaw in the government's argument, repeated here,

18   that the Hegseth Policy does not target transgender service members; it merely addresses

19   a medical condition, gender dysphoria. *Talbott*, 2025 WL 842332, at *10. Judge Reyes's

20

---

21   [18] The government suggests that the Supreme Court is likely to change this determination.
     Dkt. 76 at 23 (citing *United States v. Skrmetti*, No. 23-477 (*argued* Dec. 4, 2024)). The Court
22   will not decide a case on a party's prediction of what a higher court will decide in the future.
     *Karnoski* is binding authority.

1    recent Order denying the government's motion to dissolve the *Talbott* preliminary

2    injunction persuasively explains why the government's March 21 Guidance does not alter

3    the conclusion that, because the Hegseth Policy and subsequent Department of Defense

4    guidance implementing it expressly target transgender service members, intermediate

5    scrutiny applies. It demonstrates that the new guidance instead supports the application of

6    intermediate scrutiny, and why that March 21 Guidance actually *undercuts* each of the

7    government's claimed bases for removing all transgender service members. *Talbott*, 2025

8    WL 914716, at *3–5.

9           **(ii)**      **The Hegseth Policy discriminates on the basis of sex**

10          The Supreme Court, Ninth Circuit, and many other courts have concluded that

11    discriminating against a person for being transgender inherently discriminates against that

12    individual based on sex. It is "impossible to discriminate against a person for being

13    homosexual or transgender without discriminating against that individual based on sex."

14    *Bostock v. Clayton Cnty*, 590 U.S. 644, 660 (2020). The government argues that *Bostock*

15    is inapplicable in Fifth Amendment Equal Protection analysis because it was a Title VII

16    case. Dkt. 76 at 25. Title VII prohibits discrimination "because of . . . sex." Dkt. 76 at 75

17    (quoting 42 U.S.C. § 2000e-2(a)(1)). Nothing about differences between Title VII and

18    Fifth Amendment Equal Protection jurisprudence "prevent[s] *Bostock*'s commonsense

19    reasoning—based on the inextricable relationship between transgender status and sex—

20    from [being] appl[ied] to the initial inquiry of whether there has been discrimination on

21    the basis of sex in the equal protection context." *Fowler v. Stitt*, 104 F.4th 770, 790 (10th

22

ORDER - 32

Cir. 2024) (citing *Bostock*, 590 U.S. at 660); *see also Talbott*, 2025 WL 842332, at *23–24; *Hecox*, 104 F.4th at 1079 (quoting *Bostock*, 590 U.S. at 660).

*Bostock* provides a helpful hypothetical involving an employer and two employees that illustrates the "inextricable" relationship between transgender and sex discrimination. 590 U.S. at 660. The two hypothetical employees are identical except that one was a transgender woman and the other a cisgender woman. *Id.* Justice Gorsuch explained that if the employer fires only the transgender woman because she is transgender, it has "intentionally penalize[d]" her "for traits or actions that it tolerates in an employee identified as female at birth." *Id.* He concluded that "if changing the employee's sex would have yielded a different choice by the employer," then the discrimination is based on sex. *Id.* at 659–60.

So too with the Hegseth Policy. The Policy penalizes transgender service members for complying with standard grooming, pronoun usage, and performance metrics that the military requires in cisgender service members. Since it is the birth sex of the service member that triggers the adverse employment action rather than a failure to meet set standards, the discrimination is based on sex.

*Bostock* aside, the Ninth Circuit has already determined that "discrimination against transgender individuals constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Hecox*, 104 F.4th at 1080 (internal quotation marks omitted).

The Military Ban and Hegseth Policy do just that. First, the Military Ban and Hegseth Policy plain text and ensuing guidance classify repeatedly based on sex. *See, e.g.*, Military Ban, Dkt. 31-1 ("adoption of a gender identity *inconsistent with an individual's [birth] sex* conflicts with" military standards) (emphasis added); Hegseth Policy, Dkt. 58-7 at 7 (requires that service members "be willing and able to … [meet] the standards associated with *his or her [birth] sex*" and that they "ha[ve] never attempted to transition to *any sex other than his or her [birth] sex*.") (emphasis added); *id.* at 3 ("All Service members will only serve in accordance with their sex, defined in Executive Order 14168, 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government'"). "If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex." *Dekker v. Weida*, 679 F.Supp.3d 1271, 1289-90 (N.D. Fla. 2023), *argued*, No. 23-12155 (11th Cir. Nov. 22, 2024). The Hegseth Policy mandates that service members conform with the gender stereotypes of their birth sex by requiring them to dress, meet grooming standards, and use pronouns typically associated with it. Put another way, it relies on overbroad generalizations about sex by assuming that all people born, for example, female must groom and use pronouns typically associated with females and confine themselves to female performance standards[19] in order to have "honesty and integrity." Hegseth Policy, Dkt. 58-7 at 3. If they refuse to conform to these

---

[19] It is uncontested that some named plaintiffs whose birth sex was female successfully meet male performance standards (and vice versa) in accordance with the Austin Policy.

1   gender stereotypes associated with their birth sex, the government will separate them, and

2   seek a refund of any retention bonuses earned over their military careers.

3       In sum, the Military Ban and Hegseth Policy discriminates based on sex, which

4   provides an additional, independent basis for the Court to apply intermediate scrutiny.

5   *Virginia*, 518 U.S. at 555 ("[A]ll gender-based classifications …warrant heightened

6   scrutiny.").

7       **b.    Military deference**

8       Under intermediate scrutiny, the government bears the burden to demonstrate that

9   the Military Ban "serves important governmental objectives and that the discriminatory

10  means employed are substantially related to the achievement of those objectives."

11  *Virginia*, 518 U.S. at 524 (internal quotation marks and citations omitted). The

12  government must proffer justifications which are "exceedingly persuasive," "genuine,"

13  "not hypothesized," not "invented post hoc in response to litigation," and "must not rely

14  on overbroad generalizations." *Id*. at 531. This "burden of justification" is

15  "demanding"—not "deferential"—and "rests entirely on the [government]." *Id*. at 533.

16      The government argues that because this case involves judicial review of military

17  decision making, mere rational basis review applies. Dkt. 76 at 14. *Karnoski* rejected this

18  exact argument: "Deference informs the application of intermediate scrutiny, but it does

19  not displace intermediate scrutiny and replace it with rational basis review." 926 F.3d at

20  1201. The government's suggestion that it is plaintiffs' burden to provide data of the

21  *success* of their service under the Austin Policy (and under the Mattis Policy) is not

22  correct in any event, but it certainly is not true where, as here, the military's judgment is

ORDER - 35

1    subject to heightened scrutiny. Intermediate scrutiny places that burden squarely on the

2    government. *Id.* at 1202 (government carries the "not trivial" burden to establish that its

3    policy "significantly furthers" the government's important interests).

4         Plaintiffs also argue that the Court need not defer to the military's judgment

5    because the Hegseth Policy is not the product of a meaningful exercise of independent

6    military judgment, but rather is a "mere implementation of the Military Ban that itself

7    was issued within a week of President Trump's inauguration." Dkt. 60 at 9. *Karnoski*

8    rejected a similar argument regarding the 2018 Mattis Policy. It determined that "a

9    presumption of deference is owed, because the Mattis Policy appears to have been the

10   product of independent military judgment." 926 F.3d at 1202. Because the Hegseth

11   Policy purports to rely extensively on the Mattis Policy, the Court rejects plaintiffs'

12   argument that it is entitled to no deference at all. Action Memo, Dkt. 71-1 at 4–5.

13        But the rush to issue the Military Ban and Hegseth Policy with no new military

14   study, evaluation, or evidence does not warrant the same baseline level of deference as

15   the Supreme Court gave in *Rostker* or *Goldman*. In *Rostker*, the gender discrimination in

16   the draft at issue was born from "hearings, floor debate, and in committee" discussions.

17   453 U.S. at 72. In *Goldman*, the Court noted that the Air Force promulgated a 190-page

18   document (AFR 35–10) detailing the specifics of military uniform, and that this effort

19   evidenced "considered professional judgment" that warranted deference and in part

20   justified the military's refusal to allow the plaintiff to wear a yarmulke. 475 U.S. at 509.

21   The government here has nothing comparable to the military decision making evident in

22   *Rostker* or *Goldman.*

1    The Department of Defense explains that the Hegseth Policy "was informed

2    through consideration of, among other things," four sources: the Mattis Policy, the

3    AMSARA Report, the 2025 medical literature review, and the cost data review. Action

4    Memo, Dkt. 71-1 at 4–5.

5    The Court must "apply appropriate military deference" to the Hegseth Policy

6    while applying intermediate scrutiny. It cannot substitute its "own evaluation of evidence

7    for a reasonable evaluation" by the military. *Rostker*, 453 U.S. at 68. But "deference does

8    not mean abdication." *Witt*, 527 F.3d at 821 (quoting *Rostker*, 453 U.S. at 70). If the

9    military's use of the evidence is not reasonable, the Court cannot defer to it. The

10   government bears the burden of establishing that they reasonably determined the Hegseth

11   Policy "significantly furthers" the government's important interests, and that is not a

12   trivial burden.

13   **c.    The Military Ban and Hegseth Policy fail intermediate scrutiny**

14   The first step is analyzing whether the government's stated interests are

15   "important." *Virginia*, 518 U.S. at 533. This is self-evident here. It is uncontested that the

16   government has an important interest in maintaining military "readiness, cohesion, good

17   order, discipline" and managing the military's costs.

18   The next step is determining whether the military ban "significantly furthers"

19   those interests. It does not. The most pointed problem for the government is not just its

20   irrational use of the evidence that it relies on, but the lack of evidence it provides and the

21   ample evidence it simply ignores. The government fails to contend with the reality that

22   transgender service members have served openly for at least four years under the Austin

1   Policy (some since the Carter Policy in 2016) without any discernable harm to military

2   readiness, cohesion, order, or discipline. It provides no evidence to counter plaintiffs'

3   showing that open transgender service has in fact enhanced each of these interests. Nor

4   does it have any response to plaintiffs' evidence that excluding transgender service would

5   do irreparable harm to those interests. Instead, the government relies on the Mattis

6   Policy's concerns about problems transgender service "could" cause. It uses out of

7   context quotes from medical studies. And it repeatedly asserts that military deference

8   should insulate it from any meaningful review of its rushed decision to revert back to

9   banning transgender service and punishing those who refuse to "voluntarily" separate

10  before it takes away their bonuses and separates them anyway. The Military Ban and the

11  Hegseth Policy do not survive intermediate scrutiny.

12  **(i)     Military readiness**

13          The government contends that transgender service members compromise military

14  readiness in at least two ways. First it asserts it is "concerned" about "subjecting those

15  with a history of gender dysphoria to the unique stresses of military life" because it

16  believes they already have high suicidality rates and military life alone can be a

17  contributor to suicidality. Dkt. 76 at 29. Second, it asserts their gender affirming care can

18  make them less deployable. *Id.* at 30.

19          The government fails to provide rational support for these conclusions and fails to

20  address the evidence to the contrary. Regarding suicide risk, the government relies on the

21  medical literature review. Action Memo, Dkt. 71-1 at 4. But that review does not study

22  the military population. And, unlike the Mattis Policy, because the report is not itself the

1    product of military decision making, it does not warrant its own military deference. In

2    any event, the review repeatedly emphasized that gender dysphoria is highly treatable and

3    that suicidality reduces with treatment. *Id.* at 2. The government similarly has provided

4    no data supporting the conclusion that transgender service members posed more mental

5    health or suicidality issues than the general military population since the Austin Policy. It

6    similarly fails to acknowledge AMSARA's "key finding" that compared to cisgender

7    service members with depression (from the studied depression cohort), transgender

8    servicemembers "are more likely to remain on active duty longer following cohort

9    eligibility" and "spend less time in a non-deployable status due to mental health reasons."

10   Dkt. 71-3 at 8. The government also fails to acknowledge that military screening for

11   accession already assesses suicide risk, and it offers no explanation for why this is not

12   sufficient to root out suicidality. *See* DoD Instruction 6130.03 on Appointment,

13   Enlistment, or Induction Medical Standards 6.28(m), Dkt. 76-3 at 51. Instead, the

14   government relies only on predictions from the Mattis Policy.

15          Regarding deployability, the government relies on Mattis Policy data and the

16   AMSARA report, both of which could only make educated predictions about

17   deployability of transgender service members, because they lacked the benefit of four

18   years of transgender service members being deployable. Indeed, the AMSARA report

19   emphasized that more data was needed to determine deployability. Dkt. 71-3 at 11–12.

20          The government also ignore plaintiffs' persuasive data showing that there have not

21   been deployability concerns. Dkt. 23 at 26 (citing Wagner Decl., Dkt. 33 ¶ 44; Bourcicot

22   Decl., Dkt. 32 ¶ 27). It similarly fails to address plaintiffs' persuasive data that the

1    military would incur a significant burden to fill vacancies due to the Military Ban and

2    Hegseth Policy, many of whom are deployed oversees. Cisneros Decl., Dkt. 36 ¶¶ 26-27;

3    Skelly Decl., Dkt. 38 ¶ 23. In short, none of the government's data supports its

4    conclusion that banning transgender persons from serving is substantially related to

5    achieving military readiness. And the data the government ignores supports that the

6    Military Ban and Hegseth Policy impedes readiness. It would be an "abdication" of the

7    Court's role to review to defer to the government's out of date and out of context data on

8    this point.

9         **(ii)    Unit cohesion, good order, and discipline**

10        The government relies exclusively on the Mattis Policy's predictions to justify

11   concluding that banning transgender service members is substantially related to achieving

12   unit cohesion, good order, and discipline. Dkt. 76 at 32.

13        First, it raises privacy concerns. It points to the Mattis Policy prediction that

14   allowing transgender service people to use the facilities of their preferred gender "would

15   invade the expectations of privacy" of the other service members sharing living and

16   bathing facilities. Dkt. 76 at 30 (quoting Mattis Policy, Dkt. 31-10 at 42). The

17   government argues that "absent the creation of separate facilities for transitioned or

18   transitioning servicemembers, which could be both 'logistically impracticable for the

19   Department,' as well as unacceptable to those servicemembers, the military would face

20   irreconcilable privacy demands." *Id*. at 30-31 (quoting Mattis Policy, Dkt. 31-10 at 42). It

21   correctly observes that the implementation handbook for the Carter Policy, "repeatedly

22   stressed the need to respect the 'privacy interests' and 'rights of Service members who

1    are not comfortable sharing berthing, bathroom, and shower facilities with a transitioning

2    Service member[,]' and urged commanders to try to accommodate competing interests to

3    the extent that they could." *Id.* at 31 (quoting 2016 DoD Implementation Handbook, Dkt.

4    31-5 at 38) (citing *id.* at 22, 29, 33, 60–61, 63–64).

5         Although respecting the privacy needs of all service members is a worthy

6    objective, the government does not carry its burden to show that reverting to a ban on

7    open transgender service members is a justifiable means of achieving those ends. It relies

8    exclusively on the *predictions* of the Mattis Policy about what issues open transgender

9    service "*could*" pose to privacy concerns. It once again fails to provide any argument or

10   evidence that those predictions came to pass in the years that transgender service

11   members served openly. There is nothing in the record to support that open service

12   required "the creation of separate facilities for transitioned or transitioning

13   servicemembers," Dkt. 76 at 30, and the government does not address the far less drastic

14   suggestions for mitigating privacy concerns outlined in the Carter and Austin Policies.

15   *See, e.g.*, Dkt. 31-5 at 23 (Carter Policy proposes strategies for easing privacy concerns

16   including "adjusting personal hygiene hours"); Dkt. 33-4 at 17 (Austin Policy encourages

17   commanders to consult with "service member and [Service Central Coordination Cell]"

18   for expert advice and assistance with transgender service members' gender transitions

19   when employing privacy measures).

20        Again relying only on the Mattis Policy predictions, the government argues that

21   "exempting servicemembers from sex-based standards in training and athletic

22   competitions based on gender identity *would* generate perceptions of unfairness in the

1    ranks" and that allowing a transgender woman to compete with a cisgender woman

2    "could" pose a serious safety risk. Dkt. 76 at 31 (quoting Mattis Policy, Dkt. 31-10 at 35,

3    41) (emphasis added). The government does not provide any evidence that any of these

4    concerns materialized during the past years of open transgender service. It similarly lacks

5    any evidence to support the assertion that allowing open transgender service would

6    require leadership to "divert" too much time away from military tasks. *Id.*

7         Plaintiffs provide affirmative evidence from a variety of service member

8    declarants that these past four years of open transgender service helped, rather than hurt,

9    unit cohesion, good order, and discipline. Dkt. 23 at 25–27 (citing Vazirani Decl., Dkt. 34

10    ¶ 24, Dremann Decl., Dkt. 25 ¶¶ 8, 10-11; Morgan Decl., Dkt. 26 ¶¶ 13, 17-18; Shilling

11    Decl., Dkt. 24 ¶¶ 12-14; Schmid Decl., Dkt. 39 ¶¶ 13-19: Cisneros Decl., Dkt. 36). They

12    also provide evidence from military officials, including former Under Secretary of

13    Defense Cisneros, who testifies that allowing open transgender service "fosters openness

14    and trust among team members, thereby enhancing unit cohesion." Dkt. 36 ¶ 15.

15         The government does not provide any evidence in support of its claim that open

16    transgender service hurt cohesion. Instead, Assistant Secretary of Defense Timothy Dill

17    testifies merely that "it would be highly unusual for individualized service member

18    complaints regarding unit cohesion, military readiness, medical readiness, deployability,

19    and lethality to reach the level of [Cisneros]." Dkt. 76-6 ¶ 6. But Cisneros clearly

20    explains that "[i]t was [his] responsibility to be aware of unit cohesion military readiness,

21    medical readiness, deployability, and lethality." Dkt. 36 ¶ 3. The Court credits Cisneros's

22    testimony as to his own awareness over Dill's guess as to what he thinks Cisneros's

1  awareness would have been. The government could have cross examined Cisneros or any

2  of plaintiffs' declarants, but chose not to.

3      In short, the government falls well short of its burden to show that banning

4  transgender service is substantially related to achieving unit cohesion, good order, or

5  discipline. Although the Court gives deference to military decision making, it would be

6  an abdication to ignore the government's flat failure to address plaintiffs' uncontroverted

7  evidence that years of open transgender service promoted these objectives. It would

8  similarly be an abdication to indulge the government's irrational reliance on predictions

9  from the over 7-year-old Mattis Policy and ignore its failure to provide any updated data.

10  **(iii)  Costs**

11      The government asserts that the costs associated with gender-affirming health care

12  make service by transgender members are "disproportionate" and that the money "should

13  be better devoted elsewhere." Dkt. 76 at 33. But its estimate for transgender care costs is

14  a negligible fraction of the military's budget. *Talbott*, No. C25-00240-ACR, Dkt. 66-1.

15  The government provide no updated data comparisons to support its assertion that costs

16  expended on transgender service members are disproportionate. Instead, they rely on the

17  Mattis Policy's assertion that the medical costs for service members with gender

18  dysphoria was "nearly three times" compared to service members without the condition.

19  *Id.* (quoting Mattis Policy, Dkt. 31-10 at 46).

20      The government does not analyze the costs of discharging and replacing thousands

21  of trained service members, many with decades of experience and specialized skills.

22  Plaintiffs estimate the cost of "separating transgender servicemembers and finding and

1  training replacements" is "nearly one billion dollars— *more than 100 times greater* than

2  the cost to provide transition-related healthcare.'" Dkt. 23 at 28 (quoting *Karnoski*, 2017

3  WL 6311305, at *8) (citing Gordon Decl., Dkt. 31-24; Vazirani Decl., Dkt. 34 ¶ 13;

4  Cisneros Decl., Dkt. 36 ¶ 13; Skelly Decl., Dkt. 38 ¶¶ 14, 24).

5      In any event, the costs associated with providing transition-related care to active-

6  duty service members plainly "are exceedingly minimal." *Karnoski*, 2017 WL 6311305,

7  at *8. Even the government concedes that gender affirming care "is small relative to

8  DoD's total healthcare expenditure." Dkt. 76 at 33. On this record, it cannot show that

9  that banning transgender service is "substantially related" to cost effectiveness.

10     **d.    The Government's failure to provide and confront evidence reveal the Military Ban and Hegseth Policy would not survive even rational basis review**

11

12     Omissions in the Hegseth Policy further undermine the government's argument

13  that the Military Ban forwards its stated interests. The government concedes[20] there is no

14  evidence that being transgender is inconsistent with "honesty," "humility," or "integrity,"

15  Military Ban § 2, Dkt. 31-1, and that being transgender "conflicts with a soldier's

16  commitment to an honorable, truthful, and disciplined lifestyle," *id.* § 1.

17     All of the government's failures illustrate that the Military Ban is not rationally

18  related to the government's stated interest, let alone that it "significantly furthers"

19  important governmental interests. The reliance on seven-year-old predictions from the

20  Mattis Policy while ignoring the reality of years of open service is not reasonable and is

21  not comparable to congressional debates and extensive records supporting the military

22     [20] *See* Oral Argument Transcript, Dkt. 102 at 31.

decision in *Rostker* and *Goldman*. The near complete absence of updated data here speaks for itself. The government had every opportunity to provide their own declarants to support their points or counter plaintiffs' evidence that open service did not hurt its stated interests. But it did not.

The government's assertion that "trans-identifying persons achieved at least some version of their desired military policy from the last two Democratic Administrations and can *reasonably be expected to do so again* from the next Democratic Administration" is telling. Dkt. 76 at 24 (emphasis added). It very well is reasonable for transgender service members to expect that they be allowed to serve openly when they have done so successfully for years and the government lacks any evidence to justify banning them now. Equal Protection scrutiny does not fluctuate depending on what political party is in administration. The government's "better luck next administration" argument belies its assumption that the Court will defer blindly to the Military Ban without any meaningful review. It cannot and will not. The Military Ban and Hegseth Policy on the present record fails any level of Equal Protection scrutiny.

### e.   Animus

Plaintiffs contend that the Military Ban and Hegseth Policy are fueled by animus, and consequently fail any level of scrutiny. Dkt. 23 at 21–22; Dkt. 82 at 9. The government argues that even if the Court were to find that the Military Ban is motivated by animus, the Court still must uphold it "so long it can be understood to result from a justification independent of unconstitutional grounds." Dkt. 76 at 33–34 (quoting *Trump v. Hawaii*, 585 U.S. 667, 705 (2018)).

1    Because the Military Ban and Hegseth Policy here cannot survive the intermediate

2    scrutiny that its discrimination triggers nor the rational basis review that the government

3    argues for, the Court need not make an animus determination to grant a preliminary

4    injunction. The Military Ban and Hegseth Policy would fail on this record even if animus

5    was not plain. Although the parties are welcome to raise the implications of animus as

6    litigation continues, this preliminary injunction rests exclusively on the government's

7    failure to meet their burden under any level of review to uphold this ban.

8        **2.      Plaintiffs are Likely to Succeed on the Merits of Their First
         Amendment Claim.**

9        Plaintiffs allege the Hegseth Policy violates the First Amendment's free speech

10   guarantees. Dkt. 23 at 28. They argue the Policy constitutes impermissible content-based

11   and viewpoint-based restrictions on speech by penalizing only transgender service

12   members for expressing a gender identity different from their birth sex, even in their

13   personal lives. *Id.* at 28–29; Dkt. 59 at 34.[21]

14       The government argues, correctly, that the First Amendment's guarantees in the

15   military context do not reach as far as they do as in civilian society. Dkt. 76 at 34–35

16   (citing *Goldman v. Weinberger*, 475 U.S. 503 (1986)). It posits the Hegseth Policy's

17   requirement that service members use pronouns consistent with their birth sex reasonably

18   furthers the government's important interest in "uniformity." *Id.* at 35–36. It also asserts

19

20   _____

21       [21] Plaintiffs' reply also alleges the Hegseth Policy is speaker-based discrimination for the
     sole purpose of exercising a content preference. Dkt. 82 at 20. The Court does not entertain legal
     arguments raised for the first time in a reply brief. *United States v. Romm*, 455 F.3d 990, 997

22   (9th Cir. 2006).

1 the Policy "does not ban anyone based on speech or expressive conduct;" it just

2 "presumptively disqualifies individuals with gender dysphoria." *Id.* at 35.

3       Under the First Amendment, the government "'has no power to restrict expression

4 because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of*

5 *Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S.

6 92, 95 (1972)). Content-based speech restrictions, comprising discrimination against

7 "particular speech because of the topic discussed or the idea or message expressed," are

8 presumptively unconstitutional and subject to strict scrutiny. *Id.*; *see Karnoski*, 2017 WL

9 6311305, at *9. Viewpoint-based restrictions, based on the "motivating ideology or the

10 opinion or perspective of the speaker," are a particularly "egregious form of content

11 discrimination." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995). *See*

12 *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (First Amendment prevents government

13 from restricting speech "because of disapproval of the ideas expressed."); *Hurley v. Irish-*

14 *Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995) ("While the

15 law is free to promote all sorts of conduct in place of harmful behavior, it is not free to

16 interfere with speech for no better reason than promoting an approved message or

17 discouraging a disfavored one, however enlightened either purpose may strike the

18 government.").

19       In the military context, judicial review of regulations implicating the First

20 Amendment is more deferential than review of "similar laws or regulations designed for

21 civilian society." *Goldman*, 475 U.S. at 507. *See Parker v. Levy*, 417 U.S. 733, 760

22 (1974). This is because the "essence of military service 'is the subordination of the

desires and interests of the individual to the needs of the service.'" *Goldman*, 475 U.S. at
507 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 92 (1953)). While military service
requires some sacrifices for the sake of "obedience, unity, commitment, and esprit de
corps," it does not, "of course, render entirely nugatory the guarantees of the First
Amendment." *Id.*

The government cites *Goldman* for the proposition that military deference defeats
all of plaintiffs' constitutional claims. Dkt. 76 at 34–36. But *Goldman* concerned Air
Force uniform regulations that impinged on religious beliefs, not a free speech restriction.
*Goldman*, 475 U.S. at 509–10. More apposite is *Brown v. Giles*, involving an Air Force
regulation that required service members to seek permission from their commander
before distributing circulating any printed or written material, including petitions for
signatures. 444 U.S. 348, 350 (1980).

This case, unlike *Brown*, entails a viewpoint-based restriction on transgender
service members' speech and expression. The Hegseth Policy requires that transgender
service members "adhere to all . . . standards" associated with their birth sex, including
the use of pronouns consistent with their birth sex. Feb. 26 DoD Guidance, Dkt. 58-7 at
3, 7–8. By prohibiting transgender service members from presenting in—effectively,
identifying with—a gender different than their birth sex, the Policy imposes a restriction
on gender expression that does not conform with their birth sex. *Rosenberger*, 515 U.S. at
829. The Military Ban goes so far as to restrict transgender expression "even in one's
personal life." Dkt. 31-1 at 2.

Despite the viewpoint-based restriction at play, the Court applies intermediate scrutiny because of the deference it must give to the military's judgment. But the Hegseth Policy does not survive heightened scrutiny even under such deference. As with plaintiffs' Equal Protection claim, the government has not demonstrated that infringing upon transgender service members' gender expression even in their personal life furthers an important government interest. The military already has separate pronoun, uniform, and grooming standards for men and women. *See Singh v. Berger*, 56 F.4th 88, 101 (D.C. Cir. 2022) (Marine Corps did not have a compelling interest in mandating that male recruits shave their beards and cut their hair in violation of their Sikh faith, partially in view of different shaving and hair styling standards for women). Unlike *Goldman*, where the plaintiff sought to wear a yarmulke that did not conform with military uniform standards, plaintiffs here do not seek to create new pronoun or uniform standards for transgender service members. They instead want the freedom to choose from existing pronoun, uniform, and grooming standards to express their own gender. The government fails to justify denying transgender service members the right to choose between standard military uniforms and pronouns.

> **3.**     **Plaintiffs are Likely to Succeed on the Merits of Their Procedural Due Process Claim.**

Active-duty plaintiffs[22] argue that the Military Ban and the ensuing Hegseth Policy violate their constitutional Procedural Due Process rights because it retroactively

---

[22] Only active-duty plaintiffs assert Procedural Due Process and equitable estoppel claims. To the extent the Court's preliminary injunction is based on the likelihood of success on the merits of these claims, it applies only to active-duty service members.

1    punishes them for conduct the government previously approved, offending basic notions

2    of fairness. Dkt. 23 at 31. They accurately assert that the Military Ban and Hegseth Policy

3    retroactively deem them categorically unfit for service based on explicit, stigmatizing,

4    and wholly unsupported labels of dishonesty and dishonor. *Id.*

5         Plaintiffs implicitly concede, and the government affirmatively asserts, they have

6    no stand-alone constitutionally protected liberty or property interest in continued military

7    service. *See* Dkt. 76 at 36 (citing *Smith v. Harvey*, 541 F.Supp.2d 8, 15–16 (D.D.C.

8    2008)). But active-duty plaintiffs' Procedural Due Process claim is instead a "stigma

9    plus" claim, based on the insulting language used, and reputational harm and adverse

10   employment status it causes. Dkt. 23 at 31 (citing *Ulrich v. City of San Francisco*, 308

11   F.3d 968, 981-82 (9th Cir. 2002) ("stigma-plus" test does not require separate protectible

12   interest in employment and stigmatizing statements need only be related to adverse

13   action)).

14        Plaintiffs also argue, persuasively, that the Military Ban punishes them for "doing

15   precisely what the government invited and induced them to do"—serve openly, provided

16   they met the other requirements for service (which they do). Dkt. 23 at 32. They argue

17   that the government created a reasonable expectation that active-duty plaintiffs would not

18   be punished for disclosing their status and transitioning under the military's approved

19   process for doing so and that due process forbids such a "bait and switch." *Id.* (citing

20   *Baker v. City of SeaTac*, 994 F.Supp.2d 1148, 1154 (W.D. Wash. 2014) (public

21   employees have "property interest in continued employment" when they have

22   "reasonable expectation" based on "existing rules" or mutually explicit

1  "understandings")). They argue that "elementary considerations of fairness" dictate that

2  individuals should have an opportunity to what the law is and to conform their conduct

3  accordingly; "settled expectations" should not be "lightly disrupted." *Id.* (citing *Landgraf*

4  *v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). Plaintiffs argue that Procedural Due

5  Process protects against precisely this sort of "retribution" against unpopular groups by

6  restraining arbitrary and potentially vindictive measures. *Id.* (citing *Landgraf*, 511 U.S. at

7  269).

8      The government's response ignores this second argument entirely; it does not

9  address *Baker*, *Landgraf*, principles of fairness, settled expectations, or the "bait and

10  switch" nature of the Military Ban. Dkt. 76 at 36–38.

11      As to plaintiffs' stigma-plus Procedural Due Process claim, the government argues

12  that *Smith*'s holding that there is no constitutionally protected property interest in

13  continued military service is the reason Judge Pechman dismissed the plaintiffs'

14  Procedural Due Process claim in *Karnoski*. Dkt. 76 at 36. But the *Karnoski* plaintiffs did

15  not assert a stigma-plus Procedural Due Process claim and the Court's opinion did not

16  address or dismiss such a claim. Instead, it noted that the plaintiffs' preliminary

17  injunction motion did not "elaborate in detail" on the Procedural Due Process claim they

18  did assert. *Karnoski*, 2017 WL 6311305 at *10 n.5.

19      The government cites *Christoffersen v. Washington State Air Nat. Guard*, 855

20  F.2d 1437, 1443 (9th Cir. 1988) for the same proposition: absent a constitutionally

21  protected property interest in continued employment in the Washington Air National

22  Guard, plaintiffs facing separation had no plausible Procedural Due Process claim. Dkt.

1  76 at 36–37. But the plaintiffs there did not assert a stigma-plus claim, either.

2  *Christoffersen*, 855 F.2d at 1440.

3  The government correctly cites *Chaudhry v. Aragón*, 68 F.4th 1161, 1170 (9th Cir.

4  2023) for the proposition that to successfully lodge a stigma-plus Procedural Due Process

5  claim, plaintiffs must show: "(1) the public disclosure of a stigmatizing statement by the

6  government; (2) the accuracy of which is contested; (3) *plus* the denial of some more

7  tangible interest such as employment." Dkt. 76 at 37.

8  It argues that plaintiffs are not likely to succeed on the merits of their stigma-plus

9  claim because they are "mistaken" that "separation brands them as being dishonest or

10  dishonorable." *Id.* Instead, it asserts, under the Hegseth Policy, the military's

11  characterization of their service on discharge will be "honorable." *Id.* at 41. Because this

12  is not stigmatizing, it argues, such a discharge cannot support a stigma-plus Procedural

13  Due Process claim. *Id.* (citing *Ben-Shalom v. Sec'y of Army*, 489 F. Supp. 964, 972 (E.D.

14  Wis. 1980) (no Procedural Due Process claim where plaintiff's "discharge was

15  honorable, and there was no public disclosure by the Army of the reasons for her

16  discharge.")).

17  But the government's cite is again incomplete, and the rest of the story supports

18  plaintiffs, not the government. *Ben-Shalom* went on: "To support a 'liberty' interest

19  claim, the petitioner would be required to show that her discharge was based upon 'an

20  unsupported charge which could wrongfully injure (her reputation).'" 489 F.Supp. at 972

21  (quoting *Arnett v. Kennedy*, 416 U.S. 134, 157 (1974)). Like *Chaudhry* in 2023, *Ben-*

22  *Shalom* in 1980 recognized that the result is different where "there [is] a public disclosure

ORDER - 52

1   of the reasons for discharge by the government which necessarily impose[s] a 'badge of

2   infamy' on the employee." *Id.*

3       The Court details above the many ways in which the government has already very

4   publicly "branded" transgender service members with demeaning, cruel, and unsupported

5   "badges of infamy." These instances are in the public record. The government cites no

6   authority supporting its claim that the reputational harm is erased for Due Process

7   purposes if the discharge caused by the public stigmatization is nevertheless "honorable."

8       The Military Ban and Hegseth Policy's demeaning language is repeated even here

9   in the government's response: "The Commander has determined that it is 'the policy of

10  the United States Government to establish high standards for troop . . . honesty, humility,

11  uniformity, and integrity,' and that this policy is 'inconsistent with the . . . constraints on

12  individuals with gender dysphoria.'" Dkt. 76 at 41 (quoting Military Ban). In effect, the

13  government, in line with the Military Ban and Hegseth Policy, posits that, as a class,

14  transgender service members are only in the military as the result of a radical, insane,

15  false gender ideology. *See, e.g.*, Military Excellence and Readiness Fact Sheet ("During

16  the Biden Administration, the Department of Defense allowed gender insanity to pervade

17  our military organizations."). There is no evidence in the record supporting these

18  assertions.

19      One discharged from service based on these grounds is plainly stigmatized. The

20  accuracy of the government's proclamations is obviously contested, and plaintiffs are

21  about to lose their military careers because of them. An honorable discharge does not

22

erase or sanitize the language the government uses to describe the character of separated service members under the Military Ban and Hegseth Policy.

Plaintiffs have demonstrated the *Chaudhry* elements of a stigma-plus Procedural Due Process claim. They have also demonstrated that the Military Ban violates "bedrock" Due Process fairness principles precluding arbitrary or vindictive measures that upset settled expectations. On the record before the Court, they are likely to succeed on the merits of their Procedural Due Process claim.

The government's argument that plaintiffs cannot establish the denial of adequate procedural protections because the Hegseth Policy affords them "all statutorily required rights and benefits," Dkt. 76 at 37, is a variation of their ripeness argument, discussed and rejected above.

### 4. Plaintiffs are Likely to Succeed on the Merits of Their Equitable Estoppel Claim.

Active-duty plaintiffs also assert an equitable estoppel claim, based on similar reasoning: justice and fair play preclude even the military from reneging on its promises and punishing service members for conduct it expressly sanctioned. Dkt. 23 at 33–35. They correctly contend the Hegseth Policy is not only a drastic shift from the recent Austin Policy, it stands in "stark contrast" to even the Mattis Policy upon which it purports to rely. The Mattis Policy incorporated a reliance exception for current service members. Dkt. 31-10 at 3. It did so because the expert report Mattis had commissioned found that such service members' "reasonable expectation" that the military would "honor their service on the terms that then existed cannot be lightly dismissed"—

1    particularly considering the "substantial investment" the military had made in them. *Id*. at

2    48.

3         Plaintiffs rely on *Watkins*, which equitably estopped the Army from refusing in

4    1982 to again re-enlist Perry Watkins, whom it had drafted in 1967. 875 F.2d at 711.

5    Watkins told the Army in writing he was gay when he was drafted, they accepted him

6    anyway, and he served honorably for more than 14 years despite a regulation clearly

7    prohibiting his service on that basis. *Id.* at 701–03.

8         *Watkins* held that equitable estoppel applies to the government if, in addition to the

9    traditional elements, the plaintiff can establish two additional, threshold elements: (1)

10   "affirmative misconduct going beyond mere negligence," and (2) that the government's

11   act will "cause a serious injustice" and the public's interest will not suffer "undue

12   damage" by the imposition of the liability. *Id*. at 707 (citations omitted).

13        In *Watkins*, the "misconduct" was the Army's affirmative "misrepresentation" that

14   Watkins was qualified when admitting, reclassifying, reenlisting, retaining, and

15   promoting him throughout his exemplary military career, in violation of its own policy.

16   *Id*. The Ninth Circuit had no trouble concluding that Watkins's injury in reliance on the

17   Army's prior approval of his military career—the loss of that career—satisfied "serious

18   injustice" part of the second element, and that any harm to the public interest if he were

19   permitted to re-enlist was "nonexistent." *Id*. at 709.

20        The Ninth Circuit also easily concluded that Watkins had met the remaining,

21   traditional elements of an equitable estoppel claim:

22        (1) The party to be estopped must know the facts;

ORDER - 55

(2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) the latter must be ignorant of the true facts; and

(4) he must rely on the former's conduct to his injury.

*Id*. (citations omitted). It held that "equity cries out and demands the Army be estopped from refusing to reenlist Watkins." *Id*. at 711.

The government cites *Watkins* for the propositions that equitable estoppel against it requires some "affirmative misrepresentation" on its part, and the threat of "serious injustice" to plaintiffs. Dkt. 76 at 39–40. But it does not attempt to distinguish *Watkins*'s result or otherwise discuss or acknowledge its obvious similarities to the facts and issues here. *Id*.

The government argues that estoppel cannot apply to prevent a federal agency from "changing" its "generally applicable[23] policies." *Id*. at 38. It asserts it made no "definite representations" to induce any specific plaintiff to rely on the Carter or Austin Policy, and that any service member's reliance on the Austin Policy to enlist or transition was not reasonable because governmental policies change all the time, for any number of reasons. *Id*. at 39.

The Court does not agree. The first Trump administration's Mattis Policy recognized that it would be unfair to exclude otherwise qualified service members who had relied on the prior Carter Policy, and that their "reasonable expectations" should not

---

[23] A policy excluding a quasi-suspect class from service is not remotely "generally applicable."

1  be "lightly dismissed." Dkt. 31-10 at 48. *Landgraf* used similar language to explain that

2  "elementary considerations of fairness dictate that individuals should have an opportunity

3  to know what the law is and to conform their conduct accordingly; settled expectations

4  should not be lightly disrupted." 511 U.S. at 265. The government's current claim that a

5  service member could not have reasonable relied on its unambiguous rules is

6  unsupportable and unpersuasive.

7      The government's argument is essentially that no one can rely on any of its rules,

8  because, obviously, things change. There is no cite, no authority, and no logical support

9  for this proposition. There is ample and ancient authority for the opposite conclusion:

10  "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and

11  embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265

12  at n.17 (citing *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 842–844,

13  855–856 (1990) (Scalia, J., concurring); and *Dash v. Van Kleeck*, 7 Johns, *477, *503

14  (N.Y. 1811) ("It is a principle of the *English* common law, as ancient as the law itself,

15  that a statute, even of its omnipotent parliament, is not to have a retrospective effect")).

16      If it were true that one could not rely on the government's policies, the Army

17  would not have been estopped from precluding Perry Watkins's re-enlistment. The only

18  difference between *Watkins* and this case is that there, the government's rule was that he

19  could not serve but they let him, for 14 years, before changing its rule and attempting to

20  unfairly enforce its new rule to exclude him. Here, the government's position was that

21  transgender service members were eligible, but the government changed its rule,

22  notwithstanding any justifiable reliance or unjust consequences.

1   There is "no single test" for "detecting the presence of affirmative misconduct;

2   each case must be decided on its own facts and circumstances." *Watkins*, 875 F.2d at 707.

3   The "misconduct" in *Watkins* was letting him serve when there was a rule saying he

4   could not, and it was estopped from changing its mind. Here, the government allowed

5   transgender service members to serve and transition openly, but the government has now

6   changed its rule and seeks to exclude those service members for the very conduct it

7   previously assured them was not exclusionary. It was misconduct to lull plaintiffs into a

8   false sense of approval and security as to the military's policies on open transgender

9   service. The facts are not exactly the same as in *Watkins*, but the unmistakable and

10  fundamental unfairness is.

11      Like the Ninth Circuit in *Watkins* this Court has little trouble concluding that all

12  elements of equitable estoppel against the government are present. Active-duty plaintiffs

13  are likely to succeed on the merits of this claim. Equity does not permit this sort of "bait

14  and switch" any more than Due Process does.

15  **D.    Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief.**

16      Plaintiffs argue, and the Court agrees, that they will suffer irreparable harm absent

17  an injunction. Dkt. 23 at 35. The government responds that plaintiffs' claimed harm

18  "related to loss of employment and . . . reputational damage" in the military context does

19  not amount to irreparable harm. Dkt. 76 at 40 (citing *Hartikka v. United States*, 754 F.2d

20  1516, 1518 (9th Cir. 1985)). They further contend that because plaintiffs can "contest any

21  separation in the administrative separation board . . . and seek further [internal] review,"

22  their asserted harm is remediable, not irreparable. *Id.* at 41.

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). When the "internal affairs of the armed forces" are at issue—such as in "cases where military personnel seek preliminary injunctive relief prohibiting a discharge"—plaintiffs must make "stronger showing of irreparable harm than the ordinary standard." *Hartikka*, 754 F.2d at 1518.

For active-duty plaintiffs, loss of employment does not ordinarily constitute irreparable harm if "the temporary loss of income" can ultimately be recovered, and "adequate compensatory or other corrective relief will be available at a later date." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). However, in some "genuinely extraordinary situation[s]," the "circumstances surrounding an employee's discharge, together with the resultant effect of the employee, . . . so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. For example, the "deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (public employees discharged from employment due to partisan political affiliation incurred the loss of First Amendment freedoms that "unquestionably constitute[d] irreparable injury"). *See also Assoc. Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (alleged constitutional infringement often alone constitutes irreparable harm).

Accession plaintiff Medina alleges he will be unable to realize his long-term military career goals if the Hegseth Policy and Military Ban go into effect. Dkt. 29 at 2–4. He may no longer be eligible to join the Marine Corps even if the Policy is reversed by the next presidential administration. *Id.* at 3. While these harms are specific to Medina, the overarching basis for his irreparable harm is the Policy's violation of his constitutional rights.

Active-duty plaintiffs not only allege constitutional harms, they are disqualified from military service in circumstances far from "common to most discharged employees." *Sampson*, 415 U.S. at 92 n.68. Plaintiffs' disqualification from military service is not simply a "temporary loss of income" for which they will later receive monetary compensation. *Id.* at 90. It is a definitive loss of career in service to their country directly attributable to the likely unconstitutional Hegseth Policy and Military Ban. A service member's choice to pursue a military career and develop unique skills in that career, once wrongfully discharged, cannot find another military employer outside of the United States Armed Forces.

The Court concludes plaintiffs unequivocally meet the heightened standard for irreparable harm.

**E.      The Balance of Equities and Public Interest Support Injunctive Relief.**

The final two elements of *Winter*'s preliminary injunction standard—the balance of equities and the public interest—merge when the government is a party. *Drakes Bay*, 747 F.3d at 1092 (9th Cir. 2014). The Court must balance the competing claims of injury

1    and must consider the effect on each party of granting or withholding the requested relief.

2    *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843–44 (9th Cir. 2007).

3         Plaintiffs contend that the public's interest is in protecting constitutional rights and

4    that where, as here, they have established a violation of those rights, the balance of

5    equities favor injunctive relief. Dkt. 23 at 37 (citing *Ariz. Dream Act Coal.*, 757 F.3d at

6    1068). Active-duty plaintiffs argue that without an injunction, the government will cut

7    short their long and honorable military careers, irrevocably damaging their professional

8    and personal lives. *Id*. Similarly, accession plaintiffs face deprivation of constitutional

9    rights and a meaningful opportunity to serve their country.

10        The government again insists that the Court must defer to its and the Commander

11   and Chief's judgment in military matters. Dkt. 76 at 41. It reiterates that the judgment is

12   "based on" the recommendations of "senior military leaders and experts" who conducted

13   "extensive review and deliberation" and who were "uniquely qualified to evaluate the

14   impacts of policy changes on the combat effectiveness and lethality of the force." *Id*. at

15   41–42 (citing Mattis Policy, Dkt. 31-10 at 23).

16        The flaw in this argument is addressed above. The Court (and plaintiffs) cannot

17   and should not dispute the government's assertion that "the Constitution charges the

18   Commander in Chief with ultimate responsibility over the Nation's military policy." *Id*.

19   But the government's exclusive reliance on the Mattis Policy does not support the

20   unquestionable judgment it claims to have reached. First, the military leaders and experts

21   responsible for the Mattis Policy expressly recognized that both settled expectations and

22   the military's investment in transgender service members counseled *against* separating

currently serving transgender service members. Dkt. 31-10 at 48. Mattis—and President Trump—agreed, and the Mattis Policy included a reliance exception. *Id.*

Second, the government's response, like the Hegseth Policy implementing the Military Ban, simply ignores the military's experience under the Mattis Policy *and* the subsequent Austin Policy that permitted open transgender service, together for seven years.

The Court's deference is not absolute. Absent any evidence that such service requires the immediate implementation of the Military Ban and Hegseth Policy, equity and the public interest support enjoining an unsupported, dramatic and facially unfair exclusionary policy.

**F.    There are Serious Questions Going to the Merits of Each of Plaintiffs' Claims.**

The Court concludes plaintiffs are entitled to a preliminary injunction under the alternate *Cottrell* "serious questions" test. Plaintiffs raise serious questions going to their Equal Protection, Due Process, and First Amendment rights. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190. And, the balance of hardships tips sharply towards plaintiffs, who suffer not only loss of employment, income, and reputation, but also a career dedicated to military service. A preliminary injunction is warranted to preserve the status quo.

**G.    Scope of Injunction.**

Plaintiffs ask the Court to enjoin the Military Ban and the Hegseth Policy's enforcement as to themselves and "other current and aspiring transgender

1    servicemembers" nationwide. Dkt. 23 at 10. The government argues that any injunctive

2    relief should be limited to plaintiffs, and must not "interfere with military assignment,

3    deployment, and operational decisions." Dkt. 76 at 42.

4    　　　Injunctions are typically "limited . . . only to named plaintiffs where there is no

5    class certification." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th

6    Cir. 1996). However, district courts have "considerable discretion in ordering an

7    appropriate equitable remedy." *City of S.F. v. Trump*, 897 F.3d 1225, 1245 (9th Cir.

8    2018). "The scope of an injunction is 'dependent as much on the equities of a given case

9    as the substance of the legal issues it presents,' and courts must tailor the scope 'to meet

10   the exigencies of the particular case.'" *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018)

11   (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)) (citations

12   omitted). Where, as here, there is a "sufficiently developed [record] on the nationwide

13   impact" of the challenged actions, courts can craft an injunction to provide nationwide

14   relief. *City of S.F.*, 897 F.3d at 1231, 1244–45.

15   　　　This is the rare case that warrants a nationwide injunction. The record is clear that

16   the Military Ban would impact all branches of the military nationwide. *See, e.g.*, Dkt. 58-

17   1 (Navy implementation); Dkt. 31-15 (Air Force implementation); Dkt. 58-3 (Army

18   implementation). The Court also notes that 21 States have filed an amicus brief indicating

19   that they and their residents will be harmed by the Military ban if this Court fails to

20   enjoin it. Dkt. 53. While these States are not parties, their participation through an amicus

21   brief demonstrates the ultimate national implications of the Military Ban. If the Court

22   were to limit the injunction to the named plaintiffs, it would surely result in a flood of

1   virtually identical litigation nationwide. The fact there are two other district courts

2   adjudicating similar cases, one of which has already entered a preliminary injunction,[24]

3   provides an additional basis for issuing a nationwide injunction here. *See California v.*

4   *United States Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421, 423 (9th Cir. 2019),

5   *judgment vacated on other grounds, Little Sisters of the Poor Saints Peter and Paul*

6   *Home v. Penn.*, 591 U.S. 657 (2020) (no court has held that "an injunction imposed by

7   one district court against a defendant deprives every other federal court of subject matter

8   jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the

9   same defendant").

10        The government does not contest the nationwide impact of the Military Ban or the

11   Hegseth Policy, and they do not explain how a narrower injunction would square with

12   their stated interests in uniformity and unit cohesion. If the Court enjoined the

13   government from implementing the Hegseth Policy and ensuing guidance only as to

14   plaintiffs in this case, the military would presumably begin separating thousands of other

15   transgender service members and refusing to enlist otherwise qualified transgender

16   accession candidates. On the other hand, enjoining such action nationwide pending trial

17   simply continues the status quo. The military has operated under the Austin Policy

18   without any identified complaints about unit cohesion or readiness, for the last four years.

19

20

21

22

---

[24] The Talbott preliminary injunction is stayed until 7:00 pm EDT on Friday, March 28. 2025 WL 914716, at *8.

Without nationwide injunctive relief, there will surely be many more lawsuits, leading to the extraordinary and unnecessary expenditure of effort and resources, and the duplication of discovery and motions practice in district courts across the country.

The Court therefore enjoins the Military Ban and Hegseth Policy on a nationwide basis.

## III.  CONCLUSION

Plaintiffs have established their right to a preliminary injunction. They are likely to succeed on the merits of their claims, and they have raised serious and important questions going to the merits of those claims. Absent an injunction, all transgender service members are likely to suffer the irreparable harm of losing the military service career they have chosen, while otherwise qualified accession plaintiffs will lose the opportunity to serve. Because the military has operated smoothly for four years under the Austin Policy, any claimed hardship it may face in the meantime pales in comparison to the hardships imposed on transgender service members and otherwise qualified transgender accession candidates, tipping the balance of hardships sharply toward plaintiffs. There can be few matters of greater public interest in this country than protecting the constitutional rights of its citizens.

**IT IS SO ORDERED.**

Dated this 27th day of March, 2025.

_____
BENJAMIN H. SETTLE
United States District Judge