IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EMILY SHILLING, et al.,

      Plaintiffs-Appellees

v.

DONALD J. TRUMP, in his official capacity as
   President of the United States, et al.,

      Defendants-Appellants

No. 25-2039

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR
IMMEDIATE ADMINISTRATIVE STAY BY MARCH 28 AND
STAY PENDING APPEAL**

YAAKOV M. ROTH
   *Acting Assistant Attorney
   General*

MICHAEL S. RAAB
ASHLEY C. HONOLD
AMANDA L. MUNDELL
   *Attorneys, Appellate Staff
   Civil Division, Room 7252
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 305-1754
   Amanda.L.Mundell@usdoj.gov*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY .......................................................... 1

BACKGROUND ....................................................................................... 2

ARGUMENT ........................................................................................... 11

I.     The Government Is Likely To Prevail On The Merits ................... 11

     A.     The 2025 Policy Complies with Equal Protection ................. 11

          1.     The 2025 Policy Merits The Most Deferential Review ............................................................................. 11

          2.     The 2025 Policy Withstands Constitutional Review ............................................................................. 13

          3.     The District Court's Analysis Is Fundamentally Flawed ............................................................................ 18

     B.     The 2025 Policy Is Not Otherwise Unlawful ......................... 23

II.     The Injunction Is Overbroad .......................................................... 26

III.     The Equitable Factors Favor A Stay .............................................. 27

CONCLUSION ........................................................................................ 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## INTRODUCTION AND SUMMARY

For decades, the military generally barred individuals with gender dysphoria from serving. As recently as 2019, the Supreme Court and this Court allowed the military to do so. After then-Secretary of Defense Mattis issued a 2018 policy presumptively disqualifying individuals with gender dysphoria from service, the Supreme Court and this Court permitted the policy to take effect. *Trump v. Karnoski*, 586 U.S. 1124 (2019) (staying preliminary injunction pending appeal); *Karnoski v. Trump*, 926 F.3d 1180, 1201-03 (9th Cir. 2019) (per curiam) (staying preliminary injunction and "reject[ing] Plaintiffs' contention that no [military] deference is owed here"). The same result is warranted here: this Court should stay the worldwide preliminary injunction.

Gender dysphoria is a medical condition associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning caused by incongruence between a person's sex and the gender with which he or she identifies. Gender dysphoria, like other psychiatric conditions, limits deployability and imposes additional costs on the military. At a minimum, there is a rational basis for the military to treat individuals with gender dysphoria differently.

The district court, however, substituted its judgment for that of the military, reasoning that the Constitution and equitable principles likely preclude the military from treating gender dysphoria as disqualifying. The court issued a worldwide preliminary injunction barring the Department of Defense from implementing its policy.

The government respectfully requests a stay pending appeal and an immediate administrative stay by March 28. Otherwise, the military will be forced to continue implementing a policy that the Department has determined is not compatible with military readiness and lethality.[1]

## BACKGROUND

1.   Individuals seeking to join or continue serving in the military must meet medical requirements designed to ensure that servicemembers are "capable of performing duties," free of conditions that "may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization," and "adaptable to the military environment without geographical area limitations."   U.S. Dep't of Def. Instr.

---

[1] The government sought this relief in district court.  Dkt. No. 76, at 43.  The court orally denied it.  Add.68-69.  Plaintiffs oppose this motion.

6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction*, vol. 1, at 4-5 (May 28, 2024); *see* U.S. Dep't of Def., Instr. 6130.03, *Medical Standards for Military Service: Retention*, vol. 2, at 8, 12-37 (June 6, 2022). These requirements render 71% of Americans between ages 17 and 24 ineligible to join the military for mental, medical, or behavioral health reasons.

For decades, these standards presumptively barred individuals with gender dysphoria. Instruction 6130.03, vol. 1, at 27, 48 (Apr. 28, 2010); *Karnoski*, 926 F.3d at 1187. In 2016, the Department revised its policy, as directed by then-Secretary Carter. *See Karnoski*, 926 F.3d at 1188. Under this revision, "individuals not suffering from gender dysphoria or undergoing gender transition were eligible for service—*only* in their biological sex." *Doe 2 v. Shanahan,* 917 F.3d 694, 710 (D.C. Cir. 2019) (Williams, J., concurring in the result). Individuals diagnosed with gender dysphoria while serving could continue to serve if they met deployability standards but had to serve in their sex "until their transition was 'complete.'" *Id.* at 710-11. For accessions into the military, a history

of "gender dysphoria" and "gender transition" would be disqualifying un-less the individual had "been stable without clinically significant distress or impairment" for 18 months. *Id.* (quotation marks omitted).

In 2017, the Department began an extensive review of military ser-vice by trans-identifying individuals, as directed by then-Secretary Mattis. *Karnoski*, 926 F.3d at 1190. That months-long process, involving a "panel of experts" that conducted a "comprehensive" study, culminated in a new policy in 2018. *Id.* at 1190-92. As with the Carter policy, the Mattis policy required all individuals "without a history or diagnosis of gender dysphoria" to serve "in their biological sex," with limited excep-tions. *Id.* at 1191. The Mattis policy "presumptively disqualified for ac-cession purposes individuals with a 'history' of 'gender dysphoria' unless they were stable" for 36 months. *Doe 2,* 917 F.3d at 711 (Williams, J., concurring in the result). "[I]ndividuals 'diagnosed with gender dyspho-ria after entering into service [could] be retained if they [did] not require a change of gender and remain deployable within applicable retention standards.'" *Id.*

Although there were challenges to the Mattis policy, the Supreme Court, this Court, and the D.C. Circuit all ultimately permitted it to take

effect. *Karnoski*, 586 U.S. at 1124 (staying preliminary injunction); *Karnoski*, 926 F.3d at 1201-03; *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction and "acknowledg[ing] that the military has substantial arguments for why the Mattis Plan complies with ... equal protection").

In 2021, then-President Biden issued Executive Order 14004 permitting trans-identifying individuals to serve openly and directing then-Secretary Austin to develop a process by which servicemembers "may transition gender[s]" and "prohibit involuntary separations ... on the basis of gender identity." 86 Fed. Reg. 7471, 7471-7472 (Jan. 28, 2021). Under the Austin policy, a history of "gender dysphoria" was disqualifying unless the individual had been stable for 18 months, and a history of hormones or sex-reassignment surgery was disqualifying unless certain conditions were met. Instruction 6130.03, at 28, 30, 46, 52. The Austin policy recognized that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness," but nonetheless permitted "in-service transitions." U.S. Dep't of

Def., Instr. 1300.28, *In-Service Transition for Transgender Service Members*, 3, 7-8 (Apr. 30, 2021).

2.    In January 2025, President Trump revoked Executive Order 14004, 90 Fed. Reg. 8237, 8238 (Jan. 28, 2025), and issued Executive Order 14183 stating that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion," and "uniformity," among other traits, and that this "policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria." 90 Fed. Reg. 8757 (Feb. 3, 2025). The Order directed the Department to update its medical standards. *Id.* at 8757-58.

3.    On February 26, the Department announced its new policy. Add.71-83. Recognizing the need for servicemembers who can "meet the high standards for military service and readiness without special accommodations," the policy explains that "[m]ilitary service" by those "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria … is not in the best interests of the Military Services." Add.73. The Department subsequently explained that "[t]he phrase 'exhibits symptoms consistent with gender dysphoria' refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of

Mental Disorders." Add.168 n.2. "This language applies only to individuals who exhibit symptoms as would be sufficient to constitute a diagnosis" of gender dysphoria—namely, a "marked incongruence [between one's sex and the gender with which one identifies] and clinically significant distress or impairment for at least 6 months." *Id*.

Under the 2025 policy, applicants and servicemembers "who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" or "who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery" are disqualified. Add.76-78. But these individuals "may be considered" for a waiver "where there is a compelling Government interest," and they (1) "demonstrate[] 36 consecutive months of stability," (2) "demonstrate[] that [they have] never attempted to transition" to a different sex, and (3) are "willing and able to adhere to all applicable standards, including the standards associated with [their] sex." Add.78, 166-167.

Servicemembers no longer eligible for service "will be processed for administrative separation" and will "be provided full involuntary separa-

tion pay." Add.78-79. Characterization of their service "will be honorable" unless their "record otherwise warrants a lower characterization." Add.73.

The 2025 policy was "informed through consideration of" "prior [Department] studies and reviews of service by individuals with gender dysphoria, including a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria," among other things. Add.86. The Department considered the report underlying the Mattis policy, "[a] 2021 review conducted by [the Department's] Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity," a "2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs," and a review of cost data. Add.86-87.

4.    Plaintiffs are trans-identifying current and aspiring servicemembers. *See* Dkt. No. 59, at 4-5. They allege that the Executive Order and the 2025 policy violate equal protection, the First Amendment, and procedural due process, and that the Department is estopped from enforcing the Executive Order or 2025 policy against them. *Id.*, at 32-39.

5. The district court entered a worldwide preliminary injunction on March 27 barring the government from implementing the Executive Order and the 2025 policy. Add.1-2.

The court concluded that plaintiffs were likely to succeed on their equal-protection claim. Add.28-48. The court characterized the 2025 policy as a "blanket prohibition" without meaningful exemption. Add.4. The court concluded that intermediate scrutiny applied because the policy classifies based on "transgender status," which the court equated with sex discrimination, and because "transgender is at least a quasi-suspect class." Add.31-37. The court discounted the evidence on which the Department relied. Add.39-45. The court characterized the Mattis report's findings as "outdated" and faulted the Department for failing to consider "the military's experience under the Austin Policy." Add.4. The court also questioned the Department's reliance on the 2021 review and 2025 medical literature review, noting that evidence was mixed. Add.40-46.

Next, the court determined that plaintiffs are likely to succeed on their First Amendment claim, concluding that the policy's requirement that all servicemembers adhere to sex-based standards is a viewpoint-based restriction on speech and expression. Add.48-51.

The court further concluded that plaintiffs were likely to succeed on their procedural due process and estoppel claims, which the court acknowledged rested on similar theories. Add.51-60. The court reasoned that the previous administration had induced trans-identifying service-members to serve openly, and that the Department's change in policy unfairly "reneg[ed]" on that promise. Add.56, 60.

6.   Two other challenges to the Executive Order and 2025 policy are pending in other courts. In *Talbott v. Trump*, No. 25-cv-00240, the district court issued a universal preliminary injunction, 2025 WL 842332, at *3 (D.D.C. Mar. 18, 2025), and denied the government's motion to dissolve it, 2025 WL 914716, at *1 (D.D.C. Mar. 26, 2025). The government appealed and sought an immediate administrative stay and a stay pending appeal. On March 27, the D.C. Circuit granted an administrative stay pending further order of the court. *Talbott v. Trump*, No. 25-5087 (D.C. Cir. 2025).

In *Ireland v. Hegseth*, No. 25-cv-01918, Dkt. No. 28, at 8 (D.N.J. March 24, 2025), the court issued a 14-day temporary restraining order barring the government from implementing the Executive Order and 2025 policy as to the named plaintiffs only.

## ARGUMENT

In considering a stay pending appeal, this Court examines "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted).

## I.    The Government Is Likely To Prevail On The Merits

### A.    The 2025 Policy Complies with Equal Protection

#### 1.    The 2025 Policy Merits The Most Deferential Review

Although the military is subject to constitutional constraints, "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). For instance, judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). The same is true for decisions as to "the composition and internal administration of combat-ready military forces." *Doe 2*, 755 F.

App'x at 24; *see also, e.g., Steffan v. Perry*, 41 F.3d 677, 685 (D.C. Cir. 1994) (en banc) ("It is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference."). The Supreme Court reaffirmed this standard in *Trump v. Hawaii*, 585 U.S. 667, 704 (2018), when it applied "rational basis review" and stressed that judicial "inquiry into matters of ... national security is highly constrained," even when evaluating a "'categorical' ... classification that discriminate[s] on the basis of sex," *id.* at 703-04 (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)).

Although *Karnoski* concluded that the Mattis policy should be reviewed under "something more than rational basis but less than strict scrutiny," that conclusion rested on the fact that "the [Mattis policy] on its face treat[ed] transgender persons differently than other persons." 926 F.3d at 1201. In contrast, the 2025 policy is "neutral on its face," *Hawaii*, 585 U.S. at 702, and draws lines based on a medical condition (gender dysphoria) and related medical interventions. Such classifications receive only rational-basis review. *See, e.g., Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001).

### 2.   The 2025 Policy Withstands Constitutional Review

The 2025 policy easily satisfies this deferential standard. Even if this Court were to conclude that intermediate scrutiny applies, military deference would "inform[its] application," and the 2025 policy would survive this level of scrutiny. *Karnoski*, 926 F.3d at 1201. As Secretary Mattis explained, generally allowing individuals with a history of gender dysphoria or related medical interventions to serve poses "substantial risks" and could "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on … military effectiveness and lethality." Add.90. The military's interest in avoiding those harms is compelling: Courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted), and the Department has concluded that minimizing these risks is "absolutely essential," Add.90. At a minimum, this Court should defer to the military's judgment that this presumptive disqualification is not just rationally related to, but actually "necessary" to, furthering that critical interest. Add.91.

a. <u>Military Readiness.</u>  As the Department explained, service by individuals with a history of gender dysphoria or related medical interventions poses at least two significant risks to military readiness. First, the Department was concerned about subjecting those with gender dysphoria to the unique stresses of military life. Add.113, 134. Gender dysphoria is characterized by clinically significant distress or impairment in functioning, and the military must consider the "risk of exacerbation if [a servicemember with gender dysphoria] were exposed to trauma or severe operational stress." Add.126. That judgment is also reflected in the Carter and Austin policies, which disqualified individuals with a history of gender dysphoria absent proof that they had "been stable without clinically significant distress or impairment" for 18 months. *See Doe 2,* 917 F.3d at 710 (Williams, J., concurring in the result) (quotation marks omitted); Instruction 6130.03, at 52.

Additionally, the Department had reasonable concerns about the "considerable scientific uncertainty concerning whether [cross-sex hormones and sex-reassignment surgery] fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria." Add.124; *see* Add.113-119. A 2025 medical literature review conducted

by the Office of the Assistant Secretary of Defense for Health Affairs indicated that "[t]he strength of the evidence" on gender dysphoria and related medical interventions "is low to moderate." Add.156. Although Secretaries Carter and Austin were more willing to tolerate these risks, there is no constitutional requirement that the current Secretary of Defense hew to the risk tolerance of his predecessors. *See* Instruction 1300.28, at 3, 7-8 (Austin policy recognizing challenges associated with "in-service transition"); Add.119 (the RAND report underlying the Carter policy cautioned that "it is difficult to fully assess the outcomes of treatment" for gender dysphoria).

Second, sex-reassignment-related interventions could render transitioning servicemembers "non-deployable for a potentially significant amount of time." Add.127. As the Department noted, a 2021 medical literature review "found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period." Add.86. In addition to being inherently problematic, these limits on deployability would have harmful effects on units as a whole: any increase in the number of non-deployable servicemembers requires those

who can deploy to bear "undue risk and personal burden," which "negatively impacts mission readiness." Add.127 (quotation marks omitted); *see also* Add.86.

b. <u>Unit Cohesion, Good Order, and Discipline.</u>  Additionally, the Department determined that exempting individuals from sex-based standards would undermine the critical objectives served by those rules, namely, "good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality." Add.120.  "Given the unique nature of military service, Service members ... [must] often ... live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom." Add.129.  To protect privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women." *Id.*; *see United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (it is "necessary to afford members of each sex privacy from the other sex in living arrangements").  Permitting individuals to serve inconsistently with applicable sex-based standards imposes irreconcilable privacy demands on the military. Add.129; *cf. Roe v. Critchfield*, --- F.4th ---, No. 23-2807, 2025 WL 865721, at *6-8 (9th Cir. March 20, 2025) (plaintiffs were unlikely to succeed on equal

protection challenge to statute requiring public-school students to use only the restroom corresponding to their sex).

The Department was also concerned that exempting servicemembers from sex-based standards in training and athletic competitions would be unfair. Add.128. In *Rostker*, the Supreme Court deferred to Congress's judgment that including women in the draft would create "administrative problems such as housing and different treatment with regard to … physical standards." 453 U.S. at 81 (quotation marks omitted). As the Supreme Court has recognized, "[i]t is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization." *Id.*

Similarly, the Department was concerned that exempting servicemembers from uniform and grooming standards would create friction in the ranks, as other servicemembers may wish to be exempted from sex-based "uniform and grooming standards as a means of expressing their own sense of identity." Add.123; *cf. Goldman v. Secretary of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984) (deferring to Air Force's judgment "that

it cannot make exceptions ... for religious reasons without incurring re-

sentment from those who are compelled to adhere to the rules strictly"),

*aff'd*, 475 U.S. 503.

c. Disproportionate Costs.  The Department noted that medical in-

terventions related to gender dysphoria were "disproportionately costly

on a per capita basis." Add.133; *see also* Add.87.  Even when alleged con-

stitutional rights are involved, decisions by the political branches as to

whether a benefit "consumes the resources of the military to a degree ...

beyond what is warranted" deserve significant deference. *Middendorf v.*

*Henry*, 425 U.S. 25, 45 (1976).

### 3.   The District Court's Analysis Is Fundamen-
tally Flawed

The district court erred in concluding that plaintiffs are likely to

prevail on their claim that the Constitution precludes the military from

treating gender dysphoria as a disqualifying medical condition.

1.   The court's order hinged on its mischaracterization of the

2025 policy. *See* Add.31-34.  As the D.C. Circuit concluded, the Mattis

policy was not a "blanket ban" despite excluding individuals with "gender

dysphoria or who are unwilling to serve in their biological sex." *Doe 2*,

755 F. App'x at 23-24.  So too here.  The 2025 policy excludes individuals

based on a medical condition (gender dysphoria) or related medical inter-
ventions and requires individuals to serve in their sex. The 2025 policy
also permits individuals with a history of gender dysphoria to be consid-
ered for waivers, "provided there is a compelling Government interest in
retaining the Service member," they "demonstrate[] 36 consecutive
months of stability," have "never attempted to transition to any sex other
than their sex," and are "willing and able to adhere to" "the standards
associated with the Service member's sex." Add.78, 166-167.

The district court mistakenly relied on language used in a brief so-
cial media post by Secretary Hegseth. *See* Add.16, 31-32. But that post
merely shared a link to a news article and repeated the headline.[2] It did
not "announce[]" anything, much less anything inconsistent with the
terms of the policy itself. Add.16.

The court reasoned that "[g]ender dysphoria is plainly 'closely cor-
related' with being transgender." Add.32. But even if that is the case, it
does not change the fact that the policy applies neutral rules based on

---

[2] Pete Hegseth (@PeteHegseth), X (Feb. 27, 2025, 11:52 AM),
https://perma.cc/ESD3-TJ82.

objective facts: whether a person has gender dysphoria or has undergone related medical interventions.

2.    The district court erred in applying intermediate scrutiny, reasoning that the policy classifies based on sex and targets a quasi-suspect class. As explained above, the military's judgment about the composition of the military warrants great deference. *Goldman*, 475 U.S. at 507. In any event, the 2025 policy draws lines based on a medical condition (gender dysphoria) and related medical interventions, and not identity or status. Such classifications receive only rational-basis review. *See, e.g., Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-68 (2001).

3.    The court further erred in undertaking its own review of the evidence and concluding that it does not support the policy. Add.39-46. Judicial "inquiry into matters of ... national security is highly constrained," *Hawaii*, 585 U.S. at 704, and "in the area of military affairs," courts must be "particularly careful not to substitute" their "own evaluation of evidence for a reasonable evaluation" by the political branches, *Rostker*, 453 U.S. at 67-68.

In the military context, the Supreme Court has accepted concerns about "administrative problems" and post hoc justifications as sufficient to uphold military policies—even when sex-based classifications are involved. *Rostker*, 453 U.S. at 81 (quotation marks omitted); *see id.* at 74-75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *Schlesinger v. Ballard*, 419 U.S. 498, 508 (1975) (upholding sex-based mandatory-discharge requirements for naval officers based on what "Congress may … quite rationally have believed"). It has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including testimony from current and former military officials. *See Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 63. And it has granted the political branches wide latitude to choose "among alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71-72, as well as where to "draw[] the line," *Goldman*, 475 U.S. at 510.

For instance, *Goldman* rejected an argument that the Air Force had "failed to prove that a specific exception for [the] practice of wearing an unobtrusive yarmulke would threaten discipline" and "that the Air Force's assertion to the contrary is mere *ipse dixit*, with no support from

21

actual experience or a scientific study in the record, and is contradicted by expert testimony." 475 U.S. at 509. The Court did not question whether the Air Force's judgment rested on adequate evidence, deeming it sufficient that the issue had been "decided by the appropriate military officials" in their "considered professional judgment." *Id.*

In any event, the district court's evaluation ignored the ample evidence in the 44-page report underlying the Mattis policy, which the Department relied on in issuing the 2025 policy. Add.92-136. The court reasoned that the Mattis report does not support the 2025 policy because the Department did not assemble and analyze data from the past four years of the Austin policy. Add.40-46. But nothing required the Department to do so. In making determinations about composition of the force, the Department considers the long-term risks and consequences of service by individuals with medical conditions. *See* Instruction 6130.03, at 4-5. That judgment considers not only the current status and severity of a particular medical condition, or how controlled it has been over the past four years, but also how it may progress over time or lead to other complications in the future, such as side effects from treatment or potential

comorbidities.  The Mattis report and the conclusions of the panel of experts who conducted a "comprehensive" study are entitled to deference and reasonably support the 2025 policy. *Karnoski*, 926 F.3d at 1190; *Doe 2*, 755 F. App'x at 25 ("acknowledg[ing] that the military has substantial arguments [based on the Mattis report] for why the Mattis Plan complies with ... equal protection principles").

The court further erred in faulting the Department's reliance on certain medical literature reviews because some of the data could cut different ways or was not available.  Add.40-46.  These reviews also contain findings that support the Department's 2025 policy.  *See* Add.156 ("The strength of the evidence on transgender mental health and gender-affirming care is low to moderate."); Add.86 (data underscoring readiness risks and deployability limitations associated with gender dysphoria). That data could cut different ways is no reason to discredit the military's judgment and its conclusions about the level of risk it is willing to tolerate.

## B.    The 2025 Policy Is Not Otherwise Unlawful

The court further erred in concluding that the 2025 policy likely violates the First Amendment and procedural due process, and that the

Department is equitably estopped from applying its policy to the active-duty plaintiffs. Both free-speech and due-process challenges to military policies trigger a highly deferential form of review, *see, e.g.*, *Brown v. Glines*, 444 U.S. 348, 353-59 (1980); *Parker v. Levy*, 417 U.S. 733, 756, 758 (1974), and the Supreme Court has cautioned that "within the military community there is simply not the same individual autonomy as there is in the larger civilian community," *Goldman*, 475 U.S. at 507 (alteration omitted).

1.    The district court erred in concluding that the policy is a viewpoint-based restriction on speech and expression because it requires adherence to sex-based standards. Add.50. As *Goldman* explained, judicial review "of military regulations challenged on First Amendment grounds is far more deferential than constitutional review" in the civil context. 475 U.S. at 507. The military has an interest in "uniformity," *id.* at 510, and a policy requiring that military uniforms, salutations, and grooming standards uniformly reflect an individual's sex reasonably furthers that interest.

Even if traditional First Amendment standards were to apply in the military context, the 2025 policy is not "viewpoint-based," as it is not

"based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015). The policy requires all servicemembers to serve in their sex.

2.    The court also erred in concluding that plaintiffs' procedural due process claim is likely to succeed. The court's characterization of the Department's change in policy as a "bait and switch" is incorrect. Add.52. There is no fundamental right to serve in the military, much less in a particular manner. Add.52; *see, e.g.*, *Canfield v. Sullivan*, 774 F.2d 1466, 1469 (9th Cir. 1985). And because the military's policy has changed several times, plaintiffs could not reasonably have "expect[ed]" the Austin policy to forever remain unchanged. Add.52.

Moreover, plaintiffs' claim fails because the 2025 policy affords servicemembers "being processed for separation … all statutorily required rights and benefits," including procedures before "an administrative separation board." Add.72, 79. Such procedures are more than sufficient to satisfy the Due Process Clause's "base requirement" of an "opportunity to be heard at a meaningful time and in a meaningful manner." *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017). The court dismissed this

process as "futile." Add.26. But due process is concerned with procedures, not outcomes. That the process may not yield a favorable result does not constitute a procedural due process violation.

3.    The district court was equally mistaken in concluding that the servicemember plaintiffs are likely to succeed on their equitable estoppel claim, which largely rested on the same "settled expectations" argument underlying their procedural due process claim and fails for similar reasons. Add.56-60; *see supra*, pp. 25-26. Contrary to the district court's assertions, the government did not engage in any "misconduct" by reevaluating a generally applicable policy regarding a medical condition. Add.60. Nor did the Department act inconsistently with policies that were then in effect. The court's reliance on *Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) (en banc), was therefore misplaced. Indeed, the Supreme Court has "reversed every finding of estoppel that [it has] reviewed." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990).

## II.    The Injunction Is Overbroad

The court also erred in ordering universal relief. Universal injunctions are "legally and historically dubious," *Hawaii*, 585 U.S. at 721

(Thomas, J., concurring), and "patently unworkable," *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., joined by Thomas, J., concurring in the grant of stay). They transgress constitutional limits on courts' powers, which extend only to "render[ing] a judgment or decree upon the rights of the litigants." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., joined by Thomas and Barrett, J.J., concurring in the judgment) (alteration and quotation marks omitted). They are also incompatible with "'foundational' limits on equitable jurisdiction." *Department of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 756 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissenting from the denial of the application to vacate order). And they compromise the government's ability to carry out its functions before any court can fully examine the merits of its actions.

## III.    The Equitable Factors Favor A Stay

The court's injunction causes direct, irreparable injury to the interests of the government and the public, which merge here. *See Nken*, 556 U.S. at 435. It compels the Department to maintain a policy it has determined undermines military readiness and lethality. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time

27

a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration and quotation marks omitted)).

In contrast, a stay pending appeal would not irreparably harm plaintiffs. None of the plaintiffs who seek to enlist faces immediate harm from a stay pending appeal, because they have not yet been accepted into military service. As for the servicemember plaintiffs, any alleged harms can be remedied later. *See, e.g.*, *Guerra v. Scruggs*, 942 F.2d 270, 274-275 (4th Cir. 1991) (plaintiffs' discharge from the military under allegedly unequal procedures did not constitute irreparable injury and employment-related decisions based on discriminatory policy could be remedied by an order reinstating employment and damages).

At a minimum, the Court should stay the injunction as it pertains to the Department's policy regarding accession and stay the universal scope of the injunction pending resolution of the government's appeal. Such a stay would at least allow the military to implement in part the 2025 policy, which it has determined is in the Nation's best interests.

## CONCLUSION

This Court should enter an administrative stay and stay the district court's preliminary injunction pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney*
*General*

MICHAEL S. RAAB
ASHLEY C. HONOLD

/s/ Amanda L. Mundell
AMANDA L. MUNDELL
*Attorneys, Appellate Staff*
*Civil Division, Room 7252*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*Amanda.L.Mundell@usdoj.gov*

29

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5200 words, according to Microsoft Word.


*/s/ Amanda L. Mundell*
AMANDA L. MUNDELL

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed the foregoing with the Clerk of the Court by using the ACMS system. Service will be accomplished by the ACMS system and by email to all counsel of record.

/s/ Amanda L. Mundell
AMANDA L. MUNDELL